**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TENNESSEE**
**AT KNOXVILLE**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 3:20-CR-00021 |
| | ) | |
| ANMING HU | ) | |
| | ) | |

**AMENDED BRIEF IN SUPPORT OF**
**DEFENDANT'S MOTIONS TO DISMISS BECAUSE VOID FOR**
**VAGUENESS**
**AND**
**TO DISMISS UNDER FED. RULE CRIM. PRO. 12(b) BASED ON**
**ENTRAPMENT BY ESTOPPEL**


**INTRODUCTION**

The Defendant has consolidated these two motions because the facts are the same

for each motion and the arguments support each other.

Prof. Hu is accused of three counts of wire fraud by knowingly and willfully

devising a scheme to defraud the National Aeronautics and Space Administration

(NASA), while being a tenured professor in the Department of Mechanical, Aerospace

and Biomedical Engineering at the University of Tennessee. (Indictment, Doc. 3) (18

U.S.C. sec. 1343)

Prof. Hu is also charged with three false statement charges (Counts 4, 5 and 6)

involving billing invoices to NASA, sent by U.T.'s billing office for work performed

pursuant to the NASA grant.  The indictment alleges the billing statements were sent

under false pretenses created by Prof. Hu. (18 U.S.C. sec. 1001).

To understand how these criminal charges were brought, this Honorable Court

should become familiar with the Department of Justice's proactive China Initiative and

1

Nasa's China Funding Restriction (NASA Restriction).[1]

## DEPARTMENT OF JUSTICE'S CHINA INITIATIVE

In 2018, John Demers, the U.S. assistant attorney general for national security directed each of the 94 U.S. Attorney's districts to bring cases under the Chinese Initiative.[2]

The FBI was instructed to seek out economic espionage, especially committed by China. "The goal of the China Initiative is to identify & prosecute those engaged in economic espionage, trade secret theft, hacking & other economic crimes while protecting critical infrastructure against external threats & combating covert efforts to influence the American public."[3] It has been said, "anyone who collaborates with Chinese colleagues could become a target of the FBI. Once you become a target, everything you're doing—your life—will be under the microscope."[4]

John Demers told the country's 94 U.S. attorney's districts, "You're not going to do 125 cases in a year as a U.S. attorney's office. You're going to do maybe one, which would be great. If you do two, that's very impressive. If you do none, that's understandable and you'll get there next year."[5]

In the case at bar, the FBI was under directives to search for Chinese spies. The surveillance file on Prof. Hu was categorized as "Economic Espionage." William Powell, a U.S. attorney handling a West Virginia case, said that at least half the time his

---

[1] Department of Defense and Full-Year Continuing Appropriations Act 2011, Pub. L. No. 112-10, 125 Stat. 38 (2011)
[2] https://www.politico.com/news/2020/04/07/justice-department-china-espionage-169653
[3] THE DEPARTMENT OF JUSTICE OF THE UNITED STATES, https://www.justice.gov/opa/gallery/china-initiative-conference (last visited June 4, 2020).
[4] Andrea Widener, *70 Years of US Suspicion Toward Chinese Scientists—and What Those Caught in the Middle Should Do Now*, CHEMICAL & ENGINEERING NEWS (Mar. 22, 2020), https://cen.acs.org/policy/research-funding/70-years-US-suspicion-toward/98/i11.
[5] Betsy Swan, *Inside DOJ's Nationwide Effort to Take on China,* POLITICO, (Apr. 7, 2020, 9:37 PM), https://www.politico.com/news/2020/04/07/justice-department-china-espionage-169653.

office has been working on the China Initiative, as DOJ officials call the anti-espionage push, has been in outreach to industry and academia. "We're not attacking universities," Powell said. "These things are often very sophisticated, without university knowledge or other industry knowledge. So, we're just trying to get through it together."[6]

What Powell said is very revealing to the facts of this case because the FBI not only reached out to NASA and the University of Tennessee decision makers, the FBI forced their own narration of the NASA Restriction on them to the point that they now think, Prof. Hu violated the China Restriction and committed fraud.

About the time the "anti-espionage push" was getting started, on April 24, 2018, two FBI agents showed up at Prof. Hu's U.T. campus office and asked him questions about the Chinese 1000 talent plan.[7]  Prof. Hu told the agents he was not a member of the plan.  He explained he was a Canadian citizen and focused on fundamental research at U.T.   Prof. Hu mentioned he had a short-term plan at Beijing University of Technology, he also mentioned he was working on a NASA grant.  The agents did not seem overly interested in the NASA grant project during this interview.

In August 2018, the FBI met with the Assistant Vice Chancellor of U.T.'s Office of Sponsored Programs and began an extensive, clandestine surveillance of Prof. Hu that continued up to the time of Prof. Hu's arrest.  The FBI met with U.T. officials and NASA officials during this time.  Clearly, the FBI and other government agents were pushed by the Chinese Initiative to bring charges against Prof. Hu.

---

[6] https://www.politico.com/news/2020/04/07/justice-department-china-espionage-169653
[7] The Chinese 1000 Talent Plan is the Chinese government's plan to introduce high-level oversea talents, focusing on China development goal, in 5 to 10 years from December 2008.

## NASA CHINA RESTRICTION

Launched in 1998, the International Space Station (ISS) is a product of the collaboration of 15 different countries and space programs.[8] At the outset of the ISS, China was not invited to join the collaborative efforts as many believed their space program was not advanced enough being only five years old.[9] However, in 2003, China became only the third country to put a human into space along with the United States and Russia.[10] Nevertheless, the United States was still reluctant to invite China to the ISS program. More specifically, Frank Wolf, former Representative (R-VA) and Chairman of the Subcommittee on Commerce, Justice, Science and Related Agencies, was strongly against China. At the Commerce, Justice, and Science Implementation hearing in 2011, Wolf made note of China's excessive human rights and religious freedom abuses as well as their attempts to target, attack, and steal American patents and technology.[11]

Following this hearing, Wolf introduced two laws that included sections to restrict collaboration between China and United States space programs. (The Department of Defense and Full-Year Continuing Appropriations Act of 2011 and the Consolidated and Further Continuing Appropriations Act of 2012.) The latter, a repeat of the law from the previous year, stated in relevant part:

> (a) None of the funds made available by this Act may be used for the National Aeronautics and Space Administration (NASA) or the Office of Science and Technology Policy (OSTP) to develop, design, plan,

[8] *International Space Station: International Cooperation*, WWW.NASA.GOV, https://www.nasa.gov/mission_pages/station/cooperation/index.html (last visited June 2, 2020).
[9] Primal Space, *China's Space Station Ban*, YouTube (Feb. 11, 2020), https://www.youtube.com/watch?v=p2mTssl35Qg&t=330s; Anthony Bouchard, *Why China Was Banned from the International Space Station* (Feb. 11, 2020, 4:13 PM), https://www.labroots.com/trending/space/16798/china-banned-international-space-station.
[10] *Id.*
[11] *Commerce, Justice, Science, and Related Agencies Appropriations for 2012: Hearings Before a Subcommittee of the Committee on Appropriations*, 112th Cong. 69-70, 75-76, 192-93, 295 (2011) (statement of Rep. Frank Wolf, Chairman, Subcomm. on Commerce, Justice, Sci. & Related Agencies).

promulgate, implement, or execute a bilateral policy, program, order, or contract of any kind to participate, collaborate, or coordinate bilaterally in any way with China or any Chinese-owned company unless such activities are specifically authorized by a law enacted after the date of enactment of this Act.

(b) The limitation in subsection (a) shall also apply to any funds used to effectuate the hosting of official Chinese visitors at facilities belonging to or utilized by NASA.

(c) The limitations described in subsections (a) and (b) shall not apply to activities which NASA or OSTP have certified pose no risk of resulting in the transfer of technology, data, or other information with national security or economic security implications to China or a Chinese-owned company.

(d) Any certification made under subsection (c) shall be submitted to the Committees on Appropriations of the House of Representatives and the Senate no later than 14 days prior to the activity in question and shall include a description of the purpose of the activity, its major participants, and its location and timing. [12]

Although the current version of the Consolidated and Further Appropriations Act is still very similar, changes were made since its inception in 2011. In 2013, language was added to subsection (c) to directly condemn working with those known to have connections with human rights violations and language was changed in subsection (d) to require earlier submission to the House and Senate for certification.[13] In 2017, language was again added to subsections (c) and (d) to require consultation and approval by the FBI.[14] The last changes were made in 2019 to include consultation with the National Space Council along with NASA and the OSTP.[15]

The Act, and its changes, have not come without confusion. After NASA released their first relevant Grant Information Circular (GIC 12-01) in February 2012, attempting to explain the law and its application, they released a revision of the law in September

---

[12] Department of Defense and Full-Year Continuing Appropriations Act 2011, Pub. L. No. 112-10, 125 Stat. 38 (2011); Consolidated and Further Continuing Appropriations Act 2012, Pub. L. No. 112-55, 125 Stat. 552 (2011).
[13] Consolidated and Further Continuing Appropriations Act 2013, Pub. L. No. 113-6, 127 Stat. 198 (2013).
[14] Consolidated Appropriations Act 2017, Pub. L. No. 115-31, 131 Stat. 135 (2017).
[15] Consolidated Appropriations Act, 2019, Pub. L. No. 116-6, 133 Stat. 13 (2019).

2012. (GIC 12-01A) The September revision was a change in their guidance. The original

February Guidance Circular stated in part:

> This restriction applies to all types of NASA grants and cooperative agreements. <u>In some situations, the restrictions of the Acts may not apply to some Chinese national students, fellows, researchers, faculty, or principal and/or co-principal investigators participating under NASA grants and cooperative agreements ***provided the individual is not affiliated*** with the Chinese state to include the Government of the People's Republic of China or entities that are part of or controlled by the Chinese state.</u> However, any situation that involves any participation by Chinese nationals will be reviewed on a case-by-case basis to determine whether restricted funds can be used under the circumstances. Grant officers, in conjunction with the technical officers, shall consult with the NASA Headquarters, Office of General Counsel (Alex Bakos, phone: (202) 358-0791, e-mail: alex.t.bakos@nasa.gov) prior to awarding or funding any NASA grant or cooperative agreement that appears to include any participation by Chinese Nationals. The restrictions of the Acts and this policy neither limit nor prohibit the purchase of commercial items of supply needed to perform a grant or cooperative agreement. [16] (Emphasis added.)

The September 2012 revision removed this paragraph as written, and most

importantly all the highlighted parts.  (See Exhibit 1, February 2012 NASA

Information Circular, and, September, 2012 NASA Information Circular)

 The highlighted area from the February 2012 Circular, "***<u>affiliated</u>*** <u>with the

Chinese state to include the Government of the People's Republic of China or

entities that are part of or controlled by the Chinese state.</u>"  was removed.  And

rightly so, because how much or, what kind of "affiliation" would be necessary to

trigger the Act? This is critical because the FBI says Prof. Hu is guilty of violating

the NASA Restriction by being "affiliated" with a Chinese University.

(Indictment, P. 15, last sentence, Doc. 3).  If NASA itself is confused about what

---

[16] *Grant Information Circular 12-01: Class Deviation Implementing NASA Restrictions on Funding Activities with the People's Republic of China (PRC)*, NASA (Feb. 9, 2012), https://prod.nais.nasa.gov/pub/pub_library/grantnotices/gic12-01.html.

Rep. Wolf intended, then how could Prof. Hu know the meaning of the Act and what was to be expected of him?  It appears the FBI has proffered a narrative that is based on the old explanation of the Public Act.  The Act is so poorly defined it has allowed the Government to interject its own interpretation in order to create a crime, where one does not exist.

The September 2012 revision is not the only evidence of NASA'S confusion concerning the Act and its application. In 2013, Rep. Wolf wrote a letter to NASA attempting to clarify any disconnect between the legislation and the space program's application in response to an article published by The Guardian that Wolf stated was "riddled with inaccuracies".[17] In this letter, Wolf explained that the legislation only "restricts bilateral, not multilateral, meetings and activities" with China or Chinese-owned companies.[18] Further, he pointed out  that an email from NASA Ames Research Center and guidance to conference attendees at the center was also inaccurate. Wolf responded to this mischaracterization stating: "As you know, the congressional provision - which has been in place since early 2011 - primarily restricts bilateral, not multilateral, meetings and activities with the Communist Chinese government or Chinese-owned companies. It places no restrictions on activities involving individual Chinese nationals unless those nationals are acting as official representatives of the Chinese government. As such, the email from NASA Ames mischaracterizes the law and is inaccurate."[19]

(Exhibit 2)                         **LEGAL ARGUMENT**

In order for Prof. Hu to commit willful fraud, he must have known and

[17] Letter from Rep. Frank Wolf, Chairman, Subcomm. on Commerce, Justice, Sci. & Related Agencies, to Charles Bolden, Administrator, NASA (Oct. 8, 2013) (on file with SpacePolicyOnline).
[18] *Id.*
[19] *Id.*

understood the "NASA China Restriction" as defined by the Government, and then have willfully intended to devise a fraudulent scheme to get around the Restriction and get grant money from NASA.   In other words, the NASA Restriction, as defined by the Government, must have been clear and understandable enough to put Prof. Hu on notice to its meaning so that he could form the necessary intent to commit fraud.  In a nutshell, he must have willfully, knowingly and intentionally given false "assurances" to NASA that he would not, or was not, violating the NASA Restriction.  In reality, Prof. Hu had no idea what prescription the FBI was applying to the NASA Restriction.

The NASA Restriction, as it applied to Prof. Hu was vague, confusing and misleading.  All charges against Prof. Hu must be dismissed because they are void for vagueness.

In addition, the charges against Prof. Hu must be dismissed because he had no intent to deceive.  An authorized official told Prof. Hu that his conduct was legal. Therefore, the government is, as a matter of law, estopped from proving beyond a reasonable doubt the fraudulent intent required to convict.

As far and the Defense can tell, this is the FBI's first attempt to use the NASA Restriction to arrest and prosecute a college professor working on a NASA grant.  No prior case law has defined or explored the parameters of the NASA Restriction.

**VOID FOR VAGUENESS**

Void for vagueness simply means that criminal responsibility should not attach where one could not reasonably understand that his contemplated conduct is proscribed. *United States v. Harriss*, 347 U.S. 612, 617, 74 S.C. 808, 811, 98 L.Ed. 989 (1954). In determining the sufficiency of the notice, a statute must of necessity be examined in the

light of the conduct with which a defendant is charged. *Robinson v. United States*, 324 U.S. 282, 65 S.Ct. 666, 89 L.Ed. 944 (1945).

This Honorable Court must examine the NASA Restriction language in light of the conduct with which Prof. Hu is charged. *Robinson v. United States*, 324 U.S. 282, 65 S.Ct. 666, 89 L.Ed. 944 (1945). "The determination of vagueness must be made in the light of the facts of the case at hand." *United States v. Powell*, 423 U.S. 87, 92 (1975) (citations omitted).

**The facts of the case at hand**

Prior to moving to Tennessee, Prof. Hu, a Canadian Citizen, was a professor at Waterloo University in Canada. In 2012, he agreed to teach part time, during Waterloo's summer break, for Beijing University of Technology. (BJUT) In reality, the time spent on this summer job was closer to two weeks out of the year. (Exhibit 3)

When Prof. Hu took a position at The University of Tennessee (U.T.) in November 2013, he was presented with the U.T. Handbook, which he studied. Chapter Seven, Compensated Outside Services, (Exhibit 4), discussed the parameters of outside work Prof. Hu could perform as a nine-month employee of U.T. without creating a conflict with U.T. Paragraph 4, of Section 7.3 set the limit of outside services at no more than 20% over the total 100% of the U.T. salary per academic year. Prof. Hu's Beijing University of Technology endeavor never came close to the 20% cap. According to the U.T. Handbook, this did not create a conflict of interest. Over the years at U.T. Prof. Hu reported his various activity with BJUT in the form of papers, seminars, Chinese students and through the annual reports filed with U.T.

As a U.T. faculty member, Prof. Hu was required to apply and obtain grants to

fund the school. Prof. Hu had participated in many grants over the years but had never been advised of the NASA Restriction until U.T. proposed a NASA grant project in 2016.

In the 2016 Jet Propulsion Laboratory grant application, Prof. Hu, unaware of the NASA Restriction, communicated with a Chinese professor about working together on the grant project. (starting at Paragraph 24 of the Indictment, Doc. 3) (Exhibit 5)

On Jan. 12, 2016, the U.T. grant administrator from the office of Research and Engagement at U.T. Grant Administration, had an email exchange with Prof. Hu stating in relevant part:

> "After these two items (the credit of a co-PI and the student tuition) have been addressed, I believe we will be ready to obtain the Letter of Commitment / UTK China Assurance document and have all of this submitted.".

Prof. Hu did not understand the China Assurance document. He had never seen it, and he asked:

> "For China Assurance: are you talking about Hefei National Radiation Facilities, right? I include one letter. Does it solve this concerning?"

The U.T. Grant Administrator answered,

> "Anming, Regarding the China Assurance, NASA requires you to include a signed document stating you assure you will comply with the Chinese Funding Restrictions. However, UTK always includes a special copy stating that, as we understand it, this restriction does not apply to faculty, staff, and students. Attached is the unsigned version of the document I refer to."(Emphasis added.)

That afternoon the U.T.K. grant administrator submitted the proposal discussed with Dr. Hu to the JPL Principal investigator (JPLPI) at NASA, JPL (copied to Dr. Hu) stating:

> "On behalf of Dr. Anming Hu, please find attached the UTK-approved proposal documents consisting of the following:
> (1)     Proposal Package – UTK Budget, Justification, & UTK-specific SOW.
> (2)     Institutional Commitment Letter (With Anming Hu named as Co-

Investigator, per your request)

(3)     UTK China Assurance document – special clause included regarding the UTK understanding of the funding restriction.

Lastly, I want to note that we have reviewed the Letter of Commitment provided from Professor Zhang of National Synchrotron Radiation Laboratory, and it <u>WILL NOT</u> be considered an officially-approved UTK document.

The language from the required assurance states:

(4) By submission of its proposal, the proposer represents that the proposer is not China or a Chinese-owned company, and that the proposer will not participate, collaborate, or coordinate bilaterally with China or any Chinese-owned company, at the prime recipient level or at any subrecipient level, whether the bilateral involvement is funded or performed under a no-exchange of funds arrangement.

"Therefore, UTK cannot agree to the letter of commitment arrangement provided & still maintain our assurance. We request that the letter not be provided in the main application submission to NASA.

If you have any questions or comments, or I can provide anything further, please let me know."

The JPL Principal Investigator answered:

"Hi D--w,
 Thanks for the attachments.  I am only going to use the 3 attachments that you sent.   This includes the Assurance Document that addresses the NASA restrictions.
        Y--i"
(Exhibit 6)

The language the U.T. Grant Administrator was referring to at the bottom of the Assurance Document states:

"This letter of assurance is predicated on the understanding that the NASA Class Deviation [implementing NASA Restrictions on Funding Activities with the People's Republic of China] does not apply to the participation of student, faculty and staff from non-Chinese entities engaged in fundamental research with a meaning consistent with National Security Decision Directive 189, Such fundamental research does not raise national security or economic security concerns."

Prof. Hu openly and innocently showed the U.T. grant administrator the

correspondence he had received from the Chinese professor and shared with U.T. the

possibility the Chinese professor could help with the project. (Exhibit 5) Prof. Hu was told by the grant officer he must comply with the NASA Assurance and the letter should not be included in the grant application.

In the Indictment, the Government, making an argument that Prof. Hu was then and there advised of the Restriction, stated at Paragraph 27 of the Indictment, "Regarding the China Assurance, NASA requires you to include a signed document stating you assure you will comply with the Chinese Funding Restrictions."

This is the first time Prof. Hu was confronted with the NASA Restriction, but in the email, Prof. Hu indicates his confusion when he wrote: "For China Assurance: are you talking about Hefei National Radiation Facilities, right? I include one letter. Does it solve this concerning?"

This email exchange, the Government argues, placed Prof. Hu on notice of the NASA Restriction for future NASA projects. **But** what the FBI did not put in the Indictment was the funding officer's **next sentence** in his email to Prof. Hu which reads: "However, UTK always included a special copy stating that, as we understand it, this restriction does not apply to faculty, staff and students." (Emphasis added.)

From this exchange, what did Prof. Hu learn?

1. He learned there was a NASA Restriction.

2. He was provided with the NASA Assurance Form.

3. He learned that a professor from a Chinese University could not work on the grant project, and

4. He learned that the restriction did not apply to him.

The prosecution says because of this incident, Prof. Hu was "advised **specifically**

about NASA's China Funding Restriction." (Indictment Paragraph 34, Emphasis added.) The Defense argues there is nothing specific about this notice. He was told it did not apply to him and the wording of the Assurance, was so obtuse even the best scholar at U.T. would not know what "China or a Chinese owned company" meant, let alone a person with English as a second language.

Being told by U.T.'s Grant Administrator the Restriction did not apply to U.T. faculty is strong exculpatory evidence of not only the confusion experienced by Prof. Hu, but strong evidence of his lack of intent to deceive. The only specific thing Prof. Hu was told was that the Restriction did not apply to him. Why would he even try to commit fraud if the Restriction did not apply to him? The U.T. grant administrator was in a position of authority and knowledge to dictate the terms and scope of the grant application and Prof. Hu was reasonable to rely on the U.T. Grant Administrator's representations. And the representation was even in writing at the bottom of the page of a document Prof. Hu was told was always included in the grant application. The language at the bottom of the page was also acknowledged and accepted by NASA's grant administrator.

In the second NASA project mentioned in the indictment also in 2016, there were no Chinese professors asking to be involved, as in the previous application, yet Prof. Hu is charged with committing the first count of fraud through this grant application. (Paragraphs 34-38, Indictment, Doc. 3) This was the JPL proposal.

The Chinese Restriction language first pointed out to Professor Hu by U.T.'s Grant administrator in the earlier proposal, was almost identical to the restriction language in this JPL proposal. The JPL NASA Restriction language was placed in the

proposal on page 16 of 27 pages. (Exhibit 7). In this JPL project, since there was no

Chinese professor involved, Professor Hu thought he was in compliance.

In paragraph 37 of the Indictment, the Government states: "The Subcontract also

contained the following statement directly above the signature portion, 'The below

parties have agreed to the Subcontractor's terms and conditions and to the effective start

date.'" Prof. Hu was not one of the "below parties." He was not even a signatory on the

contract. (Exhibit 8)

Please, look at the Marshall Space Flight Center China Restriction language in the

NASA Grant & Cooperative Agreement, referred to in the Indictment, at Page 51

(Exhibit 9). Does the wording of this NASA Restriction put Prof. Hu on notice that he

cannot participate in a grant proposal on behalf of U.T.? Where is the explanation that it

even applies to him, especially with the U.T. grant administrator in his first grant

application telling him the Restriction does not apply to him? Nowhere in the NASA

restriction does it say Prof. Hu could have no affiliations with China or a Chinese

corporation. Chinese universities are not even mentioned. As the author of the NASA

Restriction Act, Rep. Wolf, pointed out to the administrator of NASA in October of

2013: "It places no restrictions on activities involving individual Chinese nationals unless

those nationals are acting as official representatives of the Chinese government."[20] Is the

FBI just ignoring the legislative intend explained by the original drafter of the Act?

Clearly, Prof. Hu was not an official representative of the Chinese government. The FBI

should do their homework before they destroy a person's career and take away his

[20] Letter from Rep. Frank Wolf, Chairman, Subcomm. on Commerce, Justice, Sci. & Related Agencies, to
Charles Bolden, Administrator, NASA (Oct. 8, 2013) (on file with SpacePolicyOnline).

liberty.  Obviously, the FBI didn't understand the NASA Restriction either.

This proves the Restriction is too Vague to support continued prosecution.

The law of vagueness has been applied in the courts under many varying circumstances. In a prisoner's rights case, the Sixth Circuit ruled that even the lower protections afforded prisoners had to be protected when due process prohibited punishment under vague prison regulations. *Wolfel v. Morris*, 972 F.2d 712,717 (6th Cir. 1992).  As in many void for vagueness cases, the *Wolfel* court ruled the regulations were unconstitutionally vague <u>as applied</u> to the prisoners. (Id. 717)(Emphasis added.) "Punishing the inmates for circulating the petitions, therefore, violated their due process rights since they had no fair warning that they were engaging in prohibited activity." *Wolfel v. Morris*, 972 F.2d 712 (6th Cir. 1992).  As in *Wolfel,* Prof. Hu had no fair warning he was engaging in prohibited activity, if in fact what he was doing was prohibited activity.[21]

Neither the language of the Public Act itself, nor the language of NASA's Grant Information Circulars, came close to putting a U.T. Professor on notice that mere affiliation with a Chinese University would prohibit a U.T. professor from assisting U.T. in applying for a NASA grant.  In fact, NASA's September 2012 Grant Information Circular (Ex. A-1) took the "affiliation" language out of the earlier February 2012 GIC, (Ex. A-2).  So, the language of the Public Act says nothing about affiliations.

Looking further, how was this Restriction applied to this particular case? At first, Prof. Hu is told he cannot collaborate with a Chinese professor from a Chinese

---

[21] After being indicted and learning what the FBI says caused him to violate the Act, Prof. Hu does not believe his affiliation with BJUT caused a violation, but it does not matter, what matters is the Act is so vague the proper interpretation is unknown.

university.  Then, in the indictment, he is being told he, himself cannot collaborate with NASA.  Even the Indictment portrays two (2) different interpretations of the Restriction.

How is Prof. Hu expected to understand this Restriction?  Did he believe it restricted a Chinese professor's help on the project?  Should he have believed it did not apply to him because the U.T. grant administrator said it did not apply to "faculty?"  The DOJ wanted a feather in its cap with an economic espionage case, so they ignored the facts and the law, destroyed the career of a professor with two PhD's in physics and in nanotechnology and now expects the Court to follow their narrative.

"The standard for vagueness in a criminal statute is that ordinary people cannot understand what is prohibited or if it encourages arbitrary or discriminatory enforcement." *U.S. v. Krumrei*, 258 F.3d 535, 537 (6th Cir. 2001) citing, *United States v. Avant*, 907 F.2d 623, 625 (6th Cir. 1990). This case does both.  Ordinary people cannot understand the Act, and it is being enforced in this seminal case in an arbitrary and discriminatory manner because the level of affiliation triggering the Act could be interpreted differently in each case.  For instance, how much "affiliation" is necessary for a U.T. professor to be in violation?  If you are Chinese, unfortunately, not much. Pre-trial dismissal of this case is the only proper resolution.

Although a vagueness analysis in the context of first amendment rights may involve consideration of hypothetical facts not specifically before the court, "it is well established that vagueness challenges to statutes which do not involve First Amendment freedoms must be examined in the light of the facts of the case at hand." *United States v. Powell*, 423 U.S. 87, 92 (1975) (citations omitted). Thus, defendant bears the burden of establishing that the statute is vague as applied to his particular case, not merely that the

statute could be construed as vague in some hypothetical situation. *Avant*, 907 F.2d at 625, ;*U.S. v. Krumrei*, 258 F.3d 535 (6th Cir. 2001). Where the conduct in question is at the margins of the meaning of an unclear statute, however, it will be struck down as applied. *United States v. National Dairy Corp.*, 372 U.S. 29 (1963).

There is nothing in the NASA Restriction that says NASA cannot give a grant to the University of Tennessee with its faculty having some association or affiliation with BJUT.  The FBI seems to argue that Prof. Hu's contact with BJUT made him "China or a Chinese Corporation" under the NASA Restriction.  The Restriction does not even come close to saying that.  The only way the FBI could be correct is for Prof. Hu to know and believe, by reading the Restriction, he was "China or a Chinese owned company."  That was not fair notice.  Would an "ordinary" person understand that prohibition?

The Indictment is interlaced with accusations that Prof. Hu did not disclose his connection with BJUT in his Outside Interests Disclosure Form.  Although not really relevant to the void for vagueness analysis, Prof. Hu's commitment to BJUT was a two-month part-time position that paid him less than the amount per year that triggers U.T.'s Conflict of Interest concerns.  The Indictment is drafted in such a way that the Grand Jury, the Court and the Petit Jury could be persuaded to believe that not listing BJUT on some of Prof. Hu's resumes or his disclosure forms violated a duty to NASA, when in fact, these allegations would only be considered a U.T. administrative issue.  NASA required no duty to disclose.

As our Supreme Court ruled long ago:

> "This is not to say that a beadsight indictment can correct a blunderbuss statute, for the latter itself must be sufficiently focused to forewarn of both its reach and coverage. *United States v. National Dairy Products Corp*, 372 U.S. 29, 33,83 S.Ct. 594, 9 L.Ed.2d 561 (1963)

Specification of details in a particular indictment will not save it because it is the statute, not the indictment, that prescribes the rules to govern conduct. *Lanzetta v. New Jersey*, 306 U.S. 451 (1939); *Edelman v. California*, 344 U.S. 357 (1953).

The Act is a total blunderbuss and does not prescribe the rules to govern Prof. Hu's conduct.

Remember, Prof. Hu had no knowledge of the Chinese Restriction until the first 2016 Grant application where Prof. Hu proffered the letter from the Chinese scientist. In that grant application the grant administrator from U.T. told Prof. Hu the Chinese Scientist could not collaborate in the grant project and the NASA Assurance did not apply to him. Now, in the second NASA grant application, Prof. Hu is accused of violating the Act under a different scenario.

Taking the facts demonstrating vagueness even further, in December of 2019, discussed at paragraphs 31 and 32 of the Indictment (Doc.3), Prof. Hu was presented with another NASA Assurance Form. The U.T. employee sent Prof. Hu an email with a document labeled "Chinese Assurance docx" stating in part:

> By submission of its proposal the proposer represents that the proposer is not China or a Chinese-owned company, and that the proposer will not participate, collaborate, or coordinate bilaterally with China or any Chinese-owned company, …

Prof. Hu read and agreed he would follow the requirements. An ordinary person would believe he was required to agree he[22] is not China or a Chinese-owned company. Then, he would agree, as the grant proposer, that he[23] would not collaborate with China

---

[22] Or, is U.T. the real proposer? U.T. is submitting the proposal. The University is the signatory on the grant application.
[23] Or, U.T.

or any Chinese owned company.  This second part is an agreement to refrain from doing something in the future.  To accept the FBI's accusations that Prof. Hu's affiliations made him China or a Chinese Company, then this assurance would require Prof. Hu to not participate, collaborate or coordinate with himself.[24]  That does not make sense.

In the case at bar, Prof. Hu's due process rights were violated by his arrest because he had no fair warning that he was engaging in prohibited activity, if in fact the activity really was prohibited.  No amount of affiliation would make him, or an ordinary person believe they were China or a Chinese corporation.  The NASA Restriction was too vague as it applied to Prof. Hu.

Besides Public Law No. 112-10, 125 Stat. 38 (2011) being totally vague, confusing and misleading to Prof. Hu, it encourages arbitrary and discriminatory enforcement, which also makes the law vague as applied to Prof. Hu.   The FBI's interpretation of the act, although incorrect, relies on Prof. Hu's allegedly undisclosed affiliations with a Chinese University.  The FBI says, had NASA or U.T. known of this affiliation, they would not have agreed to allow Prof. Hu to participate in the grant application.  Well, how much "affiliation" is necessary, one joint paper, one shared student, one part-time summer teaching job?  Who knows?  I guess we need to ask the FBI because the NASA restriction doesn't tell us. The NASA restriction does not even mention the element of "affiliation." "As such, the statute vests virtually complete discretion in the hands of the police to determine whether the suspect has satisfied the statute …" *Kolender v. Lawson*, 461 U.S. 352, 355-361,103 S.Ct. 1855, 75 L.Ed.2d 903 (1983)

---

[24] Or, U.T.

The sole linchpin of the FBI's case is that Prof. Hu had some "affiliations" he did not disclose to U.T. They say "HU caused the certifications contained in the invoices identified below to be false because, as HU then and there knew, Hu was **affiliated** with BJUT and therefore, UTK was not in compliance with NASA's China Funding Restriction." (Indictment, page 15, Doc. 3) (Emphasis added)

During the grant application processes, U.T. never considered affiliations or associations with Chinese universities to be relevant to the NASA Assurance because if they had, they would have reviewed Prof. Hu's conflict of interest forms. Exhibit 10 is an FBI interview with U.T. where U.T. admits they never reviewed Prof. Hu's conflict of interest forms in the grant application process.


**ENTRAPMENT BY ESTOPPEL**

"[T]he United States Supreme Court and several circuit courts, including the Sixth Circuit, have recognized the criminal doctrine of entrapment by estoppel, which is based on fundamental notions of fairness embodied in the Due Process Clause of the United States Constitution" *United States v. Levin*, 973 F.2d 463, 468 (6th Cir. 1992); *see, e.g.*, *United States v. Pennsylvania Indus. Chem. Corp.*, 411 U.S. 655 (1973); *Cox v. Louisiana*, 379 U.S. 559 (1965); *Raley v. Ohio*, 360 U.S. 423 (1959); *United States v. Smith*, 940 F.2d 710 (1st Cir. 1990); *United States v. Tallmadge*, 829 F.2d 767 (9th Cir. 1987). "Due process bars conviction when a defendant commits what would otherwise be a crime in reasonable reliance on an official interpretation of the law." *Entrapment by Estoppel*, Bouvier Law Dictionary (Desk ed.). This is because "citizens may not be punished for actions undertaken in good faith reliance upon authoritative assurance that

punishment will not attach." *Levin* 973 F.2d at 467. Prof. Hu was advised the NASA Restriction did not apply to him before any NASA grant was awarded.

Generally, the entrapment defense differentiates between the "unwary innocent" and the "unwary criminal." *Sherman v. United States,* 356 U.S. 369, 372 (1958). "Defendants who rely in good faith on assurances of government officials that their conduct was legal will not have acted with the statutorily-proscribed 'purpose of impairing, obstructing or defeating the lawful function of any department of Government.'" *Connelly*, *supra*, at 638 (quoting *Tanner v. United States*, 483 U.S. 107, 128 (1987). This defense applies and the defendant cannot be charged with the crime in question if "(1) the government announces that the charged criminal act was legal; (2) the defendant relies on the announcement; (3) the reliance is reasonable; and, (4) 'given the defendant's reliance, the prosecution would be unfair.'" *United States v. Lechner*, 806 F.3d 869, 875 (6th Cir. 2015) (quoting *Levin,* 973 F.2d at 468).

Although the wording of the first element depicts a high-ranking government official or body making the statement, it does not require the source have a conspicuous and pronounced association to the government. *See, e.g*., *Raley*, 360 U.S. at 438 (1959) (characterizing the source of the announcement as acting as "the voice of the State."). The perception of the defendant is also important in determining the reasonableness of reliance on the source as a government representative. Compare *Pennsylvania Indus. Chemical Corp.*, 411 U.S. at 674 (stating that the defendant had a right to look to the Corps of Engineers as the "responsible administrative agency"), with *Tallmadge*, 829 F.2d at 778 (stating reliance on a gun dealer that is clearly not associated with the government is unreasonable). Moreover, the word "announcement" also exaggerates

what is required of the first element as a government announcement does not need to be far-reaching or widespread. *See Levin,* 973 F.2d at 465 (stating that unofficial letters from the Health Care Financing Administration constituted a government announcement); *United States v. Hedges,* 912 F.2d 1397, 1405 (11th Cir. 1990) (stating advice from the military Standards of Conduct Counselor constituted a government announcement).

In the case at bar, Prof. Hu relied on the U.T. grant administrator's explanation that the NASA Restriction did not apply to faculty. Even more importantly, JPLPI the NASA grant administrator, acknowledged receipt and acceptance of the document stating the Restriction did not apply to U.T. faculty when he wrote back: "Thanks for the attachments. I am only going to use the 3 attachments that you sent. This includes the Assurance Document that addresses the NASA restrictions."

This reliance serves two purposes. First, it contributes to Prof. Hu's confusion of what the Act prescribes, and secondly, it bars prosecution when a defendant commits what would otherwise be a crime in reasonable reliance on an official interpretation of the law.

The second and third elements of the defense of Entrapment by Estoppel, that the defendant relies on the announcement and that reliance is reasonable, can be condensed to reasonable reliance. Further, reliance is defined as a "relationship between one person, thing, or idea and another, in which the relying person, thing, or idea depends for some essential element on the person, thing, or idea relied upon." *Reliance*, Bouvier Law Dictionary (Desk ed.). Moreover, "[a] person might base a decision, action, or idea on the advice or authority of another person, a perceived condition, or a source of authority, trusting in the person, condition, or source to be adequate for the person's purpose." <u>Id.</u>

For the reliance to be reasonable, it must occur in "circumstances in which a reasonable person would have similarly relied on another's statement or conduct." Id. Turning to the fourth element, it is implicit that if the first three elements are met and the offense committed is not egregious, such as murder, it would be unfair to prosecute a reasonable reliance. *Cox*, 379 U.S. at 569; *Connelly, supra,* at 634.

In the instant case, Dr. Hu is the model case of entrapment by estoppel. Dr. Hu received a government announcement in the form of correspondence from the administrator from the Office of Research and Engagement at the University of Tennessee, accepted by NASA's grant officer. The Office of Research and Engagement took the responsibility of making sure that Dr. Hu followed all university policies and used grant administration state and federal regulations and laws when applying for grants. The U.T. Grant Administrator acting as a liaison between Dr. Hu, the Office of Research and Engagement, and the relevant federal grant source, directly expressed to Dr. Hu that he complied with the law. In the communication between Dr. Hu and U.T.'s grant administrator, Dr. Hu expressed his confusion regarding compliance with the China Assurance. The U.T. grant administrator replied to this confusion with the steps Dr. Hu must follow but reassured him that the restriction "does not apply to faculty" such as Dr. Hu. Much like the defendant in *Raley*, Dr. Hu was relying on U.T. and JPLPI as "a voice of the State" and as a credible source of information. *Raley*, 360 U.S. at 438 (1959) Additionally, like the defendant in *Pennsylvania Indus. Chem. Corp.*, Dr. Hu was looked to the appropriate authorities for guidance because the U.T. grant administrator and the JPLPI were representatives of the "responsible administrative agency," the Office of Research and Engagement and NASA itself. Furthermore, if there is any doubt about the

reasonableness of Dr. Hu's reliance, the fact that he was looking for guidance is made even more reasonable because Prof. had no prior knowledge or understanding of the China Restriction.

Dr. Hu has met each of the first three elements of the defense of entrapment by estoppel; it would deeply offend "fundamental notions of fairness embodied in the Due Process Clause of the Constitution" if Dr. Hu were to be prosecuted for the results of his reasonable reliance on the university official and the federal government. Dr. Hu is clearly an "unwary innocent," not an "unwary criminal."

## CONCLUSION

The facts of this case demonstrate that no one understood the application of the NASA Restriction while the FBI was trying to arrest Prof. Hu for Economic Espionage. When the FBI could find no espionage, after spending over a year of useless surveillance on Prof. Hu, they formulated a convoluted application of the NASA Restriction and convinced NASA and the University of Tennessee that Prof. Hu violated the Restriction by having some affiliations with a Chinese University. Since this NASA Restriction had never been defined by the Courts, the FBI was able to twist and turn the interpretation of the NASA Restriction to make it seemingly apply to Prof. Hu, and then arrest him. The FBI took advantage of the poorly drafted act which allowed them to fashion their own interpretation that affiliation with a Chinese University violated the act.

The act did not place an ordinary person on notice of any such interpretation. Even if the act had come right out and prohibited "affiliation" the act is still void because it can be arbitrarily and discriminatorily applied. The act was void for vagueness.

As far as Counsel for Prof. Hu can tell, this is the first fraud prosecution based on a violation of the NASA Restriction.[25]  The NASA Restriction was too vague to place Prof. Hu on notice of what was prescribed by the act and no fraud was committed, and all counts must be dismissed.

Likewise, all the elements of Entrapment by Estoppel have been met, no fraud was committed and all counts must be dismissed.

More and more Chinese professors are wrongfully losing their careers due to the overzealous FBI Chinese Initiative.  This Court has an opportunity and responsibility to set the limits of the FBI's power in this NASA Restriction case.  Prof. Hu is not asking the Court to define the parameters of the NASA Restriction, or formulate a jury charge on its elements but only asking to rule that it is too vague to be applied in this case.

Respectfully submitted this 26th day of June, 2020.


s/A. Philip Lomonaco
A. Philip Lomonaco, BPR#011579
800 S. Gay Street, Suite 1950
Knoxville, TN  37929
(865) 521-7422
(865) 521-7433 fax
phillomonaco@gmail.com

## CERTIFICATE OF SERVICE

I do hereby certify that a copy of the foregoing document was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt.  All other parties will be served by U. S. Mail.  Parties may access this filing through the Court's electronic filing system.

s/A. Philip Lomonaco

---

[25] Apparently, another case involving the NASA Restriction has occurred recently in another circuit.