```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF TENNESSEE
 2                  AT KNOXVILLE, TENNESSEE
   _____
 3                                  )
   UNITED STATES OF AMERICA,        )
 4                                  )
            Government,             )
 5                                  )
   vs.                              ) Case No. 3:20-cr-21
 6                                  )
   ANMING HU,                       )
 7                                  )
            Defendant.              )
 8 _____ )

 9                        TRIAL PROCEEDINGS
              BEFORE THE HONORABLE THOMAS A. VARLAN
10
                          June 8, 2021
11                        Volume II of VII

12 APPEARANCES:

13           ON BEHALF OF THE GOVERNMENT:

14           CASEY ARROWOOD, ESQ.
             U.S. DEPARTMENT OF JUSTICE
15           OFFICE OF U.S. ATTORNEY
             800 Market Street
16           Suite 211
             Knoxville, TN 37902
17
             MATTHEW J. MC KENZIE, ESQ.
18           U.S. DEPARTMENT OF JUSTICE
             NATIONAL SECURITY DIVISION
19           950 Pennsylvania Avenue, NW
             Washington, DC 20530
20

21

22 REPORTED BY:
23
   Teresa S. Grandchamp, RMR, CRR
24 P.O. Box 1362
   Knoxville, Tennessee 37901
25 (865) 244-0454
```

1    **APPEARANCES:** (Continued)

2              ON BEHALF OF THE DEFENDANT:

3         A. PHILLIP LOMONACO, ESQ.
          LAW OFFICES OF A. PHILLIP LOMONACO
4         800 South Gay Street, Suite 1950
          Knoxville, TN 37929
5
                    * * * * * * * *
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

**INDEX**

2

**WITNESSES FOR THE GOVERNMENT:**                               PAGE

3

**LEE GIBSON**

4

Cross-Examination                                                6
By Mr. Lomonaco

5

Redirect Examination                                            92
By Mr. Arrowood

6

7

Recross-Examination                                             98
By Mr. Lomonaco

8

**JOHN ZOMCHICK**

9

Direct Examination                                             101
By Mr. McKenzie

10

11

Cross-Examination                                              133
By Mr. Lomonaco

12

Redirect Examination                                           168
By Mr. Mc Kenzie

13

14

Recross-Examination                                            169
By Mr. Lomonaco

15

**DAVID SMELSER**

16

Direct Examination                                             171
By Mr. Mc Kenzie

17

18

Cross-Examination                                              196
By Mr. Lomonaco

19

Redirect Examination                                           214
By Mr. Mc Kenzie

20

21

Recross-Examination                                            214
By Mr. Lomonaco

22

**ANDREW HASWELL**

23

Direct Examination                                             217
By Mr. Mc Kenzie

24

25

Cross-Examination                                              236
By Mr. Lomonaco

<u>**EXHIBITS**</u>

<u>FOR THE GOVERNMENT:</u>

   <u>EXHIBIT</u> (DESCRIPTION)                              <u>ID:</u>      <u>IN EVID:</u>

| | ID: | IN EVID: |
|---|---|---|
| **Exhibit No. 2-J**(Conflict of Interest Policy) | 109 | 109 |
| **Exhibit No. 2-D**(Hu Conflict of Interest Form) | 126 | 126 |
| **Exhibit No. 2-E**(Hu Outside Interests Disclosure Form) | 128 | 128 |
| **Exhibit No. 2-F**(Hu Outside Interest Disclosure Form) | 129 | 129 |
| **Exhibit No. 2-G**(Hu Outside Interests Disclosure Form) | 130 | 130 |
| **Exhibit No. 2-H**(Hu Outside Interests Disclosure 2018) | 131 | 131 |
| **Exhibit No. 2-I** | | 132 |
| **Exhibit No. 8-E**(Email) | 181 | 183 |
| **Exhibit No. 8-F**(Attachment to Email) | 182 | 183 |
| **Exhibit No. 8-G**(Email Attachment) | 184 | 184 |
| **Exhibit No. 8-H**(Email Attachment) | 185 | 186 |
| **Exhibit No. 8-K**(Email) | 188 | 189 |
| **Exhibit No. 8-J**(Letter of Commitment) | 190 | 190 |
| **Exhibit No. 9-B**(Letter of Commitment) | 192 | 193 |
| **Exhibit No. 9-D**(Technical Document) | 194 | 195 |
| **Exhibit No. 7-Q**(Proposal Training) | 221 | 221 |
| **Exhibit No. 8-A**(Email) | 225 | 225 |
| **Exhibit No. 8-B**(Letter of Commitment) | 227 | 228 |
| **Exhibit No. 8-C**(Email) | 228 | 229 |
| **Exhibit No. 8-D**(NASA China Assurance) | 230 | 230 |

<u>FOR THE DEFENDANT:</u>

| | ID: | IN EVID: |
|---|---|---|
| **Exhibit No. 1**(Tenure Package) | 22 | 22 |
| **Exhibit No. 6**(Annual Activity Report) | 57 | |
| **Exhibit No. 131**(NASA Restriction) | 66 | 89 |
| **Exhibit No. 137-A**(Assurance) | 82 | 81 |
| **Exhibit No. 35**(Faculty Handbook) | 145 | 145 |
| **Exhibit No. 20**(NSF Proposal) | 201 | 201 |
| **Exhibit No. 16**(JPL Contract) | 206 | |
| **Exhibit No. 81**(NASA JPL Project Narrative) | 207 | 207 |

| | | |
|---|---|---|
| **Exhibit No. 14**(2016 Proposal and Budget Development) | 210 | 210 |
| **Exhibit No. 126**(Email) | 247 | 249 |
| **Exhibit No. 134**(Email) | 252 | 253 |
| **Exhibit No. 135**(Email) | 253 | 254 |
| **Exhibit No. 21**(NSF Proposal) | 254 | 255 |

* * * * * * * *

1          THE COURTROOM DEPUTY:  All rise.

2          This honorable court is once again in session.

3   Please come to order and be seated.

4          THE COURT:  All right.  Good morning, everyone.

5   It looks like we're ready for cross-examination to

6   begin.  So we'll bring our jury in.

7          (Whereupon the following report of

8           proceedings was had within the presence

9           and hearing of the jury:)

09:05AM  10          THE COURT:  All right.  Thank you.  Everyone

11   please be seated.

12          Good morning to our members of the jury.

13   Thanks, everyone, for being on time today, and we're

14   ready to continue with the trial.

15          As you recall, the government concluded direct

16   examination of this witness yesterday, so we will pick

17   up at this point with cross-examination by the

18   defendant.

19                          **LEE GIBSON**,

20   having been previously duly sworn, was examined and

21   testified further as follows:

22                     CROSS-EXAMINATION

23   BY MR. LOMONACO:

24   Q.      Good morning.

25   A.      Good morning, sir.

1    THE COURT:  Mr. Lomonaco, did you want to leave

2  your mask on while you're asking questions?  Maybe you

3  forgot you had it on.

4    MR. LOMONACO:  I'll take it off, Your Honor.

5  Thank you.

6  BY MR. LOMONACO:

7  Q.    Mr. Gibson, yesterday you talked about a number

8  of things.

9  A.    Yes, sir.

09:06AM  10  Q.    One of the things you talked about are these

11  short-term agreements or contracts that Professor Hu had

12  with Beijing University; correct?

13  A.    Yes, sir.

14  Q.    You had a translator find -- or translate

15  contracts that were in Chinese?

16  A.    That's correct.

17  Q.    And she works for the federal government;

18  correct?

19  A.    Yes, sir, she does.

09:07AM  20  Q.    Is she an FBI agent, too?

21  A.    I don't believe she is an agent, no, sir.

22  Q.    Okay.  She works for the FBI, though; right?

23  A.    Yes, sir.

24  Q.    She translated -- we've got two contracts,

25  basically, that you talked about.  One, let's call it

1  the 2016 contract.  Do you know when that expires?

2  A.      I believe it expired in the end of 2018.

3  Q.      December of 2018; right?

4          And then the second one -- did you testify that

5  both parties signed the second one?

6  A.      On the -- there were two -- I believe there

7  were two different translations we looked at.  There was

8  one that had the specific -- had basically the first

9  number of pages that was not signed, and then there was

09:07AM 10  a final page that had signatures on it that it looked to

11  be a continuation of that contract.

12  Q.      Okay.  Now, are you talking about the Chinese

13  version?

14  A.      Yes, sir, there was -- I'd have to go back and

15  look at the exhibit, sir.

16  Q.      7-L?

17  A.      Okay.  Yes, sir.

18  Q.      We've got it up on the screen.  Is that the one

19  you're referring to?

09:08AM 20  A.      Right.  The one page that had that -- it

21  appears to be a signature at the bottom in Chinese, yes,

22  sir.

23  Q.      You said it had signatures, but there is only

24  one signature on this; correct?

25  A.      That's correct.

1  Q.        The three lines on the left were translated to
2  be, in general terms, signed by the school; is that
3  right?  That's where they would sign?
4  A.        I would have to look at the translation.  I'm
5  sorry.  From that, it's kind of hard to tell.  If I can
6  find it, I'll be happy to look at it.
7  Q.        We'll pull it up for you.
8  A.        Thank you.
9  Q.        I think that's 11-M.
10 A.        11-M.  Okay.  Yes, sir.  It looks like it says,
11 yes, Party A seal, and legal representative signature.
12 Q.        Now, was this translated by your translator?
13 A.        It was, yes.
14 Q.        And part B, it says signature, Hu Anming
15 signature.
16 A.        Correct.
17 Q.        Does that indicate to you that your interpreter
18 interpreted the previous document by saying on this
19 document that he signed it; Professor Hu signed it?
20 A.        Correct, yes, sir.
21 Q.        That's what that says?
22 A.        Yes, it does.  The signature after the name in
23 the brackets indicates that it was signed.
24           On the other side, I believe the signature
25 that's in the parentheses indicates that was what was on

the form, but there was not a signature next to it.

Q.        And when you say "on the form," are you talking

about the previous exhibit?

A.        Yes, sir, on the previous exhibit.

Q.        Okay.  So let's -- let's go to the next

exhibit, 11-L.  I think you pointed this out, too.  This

is the full contract; is that correct?

          Hold on a minute.

A.        Yes, sir, this is the -- I believe the 2019

contract.

Q.        2019 contract.

          MR. LOMONACO:  Move up to the top.

BY THE WITNESS:

A.        Yes, sir.

BY MR. LOMONACO:

Q.        Let me show a box here where it says, "To be

signed" --

          MR. LOMONACO:  Oops.  I just crossed it all

out.  That's the first time I used that and I made a

mess, didn't I?

BY MR. LOMONACO:

Q.        "To be signed upon arrival in university."  Is

that what it says?

A.        Yes, sir, that's correct.

Q.        Now let's go down to the bottom.  And your

1   interpreter interpreted this, also; right?

2   A.      Yes, sir.

3   Q.      Now, apparently there is Lu Wong Jong or -- I'm

4   bad at Chinese, but it looks like there is a signature

5   for the university there.

6   A.      It says, "Entrusted representative."  It

7   actually says signature next to it, so I would interpret

8   that to mean it was present.

9   Q.      Look at the middle line.  It says, "Legal

09:11AM  10   representative (signature)."

11   A.      Correct.

12          MR. ARROWOOD:  Your Honor, the government

13   objects.

14          Can we have a sidebar, please?

15          THE COURT:  Sidebar?

16          MR. ARROWOOD:  Yes, sir.

17          THE COURT:  All right.

18          (Whereupon a sidebar was had outside the

19           hearing of the jury as follows:)

09:12AM  20          MR. ARROWOOD:  Your Honor, in this instance,

21   the defense counsel is using the wrong Exhibit 11-L.

22   That was the previous version of 11-L that we provided

23   the defense in discovery.  However, the version that we

24   admitted yesterday, 11-L is different than the one he's

25   showing the jury today.  It's the previous version.  The

1   one that was entered yesterday that the Court has looks

2   different than that document that he's showing.

3           MR. LOMONACO:  I was unaware of that.  I was

4   unaware that we had two versions of 11-L.  If they told

5   me, I don't remember.  But if they can share their

6   version with me, I can maybe use that instead.

7           MR. ARROWOOD:  It was what was admitted

8   yesterday, Judge.

9           THE COURT:  All right.  So you need to -- so

09:12AM 10  you're okay with -- you wanted to use the admitted

11  exhibit is what the government is referring to.

12          MR. LOMONACO:  Yeah, I thought I was.

13          THE COURT:  I don't know if you all need to

14  discuss that over there, but let's clear that up.  So he

15  thought he was using it, but he wasn't.  So he's going

16  to use the admitted 11-L.

17          MR. LOMONACO:  Yeah.  Good.

18          THE COURT:  Do I need to clear that up with the

19  jury?  I think we'll just go on.

09:13AM 20          MR. LOMONACO:  Okay.  I can tell the witness

21  myself, if that's okay.

22          THE COURT:  Okay.

23          (Whereupon the following was had in open court

24           within the hearing of the jury:)

25

1  BY MR. LOMONACO:

2  Q.        Okay.  Mr. Gibson, apparently your counsel here

3  has advised me that you -- or they had two versions of

4  11-L.  Were you aware of that?

5  A.        Yes, sir, I was aware that the --

6  Q.        Exhibit 11-L?

7  A.        Correct, yeah.

8  Q.        Okay.  Apparently the one I'm showing you has

9  been replaced by another version.

09:14AM  10        MR. LOMONACO:  Can we pull that up?  Because I

11  don't think we have it.

12        Let me put this under the light here.  Thank

13  you.

14  BY THE WITNESS:

15  A.        It's really zoomed in, sir.  I can't -- thank

16  you.

17        THE COURT:  So what is before the witness and

18  the jury now is the admitted Exhibit 11-L.

19        MR. LOMONACO:  That's what I'm told, Your

09:15AM  20  Honor, please.

21  BY MR. LOMONACO:

22  Q.        So this exhibit is another version of the

23  contract.

24        Let me go to the last page.  Now, this version

25  doesn't have anybody's signatures on it; correct?

1    A.       That's correct, yes, sir.  That's the one I

2    have.

3    Q.       Okay.  Well, what version do you think is the

4    actual one that is real?

5              MR. ARROWOOD:  Objection, Your Honor.

6              THE COURT:  Objection being?

7              MR. ARROWOOD:  We have one version of 11-L,

8    Your Honor.  That's the version we're talking about.

9              THE COURT:  Say that again.

09:15AM 10              MR. ARROWOOD:  That is the version that's

11    before the Court is the version 11-L that was admitted

12    yesterday, Your Honor.

13              MR. LOMONACO:  The one that's on the screen

14    right now?

15              THE COURT:  The one that's on the screen right

16    now is the one that was admitted.

17    BY MR. LOMONACO:

18    Q.       Okay.  Well, where did that come from?

19    A.       That came from our translator.

09:16AM 20    Q.       Okay.  So the final version translates the

21    second contract as having no signatures on it?

22    A.       Correct, sir.  In looking at the original

23    version in Chinese, there does not appear to be a signed

24    signature on that.  So I believe this is accurately

25    translated.

1   Q.      So it would be fair to say then that

2   Professor -- you have no evidence that Professor Hu

3   entered into a contract after December 2018 with BJUT?

4   A.      This one is not signed, that's correct.

5   Q.      Okay.  That's a correct statement that I just

6   said; right?

7   A.      That this one is not -- I'm sorry, sir.  The

8   statement was?

9   Q.      My question was:  You have no evidence then

09:16AM  10  that Professor Hu signed a contract with BJUT after the

11  old one expired?

12  A.      We believe that the other exhibit that we

13  looked at was a follow-on page for this that was

14  returned with his signature on it for this contract.

15  Q.      I'm sorry.  You believe it was a follow-on?

16  A.      Correct.  The -- I'd have to go back and look

17  and see what exhibit that was.  I believe it was 11-M.

18  Q.      The Chinese version?

19  A.      No, sir, that would be the translated version,

09:17AM  20  which is dated March 8th, 2019.

21          MR. LOMONACO:  Can we put 11-M back up on the

22  screen.

23          THE COURTROOM DEPUTY:  Do you want the laptop?

24          MR. LOMONACO:  Yes, please.

25

 1   BY MR. LOMONACO:

 2   Q.        Now, before we talk about this, I want to make

 3   sure what you're saying.  My question was:  Based on the

 4   new version of 11-L --

 5   A.        Yes, sir, 11-L.

 6   Q.        -- the translated version shows no signatures

 7   on it?

 8   A.        That's correct, it does not show a signature.

 9   Q.        And I asked you:  Do you have any evidence that

09:18AM  10   he -- that Anming Hu entered into a contract after

11   December of 2018?

12   A.        Yes, sir.

13   Q.        Okay.  What evidence do you have?

14   A.        That would be Exhibit 11-M.

15           MR. LOMONACO:  Okay.  Let's put 11-M back up

16   there.

17   BY MR. LOMONACO:

18   Q.        Is this 11-M?

19   A.        Yes, sir.  11-M is the -- if you'll look at the

09:18AM  20   one we just talked about, 11-L, it is the same form that

21   has been signed by the defendant.

22   Q.        Well, let's go to the bottom of 11-M.

23   A.        Okay.

24   Q.        Okay.  There is a signature indicating

25   Professor Hu signed it?

1    A.        Correct.

2    Q.        Nothing indicating China, Beijing University

3    signed it; correct?

4    A.        That's correct, yes, sir.

5    Q.        So I don't know if you know contract law, but

6    it's pretty common knowledge that both sides have to

7    sign the contract before you have a contract; right?

8    A.        That's correct, yes, sir.

9    Q.        Okay.  And you don't have that, do you?

09:19AM 10    A.        No, sir.

11    Q.        Okay.  So would it be fair to say you don't

12    have a contract after December 2018?

13    A.        We don't have one signed by both parties, no,

14    sir.

15    Q.        Okay.  Thank you.

16              Let me turn to some of your statements

17    yesterday about affiliations or publications --

18    A.        Yes, sir.

19    Q.        -- that Professor Hu had with Beijing

09:19AM 20    University.

21              And I want to try to understand exactly what

22    you're saying.  Are you saying that there were

23    publications showing Anming Hu having affiliations, for

24    lack of a better word, with BJUT or their students?  For

25    instance, they would do research together; yes?

1  A.        Yes, sir.

2  Q.        And then the student or the professor or both

3  would put their names on the research paper and they

4  would publish it?

5  A.        Yes, sir, that's correct.

6  Q.        And they would publish it in research journals

7  internationally; correct?

8  A.        Yes, sir.

9  Q.        And universities encourage that kind of thing,

09:20AM 10 don't they?

11 A.        Publications is an important part of being a

12 professor, yes, sir.

13 Q.        Yes.  It helps the students?  It helps the

14 students get their name out there if they want to try

15 to, you know, make a name for themselves?

16 A.        Yes, sir.

17 Q.        It helps the professor go international, or

18 other professors and scientists, say, in Switzerland,

19 Germany, China, they look at those journals and they

09:20AM 20 say, oh, well, here is an article that's of interest,

21 and it has -- and some of them had Professor Hu's name

22 and Chinese names.  So you found a lot of those; right?

23 A.        Yes, sir, we did.

24 Q.        Now, I believe your statement or your point

25 that you were trying to make is that he didn't share

1    those with UT; is that right?

2    A.        I believe the point is that he has an

3    affiliation with the university that was not shared with

4    the University of Tennessee.

5    Q.        Okay.  So wouldn't these publications be a

6    prime example of the affiliations?

7    A.        They would.

8    Q.        And you're saying he didn't share these

9    publications with UT?

09:21AM  10    A.        I don't believe we're saying he didn't share

11    the publications themselves, but the affiliation with

12    the Beijing University of Technology.

13    Q.        Okay.  So if -- if he had a publication and it

14    had a Beijing student on it, that would show some

15    affiliation; right?

16    A.        It would show that -- if it was just a student

17    from Beijing?

18    Q.        That collaborated on this publication with

19    Professor Hu.

09:22AM  20    A.        Okay.

21    Q.        That would show an affiliation; correct?

22    A.        It would show that he worked with someone from

23    Beijing, yes, sir.

24    Q.        Okay.  And you went through and listed several

25    different publications, and I believe you indicated that

1  you found these publications, but you couldn't find them

2  in anything that he shared with the University of

3  Tennessee?

4  A.      I believe we said that -- I don't believe that

5  I ever said that he didn't share the publications.  I

6  believe we --

7  Q.      Are you saying now that he did put his

8  publications, for instance, in his annual reviews?

9  A.      I'm not sure, sir.

09:22AM  10  Q.      You're not sure.  Did you look at his annual

11  reviews?

12  A.      I did not personally, no.

13  Q.      You know, an annual review is a -- do you know

14  what a UT annual review is?

15  A.      I would assume it is a performance review that

16  everyone gets each year.

17  Q.      Would you be surprised to learn that there is a

18  big section in the annual review that says show us all

19  your publications and affiliations?

09:23AM  20  A.      No, sir.

21  Q.      You wouldn't be surprised?

22  A.      That would make sense.

23  Q.      Okay.  But you didn't review any of them?

24  A.      I did not personally, no, sir.

25  Q.      Okay.  That's one of the main vehicles for

1    Professor Hu to show what he's been doing for the year;

2    correct?  You don't know?

3    A.      I'm not sure, sir.

4    Q.      Okay.  So you did not review the annual

5    publications -- annual reviews that Professor Hu filed

6    every year?

7    A.      That's correct.

8    Q.      Were you aware of the annual reviews?

9    A.      I was not aware of the annual reviews, no, sir.

09:24AM 10   Q.      Yesterday you went to some great length

11   entering exhibits that apparently you reviewed.

12   A.      Yes, sir.

13   Q.      And a lot of them were publications.  But you

14   don't have any evidence or you have no ability to say

15   whether he disclosed that to the University of Tennessee

16   or not?

17   A.      The main things we looked at were the tenure

18   application, which was a very voluminous document

19   detailing most of his career and the things he did which

09:24AM 20   did not have any reference to those.

21   Q.      Okay.

22           MR. LOMONACO:  Do we have some?  Excuse me a

23   minute.

24   BY MR. LOMONACO:

25   Q.      You mentioned there was a lengthy document.

1  A.        Yes, sir, very lengthy.

2  Q.        And you reviewed this document?

3  A.        I did, yes, sir.

4  Q.        Okay.  Have we introduced it into evidence

5  already?

6  A.        Yes, sir.  I believe it's 2-C.

7  Q.        Okay.  And we have on the screen -- I think

8  this is -- this is our exhibit list, Exhibit 1.

9            (Defendant's Exhibit 1 was marked for

09:25AM 10            identification.)

11            MR. LOMONACO:  And just for the sake of

12  clarity, Your Honor, I would ask that this be admitted

13  as Exhibit 1 to the defense.

14            THE COURT:  Is this a different exhibit or

15  duplicative of one of the other ones?

16            MR. PARSONS:  It has highlights on it, but it's

17  substantially the same.

18            THE COURT:  All right.  Any objection to going

19  into and using this as Exhibit 1, Defendant's Exhibit 1?

09:26AM 20            MR. ARROWOOD:  No, Your Honor.

21            THE COURT:  So admitted.

22            MR. LOMONACO:  Thank you.

23            (Defendant's Exhibit 1 was received into

24             evidence.)

25

1    BY MR. LOMONACO:

2    Q.        Okay.  Let's look at page 32.  Would you mind

3    reading the funding institution of the bottom two

4    visiting Ph.D. students?

5    A.        It's still moving.

6    Q.        Do you see where it says Visiting Ph.D.

7    students on the screen?

8    A.        Yes, sir.  It's still loading on my screen.

9    I'm sorry.

09:27AM  10            Okay.  It just loaded.

11    Q.        Do you see where it says Beijing University of

12    Technology?

13    A.        Yes, sir, I do.

14    Q.        So your statement just a moment ago that you

15    found no reference to Beijing University --

16    A.        We found a reference of Dr. Hu's affiliation

17    with Beijing University of Technology.

18    Q.        Okay.  Well, do you recall now what visiting

19    Ph.D. students means?

09:27AM  20    A.        Yes, sir, students that are visiting from other

21    countries that work in research out of the university.

22    Q.        And do you know why they're listed in his

23    tenure package?

24    A.        I'm assuming that he had some type of

25    advisory --

1  Q.       Affiliation?

2  A.       -- responsibility.

3  Q.       In other words, he had some sort of connection

4  to Beijing University's visiting Ph.D. students?

5  A.       It appears that he was advising them, yes, sir.

6  Q.       Okay.  Did you discuss that with anybody at UT

7  to explain to you more fully what that means?

8  A.       I did not personally, no, sir.

9  Q.       How about the bottom, Postdoctoral Researchers,

09:28AM  10  Delong Ma.  Do you see that?

11  A.       Yes, sir, I do.

12  Q.       Postdoctoral researcher.  Now, do you know what

13  that means?

14  A.       Yes, sir, that's someone who has already

15  received their Ph.D. and is doing continuing research

16  following that.

17  Q.       Would you know why he is listed in Professor

18  Hu's tenure application?

19  A.       I'm not sure of the heading of this whole

09:28AM  20  section, but I would assume it was someone that he had

21  advised.

22           Yes, sir, academic advisor.  You passed it.  I

23  saw it.  Academic advisor, too.  So these are students

24  at the university and researchers that he was an advisor

25  to.

1    Q.        Do you know how visiting students and

2    postdoctoral researchers get involved from a different

3    university -- get involved with UT when they have

4    actually worked at a different university or are a

5    student in a different university?  Do you know how that

6    process works?

7    A.        Not specifically, no, sir.

8    Q.        So nobody told you that they would have to

9    communicate with Professor Hu in order to be a

09:29AM 10   postdoctoral researcher?

11   A.        No, sir, no one told me.  But I would assume

12   that for him to be their advisor, they would have to

13   have communicated, yes, sir.

14   Q.        Let's look at page 67.  And if you'd like to

15   read the highlighted part --

16   A.        Yes, sir.  (As read) "I have served as a

17   reviewer for the research proposals submitted to various

18   agencies worldwide, including the United States" --

19   or -- "U.S. National Science Foundation, the Department

09:30AM 20   of Energy, the Natural Sciences and Engineering Research

21   Council of Canada, the European Union Research Council,

22   the Nature Science Foundation of China, Kazakhstan

23   National Center of Science and Technology, the Romania

24   Ministry of Science and Education, Hong Kong University

25   Research Foundation, and the Singapore National Science

1    Research Foundation."

2    Q.        Thank you.

3    A.        Yes, sir.

4    Q.        And he's had a -- reviewer and done research

5    for many countries, many, many different organizations?

6    A.        He has, yes, sir.

7    Q.        Now, this tenure proposal here is a collection

8    of things he's done at the University of Tennessee and

9    other places to show the University of Tennessee that he

09:30AM  10   is eligible and qualified to be a tenured professor.

11   Are you aware what a tenured professor is?

12   A.        Yes, sir.

13   Q.        It holds special rights and duties.  There is

14   usually a pay raise that goes along with it, that kind

15   of thing; right?

16   A.        Yes, sir.  It's what you're shooting for, I

17   believe, as a professor.

18   Q.        Yes.  And he did get tenure, didn't he?

19   A.        Yes, he was granted tenure.

09:31AM  20   Q.        And he talks about the Natural Science

21   Foundation of China.

22   A.        Yes, sir, he does.

23   Q.        Is that -- that's the same institution you

24   claimed yesterday he was hiding from UTK, wasn't it?

25   A.        It's one that he has or had a research project

1    with, yes, sir.

2    Q.        No, that's -- that's not what I asked.

3    A.        I'm sorry.  That was hiding?  Yes, sir, his

4    affiliation with it.

5    Q.        Yes.  You told the jury he was hiding it from

6    UT?

7    A.        Yes, that he was working with them, yes, sir.

8    Q.        So you missed that when you went through the

9    tenure packets; right?

09:31AM  10   A.        No, sir.  Reviewing research proposals is not

11   working on research proposals.  That's reviewing other

12   people's work.  I believe that's very -- a separate

13   thing.

14   Q.        So what did you say he was hiding then; working

15   on other proposals?

16   A.        Correct, yes, sir.

17   Q.        Okay.  What kind of proposals?

18   A.        I'd have to go back and look at the documents

19   for the titles.

09:32AM  20   Q.        Well, let's look at page 72 where it says Grant

21   Proposals section.  Grant Proposals.

22   A.        Yes, sir.

23   Q.        And grant proposals is where you put together

24   what you could do, what kind of research you could do,

25   what kind of interesting things you might be able to

1    find and help the university and help the students

2    learn --

3    A.        Correct.

4    Q.        -- right?

5            Do you see where he lists China Nature Science

6    Foundation-General Research Program?

7    A.        I do, yes, sir.

8    Q.        Okay.  Is that the part you said that he didn't

9    do?

09:32AM  10    A.        Correct, that he's listed as an ad hoc

11    reviewer, not being funded by or doing work with

12    that -- reviewing, once again, is not the same as

13    working on.

14    Q.        Okay.  So in order for him to pass muster with

15    you, he's got to say things the right way; right?

16    A.        No, sir, he doesn't have to pass muster with

17    me.

18    Q.        Okay.

19            MR. LOMONACO:  Excuse me a minute.

09:33AM  20    BY MR. LOMONACO:

21    Q.        Okay.  So being a reviewer, what was he

22    reviewing?

23    A.        I have no idea.

24    Q.        Well --

25    A.        I would assume a research program that was with

1   the Chinese Nature Science Foundation.

2   Q.        It's under Grant Proposals; right?

3   A.        Correct.

4   Q.        He was reviewing a grant proposal; right?

5   A.        Yes, sir.

6   Q.        Okay.  Now, you say that's not collaboration?

7   A.        Collaboration with that university or that

8   foundation?

9   Q.        Yeah, collaboration with that university trying

09:33AM 10  to help get a proposal funded.

11  A.        From what I understand about reviewers is

12  typically there is a number of proposals that come in to

13  a particular entity.

14  Q.        There is a number -- I'm sorry?

15  A.        There are a number of proposals that will come

16  into an entity, and those entities will get experts in

17  the field to review those proposals to determine which

18  one might be worth -- or should be granted.

19  Q.        Okay.  So this one appears to have a proposal

09:34AM 20  from China Natural Science Foundation?

21  A.        Correct.

22  Q.        Came in and they got him to look at it and

23  render his opinion on whether it was a good proposal or

24  not?

25  A.        I would assume that.  I don't know for sure,

1  yes, sir.

2  Q.       But that would be in collaboration with a

3  person that wrote the proposal, wouldn't it?

4  A.       No, sir.  I wouldn't believe he would

5  collaborate with the proposal's author.  I believe he

6  would collaborate with the foundation.

7  Q.       Okay.  Well, who wrote the proposal then, the

8  foundation?

9  A.       I have no idea.  I'm assuming it would be a

09:34AM  10  list, a grouping of proposals that would be reviewed.

11  If I understand the reviewing process for proposals

12  correctly.

13  Q.       Yeah.  Well, you have that kind of experience

14  at NASA, don't you?

15  A.       Yes, sir.

16  Q.       Do you spend any time reviewing proposals at

17  NASA?

18  A.       I do not, no, sir.

19  Q.       Because you're not qualified in that area of

09:35AM  20  science; right?

21  A.       Correct, I'm not a scientist.

22  Q.       What are you qualified for; fraud

23  investigation?

24  A.       Yes, sir.

25  Q.       Okay.  So you're sort of like a detective?

1    A.       Yes, sir.

2    Q.       You go around looking for people that make

3    false statements and maybe plagiarize information;

4    although, that may be pretty hard to catch for you.  But

5    trying to get money without earning it, that kind of

6    thing?

7    A.       Yes, sir, just all types of contract and grant

8    fraud are our main things that we look at.

9    Q.       Okay.  Well, let me ask you now while I've got

09:35AM  10    that money on my mind, the grant proposals that

11    Professor Hu helped UT get, the money went to UT;

12    correct?

13    A.       Correct, yes, sir.  The agreement was with the

14    university.

15    Q.       So he didn't steal any money from NASA?

16    A.       Did he -- no, he did not steal money from NASA,

17    no, sir.

18    Q.       Okay.  So I want to talk more about this

19    proposal section, and we've got DOE-Office of

09:36AM  20    Science-Basic Energy Science.  That's our Department of

21    Energy; right?

22    A.       Yes, sir, I believe so.

23    Q.       So it's okay -- would you say that if he was

24    looking at a review of a DOE proposal, he was helping

25    somebody who was trying to get a grant from DOE?

1  A.      Just like the other one, I believe he probably

2  was looking at a group of proposals of different

3  individuals trying to get money from the Department of

4  Energy, yes, sir.

5  Q.      And the reason people were asking him to do

6  reviews is because he's got a good reputation?

7  A.      Yes, sir, he has a number of qualifications.

8  Q.      A lot of qualifications.  And this kind of

9  stuff is done all over the world in academia every day?

09:37AM 10  A.      Yes, sir.

11  Q.      There is nothing wrong with this; right?

12  A.      With reviewing proposals?

13  Q.      Yes.

14  A.      No, sir.

15  Q.      Let's go ahead and look at page 79.

16         On September 22nd, 2018, this is a support

17  letter for Dr. Hu's promotion; do you see that?

18  A.      Yes, sir, I do.

19  Q.      Okay.  Do you see where people from different

09:37AM 20  areas of the country are writing -- sort of like a

21  reference?

22  A.      Yes, I believe the packet contained a number of

23  reference letters.

24  Q.      Let's look at the second page.  Do you see

25  where he has served as a reviewer for the National

1  Science Foundation, the Department of Energy, and as

2  external reviewers for research proposals submitted by

3  National Science and Engineering Research Council of

4  Canada?

5  A.       Yes.

6  Q.       The European Research Council, Romanian

7  Ministry of Science and Education, Hong Kong University

8  Research Foundation, the Singapore National Science

9  Research Foundation.  And this is somebody else writing

09:38AM  10  on his behalf; correct?

11  A.       Yes, sir, I believe so.  I'm sorry.  I did not

12  see the top of wherever it's coming from, but I do

13  recognize this as one of the reference letters.  There

14  we go.  From the University of Nebraska.

15  Q.       Yes.  One moment, please.

16            MR. LOMONACO:  Go back to page 80.

17  BY MR. LOMONACO:

18  Q.       And he -- or this person from the University of

19  Nebraska, they're aware of his affiliations with Hong

09:39AM  20  Kong University and all these other universities; right?

21  A.       As a panel reviewer, yes, sir.

22  Q.       Okay.  Okay.  So let's look at page 84.  This

23  is another support letter; correct?  It was written to

24  Dr. Matthew Mench.  Do you know who Dr. Matthew Mench

25  is?

1    A.        I do not, no, sir.

2    Q.        Well, what does it say?  Chair of excellence --

3    A.        The Condra Chair of Excellence Professor and

4    Head, Department of Mechanical, Aerospace, and

5    Biomedical Engineering at the University of Tennessee in

6    Knoxville.

7    Q.        Okay.  So would that indicate to you that

8    Matthew Mench is the head of the department that

9    Professor Hu worked in?

09:40AM 10   A.        Yes, sir, that would.

11              MR. LOMONACO:  Okay.  Go to the second page of

12   the letter, page 85 of the proposal.  Last sentence of

13   the first paragraph on this page -- am I on the right

14   page?

15   BY THE WITNESS:

16   A.        Would you like me to read it, sir?

17   BY MR. LOMONACO:

18   Q.        Let me make sure I'm on the right spot.

19              Yes, if you could read it where it says, "This

09:40AM 20   is also..." --

21   A.        Which paragraph, sir?  I'm sorry.

22   Q.        Let's go to the last sentence in the first

23   paragraph, "He has also..."

24   A.        "He has also hosted six visiting Ph.D. students

25   from China which encourages international collaboration

1  within the students in his research group."

2  Q.       Okay.  So Matthew Mench, the head of Professor

3  Hu's department, is being told by this letter that he's

4  hosting six visiting Ph.D. students from China?

5  A.       Yes, sir, that's correct.

6  Q.       Which encourages international collaboration?

7  A.       Yes, sir.

8  Q.       So, if nothing else, this letter here told the

9  head of his department at UT that he had collaborations

09:41AM 10  with China's students?

11  A.       With Chinese students, yes, sir, which the NASA

12  restriction does not prohibit.

13  Q.       No, the NASA restriction requires collaboration

14  with what?

15  A.       With China or Chinese-owned entity.

16  Q.       China or Chinese-known --

17  A.       Owned entity, company.

18  Q.       -- company?

19  A.       Yes.

09:42AM 20  Q.       And while we're on the subject, NASA thinks

21  that the Chinese-owned company would include Chinese

22  universities?

23  A.       That's correct, yes, sir.  Per the statement

24  incorporated under the laws of the PRC.

25  Q.       Say that again.

1  A.       Per the statement for NASA, they believe that

2  Chinese universities are incorporated under the laws of

3  the People's Republic of China, I believe is the

4  phraseology.

5  Q.       Who is the first one at NASA that decided that

6  universities were included in the NASA restriction?

7  A.       I believe that the Grant Information Circular

8  is signed by a Mr. McNally, who was then the associated

9  administrator of NASA for procurement.  I'd have to

10 go --

11 Q.       Did he write it?

12 A.       Did he write it?

13 Q.       Yes.

14 A.       I'm not sure, sir.

15 Q.       This is the first time the grant -- the NASA

16 grant Chinese restriction, the NASA restriction, is

17 being litigated, isn't it?

18 A.       I believe so, yes, sir.

19 Q.       There is no previous judicial determination of

20 what a NASA restriction means; correct?

21 A.       I believe that is correct.

22 Q.       And when you say he -- the NASA restriction

23 requires that NASA not collaborate with its grant money

24 with China or a Chinese corporation or company, your

25 department decided to say that universities in China

1    should be included because they believe that the

2    universities in China are incorporated?

3    A.        Not the Inspector General, sir, no.  The NASA

4    headquarters policy in procurement --

5    Q.        Yeah.

6    A.        -- leaders decided that.

7    Q.        Did anybody do any research to find out if

8    Beijing University is actually incorporated?

9    A.        I'm not sure.  I did not work at NASA in 2012.

09:44AM  10   So I'm not sure.

11   Q.        So per your investigation, you didn't find any

12   articles of incorporation or board of directors meetings

13   or resolutions of the Beijing University, did you?

14   A.        No, sir, we did not.

15   Q.        You don't even know if it's incorporated, do

16   you?

17   A.        I'm not sure if it's incorporated.

18             MR. LOMONACO:  Okay.  If you can go to the

19   bottom of page 88.

09:44AM  20   BY MR. LOMONACO:

21   Q.        Read the first two sentences of the bottom

22   paragraph.

23   A.        Starting with, "Dr. Hu..."?  Is that the right

24   one?

25   Q.        Yes.

1    A.        Okay.  "Dr. Hu has made significant

2    contributions through service to the engineering and

3    science community.  He served as a panel reviewer for

4    over ten different funding agencies including NSF,

5    DOE-BES, NSERC Canada, EUCAS-Europe, NSF-China,

6    NSF-Singapore, NSF-Hong Kong, and the Romanian Ministry

7    of Education."

8    Q.        Thank you.

9              NSF in China, NSF in Singapore, NSF in Hong

09:45AM  10    Kong, and the first NSF that is listed in this sentence

11    stands for National Science Foundation?

12    A.        I believe some of them stand for Natural

13    Science Foundation.  Yes, sir, either National Science

14    or Natural Science Foundation.

15    Q.        Okay.  Now, you have -- you've reviewed the NSF

16    applications and proposals that Professor Hu wrote for

17    the NSF in the United States; correct?

18    A.        I do not believe I reviewed his NSF proposals,

19    no, sir.

09:46AM  20    Q.        No?

21              Would it be helpful to review other proposals

22    to see if he disclosed China when asked?

23    A.        So since it's a NASA funding restriction, if it

24    was an agency that was not -- that was not NASA, it

25    would not -- one, it would not be under my purview, and,

1  two, might not be not subject to the same restrictions.

2  Q.       Anywhere in the NASA proposal is Professor Hu

3  asked to disclose his affiliations and his

4  collaborations?

5  A.       In his proposal or in the solicitation?

6  Q.       In the NASA proposals.

7  A.       So the NASA proposals are submitted by Dr. Hu.

8  Q.       Yeah, but there is a form they follow; correct?

9  A.       There is a typical format that would include a

09:47AM  10  biography section that would -- they would be interested

11  in understanding his credentials for performing the work

12  in which he's proposing, yes, sir.

13  Q.       So you haven't reviewed NSF's forms?

14  A.       I have not reviewed any NSF proposals, no, sir.

15  Q.       Would it be better for NASA to ask right in

16  their forms, please tell us any collaborations you've

17  had with China or any affiliations you've had with

18  China?

19  A.       That's why the restriction is in the contract

09:47AM  20  itself which -- which the entity or the person who is

21  entering into it is required to certify that they will

22  comply with.

23  Q.       Okay.  So you're saying this assurance

24  letter --

25  A.       Well, the assurance letter is from the

```
 1   university.  The restriction is in the NASA terms and

 2   conditions.

 3   Q.      All right.  Well, we'll get to that.

 4           MR. LOMONACO:  If we could look at page 119.

 5   BY MR. LOMONACO:

 6   Q.      Again, it's still his tenure package.

 7   A.      Yes, sir.

 8   Q.      I believe your testimony yesterday was that he

 9   didn't disclose his affiliations with BJUT in this

10   package.  This is a teaching summary.

11   A.      Okay.

12   Q.      Okay.  And, actually, a teaching summary is a

13   portion of this section.  The section is Progress and

14   Performance Narrative.  So it shows his progress and his

15   performance.

16   A.      Okay.

17   Q.      Okay.  If we could -- can you determine by

18   looking at this who performed this summary?

19   A.      It says Matthew Mench, the MABE department

20   head.

21   Q.      Okay.  And we already discussed who he is.

22   A.      Yes, sir.

23   Q.      And it was performed on --

24   A.      It says October 12th, 2106, but I'm assuming

25   that's a typo and meant 2016.
```

09:48AM (line 10)
09:49AM (line 20)

1    MR. LOMONACO:  Let's go to the second page.

2    Page 120.

3    BY MR. LOMONACO:

4    Q.    So under the service summary --

5    A.    Yes, sir.

6    MR. LOMONACO:  Excuse me.

7    Let's start a little bit above that.

8    BY MR. LOMONACO:

9    Q.    He was invited to give talks on his research in

09:49AM 10   the United States and China last year.

11    Okay.  Giving talks in China is sort of what

12   professors do.

13   A.    I understand that.  I would assume they give

14   talks at a lot of places, yes, sir.

15   Q.    Yeah.  His research team now includes three

16   Ph.D. students, two visiting Ph.D. students, one

17   visiting scholar, and two undergrads.  He exceeds

18   expectations in this category.

19    So he's expected to do this stuff; right?  Have

09:50AM 20   Ph.D. students, visiting scholars, undergraduate

21   students.  He's expected to have that; right?

22   A.    I would assume so for trying to get tenure that

23   you would need to advise students, yes, sir, and

24   do -- and have scholars.

25    MR. LOMONACO:  Let's turn to page 147.

1    BY MR. LOMONACO:

2    Q.        This is Anming Hu's CV; correct?

3    A.        Yes, sir.

4             MR. LOMONACO:  And let's go to the third page,

5    page 149.

6    BY MR. LOMONACO:

7    Q.        Visiting Ph.D. students.

8    A.        Yes, sir.

9    Q.        Now, just so the jury understands what a Ph.D.

09:51AM 10   student visiting does, are you aware of the process with

11   a visiting student?

12   A.        Am I aware of the process for a student to come

13   here and do research?

14   Q.        As a visiting student.

15   A.        I'm not specifically aware.  I never had to do

16   that, no, sir.

17   Q.        Do you know who pays the student, pays for the

18   student's education?

19   A.        I do not.

09:51AM 20   Q.        No?

21             So you don't know exactly everything to know

22   about visiting Ph.D. students?

23   A.        No, sir, by no means.

24   Q.        Even from Beijing University of Technology?

25   A.        I do not know.

1  Q.      And he lists two in his tenure package?

2  A.      He does, yes, sir.

3  Q.      Yes, he does.  And these students come to the

4  University of Tennessee and they do research under

5  Dr. Hu in the -- UT's labs; right?

6  A.      Yes, sir, that's what I understand.

7  Q.      There is nothing wrong with that?

8  A.      I don't believe so, no.

9  Q.      And he's not trying to hide it; correct?

09:52AM 10  A.      He is not trying to hide that, no, sir.

11          MR. LOMONACO:  Let's go to page 150.  Drop it

12  down a little further.

13  BY MR. LOMONACO:

14  Q.      Postdoctoral researchers.  Dr. Delong Ma.  I

15  think you even mentioned Mr. Ma or Ms. Ma yesterday

16  under something that you found he had an affiliation and

17  didn't report it.  Did you --

18  A.      I believe so.  We did have a -- I believe we

19  had an email chain --

09:53AM 20  Q.      Yeah.

21  A.      -- where he was recommending -- I believe it's

22  a him, Mr. Delong Ma -- Dr. Delong Ma.

23  Q.      Yeah.  And here he discloses his affiliation

24  with Dr. Delong Ma in the Procedural Postdoctorate

25  Researchers section and listing him as funding

1    institute, Beijing University of Technology?

2    A.       Yes, sir, as a postdoctoral researcher.

3    Q.       Okay.  So do you know what they mean by

4    "funding"?

5    A.       I would assume that is who is funding the

6    postdoctoral researcher.

7    Q.       So the University of Technology in Beijing is

8    actually paying for this man to work at UT?

9    A.       It does appear that way, yes, sir.

09:54AM  10           MR. LOMONACO:  And, finally, page 162.

11   BY MR. LOMONACO:

12   Q.       The second paragraph under Grant Proposals says

13   Hong Kong, Polytechnic University Research Foundation.

14   A.       Yes, sir.

15   Q.       Okay.  He reviewed that grant proposal, too.

16   A.       That's what it says.  He was an ad hoc reviewer

17   for that proposal project.

18   Q.       Hong Kong is in China; right?

19   A.       It is.

09:55AM  20   Q.       At least China thinks so; right?

21   A.       They do.

22   Q.       Further down, it also lists the Chinese

23   National Science Foundation again.

24   A.       Yes, sir, I believe -- yeah, this is similar to

25   the other document we looked at from -- as an ad hoc

1    reviewer in 2017.

2              MR. LOMONACO:  Okay.  Excuse me.

3    BY MR. LOMONACO:

4    Q.        Another section that he reports is a graduate

5    recruiting committee.

6    A.        Okay.

7    Q.        And these are some of his accomplishments.

8    A.        Yes, sir.

9    Q.        Some of his committee service.  Some of the

09:55AM 10   things that he does for UT; correct?  It says up at the

11   top, Record of Committee Service.

12   A.        Yes, sir.

13   Q.        Third one down, Graduate Recruiting Committee,

14   committee member.  He helps to advise and recruit

15   Chinese background students, introduction of Chinese

16   scholarship council grants?

17   A.        Yes, sir, that's what it says.

18   Q.        Okay.  So you made quite a statement yesterday

19   that he was not disclosing his affiliations to UT.

09:56AM 20   A.        Correct.

21   Q.        Isn't it -- isn't it a fact that the part that

22   got you involved was the outside interest disclosure or

23   the conflict of interest form?

24   A.        No, sir, the part that got me involved was his

25   affiliation with the university himself as a professor

1 that was not disclosed on the -- on those interest

2 forms, yes, sir.

3 Q.        On those interest forms.

4 A.        The conflict of interest forms, yes, sir.

5 Q.        Yes.

6            Did you read the policy -- PL025; is that

7 right?  The policy -- University of Tennessee policy

8 PL025.

9 A.        I'm not sure what that corresponds to.  I'd

09:57AM 10 have to --

11 Q.        It corresponds to conflicts of interest.

12 A.        Yes, I have seen the conflict of interest

13 policy, yes, sir.

14 Q.        The one I'm referring to?

15 A.        If it's the one on the screen, then, yes.

16 Q.        Yes.

17            Did you read it?

18 A.        I have been through it.  Not cover to cover,

19 but, yes, sir.

09:57AM 20 Q.        Okay.  Are there certain levels of activity you

21 have to reach before UT calls it a conflict of interest?

22 A.        I would have to go back and read those

23 sections.  I'm happy to.

24 Q.        Well, no, I didn't ask you to read it or

25 refer -- or remember it.  I'm just asking if you knew in

1  this policy manual that there are certain levels that

2  you have to rise up to before it's a conflict of

3  interest.

4  A.        Okay.

5  Q.        Do you know that?

6  A.        I would assume that that would make sense, yes.

7  Q.        Well, did you find that in the policy manual?

8  A.        I would have to go back and review it.  I'm

9  sorry.  I don't recall.

09:58AM 10  Q.        Don't you think it's sort of important if

11  you're saying that he didn't fill in the form that says

12  you've got outside employment or a conflict of -- what

13  could be a conflict of interest to know how you define

14  conflict of interest?

15  A.        Well, not being an expert in this, sir, I

16  relied on University of Tennessee personnel to tell me

17  what they expected to be in there.

18  Q.        Okay.

19  A.        And I relied on their statements in my

09:58AM 20  investigation.

21  Q.        You had a call -- I think it was in -- you had

22  a call from, I think, Laura Slatton November 8th, 2018.

23  A.        I'm sorry.  What?

24  Q.        November 8, 2018, Laura Slatton called you and

25  said, "We're over here at the University of Tennessee

1    and Jean Mercer has got a dilemma."

2    A.        That's correct.   She did call me and let me

3    know that.

4    Q.        Yes.   And the dilemma was Jean Mercer had been

5    advised by the federal agents that without signing that

6    conflict of interest form, Anming Hu was committing

7    fraud.

8    A.        I don't believe those were exactly her terms.

9    She believed that -- from what I understand from Agent

09:59AM 10   Slatton, they were concerned with the contract -- or the

11   cooperative contract agreement that had just been

12   awarded by NASA based on the information that the agents

13   had informed them about his affiliations.

14   Q.        And Laura Slatton had to sign the document

15   before it became a contract; right?

16   A.        No, sir.

17   Q.        No?

18   A.        Laura Slatton wouldn't have signed any

19   contracts.

10:00AM 20   Q.        I'm sorry.   Jean Mercer.

21   A.        Oh, yes, sir.   Jean Mercer, I believe, was,

22   from the University of Tennessee, the signer.

23   Q.        So to sort of summarize what this phone call

24   was about, Laura Slatton, the DOE agent, sort of like

25   you're the NSA or the NASA agent --

1    A.        Yes, sir.

2    Q.        -- sort of like Mr. Sadiku is the FBI agent --

3    A.        Correct.

4    Q.        -- called you and said she has got some

5    concerns that if she knows Professor Hu is committing

6    fraud, if she signs the contract, that's going to

7    further the fraud.

8    A.        She had concerns in signing it, yes, sir.

9    Q.        Okay.  That was a concern; right?

10   A.        Yes, sir.

11   Q.        But you told her to go ahead and sign it

12   anyway?

13   A.        I told her to proceed as she normally would if

14   she didn't know the investigation was ongoing.

15   Q.        She didn't know the investigation was ongoing?

16   A.        If she didn't.

17   Q.        Oh.

18   A.        They would have entered into the contract had

19   they been not made aware by the investigating agents of

20   the affiliation.

21   Q.        Could anybody at UT that knew of this alleged

22   dilemma, this fraud, could anybody at UT that knew about

23   it, could they have told Professor Hu, "Hey, we can't

24   let you do this because it's" -- "according to the FBI,

25   you're going to be committing fraud"?  Did anybody do

1  that?

2  A.        Did anyone tell him?

3  Q.        Yeah.

4  A.        No, sir, not at that time.

5  Q.        You wanted him to just walk right into it;

6  right?

7  A.        No, sir, we wanted to continue the

8  investigation.

9  Q.        Well, that would have stopped the

10:01AM  10  investigation, wouldn't it?

11  A.        No, sir.  There were previous contracts that

12  had already been completed that also had the same issues

13  that we were investigating.

14  Q.        Okay.  So just to make sure I understand and to

15  be clear, your understanding of F10- -- or FL0125, which

16  says Conflicts of Interest, you're not sure what the

17  level of conflict is before it has to be reported?

18  A.        Once again, yes, sir, I relied on the

19  university officials who do this every day to let me

10:02AM  20  know what they would have expected him to report on

21  those.

22  Q.        And who was that?

23  A.        Jean Mercer was one of them and a number of

24  others.

25  Q.        Do you know any more?

A.        I know we talked -- individuals in the

counsel's office and other individual -- I believe

Dr. Zomchick with the chancellor's office.

Q.        Were you aware that the FBI conducted a fraud

awareness meeting with the University of Tennessee some

months before that?

A.        I was aware.  I was not present, but I became

aware of it later, yes, sir.

Q.        And --

          MR. LOMONACO:  Excuse me.  Let me get the date.

Do you remember the date?

BY MR. LOMONACO:

Q.        August 31st, 2018.

A.        Okay.

Q.        Fraud awareness meeting.  Do you know what took

place at that meeting?

A.        I would assume a fraud awareness meeting.  No,

sir.  Like I said, I was not present, nor part of the

investigative team at that time.

Q.        Fair enough.  Fair enough.

          Are you aware that after that there were three

meetings, and I think you were at the third one.

A.        I believe I was -- I'm sorry.  With the

university?

Q.        Yes.

1   A.        I believe I attended two meetings with the

2   university after I became part of the team, yes, sir.

3   Q.        One of those meetings was a slideshow

4   presentation where a number of federal agents were

5   there; right?

6   A.        I was not there for any slide presentations.

7   Q.        At no point?

8   A.        No. No, sir.

9   Q.        No PowerPoints?

10:03AM  10   A.        There could have been some PowerPoints maybe

11   that were in a printed form that were given, but I

12   don't -- I was not at a -- there was no slideshow

13   presentation given at the meetings I was at.

14   Q.        I guess I'm just generalizing, but you had some

15   handouts from the federal government --

16   A.        Yes, sir, I believe so.

17   Q.        -- to the administrators, for lack of a better

18   word, Jean Mercer, Zomchick, maybe one or two more?

19   A.        I believe there were some people from the

10:04AM  20   Research Integrity Office as well, yes, sir.

21   Q.        And I think the UT's law department people were

22   there, some of them?

23   A.        Yes, sir.

24   Q.        And Mr. -- Agent Sadiku, Ms. Slatton, the DOE

25   federal agent, and you were there.  U.S. attorneys were

1  there.

2  A.         I believe at one meeting, yes, sir.

3  Q.         Okay.  How many -- how many U.S. attorneys; do

4  you know?

5  A.         If I recall, there were two.

6  Q.         Two?  Okay.

7             And the purpose of the presentation?

8  A.         To continue to -- we commonly meet with

9  potential victims to talk about what's going on, and we

10 also had -- you know, we talked to them and asked them

11 some questions as well and updated them on our progress

12 of the investigation.

13 Q.         Would it be fair to say that the purpose also

14 was to convince the UT administrators that there was

15 fraud going on?

16 A.         No, sir, we didn't need to convince them of

17 that.

18 Q.         Did you review the handouts?

19 A.         If I did, it was then at that time.  I did not

20 create the handouts, and I don't believe I had a copy of

21 the handout.

22 Q.         So you can't recall whether the handouts were

23 all kinds of accusations against Professor Hu?

24 A.         I'm sure there were some, yes, sir.

25 Q.         Why would you be giving handouts to UT

10:04AM (line 10)
10:05AM (line 20)

1   administrators accusing Professor Hu of creating and

2   committing a crime unless you were trying to instruct

3   them and educate them and encourage them to go along

4   with you?

5           MR. ARROWOOD:  Objection, Your Honor.  He's

6   answered the question.  He didn't author them.

7           MR. LOMONACO:  I'll move on, Your Honor.

8           THE COURT:  Thank you.

9           MR. LOMONACO:  May I have one moment, Your

10  Honor, please?

11          Thank you.

12  BY MR. LOMONACO:

13  Q.      Okay.  Let's go on and talk about some of the

14  articles and publications that you talked about

15  yesterday that they weren't reported in the UT -- the UT

16  vehicles for reporting these things.  Do you remember

17  some of these articles being drafts?

18  A.      I remember one specifically because it had a

19  number of red lines in it, yes, sir.

20  Q.      Well, he wouldn't report a draft; right?

21  A.      I wouldn't assume so.

22  Q.      Now, we're talking about articles and

23  publications.  These are things that he wrote; he wrote

24  with other people.  He wrote possibly with BJUT

25  students; right?  Now, that would be collaboration;

1    right?

2    A.        If he wrote them with them?

3    Q.        Yes.

4    A.        Yeah, it would be collaborating with them, yes,

5    sir.

6    Q.        Okay.  So these articles are not published, and

7    if they're not published, they're not reported by the

8    faculty or reported to the faculty.  They have to be

9    published in order to let UT know what took place.  A

10   draft can't be published.

11   A.        I would assume you wouldn't want to publish a

12   draft, no, sir.

13             MR. LOMONACO:  Let's go to Exhibit 70 (sic).

14             MR. PARSONS:  7-O.

15             MR. LOMONACO:  Pardon me?

16             MR. PARSONS:  7-O.

17             MR. LOMONACO:  I'm sorry.  7-O.

18   BY MR. LOMONACO:

19   Q.        And I think this is your exhibit.  And I think

20   you testified about this yesterday; do you recall?

21   A.        I do, yes, sir.

22   Q.        Do you see up at the top there it's got these

23   little names and numbers?

24   A.        I do.

25   Q.        What does that indicate to you?

A.        Those indicate basically the affiliations of those individuals.

Q.        Okay.

A.        Those coauthors.

Q.        So those are coauthors.  And the name of it is 3D Printing and Laser Sintering.

A.        Sintering of aluminum nanoparticles for aluminum air batteries.

Q.        Right.  I think this is one of the articles that you said was not published.

A.        I didn't -- I don't recall stating if any of them were published or not published, sir.

Q.        Or disclosed to UT?

A.        Once again, I think we were -- all I was stating was that he was listed as an affiliation with the Beijing University of Technology.  I don't believe we --

Q.        Well, wasn't your whole theme yesterday that he wasn't sharing this information with UT, and had they known of his affiliation, they would not have let him get a NASA grant?

A.        If they had known of his professorship, yes, sir.

Q.        Okay.  More than just his professorship, his affiliations, too; right?

1    A.       Correct.

2    Q.       That's part of being a professor?

3    A.       You would think you would need to be affiliated

4    with them, yes, sir.

5             (Defendant's Exhibit 6 was marked for

6              identification.)

7             MR. LOMONACO:  Okay.  Let's go to Exhibit 6,

8    Defendant's Exhibit 6.

9    BY MR. LOMONACO:

10:09AM  10   Q.       And does this look familiar?

11   A.       No, sir, it does not.

12   Q.       It doesn't?

13   A.       No, sir, it does not.

14   Q.       Okay.  Is that because you didn't review his

15   annual activity reports?

16   A.       That's correct.

17   Q.       Okay.  So everything in these annual activity

18   reports you were not aware of?

19   A.       I did not review any of the annual activity

10:10AM  20   reports, no, sir.

21   Q.       Are you aware that sometimes the titles of

22   articles and books and publications, these undergo minor

23   revisions and name changes before publications; do you

24   know that?

25   A.       That makes sense.

1          MR. LOMONACO:  Okay.  Can we do a split screen

2    with Government's Exhibit 70 (sic)?

3    BY MR. LOMONACO:

4    Q.       So the article on the right was the one that

5    you talked about yesterday.

6    A.       Yes, sir.

7    Q.       That he was involved with Chinese students and

8    UT was not --

9    A.       I'm not sure if they were Chinese students,

10   sir.

11   Q.       Well -- well --

12   A.       It shows his affiliation with the Beijing

13   University of Technology, yes.

14   Q.       Yes.  Okay.

15            And if you look at the middle of the second

16   page, first entry, beginning with, "You," do you see

17   that?

18   A.       I do.

19   Q.       You didn't -- you didn't get a look at this;

20   right?

21   A.       No, sir, I did not.

22   Q.       Okay.  Do you see the name?

23   A.       I do, yes.  Is it possible to blow that up a

24   little bit?  I'm sorry.

25            MR. LOMONACO:  Yeah, can we blow that up a

1  little bit?

2  BY THE WITNESS:

3  A.        Yeah, that's much better.  Thank you.

4  BY MR. LOMONACO:

5  Q.        Okay.  This is the one that says -- right about

6  in the middle, it says, "Laser sintering of AL

7  nanoparticles"?

8  A.        Yes, sir, I see that one.

9  Q.        Okay.  If you click on the link there, that's

10:12AM  10  the actual publication.

11  A.        Okay.

12  Q.        Do you see how easy it is for the university to

13  find the publications if they're reported in the annual

14  review --

15  A.        Yes, sir.

16  Q.        -- with hyperlinks?

17          And if you look at the Institute of Laser

18  Engineering, Beijing University of Technology, it's

19  clearly stated there.  Also the Department of

10:12AM  20  Mechanical, Aerospace, Knoxville, Tennessee.

21  A.        Yes, sir.

22  Q.        All these affiliations are there.

23          All right.  It was pretty easy to find, wasn't

24  it, if you had reviewed the annual report?

25  A.        Yes, sir.

1  Q.        Did anybody at UT say, "Hey, we need to go look

2  at Professor Hu's annual report to see how much

3  affiliation he reported"?

4  A.        They did not say that to me, no, sir.

5  Q.        Your Exhibit 3-S from yesterday, you pulled

6  this up, also, I think, and made a point that Beijing

7  University and the University of Tennessee, I guess,

8  were affiliated or collaborating on this -- this

9  publication.

10:14AM  10  A.        We stated that according to the coauthor's

11  footnotes that Dr. Hu was affiliated with those

12  universities -- with those two universities, yes, sir.

13  Q.        And what was the purpose?  Why were you

14  bringing all these things up yesterday?

15  A.        To show that Dr. Hu was indeed -- is indeed

16  affiliated with the Beijing University of Technology.

17  Q.        And there was more to it than that.  You were

18  also saying that he wasn't disclosing it to the UT;

19  right?

10:14AM  20  A.        Correct, his job -- his professorships at the

21  University of Tennessee have not been disclosed on any

22  document provided to the university or NASA that we have

23  found.

24            MR. LOMONACO:  Okay.  So can we do another

25  split screen on that one?

1    BY MR. LOMONACO:

2    Q.        On the 2018/'19 activity report, fourth entry

3    on page 3 --

4           MR. LOMONACO:  Let's go to the top of that one

5    for one second to make sure we --

6    BY MR. LOMONACO:

7    Q.        Anming Hu, Associate Professor, 2018/'19 Annual

8    Activity Report PDF.

9           MR. LOMONACO:  Okay.  And go to the fourth

10:15AM 10   entry on page 3.  One, two, three, four.  It says Ma.

11   BY THE WITNESS:

12   A.        Yes, sir, I see it.

13   BY MR. LOMONACO:

14   Q.        Do you see it?

15   A.        Yes, sir.

16   Q.        Microstructures, it looks like?

17   A.        Microstructures and reaction properties of

18   those chemical compounds.

19   Q.        And if you click on that one, this is the

10:15AM 20   actual publication again.

21   A.        Correct.

22   Q.        Beijing University of Technology, Professor

23   Anming Hu.  So all this was available for UT to review

24   if they wanted to; would you agree with that?

25   A.        If they were to dig down into it, yes, sir.

1   Q.      Okay.  I could show you more annual activity

2   reports if you'd like to see them talking about China

3   funding, but I think you understand the process of these

4   activity reports now, annual activity.  The main thing

5   is:  You didn't review these?

6   A.      No, sir, I did not review the annual activity

7   reports.

8   Q.      So getting back to the general accusation here

9   that Professor Hu is accused of willfully, knowingly

10:17AM  10  hiding his affiliations and collaborations and his

11  part-time summer job -- if you want to make sure you

12  throw that in there -- with BJUT from UTK in order to

13  get a NASA grant.

14  A.      And a contract, yes, sir.

15  Q.      Well, yeah.  I mean, that's the fraud in this

16  case; right?

17  A.      The failure -- the failure to disclose

18  affiliations and to make the university aware, yes, sir.

19  Q.      Willfully and knowingly hiding his

10:17AM  20  affiliations.

21  A.      Yes, sir.

22  Q.      Okay.  And by not disclosing the affiliations

23  and collaborations on the UT outside interest disclosure

24  form?

25  A.      Yes, sir.

1  Q.      How do you know he knowingly had this scheme to

2  willfully defraud NASA in mind two years before he even

3  applied for a NASA grant?

4  A.      Two years before?  I don't know.

5  Q.      Did you review all of his outside interest

6  disclosure forms?

7  A.      I did, yes.

8  Q.      How far back?

9  A.      I believe 2013.

10:18AM 10  Q.      '13?

11  A.      When he began, yes, sir.

12  Q.      Same question; same answer?

13  A.      On all of the forms?

14  Q.      Yes.

15  A.      Correct, he answered no on all of the forms.

16  Q.      And, by the way, that form has been changed

17  now.  Did you review the new one?

18  A.      I went through a couple different versions of

19  the form, yes, sir, during that time period.

10:19AM 20  Q.      Because UT was changing it, saying, "We've got

21  to change these forms."  Right?

22  A.      I don't believe the questions changed

23  throughout the time period that I looked at from '13 to

24  '19.

25  Q.      Let's go back.  From 2013, you reviewed it, and

1    the question and the answer was pretty much the same

2    until maybe '18 or '19?

3    A.        Yes, sir.

4    Q.        When was the first time he applied for a NASA

5    proposal?

6    A.        I believe there was some work in 2014, but I'd

7    have to go back and look.  But I know the first one that

8    we're talking about is in 2016.

9    Q.        2016?

10:19AM  10   A.        Yes, sir.

11   Q.        So when you say there was some work, what do

12   you mean "work"?

13   A.        I believe I saw the potential applications in

14   2014.  But we're talking about 2016, the first one that

15   we're discussing.

16   Q.        What kind of application in 2014?

17   A.        I'd have to go back and look.  I don't believe

18   it was funded research.

19   Q.        You don't believe it was a NASA grant proposal?

10:20AM  20   A.        Not a grant proposal, no, sir.

21   Q.        So the first NASA grant proposal was in 2016?

22   A.        Yes, sir, and it technically was for a

23   subcontract, but, yes, sir, an award.

24   Q.        Okay.  And it's your belief that he left that

25   blank two years prior because he thought he was going to

1  get a NASA grant two years later?

2  A.      I'm not sure why he decided to withhold that

3  information.

4  Q.      You think there might be another reason that he

5  left it blank that didn't have anything to do with the

6  NASA restriction?

7  A.      I assume it had something to do with wanting to

8  get tenure at the University of Tennessee.

9  Q.      Well, that doesn't have anything to do with the

10  NASA restriction, does it?

11  A.      It does not, but I believe they would be

12  interested in knowing of outside affiliations, just as

13  NASA is.

14  Q.      It's not against the law to answer it

15  incorrectly; right?

16  A.      When you certify it.

17  Q.      Well, if it's a mistake, it's not against the

18  law, is it?

19  A.      If it's a mistake?

20  Q.      Yeah.

21  A.      Not necessarily.

22  Q.      A good-faith mistake, a misunderstanding of the

23  question?

24  A.      It could be, yes, sir.

25  Q.      Okay.  But what you're saying here is that he

1   may have had other reasons to sign that other than the

2   NASA grant?

3   A.      Sure, yes, sir.

4   Q.      But doesn't he have to willfully and knowingly

5   sign it in order to defraud NASA before it's a crime?

6   A.      He has to know what he's doing, yes, sir.

7           MR. ARROWOOD:  Objection, Your Honor.  It calls

8   for a legal conclusion.

9           MR. LOMONACO:  I'll move on.

10:21AM 10          THE COURT:  That's a fair objection.  We'll

11  move on.  I'll sustain that objection.

12  BY MR. LOMONACO:

13  Q.      So we read the NASA restriction earlier.

14          MR. LOMONACO:  Let's go to Exhibit 141.  Have I

15  got the wrong number?

16          MR. PARSONS:  Defense Exhibit 131.

17          MR. LOMONACO:  131.  I'm sorry.  Can you blow

18  that up a little bit?

19          (Defendant's Exhibit 131 was marked for

10:22AM 20           identification.)

21  BY MR. LOMONACO:

22  Q.      All right.  This is right out of the

23  Appropriations Act; right?

24  A.      I'm not sure.  I'd have to see the top.

25  Q.      Well, let's just -- that's just -- if you

1  would --

2  A.        Okay.

3  Q.        -- it says Section 539.  That's the section

4  that was placed in the Appropriations Act in 2011;

5  correct?

6  A.        I believe so, yes, sir.

7  Q.        And the actual wording starts in the yellow

8  part, "None of the funds made available by this Act may

9  be used for the National Aeronautics and Space

10 Administration or the Office of Science and Technology

11 policy to develop, design, plan, promulgate, implement,

12 or execute" -- let's take that group of words right

13 there first.  And let's just say none of NASA's money

14 can be used to develop or plan or execute a bilateral

15 policy.  Do you know what "bilateral" means?

16 A.        It would be two parties.

17 Q.        Back and forth?

18           -- "...or contract of any kind to participate,

19 collaborate, or coordinate bilaterally in any way with

20 China or any Chinese-owned company, unless such

21 activities are specifically authorized by law."

22           And that is the main wording of the NASA

23 restriction; right?

24 A.        For the most part.  Once again, this is -- this

25 is the Appropriations Act, which was then taken by

 1  NASA's policy and counsel's office where we developed

 2  our policies, right.

 3  Q.      Yeah, I wanted to talk to you a little bit

 4  about that.  This actually was an Act to restrict NASA;

 5  right?

 6  A.      It restricts the funds, yes, sir, that NASA --

 7  Q.      Restricted NASA and told them what they could

 8  do with their funds as far as China or Chinese-owned

 9  companies was concerned?

10:24AM 10  A.      Correct.

11  Q.      But then NASA decided you were going to decide

12  what it means?

13          MR. ARROWOOD:  Objection, Your Honor,

14  relevance.

15          MR. LOMONACO:  I think it's relevant, Your

16  Honor, in that somehow NASA themselves decided what the

17  meaning was instead of somebody else.  I mean --

18          THE COURT:  Well, with that questioning along

19  these lines, I'm going to overrule the objection.  I'll

10:24AM 20  let the witness answer to the extent he can.

21  BY THE WITNESS:

22  A.      I'm sorry.  Would you repeat the question, sir?

23  BY MR. LOMONACO:

24  Q.      That the Act restricts NASA --

25  A.      Yes, sir.

1    Q.        -- and NASA took it upon itself to decide how

2    much restriction they should have.  In other words, they

3    defined what they would do with the money.

4    A.        Correct.  So all of the terms and conditions

5    that are in contracts go through our policy office which

6    look at the law that's been put in place and determine

7    what that means for NASA.  So, yes, so it's NASA's job

8    to decide how it wants to, you know, abide by these laws

9    that are put in place by Congress.

10:25AM  10   Q.        So this China or Chinese company, collaborate

11   bilaterally in any way with China or a Chinese-owned

12   company, that's subject to a lot of different

13   interpretations, isn't it?

14   A.        I mean, NASA decided to interpret it one way

15   and that's the way that's put in every contract and

16   grant.

17   Q.        But it's subject to a lot of interpretations,

18   isn't it?

19             Do you know Representative Wolf?

10:26AM  20   A.        I do not know Representative Wolf.

21             MR. ARROWOOD:  Objection, Your Honor.

22   Relevance, Your Honor.

23   BY MR. LOMONACO:

24   Q.        I'm not going to get into what he said, but I

25   just want to know if you know he was the one that put

1    this in the Act.

2    A.      Yes.

3    Q.      And not telling anybody what his conversion and

4    interpretation was, do you know whether he had an

5    interpretation of this Act?

6    A.      I was not --

7            MR. ARROWOOD:  Again, Your Honor --

8            THE COURT:  Let me see.  Is there an objection

9    to that question?

10:26AM  10        MR. ARROWOOD:  Yes, Your Honor, there is.

11           THE COURT:  I think we're getting far afield

12   with that.  I'll sustain that objection.

13           MR. LOMONACO:  Okay.

14   BY MR. LOMONACO:

15   Q.      NASA has interpreted Chinese-owned companies to

16   be companies that are incorporated in China.

17   A.      Yes, sir.

18   Q.      We've already been over that a little bit.

19   A.      We have.

10:26AM  20   Q.      And NASA then said, well, Chinese universities

21   we believe are incorporated.

22   A.      Correct, yes, sir.

23   Q.      But you don't have any evidence, documentary

24   evidence of that.

25   A.      No, sir, I was not asked to investigate that.

1 Q. Well, does anybody at NASA that you know of
2 have that kind of proof?
3 A. Not that I know of, no, sir. I rely on the
4 policy individuals at headquarters.
5 Q. So let me ask you this: Is Professor Hu China?
6 A. Is Professor Hu China? I don't believe so, no,
7 sir.
8 Q. Okay. Is he a Chinese-owned company?
9 A. I believe he is affiliated with a Chinese-owned
10 company.
11 Q. No, I didn't ask if he's affiliated. I'm
12 asking: Is he a Chinese-owned company?
13 A. No, sir, he's not a Chinese-owned company.
14 Q. And the restriction -- the restriction says it
15 applies to agreements that include bilateral
16 participation, collaboration, or coordination, and you
17 are -- are you with Chinese universities?
18 A. Correct.
19 Q. Did NASA collaborate with a Chinese university?
20 A. I believe unknowingly, yes, sir.
21 Q. Unknowingly. So you're saying that Professor
22 Hu is a Chinese university?
23 A. He participates, collaborates, and coordinates
24 with Chinese universities, yes, sir.
25 Q. Well, are we saying he collaborates with a

1  Chinese university, or are we saying, according to that,

2  that he is a Chinese university?

3  A.      I believe that he collaborates, participates,

4  and coordinates with the Chinese university, not that he

5  is himself a Chinese university, no, sir.

6  Q.      Is there anything in the Act here that says

7  that a Chinese-owned company means somebody that

8  collaborates with a Chinese-owned company?  Does it say

9  that?

10:28AM 10  A.      It does not specifically say that, no, sir.

11  Q.      It says NASA shall not collaborate with a

12  Chinese-owned company, doesn't it?

13  A.      It does.

14  Q.      Did the University of Tennessee collaborate

15  with NASA?

16  A.      Yes.

17  Q.      Do you have any evidence that Dr. Hu was

18  teaching in Beijing during the grant?

19  A.      I believe there is a number of email exchanges

10:29AM 20  and other things to show that he was actively working

21  with the university during a number of months and during

22  a number of years.

23  Q.      That's not my question.  Was he in Beijing

24  working on the grant?

25  A.      I do not know.

1   Q.      Do you have any evidence that NASA grant money

2   went to China?

3   A.      I do not.

4   Q.      If nobody explained any of this to Professor

5   Hu -- let's just take a hypothetical -- how would he

6   know that he would be accused or how would he know that

7   he would be considered a Chinese company?

8           MR. ARROWOOD:  Objection, Your Honor, calls for

9   speculation.

10:30AM  10          THE COURT:  I'll sustain that objection.

11  BY MR. LOMONACO:

12  Q.      Did anybody ever explain that to him?

13  A.      I believe so, yes, sir.

14  Q.      Who?

15  A.      I believe Dr. Yoseph Bar-Cohen explained it to

16  him during an initial application to NASA in early 2016

17  that was not funded.

18  Q.      Okay.  So Dr. Bar-Cohen was presented with a

19  letter by Professor Hu from a professor in China --

10:30AM  20  A.      Correct.

21  Q.      -- that said, "I'd like to collaborate with you

22  on your grant" --

23  A.      Correct.

24  Q.      -- right?

25          So obviously Professor Hu wasn't trying to hide

1    that collaboration with NASA; correct?

2    A.        Not initially, no, sir, he was not.

3    Q.        In fact, the letter said, "Dear

4    Mr. Bar-Cohen" -- or something to that effect -- "I have

5    had a long-term collaboration with Professor Hu.  We

6    have worked together before."

7    A.        Correct.

8    Q.        Right?

9    A.        Something to that effect.

10:30AM  10    Q.        Something to that effect?

11    A.        Yes, sir.

12    Q.        And Professor -- or Mr. Bar-Cohen, who was in

13    charge of the NASA grant or the NASA --

14    A.        They're worded at the Jet Propulsion

15    Laboratory.

16    Q.        Yeah, Jet Propulsion.  He said, "Oh, Anming, we

17    can't use him."  Right?

18    A.        Correct.  I believe that he said that we cannot

19    use a Chinese university or professor from a Chinese

10:31AM  20    university.

21    Q.        Okay.  And so after being fully advised that

22    Professor Hu was collaborating and has collaborated with

23    this person in China, Mr. Bar-Cohen didn't say, "Oh, you

24    can't be involved in this."

25    A.        No, I think if Dr. Hu had at that time told

1   Dr. Bar-Cohen he was a professor at the Beijing

2   University of Technology, Dr. Bar-Cohen would have at

3   that time said, "We cannot participate in that."

4   Q.      Do you think so?

5   A.      Yes.

6   Q.      Did you talk to him about that?

7   A.      Yes, sir.

8   Q.      Did you school him and instruct him that that

9   was the rule?

10:31AM  10   A.      No, sir, not at all.

11   Q.      So he knew that all ahead of time; right?

12   A.      Yes, sir.

13   Q.      So he didn't say anything to Professor Hu at

14   the time?

15   A.      He did.  He said that a Chinese university

16   cannot or a Chinese professor cannot be a part of this.

17   Q.      Now, let's talk about what kind of job he had

18   over there in China; okay?

19   A.      Okay.

10:32AM  20   Q.      Do you know what a chair professor is?

21   A.      I don't know exactly what a chair professor is.

22   Q.      So you don't know what kind of job he had over

23   there?

24   A.      Based on the email exchanges, we understand

25   that he advised students.  He at least taught one class.

1    He had a lab that he managed.  Those are the type of

2    things that we believe he was doing.

3            THE WITNESS:  Your Honor, can I grab another

4    thing of water?

5            THE COURT:  Yes.  Can someone bring it up to

6    him?

7    BY MR. LOMONACO:

8    Q.        The NASA restriction was explained or addressed

9    in a NASA assurance letter; correct?

10:33AM 10    A.        The University of Tennessee decided to

11   create -- yes, sir, they had their own assurance letter

12   to provide to NASA that they were in compliance with the

13   policy.

14   Q.        So it was their idea to create the letter?

15   A.        I believe so, yes, sir.

16   Q.        NASA didn't require an assurance letter?

17   A.        No, sir.  We just require that you follow the

18   terms and conditions that are laid forth in the contract

19   or grant.

10:34AM 20   Q.        And are you --

21            MR. LOMONACO:  Can you put up the assurance

22   letter?

23   BY MR. LOMONACO:

24   Q.        While he's pulling that up, let me ask you:

25   You talked about -- you put in a lot of exhibits

1  yesterday.

2  A.        Yes, sir.

3  Q.        You showed a joint proposal for China and

4  Japan, a proposal.  Do you remember that, 3-F?

5  A.        I do, yes, sir.  I recall that.  It will be

6  helpful to see it, but I do recall the joint

7  Chinese-Japanese proposal.

8  Q.        Yeah.

9  A.        I believe it was an email chain discussing

10  potentially putting one in together.

11  Q.        That's not illegal; correct?  It's not against

12  the law?

13  A.        No, sir, I don't believe that's against the

14  law.

15  Q.        You showed one that talked about fundamental

16  research.  Do you know what fundamental research is?

17  A.        Fundamental research?

18  Q.        Yeah.

19  A.        As opposed to just research?  I assume that

20  would be, like, new or -- new research that hasn't come

21  out yet.

22  Q.        Okay.  You're not familiar with the technical

23  term "fundamental research" in the science community

24  then; right?

25  A.        No, sir.

1  Q.        What about specially-appointed chair professor;

2  do you know what that is?

3  A.        I don't know specifically at the Beijing

4  University what that -- what that eludes to, no, sir.

5  Q.        Do you know whether Beijing University

6  considers that a regular teaching job?

7  A.        I do not.

8  Q.        But yesterday you said he was a

9  specially-appointed chair professor.

10:36AM  10  A.        Yes, sir, that was his title that he gave.

11  Q.        But you don't know what that means?

12  A.        I would assume it's some type of professorship

13  at the university.

14  Q.        And I think in the -- another term you pointed

15  out, short-term special-hired professor at BJUT.

16  A.        Yes, sir.  I think that corresponded to the

17  contracts that we talked about earlier this morning,

18  short-term.

19  Q.        Do you know what having a chair means?

10:36AM  20  A.        When I hear the word "chair," I would think of

21  someone who is in charge of something.

22  Q.        Okay.  That's just your opinion or --

23  A.        That would be my opinion, yes, sir.

24  Q.        Okay.  We've got the assurance letter on the

25  screen here.

1    A.        Yes, sir, I see it.

2              THE COURT:  Is this -- just so the record is

3    clear, is this a defendant's exhibit?

4              THE WITNESS:  It does appear that way, yeah.

5    We have a similar exhibit.

6              MR. LOMONACO:  Yes, Your Honor.

7              THE COURT:  What's the number?

8              MR. LOMONACO:  137.  If we can move that

9    into --

10             THE COURT:  Without objection, so admitted.

11             MR. LOMONACO:  Thank you, Your Honor.

12             Let's go down to the bottom of that page.

13   BY MR. LOMONACO:

14   Q.        Are you familiar with this document?

15   A.        Yes, sir, I've seen this document.

16   Q.        So this says, "This letter of assurance is

17   predicated on the understanding that the NASA Class

18   Deviation (implementing NASA Restrictions on Funding

19   Activities with the People's Republic of China) does not

20   apply to the participation of students, faculty, and

21   staff from non-Chinese entities engaged in fundamental

22   research with a meaning consistent with National

23   Security Decision Directive 189.  Such fundamental

24   research does not raise national security or economic

25   security concerns."

1    Do you see that term "fundamental research"?

2  A.    Yes, sir, I do.

3  Q.    Does that change your knowledge or

4  understanding of what that means?

5  A.    No, sir.  Once again, when I read that, I

6  just -- I think the research that's being done by those

7  students and faculty and staff.

8  Q.    And who is supposed to sign this?

9  A.    The proposing institution and the authorizing

10  official.

11  Q.    So does Professor Hu have to sign that?

12  A.    No, I believe this is an assurance from the

13  university itself that they are in compliance with the

14  restrictions.

15  Q.    So during this grant process here, are you

16  aware that Professor Hu's outside interests, conflict of

17  interest form, the one we're talking about, was never

18  reviewed by University of Tennessee to see if he even

19  answered the question?

20  A.    I believe I was made aware of that, yes, sir.

21  Q.    So you're saying that had he disclosed his

22  part-time summer employment on that form, he wouldn't

23  have gotten the grant?  How would he have not gotten a

24  grant if they had never reviewed it anyway?

25  A.    I would assume that if he was -- he would have

1  reviewed the terms and conditions of the grants, and

2  knowing that he was in violation of that, he wouldn't

3  have put in for it to start with.

4         I believe their statements were that they

5  relied on the professor who was putting in the proposal

6  that they were in terms and -- in compliance with the

7  terms and conditions.  They relied on the honesty of

8  the --

9  Q.     Let's back up a little bit --

10  A.     Yes, sir.

11  Q.     -- and see what he was supposed to be in

12  compliance with.

13         MR. LOMONACO:  Go up into the middle of the

14  body of the page.

15  BY MR. LOMONACO:

16  Q.     So he was asked to assure that NASA is

17  restricted from using funds appropriated in the Act to

18  enter into or fund any grant or cooperative agreement of

19  any kind to participate, collaborate, or coordinate

20  bilaterally with China or any Chinese-owned company at

21  the prime recipient level or at any subsequent levels,

22  whether bilateral involvement is funded or performed

23  under the no-exchange fund agreement.  "Definition:

24  China or Chinese-owned company means the People's

25  Republic of China, any company owned by the People's

1  Republic of China, or any company incorporated under the

2  laws of the People's Republic of China"?

3  A.      Yes, sir.

4  Q.      So he was supposed to understand by reading

5  that that he was either China or a Chinese-owned

6  company, and that he couldn't assure NASA because he was

7  China based on his understanding of this document?

8          MR. ARROWOOD:  Objection, Your Honor, calls for

9  speculation.

10:41AM 10          MR. LOMONACO:  May I have one moment, Your

11  Honor?

12          I'll withdraw the question again.  I'm sorry.

13          THE COURT:  Thank you.  Yes, you can.

14          While you're doing that, I believe that this

15  document is actually 137-A and there is a different 137.

16  So I just want to make the record clear.

17          MR. PARSONS:  That's correct.

18          THE COURT:  So we're admitting 137-A.

19          MR. LOMONACO:  Thank you, Your Honor.

10:41AM 20          (Defendant's Exhibit 137-A was marked and

21           received into evidence.)

22  BY MR. LOMONACO:

23  Q.      Mr. Gibson --

24  A.      Yes, sir.

25  Q.      -- I think you introduced the guidance

1    derivative that NASA put out 2011.

2    A.        The Grant Information Circular, I believe, is

3    from 2012.

4    Q.        Yes, yes.  I'm sorry.  The Grant Information

5    Circular.  There actually were two of them; right?

6    A.        I'm sorry?  What's that?

7    Q.        Actually, there were two of them.

8    A.        There is a number of Grant Information

9    Circulars that come out, yes, sir.

10:43AM  10    Q.        All right.  And you put out which one

11    dated -- which one was the date?

12              Okay.  So you put out the second one.

13    A.        September 26th, 2012.

14    Q.        There was one previous to that, a few months

15    before that; do you recall?

16    A.        I do not recall that one, no, sir.  Typically

17    the -- this one being 12-O1a, I believe that when the

18    new one comes out, the old one is taken down.

19    Q.        When this case first started and we got

10:43AM  20    involved, there were two of them up there.

21    A.        Okay.

22    Q.        I think the February and the September one.

23    A.        Okay.

24    Q.        Now they're both off the internet.  Do you know

25    why?

1    A.        Yes, sir.   Once -- so Grant Information

2    Circulars are temporary until they are incorporated into

3    the annual Grant and Cooperative Agreement Manual each

4    year.

5    Q.        Okay.

6    A.        The Grant Information Circulars come out during

7    the year when there is new things that come out and then

8    are incorporated into the larger document, which is the

9    GCAM.

10:44AM   10   Q.        Have you produced that GCAM?

11   A.        I don't believe so.

12   Q.        So you've produced a Grant Information Circular

13   that is no longer considered to be the most

14   authoritative information?

15   A.        There is a GCAM that comes out every year.   So

16   there is a 2020 version that's out there, I'm sure.

17   Q.        But this is from --

18   A.        This is the original Grant Information Circular

19   that provided this guidance to grant officers.

10:44AM   20   Q.        Why did you pick a guidance circular from 2012

21   when there is supposed to be one every year?

22   A.        So the circular only comes out when there is

23   new deviations, and so this was the original message

24   from NASA.   And it's still used.   If you look at a

25   number of universities' websites, that's the one that's

1   typically annotated.

2   Q.        There is a more authoritative document?

3   A.        So when a new -- so for grants that are awarded

4   today, they will use the Grant Cooperative Agreement

5   Manual for 2020.  There is a new one that comes out each

6   year.

7   Q.        Okay.  So there would have been one for 2016;

8   2018, too?

9   A.        Yes, sir, there are.  And they all contain the

10  funding restriction.

11  Q.        Do you have a copy of that with you?

12  A.        No, sir, I do not.

13            THE COURT:  We've got a request for a break.

14  So we'll go ahead and take our mid-morning break at this

15  time.

16            MR. LOMONACO:  Thank you, Your Honor.  I'm

17  almost done.

18            THE COURT:  The jury is excused.

19            THE COURTROOM DEPUTY:  All rise.

20            (Jurors excused from the courtroom.)

21            THE COURTROOM DEPUTY:  This honorable court

22  stands in recess until 11 o'clock.

23            (A brief recess was taken.)

24            THE COURTROOM DEPUTY:  All rise.

25            THE COURT:  We'll bring our jury back in.

1       (Whereupon the following report of

2        proceedings was had within the presence

3        and hearing of the jury:)

4       THE COURT:  All right.  Thank you.  Everyone

5  may be seated.

6       Mr. Lomonaco, you may continue.

7       MR. LOMONACO:  Thank you, Your Honor.

8  BY MR. LOMONACO:

9  Q.     Mr. Gibson, I think you indicated in one way or

11:05AM 10 another that you were brought into this investigation

11 sort of toward the end or at the latter -- you were one

12 of the last ones to be brought into the investigation.

13 A.     I believe I was brought in after they

14 determined that there was some NASA interest, yes, sir.

15 Q.     Yes.

16 A.     I believe it was still approximately another

17 year or so of investigation before we brought an

18 indictment.

19 Q.     Right.

11:06AM 20       Who was the first one that contacted you?  Was

21 it Laura Slatton?

22 A.     Yes, sir, it was.

23 Q.     And you just said that you were contacted

24 because they thought there was a NASA problem?

25 A.     That they had discovered that Dr. Hu, who was

1    under investigation, had received a NASA contract and a

2    NASA cooperative agreement.

3    Q.        Yes.  So you didn't really have to do any of

4    that initial investigation.  It was pretty much already

5    done for you; correct?

6    A.        Which part, sir?  That finding out that he had

7    those grants and cooperative agreements?

8    Q.        Yeah, you know, digging into all of his emails

9    and seizing his computers and --

11:06AM  10    A.        So the computers were seized during the search

11    warrants which I was a part of, yes, sir.

12    Q.        You were a part of that.  But, I mean, were you

13    a part of it where he went to a symposium in Japan to

14    speak and all of his emails -- or his computer and his

15    telephone was seized in the airport?  Were you involved

16    when that happened?

17    A.        No, sir, I learned about that later.

18    Q.        Okay.  And he was -- excuse me a minute.

19              So when his computer was seized, his cellphone

11:07AM  20    was taken away from him and he had to go to Japan

21    without those, were you -- were you made aware that

22    there was a forensic search done on that?

23    A.        Yes, I believe so.

24    Q.        Through all of your understanding and your

25    research and the research that was already prepared and

1    made available to you by the FBI and the DOE, you found

2    no evidence of him taking secrets to China or anyplace

3    else; right?

4    A.      I don't recall reviewing that computer that was

5    forensically imaged, that particular computer.  I don't

6    believe -- I believe there was NASA work on the

7    computer, yes, sir.

8    Q.      But that's not sensitive material; right?

9    That's not classified information?

11:08AM  10   A.      It's not classified national security

11   information, no, but NASA does require a review by an

12   export control team before any information -- NASA

13   research is released to the public, regardless of if

14   it's classified or not.

15   Q.      Sure.  But you're not saying it was released to

16   the public?

17   A.      No.

18          MR. LOMONACO:  If we could switch to

19   Defendant's Exhibit -- for identification -- 131.  It's

11:09AM  20   on the screen.

21          Your Honor, we've got a stipulation, I believe,

22   on most everything in this case.  I'd like to move that

23   into evidence, please.

24          THE COURT:  Defendant's 131?

25          MR. LOMONACO:  Yes, sir.

1    THE COURT:  Without objection, so admitted.

2    MR. LOMONACO:  Thank you, Your Honor.

3    (Defendant's Exhibit 131 was received into

4    evidence.)

5  BY MR. LOMONACO:

6  Q.    Now, I'm going to be brief because I know it

7  probably -- well, I'll try to move through this, but the

8  NASA restriction here does not prohibit --

9  A.    I'm sorry, sir.  Is this the Appropriations

11:09AM  10  Act?

11  Q.    Yes.

12  A.    Okay.

13  Q.    So, I mean, this is the core language of the

14  NASA restriction; right?

15  A.    They do take -- yes, they take a lot from the

16  Appropriations Act into their own restriction, yes.

17  Q.    Yes.  And the language of collaborating

18  bilaterally with China or Chinese-owned company has

19  never changed?

11:09AM  20  A.    No, sir.

21  Q.    All right.  And it doesn't say that you

22  prohibit employment.  It restricts collaboration

23  as -- and participate and collaborate bilaterally.  So

24  Anming reported a lot of his collaborations, but do we

25  know of any funds from NASA that were sent to BJUT?

1    A.         I do not know that, no, sir.

2    Q.         When Professor Hu had his NASA grant and he was

3    working for NASA, they were satisfied with his work?

4    A.         From what I understand, yes, sir.

5    Q.         Did you see any letters thanking him for doing

6    a good job?

7    A.         I know there was a letter congratulating him on

8    receiving it.  I'm trying to think.  There could have

9    been.  I don't recall right off the hand.

11:10AM  10    Q.         And there were certain milestones that NASA had

11    put in their grant that you'd have to meet --

12    A.         Correct.

13    Q.         -- as you're -- as you're doing your research?

14    A.         Yes, sir, this cooperative agreement required

15    the publication of certain reports at different

16    milestones.

17    Q.         And you probably reviewed those and saw that he

18    met all those milestones.

19    A.         Yes, sir.

11:11AM  20    Q.         And basically NASA got what they bargained for?

21    A.         NASA got what they thought they had bargained

22    for.

23    Q.         Well, they got the research.  Whether he was

24    China or Santa Claus, they still got their research that

25    they bargained for?

1    A.        They got their research, yes, sir.

2    Q.        And they were satisfied with it?

3    A.        The technical reviewer was satisfied with it,

4    yes, sir.

5    Q.        But during this time that he was doing this

6    research and he was working with NASA scientists and

7    he -- he did not have a bilateral collaboration with

8    anybody in China on the grant that you know of, did he?

9    A.        On the grant itself?

11:12AM  10    Q.        Yeah.

11    A.        I think just by the -- the sheer fact that he

12    was a professor at the university, similar to how he's a

13    professor at University of Tennessee, and when NASA

14    enters into a grant with the University of Tennessee and

15    Professor Hu, they believe him to be part of that

16    university.  That would be collaborating with the

17    University of Tennessee.

18    Q.        Okay.  But that's your interpretation --

19    A.        Yes, sir.

11:12AM  20    Q.        -- of what he did.

21    A.        Correct.

22    Q.        What I'm saying is:  The physical stuff that he

23    did, you have no evidence that he took any money to

24    China or had anybody in China working on this grant?

25    A.        Correct.  That's correct.

1  Q.       The grant says that NASA shall not give funds

2  to people that collaborate with China.  So unless your

3  statement is that he himself is China, he didn't

4  collaborate with anybody across the ocean on the NASA

5  grant.

6  A.       I'm not sure.

7           MR. LOMONACO:  Okay.  Thank you, sir.

8           THE COURT:  Thank you.  Redirect examination?

9           MR. ARROWOOD:  Thank you, Your Honor.  I'll be

10 brief.

11                 REDIRECT EXAMINATION

12 BY MR. ARROWOOD:

13 Q.       Special Agent Gibson, do you recall when

14 defense counsel was asking you about the defendant's

15 contracts with the Beijing University of Technology?

16 A.       Yes, sir.

17 Q.       Do you recall that he suggested that -- or he

18 asked you, I believe, whether or not there was any

19 evidence indicating that the defendant had done work for

20 Beijing University of Technology after 2018?

21 A.       Correct.

22 Q.       I'd like to show you what's been previously

23 admitted as Government's Exhibit 7-N.  We looked at this

24 document yesterday.

25           MR. LOMONACO:  Your Honor, I would object.  I

11:13AM (lines 10, 20)

1  didn't ask him about any work he did after the contract.

2  I think this is going into --

3          THE COURT REPORTER:  Counsel, can you please

4  speak into the microphone.

5          MR. LOMONACO:  I don't think it's responsive to

6  my cross-examination, Your Honor.

7          THE COURT:  What's your response -- quickly --

8  Mr. Arrowood?

9          MR. ARROWOOD:  Your Honor, during -- as I

11:14AM 10  recall, during cross-examination, he was asking the

11  witness about signed contracts and indicating that after

12  the 2016 contract -- which had a term of execution

13  through 2018 -- was signed, that there was no additional

14  work -- that there was no evidence of any additional

15  work that the defendant did for Beijing University of

16  Technology after that first contract was signed, Your

17  Honor.

18          THE COURT:  I'll allow the question.  Overrule

19  the objection.

11:14AM 20          MR. ARROWOOD:  All right.  Thank you.

21  BY MR. ARROWOOD:

22  Q.      Again, this is Government's Exhibit 7-N.  Will

23  you please again read the top right-hand side.

24  A.      "Anming Hu, Beijing University of Technology in

25  Beijing, China."

1   Q.        What's the date of this invoice?

2   A.        8 January 2019.

3   Q.        Thank you.

4             I'd like to show you what's previously admitted

5   as Government's Exhibit 7-R.

6             Do you recall us talking about this document

7   yesterday?

8   A.        Yes.

9   Q.        Please take a look at the -- I believe it's the

11:15AM 10  top left-hand corner of this document.  What is the date

11  indicated on this document?

12  A.        February of 2019.

13            MR. ARROWOOD:  Can you scroll down just a

14  little bit, please.

15  BY MR. ARROWOOD:

16  Q.        And there is the defendant listed as coauthor

17  on this document?

18  A.        He is, yes.

19  Q.        Are his affiliations indicated?

11:15AM 20  A.        They are, through 1 and 3.

21  Q.        What's associated with the number 1?

22  A.        The College of Material Science and

23  Engineering, Beijing University of Technology.

24  Q.        Okay.  I'd like to show you Government's

25  Exhibit 5-B.

1    Do you recognize this document?

2   A.    I do.

3   Q.    There at the -- just a little way down in the

4   middle, it has some dates.  Will you please read those

5   dates to the jury.

6   A.    Yes.  It was submitted July 3rd, 2019; accepted

7   August 3rd, 2019; published online August 21st, 2019.

8         MR. ARROWOOD:  Scroll to page 2, please.

9         Stop right there.

11:16AM  10   BY MR. ARROWOOD:

11   Q.    Is the defendant listed as a coauthor on this

12   document?

13   A.    Yes, he is.

14   Q.    Are his affiliations indicated?

15   A.    They are, through 2, 4 and a).

16   Q.    Please read what is associated with the number

17   4.

18   A.    "The Institute of Solid Microstructure, Beijing

19   University of Technology, Beijing, China."

11:16AM  20   Q.    I'd now like to show you what's been

21   conditionally admitted already as Government's

22   Exhibit 11-F.

23         Do you recognize this document from yesterday?

24   A.    I do, yes.  It's the translation of a WeChat

25   video.

1    Q.        Again, will you please just read to yourself

2    that first message from the participant identified as

3    Junjun.

4    A.        Okay.

5    Q.        Would you describe for the jury what the

6    contents of that message are.

7    A.        It indicates that Professor Hu is a lecturer

8    for a class.

9    Q.        What's the name of the class?

11:17AM  10    A.        Front Line of Laser Manufacturing.

11    Q.        What's the date on this message?

12    A.        October 10th, 2019.

13    Q.        Thank you.

14              I'd like to show you what's been previously

15    conditionally admitted as Government's Exhibit 11-J.

16              Do you recognize this document from yesterday?

17    A.        I do.  It's another translated document.

18    Q.        What is the title of this document?

19    A.        Super-fast laser micro- and nano-processing

11:17AM  20    laboratory, Instrument budget, June 5th, 2019.

21    Q.        Thank you.

22              I'd like to show you what's been previously

23    conditionally admitted as Government's Exhibit 11-G.

24              MR. ARROWOOD:  Please scroll down to the

25    message that occurred -- I believe it was October 28th

1  of 2019.  First one.

2  BY THE WITNESS:

3  A.        Okay.

4  BY MR. ARROWOOD:

5  Q.        Please read the first message from the

6  participant identified by the name Chen.

7  A.        "Hi, Professor Hu.  An email regarding the

8  issues with the femtosecond laser laboratory (Science

9  Building A118) has been sent to you.  Please respond by

11:18AM  10  Thursday (October 31st).  Thank you."

11  Q.        What is the date indicated on this message?

12  A.        October 28th, 2019.

13  Q.        Thank you.

14          Now, during the cross-examination, defense

15  counsel asked you about a NASA cooperative agreement

16  that was awarded in or about the fall of 2018; do you

17  recall that?

18  A.        I do.

19  Q.        And the defense counsel asked you about your

11:18AM  20  interactions with the university with another agent

21  involved in the case.

22  A.        Correct.

23  Q.        Do you recall -- would you state again for the

24  jury what your advice was to the university at that time

25  with respect to that particular contract?

A.        I told them to proceed as normally, as they

normally would.

Q.        So when, if ever, did you tell the defendant

that he was allowed to withhold his employment at the

Beijing University of Technology from the University of

Tennessee?

A.        I did not tell him that.

Q.        And when, if ever, did you tell the defendant

that he was permitted to withhold his employment from

the Beijing University of Technology from NASA?

A.        I did not tell him that.

          MR. ARROWOOD:  Nothing further, Your Honor.

          THE COURT:  Thank you.

          Recross?

          MR. LOMONACO:  Yes, Your Honor, just briefly on

those little exhibits that we saw.

                    RECROSS-EXAMINATION

BY MR. LOMONACO:

Q.        Mr. Gibson --

A.        Yes, sir.

Q.        -- an invoice that we just saw a few minutes

ago is not evidence of a contract, is it?

A.        No, sir.

Q.        Documents that we saw do not show that there

was a contract --

1    A.        Not a contract.

2    Q.        -- during that time?

3            And even where Professor Hu got emails from

4    Beijing University saying, hey, you need to try to grade

5    these classes, sounds like he wasn't doing what he was

6    supposed to be doing, was he?

7    A.        No.  It sounds like he had not at that time,

8    yes, sir.

9    Q.        Yeah.  And you don't have to have a contract to

11:20AM 10  do that.  You could do it voluntarily; right?

11   A.        Do what?  I'm sorry.

12   Q.        He could grade the classes voluntarily without

13   having a contract if they asked him to do it?

14   A.        I'm sure he could.

15   Q.        Okay.  So do you know the last time that

16   Professor Hu went to China?

17   A.        I do not, no, sir.

18   Q.        That would maybe make a difference on whether

19   he was having an employment with China; correct?

11:21AM 20  A.        Not necessarily, no, sir.

21   Q.        So if he's got a laboratory in China, he

22   can -- he can't use that without being there, can he?

23   A.        It seemed like in the emails he was attempting

24   to manage it remotely.

25   Q.        If he had a laboratory in China, he couldn't

1    use it unless he was there, could he?

2    A.        I don't believe he could personally use it, no,

3    sir.

4    Q.        So, really, you don't have anything saying that

5    the contract was renewed; you just have some things that

6    he did for Beijing University after December of 2018?

7    A.        We have a number -- yes, sir, a number of

8    things.

9             MR. LOMONACO:  Thank you.

11:21AM  10         THE COURT:  All right.  Thank you.  This

11    witness may be excused.

12             MR. LOMONACO:  Yes, Your Honor.

13             MR. ARROWOOD:  Your Honor, may this witness be

14    allowed to remain in the courtroom?

15             THE COURT:  Any objection?  We're excusing the

16    witness.

17             MR. LOMONACO:  May he be able to leave; is that

18    what you're saying?

19             THE COURT:  If we're excusing him as a witness,

11:22AM  20    then he can remain in the courtroom.

21             MR. LOMONACO:  As long as he's not going to

22    testify again, Your Honor.

23             THE COURT:  Thank you.

24             The government may call its next witness.

25             MR. MC KENZIE:  Your Honor, the government

1  calls Dr. John Zomchick.

2          (The witness was thereupon duly sworn.)

3          THE COURTROOM DEPUTY:  If you will scoot in

4  close.

5          Will you state and spell your name for the

6  record.

7          THE WITNESS:  My name is John Zomchick,

8  Z-o-m-c-h-i-c-k.

9          THE COURTROOM DEPUTY:  Thank you, sir.

11:23AM 10          MR. MC KENZIE:  Your Honor, may I inquire?

11          THE COURT:  Yes, go ahead.

12                  **JOHN ZOMCHICK**,

13  having been first duly sworn, was examined and testified

14  as follows:

15                  DIRECT EXAMINATION

16  BY MR. MCKENZIE:

17  Q.      Dr. Zomchick, by whom are you employed?

18  A.      University of Tennessee.

19  Q.      How long have you worked for the University of

11:23AM 20  Tennessee?

21  A.      36 years.

22  Q.      What is your current title?

23  A.      Provost and senior vice-chancellor.

24  Q.      How long have you been the provost and senior

25  vice-chancellor?

1   A.          Approximately one year.

2   Q.          Will you please explain to the jury what your

3   duties and responsibilities are as the provost and

4   senior vice-chancellor.

5   A.          The provost is the chief academics officer of

6   the university.  As the chief academics officer, the

7   provost has oversight over everything that's related to

8   the university's mission with regard to the instruction

9   of students, with the oversight of academic programs,

10  and with the searching, hiring, evaluating, promoting

11  and tenuring of faculty.

12  Q.          I'd like to review your career a bit at the

13  University of Tennessee.

14              Directing your attention to in or about 1985,

15  what was your first position with the University of

16  Tennessee?

17  A.          At that time, I was hired as an assistant

18  professor in the Department of English.

19  Q.          Directing your attention now to in or about

20  1991.  At that time, did you receive a new position?

21  A.          I did.  In 1991, I was tenured and promoted to

22  associate professor.

23  Q.          And then in about year 2000, did you receive a

24  new position at the University of Tennessee?

25  A.          I did.  At that time, I served as interim

1  associate dean for academic programs in the College of

2  Arts and Sciences.

3  Q.      I'd like to direct your attention now to

4  about -- in or about 2002.  Did you receive a new

5  position at the University of Tennessee at that time?

6  A.      Yes, sir.  I was appointed head of the

7  department of English.

8  Q.      Then in or about 2007, did you receive another

9  new position at the University of Tennessee?

11:25AM  10  A.      Yes, sir.  In 2007, I was appointed associate

11  dean for academic personnel in the College of Arts and

12  Sciences.

13  Q.      What were some of your duties and

14  responsibilities at your -- at that time?

15  A.      As associate of academics personnel in the

16  College of Arts and Sciences, I was assigned oversight

17  over all processes relating to faculty.  That would

18  include things like searching for faculty, evaluating

19  faculty, meeting with faculty at times to resolve

11:25AM  20  disputes, weighing in on tenure and promotion processes,

21  those sorts of things.

22  Q.      Directing your attention now to in or about

23  2012.  Did you receive a new position at the University

24  of Tennessee during that year?

25  A.      Yes, sir.  I was appointed vice-provost for

1   faculty affairs.

2   Q.      Please explain to the jury what

3   faculties -- faculty affairs refers to.

4   A.      Faculty affairs is all the aspects of the

5   university that have to do with faculty, and that

6   includes, again, things like searching for new faculty.

7   It includes evaluating faculty on an annual basis.  It

8   includes making sure that all processes related to

9   faculty are followed according to the processes laid out

11:26AM 10  in the university policies and the Faculty Handbook.

11  Basically anything that touches faculty can come before

12  the vice-provost for faculty affairs.

13  Q.      You mentioned policies.  As your position as a

14  vice-provost for faculty affairs, were you involved in

15  developing or reviewing policies that related to faculty

16  at the University of Tennessee?

17  A.      Yes, sir.

18  Q.      Did that include a conflict of interest policy?

19  A.      Yes, sir.

11:27AM 20  Q.      What, if any -- this is in 2012 while you were

21  the vice-provost of faculty affairs.  What, if any,

22  involvement did you have with the conflict of interest

23  policy at the University of Tennessee at the time?

24  A.      During that time -- I can't remember exactly

25  when it began, but during that time, I served on a

conflict of interest review committee. And so we would

receive documents, conflict of interest documents, that

needed further review; that indicated, for example, that

there could be a potential conflict of interest and

might require something like a management plan in order

to protect the university from untoward effects of

conflict of interest. Also reviewed the policy from

time to time. Those sorts of things.

Q.        During your experience of reviewing the

University of Tennessee's policy and also serving on

that review board, did you become familiar with the

University of Tennessee's conflict of interest policy?

A.        Yes, sir.

Q.        I'd like to draw your attention now to in or

about 2016. Did you receive a new position at the

University of Tennessee at that time?

A.        Yes, sir, I did. At that time, I was appointed

interim provost and senior vice-chancellor.

Q.        Please explain to the jury what "interim"

means.

A.        Interim means that the provost who was serving

had retired, and so before -- at the University of

Tennessee, we always search for positions before we

appoint people to those positions. And so at that time

before a search could be done, we needed -- the

1    university needed a provost.  And so I held the

2    interim -- a sort of in-between or interim position

3    until a search for a new provost could be run.

4    Q.      Is that an interim version of the position that

5    you now hold?

6    A.      Yes, exactly.

7    Q.      So directing your attention now to 2016 while

8    you were in that interim role.  Will you please explain

9    to the jury what your duties and responsibilities were.

11:29AM 10    A.      So, my duties and responsibilities were exactly

11    the same as they are now.  I had oversight of the

12    university's academic mission and academics programs,

13    including all of the -- all of the processes related to

14    faculty.

15    Q.      Did that include making hiring or participating

16    in hiring decisions?

17    A.      Yes, sir, it does.  The provost approves of all

18    hiring for faculty.  We issue the appointment letters

19    out of our office and they're signed by the provost.

11:29AM 20    Q.      Does that include participating in tenure

21    decisions?

22    A.      Yes, sir, it does.

23    Q.      During your interim -- during the time you were

24    interim provost and senior vice-chancellor, did you have

25    an opportunity to participate in any policy development?

1  A.      I think so.  I mean, it's -- sometimes it's a

2  little difficult to remember.  I've been in those

3  positions, but policies change from time to time at the

4  university, and we had been -- we periodically do

5  revisions to the Faculty Handbook, for example, that

6  changes -- where policies are changed.

7  Q.      All right.  I'd like to draw your attention now

8  to 2018.  Did you receive a -- a new position with the

9  University of Tennessee at that time?

11:30AM  10  A.      Yes, sir, I did.  There was a search for a

11  provost and a new provost was appointed, and I returned

12  to my former position as vice-provost for faculty

13  affairs.

14  Q.      At that time were your duties and

15  responsibilities the same as what they were previously?

16  A.      As vice-provost of faculties affairs, yes, sir,

17  oversight of all the faculty processes.

18  Q.      I'd like to change topics now.

19          Are you familiar with the University of

11:31AM  20  Tennessee's conflict of interest policy?

21  A.      Yes, sir.

22  Q.      What is the purpose of that policy?  Please

23  explain to the jury what the purpose is.

24  A.      The purpose of the conflict of interest policy

25  is to make sure that all of our employees, not just

1  faculty, but all of our employees reveal every year any

2  potential conflict that they might have that might

3  interfere with doing their job, basically, that might

4  call into question whether or not their loyalties lie, I

5  guess, elsewhere than the university.  I think the

6  purpose is to protect the university and to protect the

7  university's reputation.

8  Q.      And how is the conflict of interest policy

9  communicated to the University of Tennessee employees?

10  A.      Each year in the -- early in the fall, an email

11  goes out to the faculty, and we use other ways -- to all

12  employees, rather, and we use other ways of making them

13  aware that it's their responsibility to complete the

14  conflict of interest form in a timely fashion.

15  Q.      Directing your attention now to in or about

16  2017.  Did there come a time when the University of

17  Tennessee's conflict of interest policy was changed?

18  A.      Yes, I believe that's correct.

19  Q.      What, if any, role did you have in reviewing

20  that policy?

21  A.      So because the conflict of interest policy is

22  very important for our faculty and because we have a lot

23  of faculty, Academic Affairs always reviews any changes

24  to policy.  We look at it carefully.  We try to make

25  sure it's in compliance with the Faculty Handbook.  We

11:32AM (line 10)
11:32AM (line 20)

1  will make recommendations.  If things have to be

2  changed, those kind of things.

3          (Government's Exhibit 2-J was marked for

4           identification.)

5          MR. MC KENZIE:  At this time, I'd like to show

6  the witness what has been previously marked as 2-J.

7  BY MR. MC KENZIE:

8  Q.      Do you recognize what has previously been

9  marked as 2-J?

11:33AM 10  A.      Yes, sir.

11  Q.      What is this?

12  A.      This is our conflict of interest policy.

13  Q.      Are you familiar with this policy?

14  A.      Yes, sir.

15          MR. MC KENZIE:  Your Honor, at this time, I ask

16  that Exhibit 2-J be admitted into evidence.

17          THE COURT:  So admitted.

18          (Government's Exhibit 2-J was received into

19           evidence.)

11:33AM 20          MR. LOMONACO:  Your Honor, may I inquire?

21          They said there was a change in 2017.  Is this

22  the prior or the changed one?

23          (A discussion was had off the record amongst

24           counsel for the parties.)

25

1  BY MR. MC KENZIE:

2  Q.       Will you please read for the jury the paragraph

3  under Objectives.

4  A.       "Objectivity and integrity are essential

5  qualities for employees and others engaged with any

6  organization in carrying out its mission and

7  particularly for those who are engaged in the service of

8  a comprehensive public university like the University of

9  Tennessee (University).  If the university is to carry

10 out its mission in the areas of instruction, research,

11 and public service with unquestioned credibility, the

12 highest standards of objectivity and integrity must be

13 maintained.  The purpose of this policy is to promote

14 those high standards."

15 Q.       Previously you stated that university employees

16 were required to fill out conflict of interest forms.

17 How frequently were they required to fill out these

18 forms?

19 A.       Annually.

20 Q.       What, if any, requirements are there to

21 disclose to the university if there are changes

22 in-between filings?

23 A.       Any -- any substantive change has to be

24 communicated to the university as soon as the change

25 happens.

DIRECT EXAMINATION - JOHN ZOMCHICK

1  Q.      I'd like to direct your attention now to

2  page 7.  And I would ask you to read paragraph e., as in

3  elephant, to the jury.

4  A.      (As read) "Covered individuals involved in

5  research (that is, investigators as defined in Section 1

6  above) must have disclosed outside interests that may be

7  affected by the research before proposals are submitted

8  to funding agencies.  Such covered individuals must keep

9  their disclosures updated for the duration of the

11:36AM  10  project.  Examples of such interests include, but are

11  not limited to, receiving payments for services

12  exceeding $10,000, having equity interest exceeding five

13  percent or $10,000, and holding intellectual property

14  rights."

15  Q.      Is that list of examples that you just read

16  exhaustive?

17  A.      No, sir.

18  Q.      How do you know?

19  A.      By the phrase "but are not limited to".

11:36AM  20  Q.      I'd like to come back to the conflict of

21  interest forms that I asked you about.  What is the

22  purpose of these forms?

23  A.      I think, as I read, the purpose of the form is

24  to, one, allow university employees, including faculty,

25  to declare any outside interests that may fall within

1  the scope of the policy so that the university can be

2  aware, review those interests, and make judgments to the

3  effect of whether or not there is a conflict.

4       If there is a conflict, then we -- we typically

5  convene a committee to look further into the matter to

6  see what further steps are necessary.

7  Q.     I'd like to now shift topics to the hiring and

8  granting of tenure.  How does the University of

9  Tennessee select applicants for research and teaching

11:38AM  10  positions?  Just in general, please explain the process

11  to the jury.

12  A.     So typically we start by forming a committee of

13  experts in the field where we're searching for.  In my

14  case, when I was hired in 1985, it would have been a

15  committee of English faculty members, and then national

16  advertisements are sent out to various places in various

17  public ways.  Applications are invited.

18       Because we are a great institution, we get a

19  lot of applications, sometimes hundreds, which the

11:38AM  20  search committee then reviews, winnows down the pool to

21  a smaller group to take a closer look at, and then comes

22  up with a finalist list.  And we will bring the

23  finalists typically to campus to give presentations and

24  to be interviewed, and from that group of finalists,

25  three to four generally for the searches, we choose the

1  person that we want to hire.

2  Q.       What types of documents are submitted as part

3  of an application for an academic position at UT?

4  A.       So the typical document includes a kind of mini

5  dossier.  It includes a letter of application saying why

6  the person might be interested in the job.

7          It includes -- definitely includes what we call

8  a CV, curriculum vitae, a resume, that tells all about

9  your academic career.  And occasionally from time to

11:39AM  10  time it will include research outputs, like a paper that

11  was published, and it might include letters

12  of -- letters from people who support you, letters of

13  support.

14  Q.       Would you just ballpark for the jury how many

15  applications and resumes you've reviewed during your

16  time with the University of Tennessee.

17  A.       Oh, thousands.  I would say thousands would

18  probably be accurate over the course of 36 years.

19  Q.       You mentioned the term "CV" or "resume".  What

11:40AM  20  type of information is expected on a resume that's

21  submitted for an academic position at the University of

22  Tennessee?

23  A.       So a complete accounting of all

24  academically-related activities, starting with your

25  degrees, where you got your degrees, continuing with an

account of your academic activity, where you worked,

where you visited, if you were a visiting faculty

member.

Many of our faculty members are visitors before

they come to us.  Some of them hold what are called

postdoctoral positions, places where they have worked

after they received their Ph.D., papers that they have

given, talks that they have given.  Anything that has

any connection to academic activity we expect to see and

11:41AM  is typically included in a CV.

Q.      What about honorary positions?

A.      Uh-huh, yes.

Q.      Summer teaching positions?

A.      Yes.

Q.      How is that expectation that there be a full

accounting communicated to an applicant; how do people

know?

A.      I think it's commonly expected.  When we send

out the -- the application materials, the call for

11:41AM  applications, we simply say submit a CV.  But it comes

under the kind of heading of common practice.  Everyone

that I know, myself included, includes all of our

academic activities.

Q.      Are you familiar with the term "tenure"?

A.      Yes, sir.

1  Q.        And in broad strokes, please explain to the

2  jury what tenure is.

3  A.        Tenure is -- tenure is something that is earned

4  after a faculty member serves a probationary period at

5  an institute of higher learning.  University of

6  Tennessee, our probationary period is for six years.

7  Faculty member serves for six years teaching, doing

8  their research and service.

9          At the beginning of the sixth year, the faculty

10  member puts together a dossier, a complete account of

11  all his or her activities for those last six years, and

12  submits it to the department.  The department meets,

13  reviews it, makes a recommendation for the department

14  head.

15          The department head makes a recommendation to

16  the college.  There is a college committee that reviews

17  it.  The college committee makes a recommendation to the

18  dean.  And then it comes to the Office of the Provost.

19  The -- the Office of the Provost reviews it.  If the

20  Office of the Provost approves, it's sent to the

21  chancellor of the university.

22          The chancellor has the final say, and if the

23  chancellor approves, that person is granted tenure,

24  which means that that person has a right to continuing

25  employment with the university unless he or she is

11:42AM (line 10)

11:43AM (line 20)

1    terminated for cause.

2    Q.        During your career with the University of

3    Tennessee, have you reviewed these tenure dossiers?

4    A.        Yes, sir.

5    Q.        Have you participated in decisions as to

6    whether or not UT employees would be granted tenure?

7    A.        Yes, sir, at all levels.

8    Q.        Would you ballpark for the jury approximately

9    how many of these decisions you've been a part of.

11:43AM  10  A.        I would say, again, probably thousands over the

11   course of my career.  36 is a long time.  Probably

12   thousands.

13   Q.        Are you familiar with a University of Tennessee

14   employee by the name of Anming Hu?

15   A.        Yes, sir.

16   Q.        Were you involved in reviewing any tenure

17   documents prepared by him?

18   A.        Yes, sir.

19   Q.        First I'd like to show you Exhibit 2-A.

11:44AM  20            Do you recognize this document?

21   A.        Yes, sir.

22   Q.        Could you just read the date on the top left.

23   A.        November 13th, 2013.

24   Q.        Did you author this letter?

25   A.        This is a template letter that my office would

1    have filled in the details; so, yes.

2              MR. MC KENZIE:  So I'm going to ask that this

3    be moved into -- or admitted into evidence.

4              THE COURT:  2-A, so admitted.

5    BY MR. MC KENZIE:

6    Q.       Could you just explain to the jury, just in

7    general, what this letter represents.

8    A.       This letter is an appointment letter that

9    establishes an appointment for -- in this case, Dr. Hu.

10   It gives the terms of his employment.  He's a 12-month

11   employee.  It gives the department that he is employed

12   in and it gives the conditions of the employment,

13   including the date that he would stand for tenure at the

14   end of that probationary period that I described just a

15   moment ago.

16   Q.       Were you involved in the hiring or decision to

17   hire Anming Hu while you were vice-provost?

18   A.       So I gave final approval to the hiring.

19   Q.       I'm going to show you now Exhibit 2-B for

20   identification first.

21            Do you recognize this document?

22   A.       Yes, sir.

23   Q.       In general, what type of document is this?

24   A.       This is a curriculum vitae.

25   Q.       Was this a CV that you reviewed as part of that

1  hiring decision in 2013?

2  A.        We do require -- I don't recall if I -- if I

3  reviewed exactly this CV, but we do require for all

4  hiring a CV before we sign off.

5           MR. MC KENZIE:  Pursuant to an earlier

6  stipulation, I ask that 2-B be admitted into evidence.

7           THE COURT:  It might already be in, but --

8           MR. MC KENZIE:  All right.  That will admit it.

9           THE COURT:  It is admitted.

11:46AM 10           MR. MC KENZIE:  All right.  Could you please

11  scroll down to the heading Employment and Professional

12  Experience.

13           Give the witness an opportunity to read this

14  first heading on the -- or first entry on the first

15  page, and then please scroll down so he can read the

16  second page.

17           Please keep scrolling down.  Please keep

18  scrolling down.  Please keep scrolling down.

19  BY MR. MC KENZIE:

11:47AM 20  Q.        Was there any mention on this CV of current

21  employment at the Beijing University of Technology?

22  A.        No, sir, not that I noticed.

23  Q.        For this resume submitted as part of a hiring

24  package, what types of -- would you expect to see

25  current employment at another university listed on this

1    CV?

2    A.        Yes, sir.

3    Q.        Would that include honorary positions?

4    A.        Yes, sir.

5    Q.        Would that include summer positions?

6    A.        Yes, sir.

7    Q.        Why is that important?

8    A.        It's important for us for a number of reasons.

9    One, again, when we hire someone, we expect full

11:48AM 10   disclosure of all of their academic activities.

11             The -- the other issue is that from time to

12   time we will reach out and do what we call off-list

13   reference checks, if we think that that's appropriate,

14   and we would expect to have listed on the CV all

15   affiliations, honorary or otherwise, that a faculty

16   member might have.

17             And, finally, in our Faculty Handbook, we have

18   a policy that states that a University of Tennessee

19   faculty member is expected to give 100 percent of his or

11:49AM 20   her effort to the university.  Anything less than a

21   hundred percent of that effort we consider -- we call a

22   conflict of commitment.  And it's something that we seek

23   to avoid and sort of instruct our faculty that because

24   we expect a hundred percent of their effort, we have a

25   right, I think, to understand what other kinds of

1    activities they're engaging in outside the university.

2    Q.        I'd like to direct your attention now to what

3    is in evidence as 2-C.  Do you recognize the first page

4    of this document?

5    A.        Sorry.  I have to look at the screen.  Yes,

6    sir.

7    Q.        Is this the dossier that you mentioned earlier

8    regarding tenure?

9    A.        Yes, sir.

11:50AM  10  Q.        I'd like to direct your attention to page A-6,

11   which I'm using the numbering system used on the

12   document itself.

13            Can we scroll down to the heading Employment

14   History.  I'd like you just to review that employment

15   history and look up at me after you've had an

16   opportunity to read it.

17            What, if any, disclosures regarding employment

18   at the Beijing University of Technology appear on this

19   page?

11:50AM  20  A.        None.

21   Q.        If at the time this document was submitted the

22   defendant did hold employment at the Beijing University

23   of Technology, would you have expected to see it in this

24   section of employment history?

25   A.        Yes, sir.

1  Q.      Why is that?

2  A.      Because without it, the record would be

3  incomplete.

4  Q.      I'd like to turn your attention now to page

5  B-7, and I'd like to draw your attention to the section

6  that says Visiting Ph.D. Students.  Could you just

7  explain to the jury what a visiting Ph.D. student is.

8  A.      A visiting Ph.D. student is someone who comes

9  from another university, who is enrolled as a student in

11:51AM 10  another university in order to work with a faculty

11  member on our -- on our campus.

12  Q.      You said a faculty member on your campus.  Are

13  you referring to University of Tennessee employees?

14  A.      Yes, sir.

15  Q.      And who pays for those visiting Ph.D. students

16  to come and study and work at the University of

17  Tennessee?

18  A.      It depends, I think.  Sometimes -- sometimes

19  the faculty member, if the faculty member has grants,

11:52AM 20  can pay for those students, and sometimes the students

21  are paid -- are paid by their home institution.

22  Q.      Is it common for University of Tennessee

23  employees to work with visiting Ph.D. students from

24  other schools?

25  A.      Yes, sir, especially in the STEM, the science

1  technology, engineering, and math disciplines.

2  Q.        When a University of Tennessee employee is

3  supervising a visiting Ph.D. student, who is -- who is

4  considered the -- the researcher's employer during that

5  time?

6  A.        Could you -- could you ask that again.

7  Q.        Yeah, that's a little bit confusing.  I'm

8  sorry.

9         So while a researcher, a UTK -- or excuse me --

11:53AM 10  a University of Tennessee researcher is hosting a

11  visiting Ph.D. student, who is that researcher's

12  employer?

13  A.        Oh, the University of Tennessee.

14  Q.        By hosting a visiting Ph.D. student from

15  another university, does that mean that the University

16  of Tennessee employee somehow works for the visiting

17  Ph.D. student's home university?

18  A.        No, sir, not at all.

19         MR. MC KENZIE:  Could we scroll down the page a

11:53AM 20  little bit to Postdoctoral Researchers.

21  BY MR. MC KENZIE:

22  Q.        Could you please explain to the jury what a

23  postdoctoral researcher is.

24  A.        Somebody that's already received a Ph.D. at

25  another institution and then comes to work for a faculty

1  member in order to assist that faculty member in

2  research.

3  Q.      And what is the interaction between -- let me

4  rephrase that question.

5          When a University of Tennessee employee

6  supervises the work of a postdoctoral researcher, who is

7  that University of Tennessee researcher employed by?

8  A.      By the University of Tennessee.

9  Q.      I'd like to now draw your attention to page

11:54AM 10  D-8.  I think it might just be the next page down.

11          MR. MC KENZIE:  If you'll just scroll down one

12  page.  D, as in dog.  I'm sorry.  This is a chart that

13  we saw earlier.  D, as in David.  Thank you.

14  BY MR. MC KENZIE:

15  Q.      Dr. Zomchick, are you familiar with the term

16  "peer review process"?

17  A.      Yes, sir.

18  Q.      Could you please explain to the jury what the

19  peer review process is.

11:55AM 20  A.      Peer review is kind of the foundation for all

21  research that's done at the university, and so when a

22  faculty member is doing her or his research and

23  has -- reaches conclusions and decides that they want to

24  publish something, they submit it, and the papers are

25  reviewed by peers in the field who have expertise in

1  that field.

2  Likewise, all grant applications, requests for

3  funding for -- for a line of research are also reviewed

4  by experts in the field who would be considered the

5  grant submitter's peer.

6  Q.      Are University of Tennessee employees allowed

7  to act as peer reviewers?

8  A.      In fact, they're encouraged to act as peer

9  reviewers.  It's part of their sort of service

11:56AM  10  expectations to the disciplines.

11  Q.      And as a peer reviewer, is that University of

12  Tennessee employee considered an employee of whatever

13  other organization for whom they're reviewing?

14  A.      No, never.

15  Q.      Could I please turn your attention to page

16  C-11.  C, as in cat.

17  A.      Uh-huh.

18  Q.      To what extent, if any, does receiving grant

19  funding factor into a decision as to whether or not to

11:57AM  20  grant tenure?

21  A.      It really depends on what your discipline is.

22  For an English professor, not at all.  For someone in

23  the College of Engineering, it's absolutely essential,

24  and, actually, the college has expectations listed in

25  its bylaws that its faculty bring in external funding.

1  Q.      I'd like to direct your attention to the table

2  there that said Completed Grants and draw your attention

3  to the column that says Total.  Could you tell me which

4  grant had the highest total or who the sponsor was of

5  the highest total grant that Anming Hu received?

6  A.      JPL-NASA.

7  Q.      Earlier you mentioned that you reviewed this

8  dossier in making a tenure decision.  To what extent did

9  you rely on the defendant's representations when

11:58AM  10  deciding whether or not to grant tenure?

11  A.      To a very, very, very large extent.  We -- we

12  enter the process with the expectation that the faculty

13  member will reveal everything and it will be factual.

14  In fact, in the dossiers, there is something called a

15  signature page where the faculty member attests that the

16  factual information that's been provided is true and

17  accurate.

18  Q.      To what extent does the university have, like,

19  private investigators to verify this information?

11:59AM  20  A.      We do not have that at all.  We -- in a typical

21  year, we review about 80 dossiers for promotion and

22  tenure, somewhere between 60 and 80 dossiers for

23  promotion and tenure.  Dossiers can be as long as 200

24  pages.  We simply don't have the resources or employees

25  to investigate each dossier.

DIRECT EXAMINATION - JOHN ZOMCHICK

1  Q.        After reviewing this dossier, did you make a

2  recommendation as to whether or not the defendant should

3  receive tenure?

4  A.        Yes, sir.

5  Q.        What was that recommendation?

6  A.        That the defendant should receive tenure.

7  Q.        Would you have made that recommendation if you

8  knew that he had unreported employment in China?

9  A.        No, sir, not without further investigation,

11:59AM 10  review.

11             (Government's Exhibit 2-D was marked for

12              identification.)

13  BY MR. MC KENZIE:

14  Q.        I'd like to show you what is marked as 2-D, as

15  in David.

16             Do you recognize this?

17  A.        Yes, sir.  It's our conflict -- the

18  university's conflict of interest form, disclosure form.

19             MR. MC KENZIE:  Your Honor, I'd like to admit

12:00PM 20  2-D into evidence.

21             THE COURT:  So admitted.

22             (Government's Exhibit 2-D was received into

23              evidence.)

24  BY MR. MC KENZIE:

25  Q.        Dr. Zomchick, can you read the name at the top

1   of this -- this form.

2   A.          Anming Hu.

3           MR. MC KENZIE:  Could you scroll up real quick,

4   April.

5           Okay.  And then could we go to the first

6   question on the form.  Scroll down just a little bit,

7   April, so he can see.

8   BY MR. MC KENZIE:

9   Q.          Will you please read the first question.

12:00PM 10   A.          "Do you hold an office, directorship, or

11   employment in an outside organization?"

12   Q.          And could you please indicate how the -- how

13   the person who filled this form out answered.

14   A.          The person answered no.

15           MR. MC KENZIE:   April, would you please scroll

16   down to the bottom, please.

17   BY MR. MC KENZIE:

18   Q.          Could you just read the affirmation at the

19   bottom here.

12:01PM 20   A.          "I understand that if I acquire an interest

21   during the year that requires disclosure, I will take

22   the initiative to disclose it.  I also understand that I

23   must complete a new form annually as long as an interest

24   I have previously disclosed exists.  I acknowledge that

25   I have read and understand the university's conflict of

1   interests policy and have made all necessary

2   disclosures."

3   Q.        Okay.  And could you please read the date.

4   A.        November 4th, 2013.

5   Q.        I'm not going to ask you to read the signature,

6   but does it appear to have been signed?

7   A.        Anming Hu.  Yes, it does.

8             (Government's Exhibit 2-E was marked for

9              identification.)

12:02PM 10   BY MR. MC KENZIE:

11   Q.        I'd like to now show you 2-E, as in Edward.

12   What is this?

13   A.        This is a later version of our outside

14   disclosure form.

15             MR. MC KENZIE:  Your Honor, I request to admit

16   2-E into the record.

17             THE COURT:  So admitted.

18             (Government's Exhibit 2-E was received into

19              evidence.)

12:02PM 20   BY MR. MC KENZIE:

21   Q.        Could you please read the Date Created on this

22   document?

23   A.        9/25/2015.

24   Q.        Can you please read the Full Name.

25   A.        Anming Hu.

1      MR. MC KENZIE:  Can we please scroll down.

2  BY MR. MC KENZIE:

3  Q.      And read the first question and the answer.

4  A.      "Do you hold an office, directorship, or

5  employment in an outside organization?"  Answer, "No."

6          (Government's Exhibit 2-F was marked for

7           identification.)

8          MR. MC KENZIE:  All right.  Could we now have

9  Exhibit 2-F, as in Frank.

12:03PM  10  BY MR. MC KENZIE:

11  Q.      Do you recognize this?

12  A.      Yes, sir.

13  Q.      What is this?

14  A.      Outside Interests Disclosure Form.

15          MR. MC KENZIE:  Your Honor, I move to admit 2-F

16  into evidence.

17          THE COURT:  So admitted.

18          (Government's Exhibit 2-F was received into

19           evidence.)

12:03PM  20  BY MR. MC KENZIE:

21  Q.      Could you please read the Date Created.

22  A.      9/15/2016.

23  Q.      Could you please read the Full Name.

24  A.      Anming Hu.

25  Q.      And then could you please read to the jury the

1    first question and the answer on this form.

2    A.        "Do you hold an office, directorship, or

3    employment in an outside organization?"  Answer, "No."

4              (Government's Exhibit 2-G was marked for

5               identification.)

6    BY MR. MC KENZIE:

7    Q.        I'd like to now show you Exhibit 2-G, as in

8    George.

9              What is this?

12:03PM  10   A.        Outside Interests Disclosure Form.

11             MR. MC KENZIE:  Your Honor, I move to admit

12   2-G.

13             THE COURT:  So admitted.

14             (Government's Exhibit 2-G was received into

15              evidence.)

16   BY MR. MC KENZIE:

17   Q.        Would you please read the Date Created on this

18   document.

19   A.        10/30/2017.

12:04PM  20   Q.        Would you please read the Full Name.

21   A.        Anming Hu.

22   Q.        And will you please read the first question and

23   the answer.

24   A.        "Are you an officer, director, board member,

25   trustee, or employee of any organization or business

1   entity (for profit or non-profit) other than the

2   university?"  Answer, "No."

3           (Government's Exhibit 2-H was marked for

4            identification.)

5           MR. MC KENZIE:  Okay.  Now, please show the

6   witness 2-H, as in horse.

7   BY MR. MC KENZIE:

8   Q.       What is this?

9   A.       It is an Outside Interests Disclosure Form.

12:04PM  10      MR. MC KENZIE:  Your Honor, I move to admit 2-H

11  into evidence.

12          THE COURT:  So admitted.

13          (Government's Exhibit 2-H was received into

14           evidence.)

15  BY MR. MC KENZIE:

16  Q.       Could you please read the Full Name.

17  A.       Anming Hu.

18  Q.       Could you please read the first question as

19  well as the answer?

12:05PM  20  A.       "Are you an officer, director, board member,

21  trustee, owner, employee, or employee of any

22  organization or business entity (for profit or

23  non-profit) other than the university?"  Answer, "No."

24          MR. MC KENZIE:  Will you please scroll down to

25  the bottom, April.

1   BY MR. MC KENZIE:

2   Q.        Under Approval Path History, could you just

3   read the last date.

4   A.        9/11/2018.

5   Q.        Thank you.  I'd like to show you now 2-I, as in

6   ivy.

7             What is this?

8   A.        Outside Interests Disclosure Form.

9             MR. MC KENZIE:  Your Honor, I admit -- I move

12:06PM 10   to admit 2-I.

11             THE COURT:  So admitted.

12             (Government's Exhibit 2-I was received into

13              evidence.)

14   BY MR. MC KENZIE:

15   Q.        Will you please read the Full Name.

16   A.        Anming Hu.

17   Q.        Will you please read the first question and the

18   answer as well, please.

19   A.        "Are you an officer, director, board member,

12:06PM 20   trustee, or employee of any organization or business

21   entity (for profit or non-profit) other than the

22   university?"  Answer, "No."

23             MR. MC KENZIE:  April, if you would please

24   scroll down to the bottom.

25

 1  BY MR. MC KENZIE:

 2  Q.        And then under Approval Path History, will you

 3  please read to the jury the date.

 4  A.        9/5/2019.

 5  Q.        During any of the conflict of interest forms we

 6  just reviewed, did the defendant reveal any employment

 7  at Beijing University of Technology?

 8  A.        No, sir.

 9            MR. MC KENZIE:  Your Honor, I have no further

12:07PM 10  questions.

11            THE COURT:  Thank you.  Cross-examination.

12            MR. LOMONACO:  Your Honor, it's 12:00.  Can we

13  take a break?

14            THE COURT:  The direct was pretty short.  Let's

15  see if we can get done.

16            MR. LOMONACO:  I don't think I can get done.

17            THE COURT:  Well, let's get started then.

18            MR. LOMONACO:  Okay.

19                      CROSS-EXAMINATION

12:07PM 20  BY MR. LOMONACO:

21  Q.        Good afternoon, Dr. Zomchick.

22  A.        Good afternoon.

23  Q.        I believe I heard your testimony to start with

24  about the conflict of interest forms and the policy.

25  And you've explained what a conflict is.  It's true, is

1    it not -- and I'm trying to get to the exhibit

2    that -- to the Exhibit 2-J.

3            MR. LOMONACO:  Can we pull that up there,

4    please.

5    BY MR. LOMONACO:

6    Q.      Your testimony was that policy 2-J talks about

7    a conflict of interest; is that correct?

8    A.      Yes, sir.

9    Q.      And -- I'm sorry -- let me get to that real

12:08PM  10   quick.

11            And it also sets, does it not, the parameters

12   of the policy, as far as what is a conflict and what

13   isn't a conflict; is that right?

14   A.      Yes, sir.

15   Q.      And you read those to the jury, I believe.

16            MR. LOMONACO:  Go up a little bit more.

17   BY MR. LOMONACO:

18   Q.      And this is in section -- it's on the screen

19   here.

12:09PM  20           First of all, I think we have to establish

21   something.  Your Exhibit 2-A, this appointment letter

22   that you said was a form --

23   A.      Yes, sir.

24   Q.      -- it says that you're going to give a job to

25   Professor Hu, basically; right?

1    A.        Yes, sir.

2    Q.        And it stated, we're going to give you a

3    12-month employment job?

4    A.        Yes, sir.

5    Q.        That was incorrect; right?

6    A.        I don't know if that was incorrect.

7    Q.        Well, do you know he's a nine-month employee?

8    A.        I did not know that he was a nine-month

9    employee.

12:09PM 10   Q.        Okay.

11   A.        We have -- we also have 12-month faculty

12   employees.

13   Q.        You have 12-month, but you also have

14   nine-month?

15   A.        Yes, sir, both.

16   Q.        And so as form letters sometimes happen, you

17   don't change all the wording to make it fit exactly the

18   situation.

19             So would it be fair to say that you don't know

12:10PM 20   whether he's a nine-month or a 12-month employee?

21   A.        We could easily find that out, but we do try

22   and change -- if we make a mistake, if we detect an

23   error, we certainly will revise it.

24   Q.        Sure.  Well, he's only getting paid for nine

25   months, so that probably means he's a nine-month

1  employee; right?

2  A.        Yes, sir.

3  Q.        So if he's a nine-month employee, there are

4  certain procedures that are followed as far as conflicts

5  of interest compared to a 12-month employee; right?  And

6  what I'm referring to is:  Professors that work the

7  academic year as opposed to not the academic year are

8  treated differently as far as their employment is

9  concerned; correct?  Do you understand what I'm saying?

12:11PM 10  A.        I do, but I'm not sure I agree with you, sir.

11  Q.        Well, let me ask you this:  A nine-month

12  employee has an academic year of nine months; right?

13  A.        Yes, sir.

14  Q.        And that means the other three months he can go

15  to Timbuktu if he wants to?

16  A.        Yes, sir.

17  Q.        All right.  And if he has a job during that

18  three months, it's not really affecting his academic

19  year, is it?

12:11PM 20  A.        It depends.

21  Q.        Well, let me -- let me ask you it a little bit

22  differently.

23           You've got a definition here of outside

24  interests, conflict of interest, that says -- and you've

25  got examples.

1   A.        Uh-huh.

2   Q.        "Such interests include, but are not limited

3   to, receiving payments for services exceeding $10,000,

4   having equity interest exceeding five percent or

5   $10,000, and holding intellectual property rights."

6           Now, if somebody is looking at a part-time job

7   that they have during the summer and they don't make

8   $10,000 in that job, even if it's during the academic

9   year, some of it, that wouldn't be a conflict of

10  interest, would it?

11  A.        Not -- not -- no, it would not.

12  Q.        It would not.

13          And are you familiar with -- I guess you would

14  be.  You seem to have -- I mean, I'm sure you have a lot

15  of experience and so on with visiting students.

16  A.        Yes, sir.

17  Q.        In order to get a visiting student, how does

18  that process usually start?  Does somebody from a

19  different place say, hey, I want to be a visiting

20  student?

21  A.        Oh, I think there are a lot of different

22  pathways whereby visiting students come to the

23  university.  Sometimes there are connections; faculty

24  members could have collaborators at another institution,

25  for example, and take a visiting student that way.

1    Faculty members could meet students at meetings and

2    express an interest.  I'm not sure that there is one

3    pathway for visiting students to come and work with a

4    faculty member.

5    Q.        Okay.  Now, I think I understood your

6    definition of visiting student.  Usually, not always,

7    but usually is paid by a different university to come

8    and visit your university?

9    A.        Sometimes, yes.

12:14PM 10   Q.        And so it doesn't cost the university anything;

11   you don't charge them tuition?

12   A.        No, sir.

13   Q.        And so he is a benefit to your school, is he

14   not?

15   A.        Yes, sir.

16   Q.        And how can he be of benefit if he's a student?

17   He comes to do research; right?

18   A.        Yes, sir.

19   Q.        That's right.  So he actually doesn't come to

12:14PM 20   just sit in a classroom and take notes; he comes to

21   assist the professors?

22   A.        In many cases, that's correct, yes.

23   Q.        Okay.  Do you have visiting students that just

24   come and go to classes and not help the professors or

25   anything?

1    A.      Yes, we do.

2    Q.      You do?  What -- what classes would -- what

3    normal areas of the university would they come to?

4    A.      Oh, I'm not sure I could say where they would

5    all come, but we've had, for example, students in our

6    foreign language department, for example, who come and

7    take classes.  We have students from -- from just a lot

8    of disciplines who also come and take classes,

9    especially -- I think especially in those disciplines

10   where there is not lab work involved where -- the

11   non-STEM disciplines.

12   Q.      You know, I forgot to ask you a question about

13   this outside interests/conflict of interest form.

14   A.      Uh-huh.

15   Q.      You've introduced and identified 2015, '16,

16   '17, '18, and '19 as Professor Hu's outside interests

17   form.  And that's also considered a conflict of interest

18   form; is that right?

19   A.      Yes, sir.

20   Q.      And where it asks if you have employment, if

21   the employment doesn't reach a certain level, then it's

22   not a conflict of interest.  You've already said that;

23   right?

24   A.      That's a really tricky question.  I mean, I

25   think that --

1  Q.        Let me put it this way --

2  A.        Yeah.

3  Q.        -- could a person believe it to be that way?

4        MR. MC KENZIE:  Objection, Your Honor.  Calls

5  for speculation.

6        THE COURT:  Do you have a response to the

7  objection so I can rule on it?

8        MR. LOMONACO:  I'll ask it a different way,

9  Your Honor.

12:16PM  10        THE COURT:  Go ahead.

11  BY MR. LOMONACO:

12  Q.        Professor Zomchick, according to your own

13  policy manuals --

14  A.        Uh-huh.

15  Q.        -- the handbook sort of tracks that policy

16  manual, too, as far as the amount of money necessary to

17  make it a conflict of interest.  According to that

18  policy, if you don't have that much income coming in

19  from another employment, UT does not consider that a

12:16PM  20  conflict of interest?

21  A.        We might consider it a conflict of commitment

22  in that case.

23  Q.        Well, that's not my question.

24  A.        Yeah, I know.  I'm just -- I'm just hesitant to

25  say that -- that $10,000 -- yeah, I don't know the

1   answer to that.  I would have to talk to others in

2   my -- among my staff and review that.

3   Q.      Well, you've been working there how many years?

4   A.      36.

5   Q.      You still don't understand that policy?

6   A.      Oh, I do understand the policy, but --

7   Q.      You're having a hard time understanding whether

8   it's a conflict of interest or not?

9   A.      No, not at all.  I mean, if someone says to me

12:17PM  10  that they're employed at another institution, I would

11  say that's a potential conflict of interest, and I would

12  like to learn more about that no matter how much

13  compensation that they're getting.

14  Q.      Well, let me ask you this, though:  Aren't they

15  only supposed to disclose their conflicts of interest?

16  Isn't that the purpose of that form?

17  A.      That's the purpose of the form, yes.

18  Q.      Okay.  Does that lead somebody to believe --

19  you're an English major -- that that's the purpose of

12:17PM  20  the form?

21  A.      But, sir, remember, it says "included but not

22  limited to," so I think that gives the university some

23  leeway there in -- in trying to sort of manage its

24  employees.

25  Q.      Sure.

1      Now, examples of such interests include

2  services exceeding $10,000.  So, to me, I mean, I'm not

3  an English major or anything, but, to me, that means to

4  say that if I make less than $10,000, that is not

5  included as an interest.

6      MR. MC KENZIE:  Objection, Your Honor.

7  BY MR. LOMONACO:

8  Q.      Would that be fair to say?

9      MR. MC KENZIE:  He just said what the statement

10  says to him.  It's not relevant.

11      THE COURT:  Well, mindful that the questions of

12  attorneys are not evidence.  To the extent the witness

13  can answer, we'll allow it.

14  BY THE WITNESS:

15  A.      So, again, I would say that the "not limited

16  to" gives the university more leeway there.

17  BY MR. LOMONACO:

18  Q.      Okay.  "But not limited to."  I understand.

19  That's the normal phrase that people put into these

20  types of things.  But it talks about specific amounts,

21  and would that not mean to the person that read it that

22  if I don't make $10,000 a year in a job, according to

23  this form, that would be an example of not a conflict of

24  interest?

25      MR. MC KENZIE:  Objection.  Again, it calls for

1    speculation, what someone might think.

2              THE COURT:  Do you want to move on or rephrase,

3    Mr. Lomonaco, or --

4              MR. LOMONACO:  I think I've asked it enough

5    times, Your Honor.

6              THE COURT:  Let's go on.

7              MR. LOMONACO:  Your Honor, I'd ask that we

8    break for lunch.  I have a set for Mr. Zomchick and it's

9    buried in here.  I've got to dig it out and --

12:19PM 10              THE COURT:  Okay.  We're close for a break.

11   We'll go ahead and break.

12              MR. LOMONACO:  Thank you, Your Honor.

13              THE COURT:  We'll take an hour and 15 minutes,

14   give the jury plenty of time to get in and out.  So

15   we'll plan to resume at 1:35.

16              THE COURTROOM DEPUTY:  All rise.

17              (Jurors excused from the courtroom.)

18              THE COURTROOM DEPUTY:  This honorable court

19   stands in recess until 1:35.

12:20PM 20              (A luncheon recess was taken at 12:19 p.m.)

21                        **AFTERNOON SESSION**

22                            (P.M.)

23              THE COURTROOM DEPUTY:  All rise.

24              THE COURT:  All right.  Thank you.  We'll bring

25   the jury back in.

1          (Whereupon the following report of

2           proceedings was had within the presence

3           and hearing of the jury:)

4          THE COURT:  Thank you.  Everyone may be seated.

5          Mr. Lomonaco, you may continue with

6    cross-examination.

7          MR. LOMONACO:  Thank you, Your Honor.

8    BY MR. LOMONACO:

9    Q.     Now, Dr. Zomchick, besides the PL025 (sic)

01:40PM 10   policy/procedures document we talked about -- did I get

11   that number right?

12   A.     I don't know what you're referring to.  Are you

13   referring to the conflict of interest?

14   Q.     Well, the policy procedure.

15   A.     It begins with FI because it's a financial

16   policy, I believe.

17   Q.     FI0125?

18   A.     Yes, that's correct.

19   Q.     Yes.  I'm sorry.  I'm looking at some Ps here

01:40PM 20   on my computer.

21          So we talked about that.  We talked about the

22   dollar amounts in there, and there is also another

23   policy or procedure manual for UT called the Faculty

24   Handbook; correct?

25   A.     That's correct.

1    Q.        And the Faculty Handbook is a guideline that

2    allows the faculty to have an understanding of what they

3    should do and what they shouldn't do.  It's pretty

4    broad.  It's a big book; right?

5    A.        Seven chapters, I believe, with an appendices,

6    yes, sir.

7    Q.        Yes, sir.  Let's look at that.

8              (Defendant's Exhibit 35 was marked for

9               identification.)

01:41PM  10            MR. LOMONACO:  If we could show what we are

11   asking to be marked as Exhibit 35.

12   BY MR. LOMONACO:

13   Q.        Here is a picture, Faculty Handbook, 2019,

14   University of Tennessee.  Office of the Provost.  So

15   you're probably pretty familiar with that.

16   A.        Yes, sir.

17            MR. LOMONACO:  Could we mark that the next

18   exhibit, Your Honor, 35.

19            THE COURT:  Defendant's 35, without objection,

01:42PM  20   so admitted.

21            MR. LOMONACO:  Thank you.

22            (Defendant's Exhibit 35 was received into

23             evidence.)

24            MR. LOMONACO:  Let's go ahead and turn to

25   page 77, and let's take a look at it.

1    Okay.  Is that 77?  Can you scroll down a

2  little bit, please.  That's 74.  Keep going.

3    Okay.  Here we go.  Back up a little bit.

4  BY MR. LOMONACO:

5  Q.    This is Chapter Seven, Compensated Outside

6  Services.

7    Now, that means faculty having a job someplace

8  else or making money someplace else; right?

9  A.    Yes, sir.

01:43PM 10  Q.    Okay.  And, "Full-time faculty members" -- let

11  me read the first part -- "appointed to The University

12  of Tennessee agree to devote themselves to UT's mission

13  of teaching, research, and public service.  Fulfillment

14  of these responsibilities demands a full-time, 100

15  percent commitment to normal university duties..."

16    Now, a full-time 100 percent commitment to

17  university duties, does that mean that they need to do

18  nothing but work full-time for the University of

19  Tennessee?

01:43PM 20  A.    No, sir.

21  Q.    What that means is their heart and soul needs

22  to have a full-time commitment, basically; right?  Is

23  that more what it means?

24  A.    I don't know about "heart and soul," but I

25  think a hundred percent, yes, means that they need to be

1  fully -- nothing that distracts them from their job

2  duties.

3  Q.      Okay.  But it doesn't mean that they have to

4  work a hundred percent in their job duties and do

5  nothing else, does it?

6  A.      It depends.

7  Q.      Okay.  Well, we'll go on through here, and I

8  believe, and I don't want to misquote it, but I believe

9  it talks about during the academic year, you can do

01:44PM  10  other things, as long as it doesn't conflict with your

11  main job at University of Tennessee; correct?

12  A.      And as long as you let your supervisor know.

13  Q.      Oh, okay.  Does it say that in there?

14  A.      I believe it does, sir.

15  Q.      Okay.  Let's see if we can find that; okay?

16        So --

17        MR. LOMONACO:  Hold on.  Back up.

18  BY MR. LOMONACO:

19  Q.      It says, (as read) "For many faculty members,

01:44PM  20  as an important part of keeping up-to-date lies outside

21  the classroom and involves testing one's academic skills

22  and duties, abilities, and real-world life."

23        So basically they're saying that you've got to

24  be a well-rounded person there to help with your job;

25  right?

1    Next paragraph.  (As read) "University-wide

2  policies governing compensated outside activities by

3  faculty require each campus to establish procedures to

4  ensure that the professional development of the faculty

5  is encouraged and, at the same time, ensures that

6  faculty meet their regular university responsibilities

7  in a timely and effective manner."

8    And if you will go ahead and stop me where it

9  says they have to report -- okay? -- something else.  Do

01:45PM 10  you know where that is in this particular section?

11  A.    It's certainly in our instructions for filling

12  out your annual performance review.  I'm not sure if

13  it's in -- I haven't looked at this chapter in a bit.

14  So I'm not sure if it's in here.

15  Q.    Instructions to who?

16  A.    The faculty.  We have an appendix in -- the

17  Faculty Handbook also includes appendices.  They're

18  related to annual performance reviews.

19  Q.    Okay.  Annual performance reviews are different

01:46PM 20  than the annual reports or the conflict of interest

21  reports.

22  A.    That's correct.

23  Q.    Do you have a manual that shows you how to fill

24  out the conflict of interest report?

25  A.    No, sir.

1    Q.        Okay.  Moving along, "Full-time faculty

2    members" -- this is section 7.2, paragraph 1.

3             Let's go down to paragraph 2.  (As read) "While

4    compensated outside activities may be valuable for both

5    faculty and university, the primary responsibility of a

6    faculty member is to fulfill the teaching requirements."

7    And that's what you were talking about.  "...have a

8    responsibility not to undertake external activities that

9    substantially burden or interfere with commitments to

01:46PM  10    the university."

11             So that line right there -- do you see that

12    line I just read?

13    A.        Yes, sir.

14    Q.        That presupposes that they can undertake

15    external activities, as long as they do not

16    substantially burden or interfere with the university.

17    A.        With their university duties.

18    Q.        I don't see the word "duties," but interfere

19    with --

01:47PM  20    A.        Commitments to the university.

21    Q.        -- commitments.  Commitments to the university.

22    Okay.

23             So let me ask the question again:  Does that

24    say that a faculty member can undertake external

25    activities as long as it doesn't substantially burden or

1  interfere with commitments to the university?

2  A.        Yes, sir.

3  Q.        Okay.  Do you know of any commitments to the

4  university that Professor Hu interfered with?  Has he

5  been reported anywhere that you know of, been written up

6  for doing things that would interfere with the

7  university that you know of?

8  A.        So, no, sir.

9  Q.        All right.  I just wanted to cover that as we

01:48PM 10  go by it.

11        Full-time appointment, and that means -- could

12  be a nine-month appointment or a 12-month employment

13  appointment.  Both of them are full-time appointments;

14  correct?

15  A.        Correct.

16  Q.        Okay.  "A full-time employment includes an

17  obligation to maintain a meaningful presence on behalf

18  of the university in the performance of

19  responsibilities."  That means they need to be there and

01:48PM 20  do their job.  They need to show up for classes, to give

21  classroom time, office time; everything a professor is

22  supposed to do, and not be playing golf or off making

23  money at Oak Ridge or something like that; right?

24        So the obligation means being accessible on

25  campus to students, staff and colleagues.  "Compensated

1  outside activities must not result in a conflict of

2  interest or a conflict of commitment with respect to the

3  faculty member's university duties."

4         So that sentence right there says to me, you

5  can have compensated outside activities, as long as they

6  don't interfere or conflict with respect to the faculty

7  member's university duties.

8  A.      Correct.

9         MR. MC KENZIE:  Objection, Your Honor.  Defense

01:49PM  10  counsel just said what it said to him.  So relevance to

11  that.

12         THE COURT:  Well --

13         MR. LOMONACO:  I asked him if he agreed with

14  it.

15         THE COURT:  I guess the jury can ignore that

16  portion of the question to him personally.  Just view

17  the question and answer as the witness's understanding

18  of this particular phrase.

19         Go ahead, Mr. Lomonaco.

01:49PM  20         MR. LOMONACO:  Thank you, Your Honor.

21         Move down to the next highlighted section.

22  BY MR. LOMONACO:

23  Q.      Okay.  Now we're down to Section 5.  And if you

24  want me to go up to any of these and you want to comment

25  on anything, let me know.

1  A.          Just that -- just that No. 4 -- No. 4 implies

2  that the faculty member or the employee has an

3  obligation to communicate her or his outside activities

4  with the appropriate administrative officers.

5  Otherwise, they would have no way of knowing whether or

6  not that faculty member is engaged in outside -- outside

7  activities.  And I'll just read it.  "Administrative

8  officers, such as deans or department heads, who believe

9  their faculty member has engaged in compensated outside

01:50PM  10  activities in a manner inconsistent with these

11  guidelines or applicable bylaws may initiate appropriate

12  actions."

13          So we've always taken that, I think, to mean

14  that we have it in our annual review that faculty

15  members are required to report outside compensated

16  activities.

17  Q.          It doesn't say that in here, though.

18  A.          I think it implies it.

19  Q.          It implies it?

01:51PM  20  A.          Yes, sir.

21  Q.          It implies that officers and deans of the

22  department heads who believe the faculty member is

23  engaged in compensated outside activities in a manner

24  inconsistent with these guidelines, but it doesn't say

25  anything about them having to -- faculty members having

1  to report it in here; correct?

2  A.      Yes, sir.

3  Q.      I mean, you could change that and put it in

4  there if you wanted to; right?

5  A.      Faculty handbooks are written by and in

6  conjunction with faculty, and it's a -- it's a joint

7  communal effort, and so sometimes it takes a while to

8  change things.

9  Q.      Okay.  Well, you're pretty high up.  I mean,

01:51PM 10  you probably have a little bit of pull there to say,

11  hey, we need to put in there that they need to tell us.

12  A.      Have you ever worked with faculty?  Sorry.

13          It's a matter of:  We believe in shared

14  governments at the university.  I don't want to be

15  flippant.  We believe in shared governments, and so we

16  as administrators do not have the right to change

17  anything in this book without approval and voting by the

18  faculty senate.

19  Q.      Okay.

01:52PM 20  A.      And then approval on up the line, including the

21  president of the university.

22  Q.      Fair enough.  So it's pretty important what's

23  already said in it?

24  A.      Yes, sir.

25  Q.      Okay.  So getting down to 5, "These policy

1  guidelines primarily concern long-term or

2  continuing/recurring short-term arrangements between

3  faculty members and clients.  These guidelines do not

4  apply to activities such as:  Occasional short-term

5  activities."

6        So let's back up and look at that again.

7  Starting at paragraph 5, "These policy guidelines

8  primarily concern long-term or continuing/recurring

9  short-term arrangements between faculty members and

01:52PM  10  clients."

11        Who is the client?

12  A.        Whoever the faculty member is contracting with.

13  Q.        Like an outside client, or are you talking

14  about NASA?  Or who would a normal client be?

15  A.        For compensated outside activities, it would

16  typically be someone who does not engage the university

17  but engages directly with the faculty member.

18  Q.        Okay.  Sort of like the local bar down the

19  street having a faculty member being a bartender.

01:53PM  20  A.        No, no, not that.

21  Q.        That's not an outside activity?  Are you

22  talking about --

23  A.        I'm talking -- most of the time we think about

24  professional activities.  So for compensated outside

25  activities, it would be consulting with a company,

1  providing services to perhaps a community organization

2  and getting some compensation for it, or even minimal

3  compensation.

4  Q.      So maybe doing some part-time work for another

5  university?

6  A.      Yes, sir.

7  Q.      Okay.  Could that be, like, a continuing,

8  reoccurring short-term arrangement?

9  A.      Could be.

01:54PM 10  Q.      Like working part-time in the summer for

11  another university?

12  A.      Could be.

13  Q.      Okay.  So that first bullet point, (as read)

14  "Occasional short-term activities (which are typically

15  not compensated except for modest honorariums), which

16  include, but are not limited to, publications and/or

17  editing of research papers, community activity,

18  participation in symposia, accreditation visits,

19  research presentations, professional licensing,

01:54PM 20  examination questions," and so on.

21          So these guidelines do not apply to that.

22  That's even lower than what the guidelines apply to;

23  correct?

24  A.      Yes.

25  Q.      Okay.  Doesn't apply to compensated activities

1  conducted in the summer by faculty who serve in an

2  academic-year appointment?

3  A.        Correct.

4  Q.        Nine-month academic appointment, you do what

5  you want to do in the summer?

6  A.        Yes, sir.

7  Q.        Doesn't even have to be considered; doesn't

8  have to be applied -- doesn't have to -- as long as it's

9  not something illegal that would give the university a

01:55PM 10  bad name or something, it's okay for them to do what

11  they want to do?

12  A.        Yes, sir.

13  Q.        And the last one, "Faculty compensation through

14  grants and contracts."  Sometimes faculty members will

15  do grants and contracts and they get compensated for

16  that, but that doesn't really cause a conflict, as long

17  as it's working for the university?

18  A.        As long as it's run through the university,

19  yes, sir.

01:55PM 20  Q.        Okay.  And this says that these guidelines

21  shall be construed and be consistent with university's

22  policies regarding conflicts of interest.  That's that

23  other form we talked about; is that right?

24  A.        Yes, sir.

25  Q.        So they're trying to make them fit together,

 1    say the same thing; right?

 2    A.        Yes, sir.

 3    Q.        More or less.

 4    A.        Consistent, yes.

 5              MR. LOMONACO:  Okay.  Let's move a little bit

 6    further here to the next highlight.

 7    BY MR. LOMONACO:

 8    Q.        So now up in paragraph 3, (as read) "Nine-month

 9    faculty members are expected to perform

10    university-related activities for nine months.  The

11    nine-month faculty member should limit their total

12    compensated outside services to no more than 20 percent

13    over their total 100 percent university effort during a

14    given academic year, exclusive of nonacademic year,

15    course schedules," etcetera.

16              Now, it took me a couple times to read that,

17    but does that mean that a person with a nine-month

18    academic year can still perform outside services as long

19    as those services are no more than 20 percent over their

20    total 100 percent university effort?

21    A.        Yes, sir.

22    Q.        So if I'm working a hundred percent on my

23    academic year, I can still work another 20 percent or

24    less on outside interests?  Is that right?

25    A.        Yes, sir.

1  Q.       Okay.  And it's not a conflict of interest;

2  correct?

3  A.       Could be a conflict of interest, but it's

4  certainly allowed, in terms of effort.  It could be

5  allowed.  Conflict of interest covers other kinds of

6  considerations besides who you're working -- the amount

7  of time that you're working.

8  Q.       So if you don't like what he's doing, then that

9  could be a conflict?

01:57PM  10  A.       Well, if you scroll back up to No. 2 there --

11            MR. LOMONACO:  Scroll up.

12  BY THE WITNESS:

13  A.       Sorry.  Under 7.3, you see there that that's

14  the place where a faculty member needs to report, and it

15  says, (as read) "Should a faculty member wish to pursue

16  compensated outside activities, the faculty member and

17  her or his department head must agree about the faculty

18  development benefits that will be gained by the planned

19  activities as part of the annual review process."

01:58PM  20  That's what I was referring to.  I just hadn't read it

21  in a while, and it had slipped my -- slipped my memory

22  that it was actually stated in there.

23            So that's the requirement of notice.  The

24  faculty member gives notice.  The department head there

25  has -- if after their review a faculty member has an

1    opportunity to pursue a new compensated outside activity

2    or of any significant changes to an agreed plan from the

3    last annual review occur, the faculty member must report

4    the situation to her/his department head and develop a

5    new or revised plan with the head's concurrence.

6              To us, what's important there is that outside

7    compensated activity should be not simply for the

8    purpose of -- should provide benefits to the faculty

9    member, faculty development benefits, and it's within

01:59PM    10   the prerogative of the supervisor to make that call.

11             MR. LOMONACO:  Okay.  Let's go up a little bit

12   higher than that.

13             Keep going.

14   BY MR. LOMONACO:

15   Q.       So it says in here -- does it say in here that

16   outside compensated activities not during the academic

17   year need to be reported?

18   A.       There is an exclusion for summer --

19   Q.       Summer.

01:59PM    20   A.       -- for nine-month faculty.

21   Q.       So we're talking about when you're working your

22   100 percent UT job?

23   A.       Yes.

24   Q.       And I think --

25             MR. LOMONACO:  Go on down past 7 or 5.  Keep

1  going.

2  BY MR. LOMONACO:

3  Q.      So here on Section 4, (as read) "Nine-month

4  faculty employed full-time at the university must ensure

5  that their annual compensated outside service activity

6  is no more than 20 percent."  And we've talked about

7  that before.  That's saying the same thing again; right?

8  A.      Yes, sir.

9  Q.      That's while you're working at UT.  Okay.

02:00PM  10      MR. LOMONACO:  All right.  Let me go to -- you

11  can turn that off.

12  BY MR. LOMONACO:

13  Q.      In July 18th, 2019, were you part of a meeting

14  with the FBI DOE Officer Sadik- -- or Slatton and FBI

15  Agent Sadiku?

16  A.      I believe I was.

17  Q.      And there were other administrators there?

18  A.      Yes, sir.

19  Q.      And who called the meeting?

02:01PM  20  A.      I don't recall.

21  Q.      You don't recall whether the FBI asked to meet

22  with you or --

23  A.      I never had direct contact with the FBI.

24  They -- a meeting would be called and I would be there.

25  In 2019, I was in my position as vice-provost for

1  faculties affairs, and I'd be informed of the meeting

2  and I would attend the meeting.

3  Q.      So you just sat back and really didn't get

4  engaged with the meeting; is that what you're saying?

5  A.      No, sir, that's not what I'm saying at all.

6  I'm saying I wasn't responsible for calling the meeting.

7  I was certainly present and attentive.

8  Q.      Okay.  The purpose of the meeting was for the

9  FBI to inform you about Anming Hu; correct?

02:02PM 10  A.      To talk about Dr. Hu, yes, sir.

11  Q.      And they had a PowerPoint presentation,

12  basically?  They had handouts listing things that

13  Professor Hu did or didn't do?

14  A.      Yes, sir.

15  Q.      Okay.  Were you aware of any of that before

16  they came and talked to you?

17  A.      I believe -- I believe that -- I'm not sure if

18  that was the first meeting that I attended.  I think

19  that there may have been earlier meetings, but I haven't

02:02PM 20  reviewed that.

21  Q.      That's fair enough.

22          There was a meeting called a fraud awareness

23  meeting prior to this and it was in 2018?

24          MR. PARSONS:  August 31st.

25

1    BY MR. LOMONACO:

2    Q.        August 31st.  Did you attend that meeting?

3    A.        I'm not certain.

4    Q.        In this meeting, they showed several little

5    slides about what Anming Hu did or didn't do; correct?

6    A.        Yes, sir.

7             MR. MC KENZIE:  Your Honor, which meeting are

8    we talking about before I object?

9             MR. LOMONACO:  I'll go back to the July 18th

02:03PM  10   meeting, since he does recall that one.

11   BY MR. LOMONACO:

12   Q.        Were you told that there was exhibits for those

13   handouts?

14   A.        Yes, sir.

15   Q.        Did you see any exhibits?

16   A.        Yes, sir.

17   Q.        You did?

18   A.        I believe I did, yes, sir.

19   Q.        Okay.  Do you know what the purpose of that

02:04PM  20   meeting was?

21   A.        To discuss Dr. Hu.

22   Q.        And do you know that at that meeting they were

23   telling you Dr. Hu was committing fraud; correct?

24   A.        They were telling us of concerns that they had

25   about Dr. Hu, yes, sir.

1  Q.        They were telling you things like he was

2  involved in the Chinese military?

3  A.        My memory is that they were talking about his

4  connections with Chinese universities that had

5  connections, perhaps, to the military.

6  Q.        Okay.  It sounded pretty dire; right?

7  A.        My purpose was to just sit there and listen and

8  to try to understand.  It was not -- I try not to rush

9  to judgments.

02:04PM 10  Q.        Okay.  I appreciate that.

11        Is that why they had another meeting in August

12  of 2019 similar to the July meeting?

13  A.        My memory is that we met several times, yes,

14  sir, with a group of people about Dr. Hu's activities.

15  Q.        All for the same purpose of talking about

16  Dr. Hu?

17  A.        Yes, sir.

18  Q.        And all for the same purpose of telling the

19  administrators that, in their opinion, he was committing

02:05PM 20  fraud or a crime of some kind?

21  A.        I think at that time they -- the -- again,

22  relying on my memory, at that time, there was suspicions

23  of inappropriate contact.

24  Q.        Inappropriate?  You mean, like, illegal,

25  unlawful?

1   A.      I honestly don't recall the word "fraud" being

2   used. It very well may have been, but I don't -- I

3   don't recall.

4   Q.      Inappropriate contact with who?

5   A.      With a Chinese university.

6   Q.      Not -- it's not against the law to have contact

7   with Chinese universities per se; correct?

8   A.      That's correct.

9   Q.      And, in fact, the University of Tennessee

02:06PM 10   encourages their professors and scientists to

11   collaborate internationally?

12   A.      We do.

13   Q.      Encourage them to write as many papers as they

14   can, and, you know, put their name on as many

15   publications as they can for their sake and the

16   university's sake?

17   A.      We do.

18   Q.      So inappropriate activity, I'm not sure what

19   you're talking about. Can you be more specific about

02:06PM 20   what they told you?

21   A.      So relying on my memory, it was a concern that

22   Dr. Hu was hiding, not revealing associations with a

23   Chinese university, and that's -- that's pretty much the

24   gist of it.

25   Q.      Okay. Did you look into any of that?

1   A.      No, sir.

2   Q.      No?

3   A.      No.

4   Q.      You just took their word for it?

5   A.      No, sir, I'm not an investigator.  We have

6   investigators in the university who perform that

7   function.

8   Q.      So did you have somebody at the university

9   perform the function of whether they were reporting

10  things to the University of Tennessee?

11  A.      Yes, sir.

12  Q.      Okay.  Who would that be?

13  A.      That was the research integrity officer.

14  Q.      Okay.  And who was that?

15  A.      Sarah Pruitt.

16  Q.      Sarah Pruitt.  Okay.  And she reported back to

17  you?

18  A.      No, sir.  Excuse me.  No, sir, she doesn't

19  report directly to me; she reports to the

20  vice-chancellor for research.

21  Q.      Well, did anything become of that?

22  A.      I'm not sure what you mean.

23  Q.      Well, if Professor Hu was doing something

24  inappropriate and he was investigated, did an

25  investigation reveal anything?

1  A.      Yes, sir.

2          MR. MC KENZIE:  Objection, Your Honor.  That

3  definitely calls for hearsay, and we're getting pretty

4  far afield from my direct examination.

5          MR. LOMONACO:  Well, cross-examination is sort

6  of open, isn't it?

7          THE COURT:  Well, I'll overrule the objection.

8  You can go on.

9  BY MR. LOMONACO:

02:08PM  10  Q.      Let's zero in then.

11          Did you review Professor Hu's annual activity

12  report after these meetings to see if he disclosed his

13  association with BJUT?

14  A.      No, sir.

15  Q.      No?

16  A.      No.

17  Q.      Did you or anybody else you know of look at the

18  outside interests and conflict of interest form that

19  Professor Hu is accused of not filling out the right way

02:08PM  20  and determine that the form was not looked at during the

21  grant applications for NASA?

22  A.      Not to my -- I don't know the answer to that

23  question.

24  Q.      So you didn't?

25  A.      I did not, no, sir.

1  Q.      That wouldn't be your job?

2  A.      No, sir.

3  Q.      Would it have been Ms. Smelser's job or Jean

4  Mercer's job?

5  A.      I'm not sure whose job that is.  That's in a

6  different office.

7  Q.      You don't know what -- do you know what Jean

8  Mercer does?

9  A.      Yes, sir.

02:09PM  10  Q.      What's her position?

11  A.      She is an associate vice-chancellor for

12  research.

13  Q.      Okay.  So would she be involved in the grant

14  applications?

15  A.      Yes, sir.

16  Q.      So without reaching -- so without reviewing

17  Professor Hu's annual activity reports, you're not sure

18  what he reported and what he didn't report to the

19  University of Tennessee; correct?

02:09PM  20  A.      Correct.

21          MR. LOMONACO:  May I have one moment, please?

22          That's all I have, Your Honor.

23          THE COURT:  Thank you.

24          Redirect examination?

25          MR. MC KENZIE:  Very briefly, Your Honor.

1          REDIRECT EXAMINATION

2    BY MR. MC KENZIE:

3    Q.        Dr. Zomchick, when does the academic year

4    start?

5    A.        August 1st.

6    Q.        When does the academic year end?

7    A.        That's a good question.  Typically it ends at

8    commencement or right around commencement.  So May,

9    middle to -- middle of May, I'd say.

02:11PM   10   Q.        Could you please -- I'd like to show the

11   witness Exhibit 2-J again and direct your attention to

12   page 7, paragraph e.

13             Let's see if I can clear this real quick

14   (indicating).

15             Could you just read that first sentence for the

16   jury, please.

17   A.        (As read) "Covered individuals involved in

18   research (that is, investigators as defined in Section 1

19   above) must have disclosed outside interests that may be

02:12PM   20   affected by the research before proposals are submitted

21   to funding agencies."

22   Q.        Thank you.

23             MR. MC KENZIE:  Your Honor, I have no further

24   questions.

25             THE COURT:  Thank you.

1          Any recross?

2          MR. LOMONACO:  Yes, Your Honor.

3                    RECROSS-EXAMINATION

4     BY MR. LOMONACO:

5     Q.       So if I remember what you just said,

6     researchers like Professor Hu -- he would be a

7     researcher; right?

8     A.       He would be a researcher, yes, sir.

9     Q.       He would have to report outside interests that

02:12PM   10  would affect the research; is that what you're saying?

11    A.       I was reading from the policy statement.

12    Q.       Yeah, we'll get it back up.  I'm sorry.

13         MR. LOMONACO:  Got it?

14    BY MR. LOMONACO:

15    Q.       And what did he have you read?  I'm sorry.  (As

16    read) "Covered individuals involved in research

17    (investigators) must have disclosed outside interests

18    that may be affected by research before proposals are

19    submitted to funding agencies."

02:13PM   20       So let's -- you're an English major.  You have

21    a lot of history in English; correct?  So we know the

22    first part is -- let's just say the first part is

23    Dr. Hu.  Must have disclosed, must have told, I guess,

24    UT outside interests, and I guess we're talking about

25    working someplace else or doing something other than UT

1  that may be affected.  Now, to me, that says if it would

2  affect the outside interests.  Is that what it says to

3  you?

4  A.       That's what the words say, yes, sir.

5  Q.       By any research that UT or the proposals would

6  have, basically.  So outside interests that may be

7  affected by UT research.

8           So if he's doing a NASA grant and it doesn't

9  affect his job someplace else, he doesn't have to report

02:14PM  10  that, according to this, does he?

11  A.       (No audible response.)

12           MR. LOMONACO:  No further questions.

13           THE COURT:  Did you want to respond any

14  further?  I didn't know if the witness responded.

15           MR. LOMONACO:  I'll withdraw my question, Your

16  Honor.

17           THE COURT:  Okay.  All right.  Then that

18  concludes this witness's testimony.

19           Dr. Zomchick, you may be excused.

02:14PM  20           THE WITNESS:  Thank you.

21           THE COURT:  Government may call its next

22  witness.

23           MR. MC KENZIE:  Your Honor, at this time the

24  government calls David Smelser.

25           (The witness was thereupon duly sworn.)

 1          THE COURTROOM DEPUTY:  Have a seat, please.  If

 2     you could scoot up as close as you can.

 3          Will you state and spell your name for the

 4     record.

 5          THE WITNESS:  David Smelser, D-a-v-i-d,

 6     S-m-e-l-s-e-r.

 7          THE COURTROOM DEPUTY:  Thank you, sir.

 8          MR. MC KENZIE:  Your Honor, may I inquire?

 9          THE COURT:  Yes.

10                    **DAVID SMELSER**,

11     having been first duly sworn, was examined and testified

12     as follows:

13                    DIRECT EXAMINATION

14     BY MR. MC KENZIE:

15     Q.     Good afternoon, Mr. Smelser.  Please tell the

16     jury by whom you're employed.

17     A.     I'm employed by the University of Tennessee.

18     Q.     What is your current position?

19     A.     I am the assistant director of sponsored

20     programs.

21     Q.     Approximately how long have you served in this

22     role?

23     A.     About seven years.

24     Q.     What is your educational background?

25     A.     I received a bachelor's degree from the

02:16PM (next to line 20)

1    University of Tennessee and a master's degree from

2    Emmanuel College.

3    Q.        What was your master's degree; what was the

4    subject of your master's degree?

5    A.        Management.

6    Q.        You mentioned the term "sponsored programs".

7    Will you please explain to the jury what sponsored

8    programs are.

9    A.        Sure.  A sponsored program is when usually a

02:16PM  10    faculty member, but any sort of researcher or scholar at

11    the university wants to receive funding to do some sort

12    of project or scholarly activity, and they will request

13    a sponsor or an external entity to fund that activity.

14    Q.        Have you worked in sponsored programs prior to

15    your position with the University of Tennessee?

16    A.        I worked in -- at the University of Tennessee

17    since 2008 in sponsored programs.

18    Q.        What was your original position?

19    A.        I was a proposal coordinator.

02:17PM  20    Q.        Explain to the jury what a proposal coordinator

21    is.

22    A.        When a researcher wants to do a sponsor

23    program, they would submit a proposal through the

24    university, and a proposal coordinator is someone in the

25    sponsor program's office who receives that proposal from

the faculty member, and then will review it for various

compliance purposes before the university officially

submits it on to the sponsor.

Q.      When you came to work for the University of

Tennessee, did you receive any training on how to create

and submit these proposals?

A.      I did.

Q.      Will you please in broad terms describe to the

jury what your training was.

A.      Certainly.  When I began as a proposal

coordinator, the supervisor at the time did most of the

hands-on training, and also learning from other more

senior personnel who had been in the office longer.

        And then our -- many of our proposal

coordinators and office members are members of

professional organizations who also do kind of, like,

trade association trainings for the profession.

Q.      Are you a member of any such trade groups or

associations?

A.      I am.

Q.      What groups are -- do you belong to?

A.      I'm a member of the National Council of

University Research Administrators.

Q.      And as part of your association, have you

received any training on how to create and submit

1    proposals?

2    A.        Yes.

3    Q.        Will you please explain to the jury what types

4    of trainings you've received.

5    A.        Certainly.  The NCURA, the short name for it,

6    offers traveling workshops.  They offer publications.

7    They offer conferences, printed materials that you can

8    read.  They have a journal/magazine-type thing, and I

9    usually will go to conferences and webinars and things

02:19PM  10   like that; maybe four a year.

11   Q.        Through your training and experience, have you

12   become familiar with the term "conflict of interest" as

13   it relates to grant applications?

14   A.        Yes.

15   Q.        Will you please explain to the jury what

16   conflict of interest means when it comes to a grant

17   application.

18   A.        Conflict of interest is essentially when there

19   is some sort of conflict between what a researcher or

02:19PM  20   anyone who is working on a project has in their

21   university life and some other external factor that's

22   going on, maybe professional or personal.

23   Q.        Are you familiar with the term "conflict of

24   commitment" as it relates to grant applications?

25   A.        Yes.

Q.        Will you please explain to the jury what a
conflict of commitment is.

A.        A conflict of commitment is usually associated
with the time that an individual has in their employment
and where they spend that time, and the conflict can be
you can't work more than a certain amount of time in
multiple places.

Q.        What, if any, duty does the university have in
applying for grants to disclose conflicts of interest
and conflicts of commitment to a sponsoring agency?

A.        Each sponsor has some of their own
requirements, but whenever those requirements do exist,
our office is responsible for reviewing the application
materials and trying to identify if there is anything in
there that would represent a conflict.

Q.        And why is it important to disclose those
conflicts?

A.        There are -- there is certain financial issues
that may come up related to a conflict.  There are
certain sponsors who do not allow certain conflicts to
exist, and when those situations occur, it's important
that we disclose those to the sponsor so that everyone
is aware of the situation at hand.

Q.        Now I'll ask that you please walk the jury
through your duties and responsibilities, but in doing

1   so, explain to them how one goes about applying for and

2   submitting one of these proposals.

3   A.        So the process originates from the faculty

4   member or the researcher themselves.  They come up with

5   some sort of idea that they want to have funded and work

6   on.  Then they will identify a sponsor who has a similar

7   interest who is interested in funding that type of

8   activity.

9        Most sponsors will release what's called a

02:22PM 10  solicitation, and it's their kind of formal process of

11  saying, this is what we're interested in; please submit

12  your application.

13       Then the researcher will prepare the proposal

14  itself, and most people think about the proposal in

15  terms of it being a technical document, and that's true.

16  It's a very important part.  And then there is also a

17  variety of other documents that are included in this

18  comprehensive proposal package.

19       Every sponsor has a little bit of a different

02:22PM 20  format in how you would submit, but usually there is

21  some sort a budget, an explanation of your budget,

22  justification for those costs.  It's common that you

23  will include something called a facilities, equipment,

24  and other resources document that explains how you have

25  the certain equipment or whatever it may need to do the

1    actual work.

2              There is some documents that are very common

3    called a biosketch or biographical sketch which people

4    outside academia would call a resume.  Other -- another

5    important document is a current and pending support

6    form, which essentially lists all of the current support

7    you have for your work, and any pending or essentially

8    proposals that are under review already for your work.

9    Those are all very common.  And then every sponsor may

02:23PM 10   have a subset that they're specifically interested in.

11   Q.       And when the Office of Sponsored Programs is

12   compiling all that information, who, if anyone, do they

13   rely on to provide that information to the university?

14   A.       Depending on the document itself and which one

15   we're talking about, we rely on a couple of different

16   people.  One is the business manager or sometimes the

17   faculty or researcher themselves related to the budget.

18   What are the appropriate costs, you know, how much are

19   the costs, like salaries or supplies.  We don't know how

02:24PM 20   much supply money is really needed because we're not

21   experts in the technical work.  Of course, the technical

22   documents need to be written and prepared by the faculty

23   members or researchers.  They're the experts in that

24   area.  Other documents like the biographical sketch.

25   That will include things like a publications list that

1    we would rely on a faculty member to prepare because we

2    don't know what publications that they have written.

3         We would -- that document can also include

4    appointments at institutions.  Also, they have to

5    provide that because we don't know everywhere that they

6    work.  Another is their educational preparation, where

7    they went to school; what they majored in.  Again, we

8    would rely on them to provide us with that type of

9    information.

02:24PM  10   Q.    Does your office independently investigate or

11   verify that information provided to you by UTK

12   researchers?

13   A.    No.

14   Q.    So, now I'd like to move to the next step of

15   the proposal process.  After all of these documents have

16   been gathered and reviewed, please explain to the jury

17   what happens next.  How does this get sent off, and walk

18   them through that process.

19   A.    Okay.  So once the faculty member and the

02:25PM  20   proposal coordinator interact and the proposal is

21   considered finished, most sponsors, especially the

22   larger, like, federal-type sponsors, they have an

23   electronic system that you would enter your documents,

24   fill in some blanks, attach some files, and once the

25   faculty member says, yes, those are all the final

1  versions, those are the copies that I want to have

2  submitted, the proposal coordinator in the office would

3  log into that port on the official, like, clicking the

4  button to send it on to the sponsor.

5  Q.       Now, earlier you mentioned that different

6  universities are -- excuse me -- different sponsors have

7  different restrictions.  Are you familiar with sponsored

8  programs funded by NASA?

9  A.       Yes.

02:26PM 10  Q.       What, if any, restrictions are you aware of

11  that NASA places on their -- on their awards?

12  A.       The restriction that NASA places on their

13  awards is that individuals receiving funding from NASA

14  doing work on NASA projects cannot have affiliations and

15  members of the research team cannot have affiliations

16  with China or Chinese entities.

17  Q.       Are -- did -- as a result, are you familiar

18  with whether or not the Office of Sponsored Programs at

19  the University of Tennessee developed any type of policy

02:27PM 20  or assurance on how they communicate their compliance to

21  NASA?

22  A.       There is a form.

23  Q.       Are you familiar with that form?

24  A.       Yes, it is called the Chinese -- China

25  Assurance form.

1  Q.        What is the purpose of that form?

2  A.        That form lays out the restrictions that are

3  in -- that are set forth by NASA.

4  Q.        In addition to laying out those restrictions,

5  what, if anything else, does the form assert?

6  A.        It would assert that the -- we would provide

7  that document to the faculty member and ask them to

8  verify that they understand that document, and once they

9  do that, then we would sign that document and that would

02:27PM 10  be our assertion onto the -- to NASA that it is correct.

11  Q.        Do you occasionally sign these NASA assurance

12  forms?

13  A.        I used to sign them, yes.

14  Q.        Who currently signs those forms?

15  A.        My supervisor now signs those forms.

16  Q.        Who is your supervisor?

17  A.        Her name is Jean Mercer.

18  Q.        Do you remember, ballpark, when you stopped

19  signing them and Jean Mercer started signing them?

02:28PM 20  A.        I would estimate four years ago.

21  Q.        I'd like to draw your attention now to

22  approximately January of 2016.  At that time, were you

23  acting as a supervisor in the Office of Sponsored

24  Programs?

25  A.        2016?  Yes, I was.

1   Q.      Did you supervise the work of an individual by

2   the name of Drew Haswell?

3   A.      I did.

4   Q.      What was Drew Haswell's position?

5   A.      He was a proposal coordinator.

6   Q.      Is that the same position that you had before

7   you were promoted?

8   A.      Yes.

9           (Government's Exhibit 8-E was marked for

02:29PM 10          identification.)

11          MR. MC KENZIE:  Your Honor, I'd like to show

12  the witness what has been marked for identification as

13  Exhibit 8-E, as in Edward.

14  BY MR. MC KENZIE:

15  Q.      Showing you 8-E.

16          MR. MC KENZIE:  And could we just zoom in on

17  the top there.  Thank you.

18  BY MR. MC KENZIE:

19  Q.      What does this appear to be?

02:29PM 20  A.      This -- this appears to be a proposal from

21  Drew's email sent to a Dr. Bar-Cohen on behalf of

22  Dr. Anming Hu.

23  Q.      Did you write this email?

24  A.      I do not believe so, no.

25  Q.      Did you -- were you a recipient on this email?

1   A.        No.

2   Q.        Just looking, does this email appear to have a

3   number of attachments?

4   A.        It appears to have three.

5              (Government's Exhibit 8-F was marked for

6              identification.)

7   BY MR. MC KENZIE:

8   Q.        Okay.  I'd like to move now to one of those

9   attachments, 8-F.

02:30PM  10        MR. MC KENZIE:  And could we zoom in on the top

11   of this.

12              And can we blow up the Funding Agency, PI

13   Name(s), and Project Title.

14   BY MR. MC KENZIE:

15   Q.        What type of document is this?

16   A.        This is a budget form.  In the College of

17   Engineering, they have a required budget template that

18   they prepare internally and route through the college

19   and onto the central office.

02:30PM  20   Q.        Is this the type of proposal form that

21   frequently came through your office?

22   A.        Very frequent.

23   Q.        Could you -- could you please read the Project

24   Title?

25   A.        "Microgravity effects on molten metal flow of

1    rapidly heated new generation nano-braz and traditional

2    braze materials."

3             MR. MC KENZIE:  Could we please scroll down to

4    page 9.

5             THE COURT:  Any objection to making this an

6    actual Exhibit 8-F?

7             MR. MC KENZIE:  Pursuant to our earlier

8    stipulations, Your Honor, I'll move to admit 8-F.

9             THE COURT:  We'll admit 8-F.

02:31PM  10             (Government's Exhibit 8-F was received into

11              evidence.)

12             THE COURT:  What about the email?

13             MR. MC KENZIE:  It's stipulated, so we might as

14    well move it in, too.

15             THE COURT:  We'll admit 8-E and 8-F.

16             (Government's Exhibit 8-E was received into

17              evidence.)

18    BY MR. MC KENZIE:

19    Q.       Could you please read the paragraph that

02:31PM  20    begins, "Dr. Anming Hu..."

21    A.       "Dr. Anming Hu, UTK, assistant professor at the

22    Department of Mechanical, Aerospace, and Biomedical

23    Engineering, has a Ph.D. in applied physics.  He will be

24    responsible for the nano-brazing, the reactive

25    multilayer metal films and m-NPs synthesis, as well as

1  nondestructive evaluations, including scanning acoustic

2  microscopy, X-ray CT and Synchrotron X-ray tomography,

3  and the in-situ imaging characterization."

4  Q.       Thank you for reading that.

5           (Government's Exhibit 8-G was marked for

6            identification.)

7           MR. MC KENZIE:  Could we now show the witness

8  another one of those attachments, 8-G.

9           And pursuant to that stipulation, I'd like to

02:32PM  10  move 8-G, as in George, into evidence.

11           THE COURT:  So admitted.

12           (Government's Exhibit 8-G was received into

13            evidence.)

14  BY MR. MC KENZIE:

15  Q.       Could you read the title of this -- first, what

16  is this?

17  A.       This is a pretty stock letter that the

18  university would include when we are a -- submitting a

19  proposal to another organization who would be the prime

02:33PM  20  recipient of the funding.

21  Q.       What is the title of the proposal?

22  A.       "Microgravity effects on molten metal flow of

23  rapidly heated new generation nano-braz and traditional

24  braze materials".

25  Q.       Who is the recipient of this letter?

1  A.        Dr. Yoseph Bar-Cohen.

2  Q.        And if I could direct your attention to the

3  first para- -- first sentence of the first full

4  paragraph.  Who is the co-investigator in this letter?

5  A.        Dr. Anming Hu.

6          MR. MC KENZIE:  And could we please slide down

7  to the bottom.

8  BY MR. MC KENZIE:

9  Q.        Whose signature is on this letter?

02:33PM  10  A.        That's mine.

11  Q.        What purpose does this letter serve?

12  A.        The -- when we include a letter like this in

13  our proposal to a lead organization, who would then

14  submit it on to another organization, we write this to

15  ensure that they under- -- that we're committing to the

16  statement of work that we're providing.  We're saying

17  how much money we expect to receive for that work.  And

18  then we include the dates that we would anticipate the

19  project to happen.

02:34PM  20          (Government's Exhibit 8-H was marked for

21           identification.)

22          MR. MC KENZIE:  Your Honor, I'd like to show

23  the witness 8-H, as in Harry, and I'd like to move this

24  into evidence as well.

25          THE COURT:  So admitted.

 1                    (Government's Exhibit 8-H was received into

 2                     evidence.)

 3     BY MR. MC KENZIE:

 4     Q.          Will you please read the proposed title on the

 5     top of the screen?

 6     A.          "Microgravity effects on molten metal flow of

 7     rapidly heated new generation nano-braz and traditional

 8     braze materials."

 9     Q.          Please explain to the jury what this document

02:35PM 10     is.

11     A.          This is the China Assurance form that I

12     mentioned earlier.

13                 MR. MC KENZIE:   April, can we scroll down,

14     please.

15     BY MR. MC KENZIE:

16     Q.          Whose signature is on this form?

17     A.          That is mine.

18     Q.          Why did you sign this document?

19     A.          When we submit proposals related to NASA

02:35PM 20     funding, we are required to make the attestation that we

21     are -- that the project personnel do not have

22     affiliations with China or Chinese entities.

23                 So when the process of the proposal review

24     happens, the proposal coordinator will go through the

25     process of verifying that through the faculty member.

1   That individual, whoever is reviewing that proposal,

2   will then send it on to me.  I sign the document.

3   Q.      Will you please read that last bold paragraph

4   for the jury.

5   A.      (As read) "This letter of assurance is

6   predicated on the understanding that NASA Class

7   Deviation [implementing NASA Restrictions on Funding

8   Activities with the People's Republic of China] does not

9   apply to the participation of students, faculty, and

02:36PM 10  staff from non-Chinese entities engaged in fundamental

11  research with a meaning consistent with the National

12  Security Decision Directive 198 (sic).  Such fundamental

13  research does not raise national security or economic

14  security concerns."

15  Q.      At the time you signed this form, did you

16  believe it was accurate?

17  A.      Yes.

18  Q.      Upon what did you base that belief?

19  A.      The process in the office is such that the

02:36PM 20  proposal coordinator would verify that.  So I made my

21  signature based under the assumption that they had done

22  that verification process.

23  Q.      At the time you signed this, did you have any

24  reason to believe that the defendant was employed by a

25  university in China?

1  A.       I did not.

2  Q.       If you had known that he worked at a university

3  in China, would you have signed this document?

4  A.       No.

5  Q.       What would you have done?

6  A.       I would have gone back to make sure that the

7  faculty member was aware of the document, and if they

8  would still have said, "No, I'm not," and I had personal

9  knowledge that there was an employment relationship, I

02:37PM  10  would have referred that on to the supervisor or our

11  research compliance unit.

12  Q.       Would you have submitted it to NASA?

13  A.       No.

14  Q.       I'd like to direct your attention now to

15  September of 2016.  At that time, were you also -- were

16  you still working as a supervisor in the Office of

17  Sponsored Programs?

18  A.       Yes.

19           (Government's Exhibit 8-K was marked for

02:38PM  20            identification.)

21           MR. MC KENZIE:  I'd like to show the witness

22  Exhibit 8-K, as in kite.  And pursuant to our earlier

23  stipulation, I'd like to move 8-K into evidence.

24           THE COURT:  So admitted.

25

1          (Government's Exhibit 8-K was received into

2           evidence.)

3    BY MR. MC KENZIE:

4    Q.        Will you please read the title of this document

5    for the jury.

6    A.        "Nanobrazing stainless steel containers for

7    breaking the chain-of-contact (BTC) Mars Sample Return

8    Mission."

9    Q.        And in whose name is listed underneath that

02:38PM  10  title?

11   A.        Anming Hu.

12   Q.        What is -- in general terms, what is this

13   document?

14   A.        This appears to be a proposal statement of

15   work, the technical content of an application package.

16   Q.        Who prepares this type of document, these

17   proposal packages?

18   A.        The technical document would be prepared by the

19   faculty member or the researchers.

02:39PM  20  Q.        Would this proposal be accompanied with

21   a -- with a commitment letter from the university when

22   it was sent to NASA or some other funding agency?

23   A.        If -- if we are a subcontractor, the letter is

24   usually included.  If we submit the proposal directly to

25   the sponsor, so if we were to submit it directly to

1    NASA, it would not include a letter.  If we submitted it

2    to someone else and we were doing a part with them, then

3    a letter would be included.

4              (Government's Exhibit 8-J was marked for

5               identification.)

6              MR. MC KENZIE:  April, can we show the witness

7    8-J, as in Jeffrey.

8              I'd move to admit 8-J into evidence as well.

9              THE COURT:  So admitted.

02:40PM 10    (Government's Exhibit 8-J was received into

11               evidence.)

12   BY MR. MC KENZIE:

13   Q.        What is -- what is 8-J?

14   A.        This is a letter of commitment that we would

15   have included for a proposal in which we were not the

16   lead recipient.

17   Q.        Will you please read the title under, "NASA

18   proposal entitled..."

19   A.        "Nanobrazing stainless steel containers for

02:40PM 20   breaking the chain-of-contact (BTC) Mars Sample Return

21   Mission."

22   Q.        Who is the recipient of this letter?

23   A.        Dr. Joseph Bar-Cohen.

24   Q.        Directing your attention to the first sentence

25   of the first paragraph.  Who is the University of

1    Tennessee investigator?

2    A.        Dr. Anming Hu.

3    Q.        And who signed this letter?

4    A.        I did.

5    Q.        Why did you sign this letter?

6    A.        It would be included in our submission package

7    on to -- I believe the sponsor was JPL at the top of the

8    document.

9    Q.        Looking at this letter, you said you believed

02:41PM 10   JPL was the recipient.  Had you worked with JPL in the

11   past?

12   A.        I would assume so.  We work with many sponsors.

13   Q.        Do you know who the ultimate funding agency was

14   for this proposal?

15   A.        Based on the title -- if we could scroll back

16   up -- where it's listed NASA proposal, that would

17   indicate NASA would be giving money to JPL and JPL would

18   be giving money to us.

19   Q.        If NASA was funding it, do you believe that the

02:42PM 20   NASA restrictions applied?

21   A.        Yes.

22   Q.        Why is that?

23   A.        When -- when you receive a subcontract

24   from -- from -- when one entity gives money to another,

25   when a sponsor gives money to an institution and an

1   institution subcontracts it to us, there is something

2   called flow-down terms, which are any terms and

3   conditions which the sponsor put on the prime recipient

4   also would be given to the subrecipients.

5   Q.        At the time you submitted this letter, did you

6   have any reason to believe that the defendant held a

7   position as an employee of a Chinese university?

8   A.        I did not.

9   Q.        If you did have reason to believe that Dr. Hu

02:42PM  10  was employed by a Chinese university, would you have

11  submitted this proposal?

12  A.        No.

13  Q.        What would you have done?

14  A.        I would have -- with firsthand knowledge of

15  that, I would have gone back to the faculty member to

16  ensure that they knew the restrictions, and if they

17  still said no, I would refer that on to either my

18  supervisor or the compliance units.

19            (Government's Exhibit 9-B was marked for

02:43PM  20             identification.)

21  BY MR. MC KENZIE:

22  Q.        I'd like to direct your attention now to in or

23  about August of 2018, and I'd like to show you what has

24  been marked as 9-B, as in boy.

25            MR. MC KENZIE:  And I'd like to go ahead and

1   move to admit 9-B, as in boy.

2            THE COURT:  So admitted.

3            (Government's Exhibit 9-B was received into

4             evidence.)

5   BY MR. MC KENZIE:

6   Q.       What is this?

7   A.       This is another letter of commitment.

8   Q.       And who is this letter directed to?

9   A.       Not to a specific person, but to Marshall Space

02:43PM 10  Flight Center.

11  Q.       Will you please read the title of this

12  proposal.

13  A.       (As read) "Printed metallic sensors based on 3D

14  printing and laser sintering on aluminum nanoinks."

15  Q.       And who is -- based on this letter, who is

16  funding this project?

17  A.       NASA.

18  Q.       As a result, did you believe that the NASA

19  restrictions applied?

02:44PM 20  A.       Yes.

21  Q.       Why?

22  A.       When the -- when a sponsor gives money to a

23  prime recipient, those flow-down terms, the terms that

24  are given to the prime recipient, would flow down to the

25  subrecipients as well.

1   Q.          What was the purpose of this letter?

2   A.          This -- the letter of commitment is to confirm

3   our involvement of our faculty member, how much money

4   we're expecting to receive, the dates to be performed,

5   and it says that we'll do the statement of work that was

6   included in the application.

7   Q.          At the time --

8              MR. MC KENZIE:  Can we scroll down a little

9   bit.

02:45PM   10   BY MR. MC KENZIE:

11   Q.          Did you sign this letter?

12   A.          I did.

13   Q.          At the time that you signed this letter, did

14   you have any reason to believe that the defendant worked

15   at a Chinese university?

16   A.          No.

17   Q.          If you did, would you have signed this letter?

18   A.          No.

19   Q.          If you did believe that the defendant worked at

02:45PM   20   a Chinese university, would you have submitted this

21   letter?

22   A.          No.

23              (Government's Exhibit 9-D was marked for

24               identification.)

25              MR. MC KENZIE:  Your Honor, I'd like to show

 1   the witness now 9-D, as in dog.

 2            THE COURT:  All right.  We'll admit this

 3   document as well.

 4            (Government's Exhibit 9-D was received into

 5             evidence.)

 6   BY MR. MC KENZIE:

 7   Q.       Will you explain to the jury in general terms

 8   what this document is.

 9   A.       This appears to be the top part of the

02:46PM 10   technical document related to a proposal, and I would

11   assume it's to Marshall Space Flight Center.

12   Q.       Sorry to make you read scientific terms again,

13   but will you please read the project title.

14   A.       (As read) "Printed metallic senors based upon

15   3D printing and laser sintering of aluminum nanoinks."

16   Q.       Will you please read what it says under

17   Principal Investigator.

18   A.       "Dr. Anming Hu, Assistant Professor,

19   Mechanical, Aerospace, and Biomedical Engineering,

02:46PM 20   University of Tennessee, Knoxville, 4904 Doughty

21   Engineering Building, 1512 Middle Drive, Knoxville,

22   Tennessee 37796."

23   Q.       Is this the proposal that was submitted along

24   with the letter containing the same title that we just

25   looked at in 9-B, as in boy?

1   A.        I would assume so based on the titles.

2             MR. MC KENZIE:   Your Honor, I have no further

3   questions.

4             THE COURT:   Thank you.

5             Cross-examination?

6                        CROSS-EXAMINATION

7   BY MR. LOMONACO:

8   Q.        Hello, Mr. Smelser.

9   A.        Hello.

02:47PM 10  Q.        How did you develop your opinion that Anming Hu

11  working part-time for a Chinese university would be

12  disqualified from the NASA grant?

13  A.        The -- the training that I received, it would

14  indicate that NASA has --

15  Q.        Which training is that?

16  A.        From the time I entered the Office of Sponsored

17  Programs in 2008.

18  Q.        Okay.  So is there a training manual for that?

19  A.        No.

02:47PM 20  Q.        All right.  Is there a brochure or a handout

21  for that training?

22  A.        No.

23  Q.        Who gave you the training?

24  A.        When I originally entered the Office of

25  Sponsored Programs, the first lady that I worked with

1  for training of all sorts, her name was Carolyn Webb.

2  Q.        Carolyn Webb?

3  A.        Yes.

4  Q.        And what did she tell you?

5  A.        She trained me on all sorts of things related

6  to all sorts of sponsors.  So I cannot say specific

7  words as to what she said on any specific topic.

8  Q.        Well, can you say specific words on what she

9  said about the NASA restriction?

02:48PM  10  A.        I cannot say when or how she explained that to

11  me.

12  Q.        Okay.  Well, you just got done saying that the

13  restriction -- that people working on grants do not have

14  any affiliation with China.  You don't recall her

15  telling that you now.  You say you don't recall any

16  specifics she told you?

17  A.        I don't -- since coming to the office, I don't

18  recall specifically how I learned that information.

19  Q.        Did you go to the fraud awareness meeting that

02:49PM  20  the FBI held at the University of Tennessee in 2018?

21  A.        I have attended one meeting that the FBI held.

22  I do not know what time or date it was.

23  Q.        Was it in '18 or '19?

24  A.        I do not know.

25  Q.        Okay.  They held four of them.  You only went

 1    to one?

 2    A.        Correct.

 3    Q.        Okay.  At that meeting, it was all about

 4    Dr. Hu; right?

 5    A.        I do not recall that, no.

 6    Q.        You don't recall that?

 7              Okay.  You don't recall what they talked about

 8    at all?

 9    A.        My recollection of that meeting was explaining

02:50PM  10   or letting folks on campus know of an increased concern

11    of undue influence of foreign entities and an increasing

12    awareness of foreign governments and a program called

13    the Thousand Talents Program and how that some faculty

14    are working in different countries and may have an

15    intent to take the intellectual property that is

16    developed in one country and take it to a different

17    country.

18    Q.        And the topic of Professor Hu was mentioned?

19    A.        Not that I recall.

02:50PM  20   Q.        No?

21              You don't recall what year it was either,

22    though?

23    A.        No.

24    Q.        All right.  Now, the assurance form lays out

25    the restrictions; correct?

1  A.      Yes.

2  Q.      And you said there is a restriction that people

3  working on grants not have any affiliation with China.

4  And if we look at the Government's Exhibit 8-E, that

5  word "affiliation" is not in that form at all, is it?

6          MR. LOMONACO:  Can you put 8-E up, Government's

7  Exhibit.

8          MR. PARSONS:  E?

9          MR. LOMONACO:  Uh-huh.

02:51PM 10          MR. PARSONS:  Are you looking for the China

11  Assurance?

12          MR. LOMONACO:  Yeah.  I had 8-E on here.  Oh,

13  I'm sorry.  H.

14  BY MR. LOMONACO:

15  Q.      This is the assurance; right?

16  A.      Yes, it's the China Assurance form.

17  Q.      Now, where does it say that people working on

18  grants not have any affiliation with China?  The word

19  "affiliation" isn't there; right?

02:52PM 20  A.      Correct.  I used the word affiliation

21  with -- with respect to the "not participate,

22  collaborate or coordinate bilaterally."

23  Q.      Okay.  So that's the proposer may not do that;

24  right?

25  A.      Correct.

1  Q.        And who is the proposer?

2  A.        The University of Tennessee on behalf of the

3  faculty members.

4  Q.        Okay.  So the proposer is the University of

5  Tennessee, and it says the proposer will not

6  participate, collaborate or coordinate.

7          Would it be fair to say that, in your opinion,

8  this document could have been rewritten to make it a

9  little bit more clear what it means?

02:53PM  10          MR. MC KENZIE:  Objection.  His opinions are

11  irrelevant and also the opinion testimony of a

12  layperson.

13          THE COURT:  Speak up a little bit?

14          MR. MC KENZIE:  Also seeking the opinion of a

15  layperson.

16          MR. LOMONACO:  I'm asking about his opinion,

17  Your Honor, whether reading this and using it all the

18  time, whether he has an opinion that it could be written

19  so it wouldn't be so confusing.

02:53PM  20          THE COURT:  We'll leave that for argument.

21  I'll sustain the objection.

22          MR. LOMONACO:  Okay.

23  BY MR. LOMONACO:

24  Q.        Now, Mr. Smelser, you're -- Exhibit 20 --

25  you're also involved, besides the NASA grant, in the

1  NSF, National Science Foundation grants; is that

2  correct?

3  A.        Our office would submit proposals to all

4  sponsors.

5  Q.        You've signed them before?

6  A.        I have submitted proposals to NASA -- or

7  sorry -- to the National Science Foundation.

8  Q.        I'm sorry; I'm getting old and I can't hear

9  very well anymore.  But can you speak up a little bit.

02:54PM 10  A.        I have submitted proposals to the National

11  Science Foundation.

12  Q.        Have you submitted one for Professor Hu that

13  you remember?

14  A.        Not that I remember specifically.

15            (Defendant's Exhibit 20 was marked for

16             identification.)

17  BY MR. LOMONACO:

18  Q.        Let me show you what's been marked Exhibit 20,

19  Defendant's Exhibit 20.

02:54PM 20            MR. LOMONACO:  And, Your Honor, I'd like to

21  move that in, if I could.

22            THE COURT:  Without objection, so admitted.

23            (Defendant's Exhibit 20 was received into

24             evidence.)

25

1    BY MR. LOMONACO:

2    Q.        Let's take a look at this, and let's go down to

3    the bottom and see if we can find out who is involved in

4    this; okay?

5              MR. LOMONACO:  At the bottom.  I'm sorry, I

6    thought the signature line was at the bottom, but I

7    guess it's at the top.  There it is (indicating).

8    BY MR. LOMONACO:

9    Q.        Do you see that?  Was this one that you got

10   involved in?

11   A.        That stamp there would have been placed when I

12   clicked the submit button in the NSF portal.

13   Q.        Okay.  So you submitted this?

14   A.        Correct.

15   Q.        It's got your name on it?

16   A.        Correct.

17   Q.        And this is a project submitted by you on

18   behalf of Dr. Hu; is that correct?

19             Let's take a look at the beginning of it.

20   A.        That's correct.

21   Q.        Okay.  Now, NSF is what, National Science

22   Foundation?

23   A.        Correct.

24   Q.        And you get grants from them?

25   A.        Yes.

1  Q.        And Professor Hu does research and tries to

2  help the university get grants from the National Science

3  Foundation?

4  A.        He has submitted proposals to NSF, yes.

5  Q.        Yes.  He's submitted quite a few of them,

6  hasn't he?

7  A.        I believe so.

8            MR. LOMONACO:  And let's turn to the

9  highlighted part.

02:56PM  10  BY MR. LOMONACO:

11  Q.        This actual grant application has a section,

12  does it not, for --

13            MR. LOMONACO:  Keep going.  There it is

14  (indicating).

15  BY MR. LOMONACO:

16  Q.        -- for listing collaborations, for Professor

17  Hu's collaborations; right?

18  A.        Correct.

19  Q.        This NSF form asks the question, "Have you

02:57PM  20  collaborated or associated or affiliated with other

21  entities?"  Right?

22  A.        The various sections of this have some time

23  limits to say within the last 48 -- 48 months, within

24  the last 24 months.

25  Q.        Yes, all they're interested in is if you've

1    messing with somebody in the last couple years; right?

2    Four years or whatever?

3    A.        If you've had a collaboration, yes.

4    Q.        Collaboration.  And your understanding of

5    collaboration is Professor Hu working or collaborating

6    with somebody outside the University of Tennessee?

7    A.        Or inside, but --

8    Q.        Or inside.

9    A.        Yes.

02:57PM 10    Q.        And isn't it a fact that on this page right

11    here (indicating), Professor Hu reports some students

12    and the Beijing University of Technology in China?

13    A.        I --

14    Q.        Is that right?

15    A.        It's in the Graduate Student and Postdoctoral

16    Student section.  There is an individual listed at

17    Beijing University of Technology.

18    Q.        Yes.  And you go up to the Collaborators

19    section and it says Tao Chen, Beijing University of

02:58PM 20    Technology; right?

21    A.        Yes.

22    Q.        So when he's asked, he provides the

23    information.

24    A.        It is included in this proposal, yes.

25    Q.        Now, NASA doesn't have this kind of clause or

1  question on their form, does it?

2  A.        In their biographical sketch form?

3  Q.        Yeah.  I mean, on the proposal.  There is no

4  place where it says, "List your collaborations within

5  the last 48 months."  There is nothing there, is there?

6  A.        I don't recall that there is.

7  Q.        Well, so you have had training on the NSF?

8  A.        Yes.

9  Q.        And you've had training on NASA?

02:59PM 10  A.        Yes.

11  Q.        Do you recall the 48 hours on NSF -- 48 months

12  on NSF, but you don't recall if there is any question on

13  the NASA form?

14  A.        I do not.  I have -- in my current role, I

15  don't review proposals very often at all.  So for the

16  last seven years, that's not been my primary

17  responsibility.

18  Q.        If Professor Hu is disclosing his

19  collaborations and his affiliations with Beijing

02:59PM 20  University on the NSF grant, why would he do that if

21  he's trying to hide his collaborations?

22              MR. MC KENZIE:  Objection.

23              MR. LOMONACO:  I'll withdraw that question,

24  Your Honor.  Halfway through it, I knew I was going to

25  get an objection.

1    (Defendant's Exhibit 16 was marked for

2         identification.)

3  BY MR. LOMONACO:

4  Q.    Let's turn to Exhibit 16, if we can.  In

5  this -- can you identify what this is?

6  A.    It appears to be a contract from the Jet

7  Propulsion Lab.

8  Q.    Would a contract have an assurance letter

9  attached to it?

03:01PM  10  A.    I don't review contracts for the university.

11  Q.    You don't review contracts?

12  A.    I do not.

13  Q.    Okay.  So you're not involved in this at all?

14  A.    Not after the proposals are submitted.

15  Q.    Okay.

16    MR. LOMONACO:  Do we have the proposal on this?

17  BY MR. LOMONACO:

18  Q.    While they're looking for that, are you

19  familiar with the performance of Mr. Hu on these

03:01PM  20  contracts?

21  A.    No.

22  Q.    No?

23    So your job is basically just to help put the

24  proposal together, make sure the technical aspects are

25  all correct; is that it?

 1  A.       Our office doesn't review the technical content

 2  for any sort of correctness.  We would review for

 3  sponsor compliance and --

 4  Q.       Sponsor compliance?

 5  A.       Correct, like, are the forms -- are the correct

 6  forms included and things like that.

 7  Q.       Okay.  So I think all we're going to be able to

 8  show you is the proposal for the JPL subcontract.  Does

 9  that look like what this is?

03:02PM 10  A.       It looks like the beginning section of a

11  proposal, but I -- I don't know who the sponsor is.

12           (Defendant's Exhibit 81 was marked for

13            identification.)

14           MR. LOMONACO:  Let's go on down through it.

15           Your Honor, this is Exhibit 81 for

16  identification.  I'd ask that it be moved into --

17           THE COURT:  81, so admitted.

18           MR. LOMONACO:  Thank you.

19           (Defendant's Exhibit 81 was received into

03:03PM 20            evidence.)

21  BY MR. LOMONACO:

22  Q.       There is no assurance letter on this proposal.

23  Do you know why?

24  A.       I do not.

25  Q.       It should have one; right?

1  A.      Over the course of the past several years, the

2  processes in the office have changed.  At what point we

3  were -- we began including the letters for subcontracts

4  versus prime, I don't know when that changed.

5  Q.      Okay.  Now, are you familiar with any training

6  UT does now on the NASA restriction?

7  A.      Specific to the NASA restriction?

8  Q.      Uh-huh.

9  A.      No.

03:04PM 10  Q.      Are you still involved with the grants for NASA

11  proposals?

12  A.      I do -- I very rarely review.  The proposal

13  coordinators do the reviews.

14  Q.      For what?

15  A.      The proposal coordinators do the reviews.

16  Q.      The proposal for what review?

17  A.      The proposal coordinators.

18  Q.      Coordinators.  Okay.

19          So -- I'm sorry; I don't understand your

03:04PM 20  answer.

21          Are you still involved in the NASA grant

22  proposals?

23  A.      I very rarely review a proposal for any

24  sponsor.  The proposal coordinators, the proposal

25  coordinating staff do those reviews.

1  Q.      All right.  So if they have new training for

2  NASA proposals, you wouldn't go to that training; right?

3  A.      If a -- if a sponsor offered a training, I may

4  attend that training.

5  Q.      What about if UT produced and created a new

6  training manual for proposals for NASA grants, would you

7  go to that training or get a copy of that proposal?

8  A.      If there was a -- if there was a new

9  requirement that was issued, I would probably attend

03:05PM  10  that training.

11  Q.      New requirement.  No, a new training proposal.

12  That's what I'm saying.  Would you get a copy of that or

13  go to that training?

14  A.      I don't understand the term "training

15  proposal".

16  Q.      If the -- if the University of Tennessee puts

17  together a manual that says how you would propose a NASA

18  grant, would you be given a copy of that manual?

19  A.      Most likely, yes.

03:05PM  20  Q.      Okay.  Have you been given a copy of one in the

21  last year or two?

22  A.      I don't know that such a training manual

23  exists.

24  Q.      All right.

25          MR. LOMONACO:  Excuse me one moment.  Put it on

1    the screen.

2    BY MR. LOMONACO:

3    Q.        Did you go to the 2016 training on NASA

4    proposals?

5    A.        I do not know.

6    Q.        Did you go to the 2018 training on NASA

7    proposals?

8    A.        I do not know.

9    Q.        Well, okay.

03:06PM    10            Do you see this --

11            MR. LOMONACO:  What exhibit is this?

12            MR. PARSONS:  14.

13            (Defendant's Exhibit 14 was marked for

14             identification.)

15            MR. LOMONACO:  Your Honor, I'd move Exhibit 14

16    as the proposal and budget development from 2016.

17            THE COURT:  14?  This is 14?

18            MR. LOMONACO:  Yes, 14, Your Honor.

19    Exhibit 14.

03:07PM    20            THE COURT:  So admitted.

21            (Defendant's Exhibit 14 was received into

22             evidence.)

23            MR. LOMONACO:  Let's go down to page 2 for a

24    minute.  Slow down for a minute.  Go to the first page.

25

1    BY MR. LOMONACO:

2    Q.        It says, "The objective of this session is to

3    offer tips for developing proposals and budgets for

4    multiple sponsors.  We will explore different budget

5    formats required, as well as some specific nuances for

6    different agencies."

7              MR. LOMONACO:  Can you go to the next page?

8    BY MR. LOMONACO:

9    Q.        Does this look familiar?

03:07PM 10    A.        Yes.

11    Q.        You've seen this before?

12    A.        That budget format?

13    Q.        Yes.  Have you seen this document before?

14    A.        I can't say specifically that I have.

15    Q.        Okay.

16              MR. LOMONACO:  Keep going.  Now -- wait a

17    minute.  Back up.

18    BY MR. LOMONACO:

19    Q.        NIH, National Institute of Health, that's an

03:08PM 20    agency that gives grants sometimes; correct?

21    A.        Correct.

22              MR. LOMONACO:  Okay.  Keep going.

23    BY MR. LOMONACO:

24    Q.        And they have got several pages; right?

25    Talking about that; right?

1    MR. MC KENZIE:  Your Honor, objection.  The

2  witness says he's not familiar with this document and

3  hasn't seen it.

4    MR. LOMONACO:  I think he just said he was.

5    THE COURT:  Let's see if he is.  Ask your

6  question.

7  BY MR. LOMONACO:

8  Q.    All right.  Do you recall having this training

9  document?

03:08PM 10  A.    I may have attended a training, this training.

11  I don't know.

12  Q.    Okay.  Let me show you another page.  Maybe it

13  will help.

14    MR. LOMONACO:  Go up one page.  No, the other

15  way.  Down one page.  There you go.  All right.

16  BY MR. LOMONACO:

17  Q.    Right there (indicating), that's NASA insignia

18  right there; right?

19  A.    Yes.

03:08PM 20    MR. LOMONACO:  Okay.  Keep on going.

21  BY MR. LOMONACO:

22  Q.    Does that look familiar?

23  A.    The logo does.

24  Q.    Okay.  Well, let's get to the part about NASA

25  and we'll read and see if you agree with it.  There

1    (indicating).  "Special proposal requirements for NASA

2    submissions."

3            MR. MC KENZIE:  I renew my objection.  The

4    witness hasn't said he's familiar with this document.

5    BY MR. LOMONACO:

6    Q.      Have you seen this document?

7            THE COURT:  I mean, he said he didn't recall

8    specifically.  So let's see if he's seen -- this may jog

9    his memory, one way or the other, whether he's seen it

03:09PM 10    or not.  If he hasn't seen it, he can't talk about it.

11    If he has, then he can answer.

12            Go ahead.

13    BY MR. LOMONACO:

14    Q.      "Special proposal requirements for NASA's

15    submissions."  Do you recall seeing that document or

16    going to that training?

17    A.      Not specifically.

18    Q.      Okay.  Never mind.

19            So that was in 2016, if you don't recall that.

03:10PM 20    But there was one in 2018.  Do you recall training on

21    NASA requirements in 2018?

22    A.      Not specifically.

23    Q.      No?  All right.  Hold on a minute.

24            MR. LOMONACO:  Nothing further, Your Honor.

25            THE COURT:  All right.  Thank you.

1    MR. LOMONACO:  Thank you, Mr. Smelser.

2    THE COURT:  Redirect examination?

3    MR. MC KENZIE:  Yes, Your Honor.  Very briefly.

                  REDIRECT EXAMINATION

5  BY MR. MC KENZIE:

6  Q.        You were asked about an NSF application.  Are

7  you, through your training and experience, aware of

8  whether or not NSF has an NSF China restriction similar

9  to NASA's?

03:11PM  10  A.        I do not.

11    MR. MC KENZIE:  Thank you.  No further

12  questions, Your Honor.

13    THE COURT:  Thank you.

14    Any recross?

                  RECROSS-EXAMINATION

16  BY MR. LOMONACO:

17  Q.        If Professor Hu did not list his collaborators

18  on the NSF program, would the NSF deny him a grant?

19    MR. MC KENZIE:  Objection, calls for

03:11PM  20  speculation.

21  BY MR. LOMONACO:

22  Q.        Would you recommend --

23    MR. LOMONACO:  I'll --

24    THE COURT:  Do you want to rephrase it?

25    MR. LOMONACO:  I'll rephrase it.

1    THE COURT:  All right.  Go ahead.

2  BY MR. LOMONACO:

3  Q.    If NSF had -- if there was an application for

4  NSF and Professor Hu, knowing what you know about

5  Professor Hu, did not put down his collaborations, would

6  you recommend that he not get the grant?

7  A.    If I had knowledge that his collab- -- that

8  there were collaborators not listed, we would encourage

9  them to -- a faculty member to list all of their

03:12PM  10  collaborators.

11  Q.    But on your grant, the one you were involved

12  with, he listed his collaborators because he was asked

13  to; correct?

14  A.    I assume he listed all of them.

15  Q.    You what?

16  A.    I assume he listed all of them.  I don't know

17  if all of collaborations are listed or not.

18  Q.    Well, he listed Beijing University; correct?

19  A.    There was -- there was that, yes.

03:12PM  20    MR. LOMONACO:  Thank you, sir.

21    THE COURT:  Thank you.  This witness may be

22  excused, and why don't we go ahead and take an afternoon

23  break at this time.

24    The jury is excused.

25    (Jurors excused from the courtroom.)

1      THE COURTROOM DEPUTY:  This honorable court

2  stands in recess until 3:30.

3      (A brief recess was taken.)

4      THE COURTROOM DEPUTY:  All rise.

5      THE COURT:  Okay.  Looks like we're ready for

6  our next witness.  We'll bring our jury in.

7      (Whereupon the following report of

8       proceedings was had within the presence

9       and hearing of the jury:)

03:37PM  10      THE COURT:  All right.  Thank you.  Everyone

11  may be seated.  And the courtroom deputy will swear in

12  the next witness.

13      (The witness was thereupon duly sworn.)

14      THE COURTROOM DEPUTY:  Have a seat, please.

15  Scoot in.

16      And will you state and spell your name for the

17  record.

18      THE WITNESS:  My legal name, Andrew Haswell,

19  A-n-d-r-e-w.  Last name H-a-s-w-e-l-l.

03:37PM  20      THE COURTROOM DEPUTY:  Thank you.

21      MR. MC KENZIE:  Your Honor, may I inquire?

22      THE COURT:  Yes.

23

24

25

1        **ANDREW HASWELL**,

2    having been first duly sworn, was examined and testified

3    as follows:

4                        DIRECT EXAMINATION

5    BY MR. MC KENZIE:

6    Q.        Mr. Haswell, by whom are you employed?

7    A.        The University of Tennessee, Knoxville.

8    Q.        What is your current position?

9    A.        I am a research coordinator in the College of

03:38PM 10   Arts and Sciences.

11   Q.        And how long have you been in that position?

12   A.        Since about April of 2017.

13   Q.        Prior to April 2017, did you have any

14   experience working in sponsored programs at the

15   University of Tennessee?

16   A.        I did.  That was my position immediately

17   preceding this current position.

18   Q.        And what was your title prior -- at that time?

19   A.        I think colloquially it was a proposal

03:38PM 20   coordinator, but I think formally in HR, it was a

21   sponsored programs administrator.

22   Q.        As a -- at that time when you were working as a

23   proposal coordinator, who was your supervisor?

24   A.        David Smelser.

25   Q.        The jury has already heard about how a grant

1    and everything is put together.  But not in specific

2    detail, in general terms, please explain to the jury

3    what your duties and responsibilities were as a proposal

4    coordinator.

5    A.      Yeah.  We weren't assigned any specific

6    agencies, but proposals would get routed in and our

7    supervisor would assign us to them, and then based on

8    how many days we had until the deadlines, we would do a

9    variety of compliance checks, both for regulations, but,

03:39PM 10    you know, down to scrutinous things like page formats

11    and stuff like that.  Just anything within the agency

12    guidelines.  We would vet the application package to

13    make sure it was complete and obtain institutional

14    approvals, like signatures-wise that we would need, and,

15    you know, review everything to the best we could for

16    accuracy and completeness.

17    Q.      After that review process was completed, what

18    was your role, if any, in submitting the proposal?

19    A.      Yeah.  So, you know, immediately starting in

03:40PM 20    the position, I required some more double-checking, but

21    ultimately proposal coordinators were responsible for

22    submitting everything through the application portals or

23    to the agency representatives via email.  So submitting

24    the final application package.

25    Q.      The underlying documents for the proposals, who

1    provided those documents to you?

2    A.        The faculty or staff person who was desiring to

3    submit a sponsored program would route them through our

4    internal electronic system Cayuse.  Started as

5    TARA-PAMS, but it's been Cayuse most of the time I was

6    in the office.

7    Q.        Would you spell that for the court reporter.

8    A.        Oh, sure.  TARA-PAMS was T-A-R-A-dash-P-A-M-S.

9    Q.        And what was the other acronym you used?

03:40PM 10   A.        Cayuse is the name of the program we use now.

11   It's C-a-y-u-s-e.

12   Q.        During your time as a proposal coordinator, did

13   you ever work on any proposals for NASA?

14   A.        Yes.

15   Q.        Did you become familiar with NASA, whether or

16   not NASA had any funding restrictions?

17   A.        Yes.  I'm aware there was the China Assurance

18   document that we included with all NASA applications.

19   Q.        How did you become aware of those NASA

03:41PM 20   assurance documents?

21   A.        I think through my onboarding as, you know, a

22   proposal coordinator, you know, it was one of the

23   documents listed in the solicitation guidelines for what

24   components need to be included in a complete

25   application, and so any awareness, you know, beyond that

1  would have been from direct discussion with my

2  supervisor.

3  Q.        Have you filled out those NASA assurance forms

4  before or prepared them to be filled out by your

5  supervisors?

6  A.        Yes.  I mean, to my recollection, the only

7  project-specific information would be, like, the title

8  and the lead investigator, and then I would send them to

9  my supervisor for his signature.

03:42PM  10  Q.        Were you allowed to sign those forms?

11  A.        I was not.

12  Q.        Back in 2016, do you recall who did sign them?

13  A.        That would be my supervisor, David Smelser.

14  Q.        Before submitting those forms for Mr. Smelser's

15  signature, what, if anything, would you do to make sure

16  that the document was correct or --

17  A.        Again, time permitting, you know, we discussed

18  all application components with the individual

19  investigators.  So I may have, you know, discussed with

03:43PM  20  them, you know, its inclusion.

21  Q.        Before submitting the document to David Smelser

22  for signature, would you confirm with the investigator

23  that the assurances would be followed?

24  A.        I don't -- I don't remember any standard

25  procedures for doing so.  I don't recall.  2016.  So

1  it's been a long time.

2  Q.      In addition to preparing grant proposals and

3  submissions, did you also conduct training and outreach

4  to the University of Tennessee faculty and staff?

5  A.      Yes.

6  Q.      Was that a major part of your job?

7  A.      No.  I mean, I think when I first started, the

8  office strived to put on regular trainings.  But as time

9  went on, we had less opportunities to do so.  But I

03:44PM  10  would say maybe quarterly, or so, or occasionally

11  monthly there would be sessions, but it was not -- you

12  know, I wouldn't say it was ten or 20 percent of my job,

13  even.

14  Q.      When you were conducting these trainings, did

15  you occasionally use PowerPoint presentations?

16  A.      Yes.

17          (Government's Exhibit 7-Q was marked for

18           identification.)

19          MR. MC KENZIE:  April, can we show the witness

03:44PM  20  what has been marked as 7-Q for identification.

21  BY MR. MC KENZIE:

22  Q.      Do you recognize this?

23  A.      This looks like -- yes, this looks like a

24  proposal training that I delivered with some co-workers

25  in OSP.

1    MR. MC KENZIE:  Your Honor, I ask at this time

2  that 7-Q be admitted into evidence.

3    THE COURT:  So admitted.

4    (Government's Exhibit 7-Q was received into

5    evidence.)

6  BY MR. MC KENZIE:

7  Q.    Did you help prepare this document?

8  A.    I did.

9  Q.    Did you create every slide?

03:45PM  10  A.    I don't think I created every slide.  It was a

11  team effort.  And I think we all kind of divvied up

12  individual components and developed our portion.

13    MR. MC KENZIE:  Could we please go to the very

14  last slide, please.  The very, very end, please.

15  BY MR. MC KENZIE:

16  Q.    Is this your name and contact information as

17  part of the slide?

18  A.    Yeah, it was my contact information at the

19  time.

03:46PM  20  Q.    And who are the other two individuals who are

21  listed?

22  A.    Those were other proposal coordinators in the

23  office.

24  Q.    As part of the training, did you discuss

25  sponsor-specific issues?

A.      Yes, my recollection was that we were, in general, discussing sort of nuts and bolts of applications, and certain sponsors, you know, every year will update requirements.  And so my recollection is that this was mostly, you know, what -- what sort of documents and format are we looking for budget-related issues and then any particular agency requirements for those documents, and then some ad hoc nuts and bolts, if you will.

Q.      Was this created to be like a fulsome, everything you need to know about how to submit a grant-type of presentation?

A.      I don't -- I don't think you could ever really encapsulate everything you need to submit a grant in a one-hour training, but I think it was designed to be an efficient overlook of things that will help tremendously in the process of routing and obtaining approvals.

Q.      Do you recall exactly when you gave this presentation?

A.      I do not.

Q.      Do you recall exactly how many times you gave this presentation?

A.      It's my recollection that it was a single, a one-off training.

Q.      Do you recall any of the particular people who

1    were present during that training?

2    A.         I do not.

3    Q.         Would you say with any certainty whether or not

4    the defendant was present?

5    A.         I could not.

6              MR. MC KENZIE:  Can we direct the witness's

7    attention to slide 37.

8    BY MR. MC KENZIE:

9    Q.         Could you please read the first two bullets on

03:48PM  10    this slide.

11    A.         (As read) "UTK always includes an amended NASA

12    China Assurance document as the final page of an

13    application.  The language indicates that we do not view

14    our faculty, staff, and students to be entities of

15    China."

16    Q.         Do you remember whether or not you created this

17    slide?

18    A.         It -- I don't remember particularly if

19    I -- yeah, it is my -- I do believe that I was assigned

03:48PM  20    this -- this sponsor for the training session.

21    Q.         What, if any, additional guidance did you

22    provide in conjunction with this training on these two

23    bullets, if you remember?

24    A.         I don't remember.  A lot of -- like I -- in

25    trainings like these, it's meant to be a high-level

1  efficient review.  Oftentimes we broach requirements and

2  topics, but we expect the faculty will engage us if they

3  have specific questions about fulfilling those

4  requirements.

5  Q.      Now, drawing your attention specifically to the

6  second -- the second bullet.  Did you personally develop

7  this policy?

8  A.      I did not.

9  Q.      Do you know who did develop this policy?

03:49PM 10  A.      I don't specifically.  I believe -- my

11  recollection is that an export control officer at least

12  reviewed the language and agreed to it, but I'm not sure

13  who came up with the final UT version of it.

14  Q.      Drawing your attention now to January of 2016.

15  I would like to show you Exhibit 8-A.

16          (Government's Exhibit 8-A was marked for

17           identification.)

18          MR. MC KENZIE:  And at this time, Your Honor,

19  I'd like to just go ahead and move 8-A into evidence.

03:50PM 20          THE COURT:  So admitted.

21          (Government's Exhibit 8-A was received into

22           evidence.)

23  BY MR. MC KENZIE:

24  Q.      Before we review this, what is this document?

25  A.      From what I can see on my screen, this looks

1    like an email communication coordinating a proposal

2    submission.

3    Q.        And who does the email -- who is the email

4    from?

5    A.        It's from Dr. Anming Hu.

6    Q.        And who is it sent to?

7    A.        Myself, and Kenneth Carter, who was the College

8    of Engineering coordinator.

9    Q.        And I'd like to direct your attention to the

03:51PM  10   third paragraph.  Could you please read the third

11   paragraph for the jury, please.

12   A.        "For China Assurance:  Are you talking about

13   Hei-" -- forgive me -- "Hefei National Radiation

14   Facilities; right?  I include one letter.  Does it solve

15   this concerning?"

16   Q.        Could you read the subject of the email.

17   A.        "Re:  Proposal No. 16-0121 NASA."

18   Q.        Could you explain to the jury the context in

19   which this email arose.

03:51PM  20   A.        So 16-0121 would be the Cayuse, the electronic

21   routing system, the Cayuse identifier number, and this

22   would be a somewhat typical exchange about components of

23   the application and things we had identified, things we

24   need to include, things we might need to revise.

25   Q.        And scrolling down, showing you an earlier part

1    of the email exchange.  In general, what was this email

2    discussing?

3    A.       It looks like there might have been some effort

4    disclosures in the budget justification that were not

5    being requested for funding, which would technically

6    constitute a formal cost share commitment, which the

7    university tries to avoid when we can.  And so this was

8    discussion about how NASA has a specific table of work

9    effort that they indicate you can -- you can disclose

03:53PM  10    effort here without it being deemed cost share.

11           So I think I was coordinating rather than

12    disclosing the effort in the budget justification to

13    commit cost share that we coordinate that information

14    over to the table of personnel and work effort.

15    Q.       So this discussion was about a NASA proposal;

16    correct?

17    A.       It was about a NASA proposal.

18    Q.       I'd like to scroll up to the top real quick,

19    and does it indicate whether or not there is an

03:53PM  20    attachment to this email?

21    A.       It says, "Attachments:  Scan-4.pdf."

22           (Government's Exhibit 8-B was marked for

23            identification.)

24           MR. MC KENZIE:  Your Honor, at this time, I'd

25    like to show the witness Exhibit 8-B, the attachment to

1  this email.  And I'd like to just go ahead and move 8-B

2  into evidence.

3          THE COURT:  So admitted.

4          (Government's Exhibit 8-B was received into

5           evidence.)

6  BY MR. MC KENZIE:

7  Q.      Do you recognize this letter?

8  A.      Not -- not intimately, if you will.  I've seen

9  it in the last couple weeks, but I don't remember it

10 from 2016.

11 Q.      What does it appear to be?

12 A.      A letter from Professor Guobin Zhang from the

13 National Synchrotron Radiation Laboratory.

14         MR. MC KENZIE:  Can we please scroll down a

15 bit.

16 BY MR. MC KENZIE:

17 Q.      Did you understand the purpose of this letter

18 being submitted to you?

19 A.      It -- barring all of the compliance regulations

20 associated today, it looks pretty consistent with a lot

21 of letters of commitment that will get included in

22 applications for funding.

23         (Government's Exhibit 8-C was marked for

24          identification.)

25         MR. MC KENZIE:  I'd like to now show the

1    witness Exhibit 8-C, as in cat.  We'll just go ahead and

2    admit this into evidence as well, Your Honor.

3              THE COURT:  So admitted.

4              (Government's Exhibit 8-C was received into

5               evidence.)

6    BY MR. MC KENZIE:

7    Q.        Who authored this email?

8    A.        It looks like I did.

9    Q.        Who did you send it to?

03:55PM 10   A.        Dr. Anming Hu and Ken Carter from the College

11   of Engineering at -- and cc to Yoseph Bar-Cohen.

12   Q.        All right.  Will you please read the first

13   three lines of the email.

14   A.        "Regarding the China Assurance, NASA requires

15   you to include a signed document stating you assure you

16   will comply with the Chinese Funding Restrictions.

17   However, UTK always includes a special copy stating

18   that, as we understand it, this restriction does not

19   apply to faculty, staff, and students.  Attached is the

03:56PM 20   unsigned version of the document I refer to."

21   Q.        At the time that you sent this email, did you

22   have any reason to believe that the defendant worked for

23   any other university other than the University of

24   Tennessee?

25   A.        I don't -- I don't believe so.

1  Q.      At the time that you sent this email, did you

2  have any reason to believe that the defendant worked for

3  a university in China?

4  A.      I do not believe so.

5  Q.      I'd like to draw your attention now to 8-D, as

6  in David, which is an attachment to 8-C.

7          MR. MC KENZIE:  And I'd like to go ahead and

8  please move this into evidence, Your Honor.

9          THE COURT:  So admitted.

03:57PM 10         (Government's Exhibit 8-D was received into

11          evidence.)

12  BY MR. MC KENZIE:

13  Q.      Will you please explain in general terms to the

14  jury what this form is.

15  A.      This looks to be the assurance of -- the China

16  funding assurance form that gets appended into all NASA

17  applications.

18          MR. MC KENZIE:  Your Honor, I'd like to now

19  show the witness 8-E, as in Edward, and this is already

03:57PM 20  in evidence, actually.

21          Can we please blow up the top.

22  BY MR. MC KENZIE:

23  Q.      And who sent this email?

24  A.      I did.

25  Q.      And who is the first recipient of the email?

1   A.      Yoseph Bar-Cohen.

2   Q.      Who is the second recipient of the email?

3   A.      Dr. Anming Hu.

4   Q.      Are there attachments to this email?

5   A.      Yeah, I see three attachments.

6   Q.      Will you please read the email to the jury

7   beginning with, "On behalf of Dr. Anming Hu..."

8   A.      (As read) "On behalf of Dr. Anming Hu, please

9   find attached the UTK-approved proposal documents

03:58PM 10   consisting of the following:  1) Proposal package - UTK

11   Budget, Justification, and UTK-specific statement of

12   work.  2) Institutional Commitment Letter (With Anming

13   Hu named as Co-Investigator, per your request).  3) UTK

14   China Assurance document - special clause included

15   regarding the UTK understanding of the funding

16   restriction."

17          MR. MC KENZIE:  Can we please scroll down.

18   BY MR. MC KENZIE:

19   Q.      And will you please read the next paragraph to

03:59PM 20   the jury.

21   A.      "Lastly, I want to note that we have reviewed

22   the Letter of Commitment provided from Professor Zhang

23   of National Synchrotron Radiation Laboratory, and it

24   will not be considered an officially-approved UTK

25   document."

1  Q.      Please continue.

2  A.      (As read) "The language from the required

3  assurance states:  Part (4).  By submission of its

4  proposal, the proposer represents that the proposer is

5  not China or a Chinese-owned company, and that the

6  proposer will not participate, collaborate, or

7  coordinate bilaterally with China or any Chinese-owned

8  company, at the prime recipient level or at any

9  subrecipient level, whether the bilateral involvement is

04:00PM 10  funded or performed under a no-exchange of funds

11  arrangement."

12  Q.      Please continue.

13  A.      (As read) "Therefore, UTK cannot agree to the

14  letter of commitment arrangement provided and still

15  maintain our assurance.  We request that the letter not

16  be provided in the main application submission to NASA.

17  If you have any questions or comments, or I can provide

18  anything further, please let me know."

19  Q.      Thank you very much.

04:00PM 20          Why did you decide not to include Professor

21  Zhang as part of the grant application?

22  A.      It appeared to be against the requirement for

23  the application and for the funding program.

24  Q.      Did you make that decision alone or did you

25  consult with your supervisor?

1   A.        It is my understanding that I consulted with my

2   supervisor.

3   Q.        At the time you sent that email, did you have

4   any reason to believe that Dr. Hu worked for a Chinese

5   university?

6   A.        Not to my knowledge.

7   Q.        After you sent that email, when, if ever, did

8   the defendant contact you to inform you that he also

9   worked for a Chinese university?

04:01PM 10   A.        I don't have any recollection of such contact.

11  Q.        I'd like to show you 8-F, which is already in

12  evidence.

13            Do you recognize what this type of form is?

14  A.        This is a pretty standard budget template at

15  the University of Tennessee for internal purposes, not

16  for -- well, it's a standard budget template that we

17  used in OSB.

18  Q.        I'd like to show you now 8-G, as in George,

19  which I believe is also in evidence.

04:02PM 20            Do you -- what is this?

21  A.        This is the standardized letter of commitment

22  that the University of Tennessee would sign.  Most

23  typically when we were subrecipients on an application

24  to a funding agency.

25            MR. MC KENZIE:  Can we please scroll down.

1    BY MR. MC KENZIE:

2    Q.        I'd like to draw your attention to the -- to

3    the bottom here (indicating).  Who is listed as the

4    contact person on this -- I think I just accidentally

5    drew over your name.  But who is supposed to be

6    contacted on this?

7    A.        It looks like I was.

8    Q.        And who signed this document?

9    A.        David Smelser, my supervisor at the time.

04:03PM  10   Q.        Who prepared this document for his signature?

11   A.        I would have to wager that I did.  I mean,

12   typically what would happen is:  There are certain

13   pieces that we had to -- if you will, fill in the blank

14   that were project-specific information, and then we

15   would send it to our supervisor at the final stage when

16   we're ready to approve everything formally and submit

17   the applications.

18   Q.        I'd like to direct your attention now to 8-H,

19   as in Harry.

04:03PM  20            What is this?

21   A.        Again, it looks to be the NASA China funding

22   restriction assurance.

23            MR. MC KENZIE:  Can we please scroll down.

24   BY MR. MC KENZIE:

25   Q.        Who signed this?

1    A.        David Smelser, my supervisor at the time.

2    Q.        Who prepared this document for David Smelser's

3    signature?

4    A.        I believe I did.

5    Q.        Was this document -- was this assurance

6    included in the email that you sent to Dr. Bar-Cohen

7    with the proposal to JPL?

8    A.        It did appear to be listed in the attachments.

9    Q.        At the time that email was sent, did you have

10   any reason to believe that Dr. Hu worked at a Chinese

11   university?

12   A.        Not to my knowledge.

13   Q.        Do you know whether or not this proposal was

14   even accepted?

15   A.        I don't.

16   Q.        Do you work on proposals after the proposals

17   are sent?  Do you work on the contracts and funding

18   afterwards?

19   A.        Not the contracts.  Occasionally prior to

20   issuing an award, an agency will come back and ask us to

21   update revised budgets or other documents.  But once it

22   hits the contract negotiation stage, it would go to

23   another team member in our office.

24            MR. MC KENZIE:  All right.  Thank you.  I have

25   no further questions, Your Honor.

04:04PM

04:05PM

1    THE COURT:  Thank you.  Cross-examination.

2    CROSS-EXAMINATION

3  BY MR. LOMONACO:

4  Q.    Good afternoon, Mr. Haswell.

5  A.    Good afternoon.

6  Q.    I'm going to put Government's Exhibit 8-B back

7  on the screen.  That's that letter from the Chinese

8  professor.

9  A.    Uh-huh.

04:05PM 10  Q.    And I take it that you were talked to by the

11  government or their coordinators about this trial just

12  recently?

13  A.    I have spoken with some people about the trial.

14  Q.    Yeah.  Did they show you these documents and so

15  on?

16  A.    I've seen some documents related to the year of

17  2016.

18  Q.    Okay.  I know it's been a while, so it's --

19    MR. LOMONACO:  Okay.  Go right to the top.

04:06PM 20  BY MR. LOMONACO:

21  Q.    Now, this is the letter that Professor Hu gave

22  to you during this grant application for a NASA grant,

23  the proposal, and I'll probably skip through some of the

24  finer details, but what I wanted to make sure that the

25  jury knew is this letter is from China; right?

1    MR. LOMONACO:  Put the heading up there on top.

2   BY MR. LOMONACO:

3   Q.        I mean, it's in Chinese across the top; right?

4   National Synchrotron Radiation Laboratory.  Did you get

5   the opinion right away that this was a letter from

6   somebody in China?

7   A.        I assumed that I understood that.  I mean,

8   China is in the address line from the deliverer.

9   Q.        Yes.

04:07PM 10        MR. LOMONACO:  And if you'll go down to the

11  body of the document.

12  BY MR. LOMONACO:

13  Q.        Professor Hu gave you this, and he gave it to

14  you because he wanted to, I guess, have this person

15  collaborate in the grant that you were applying for from

16  NASA; is that right?  Is that your understanding?

17  A.        That is my understanding from the language of

18  the letter.

19  Q.        Really, that's about all the memory you have is

04:08PM 20  what you can read; right?

21  A.        That is correct.

22  Q.        I understand.

23        So let's go to the letter itself.  It says that

24  the National Synchrotron Radiation Laboratory in the

25  University of Science and Technology of China in Hefei,

1  China, is dedicated for scientific research via various

2  X-ray methods.  (As read) "I have a long-term

3  collaboration on nanostructure characterization with

4  Dr. Anming Hu at the University of Tennessee."

5          Now, given the fact that Professor Hu gave you

6  this letter and the letter says, "I had a long-term

7  collaboration with him," doesn't it appear from this

8  letter that Dr. Hu is openly disclosing that he had a

9  collaboration with this person?

04:09PM 10  A.      I wouldn't -- I wouldn't say from my desk that

11  I could determine the exact extent of the

12  collaboration --

13  Q.      No.

14  A.      -- or the nature of the relationship, either,

15  but it does seem to indicate that there is some

16  relationship there.

17  Q.      Okay.  Now, you told him that, "We can't use

18  this" -- right? -- "because NASA has a restriction about

19  collaborating with China."  Did that sort of dawn on you

04:09PM 20  when you saw the letter?

21  A.      I believe so.

22  Q.      Yeah.  And so Professor Hu was confused; right?

23  A.      There seemed to be some confusion from the

24  nature of the email exchange that I saw.

25  Q.      That we just -- that you and the prosecutor

 1    just went through; is that what you're saying?

 2    A.        Yes, yes.

 3    Q.        And, for instance --

 4              MR. LOMONACO:  8-C.  8-C.

 5    BY MR. LOMONACO:

 6    Q.        You wrote a letter to Dr. Hu saying that --

 7    A.        Could I see the very beginning section of the

 8    email exchange?

 9    Q.        Sure.  Is that on the top or the bottom?

04:10PM  10   A.        I believe it's on the bottom.  Okay.

11    Q.        So here they're talking about budget

12    justifications and so on --

13    A.        Uh-huh.

14    Q.        -- not NASA.

15              MR. LOMONACO:  Can we go to the next one?  More

16    budget justification.  Okay.  Slow down.

17    BY THE WITNESS:

18    A.        I mentioned the China Assurance.  I just wanted

19    to see how we led up into the --

04:11PM  20   BY MR. LOMONACO:

21    Q.        Yeah, go ahead.  This is more funding stuff you

22    had; right?

23    A.        Yeah.

24    Q.        Okay.  So -- so this is typical with the

25    professors?  They would go back and forth about what had

1    to be in the proposal, and you would tell them

2    information, and they would give you information and try

3    to find out what you wanted; right?

4    A.        Yes.  Again, with the -- based on the amount of

5    time provided, sometimes we get same-day submissions and

6    there is only so much time to go so far.  So -- but --

7    but it is typical protocol to go back and forth and try

8    and tidy everything up and make sure everything is tight

9    and accurate.

04:11PM  10            MR. LOMONACO:  Let's go to the next one.  Go

11    up.

12    BY MR. LOMONACO:

13    Q.        "I am fine with a tuition declaration."  Is

14    that somebody getting paid for the work they're going to

15    do in the budget or something like that?

16    A.        I think that was part of the lower exchange.  I

17    don't remember the specific nature of it, but NASA has

18    specific declarations you have to make if you are

19    providing tuition towards students.

04:12PM  20    Q.        Here he says, "For China Assurance.  Are you

21    talking about the Hefei National Radiation Facility?"

22    Right?  That's the letter he gave you; right?

23    A.        I believe so.

24    Q.        Can you go down below that?  It seems like

25    there is something that mentioned that ahead of time.

1    MR. LOMONACO:  Okay.  Hold on.  Slow down.

2  BY MR. LOMONACO:

3  Q.      There doesn't appear to be anything regarding

4  the previous emails?

5  A.      At the bottom there, I say, "I believe we'll be

6  ready to obtain the letter of commitment and UTK China

7  Assurance document and have all this submitted after

8  this."

9  Q.      Okay.  So saying we will be ready to obtain the

04:12PM  10  letter of commitment/UTK China Assurance document.  So

11  that triggered Professor Hu to say, "Are you talking

12  about the Hefei letter I included; correct?"  Basically.

13  A.      It appears so, yes.

14  Q.      Okay.  So it seems like you had a little

15  confusion about that; right?

16  A.      I mean, my recollection --

17    MR. MC KENZIE:  Objection, Your Honor.  It's

18  calling for an answer to speculate into an independent

19  state of mind.

04:13PM  20    THE COURT:  Did you ask if he had confusion or

21  if the defendant had confusion?

22    MR. MC KENZIE:  The defendant was confused.

23    THE COURT:  That's probably objectionable.  So

24  I'll sustain that objection.

25

1  BY MR. LOMONACO:

2  Q.        Did you have confusion about that letter being

3  submitted?

4  A.        In what - --

5  Q.        I mean, let me ask it this way:  You recognized

6  the letter as being something from China that shouldn't

7  be in a NASA grant.

8  A.        Yes.

9  Q.        Did you ask Professor Hu to explain the

04:13PM 10  collaboration he had?

11  A.        From the records I've seen, it does not appear

12  I did.  I wonder what sort of timeline I was working on,

13  and I'll also state that, you know, we strongly enforce

14  and go over at UT that compliance issues are primarily

15  the responsibility of the principal investigator.  We're

16  there to help and assure that they can get information

17  if they ask for it.  But, you know, again, like I said,

18  we get a lot of same-day submissions, and if you're not

19  asking the right questions, we may not have time to deep

04:14PM 20  dive into certain things.

21  Q.        Okay.  So you don't recall asking him to

22  explain the collaboration?

23  A.        I don't recall asking any further information

24  of Dr. Hu.

25  Q.        You just told him, "We can't use this letter,"

1    and you submitted the proposal without the letter?

2    A.         That appears to be correct, yes.

3    Q.         Now, you talked about training, that you were

4    involved in training; is that right?

5    A.         Yes.

6    Q.         And you put together part of that 2016 training

7    document; right?

8    A.         I think the document was a follow-up resource

9    from a present -- I mean, I -- sure, yes, I put together

10   the document.  I'm not -- I don't recall whether we, you

11   know, publically hosted it or if it was just passed out

12   to recipients or attendees of the training workshop.

13   Q.         I'm sorry; say that again.

14   A.         I just simply don't remember if we published

15   this on our website as, you know, an advertised training

16   resource or if it was simply disbursed to the attendees

17   that came to the training workshop that day.

18   Q.         Okay.  So you don't know who got the training

19   document?

20   A.         I don't remember who was present and who might

21   have received it or where it was published beyond

22   putting it on that day on a PowerPoint on a projector.

23   Q.         And would it be fair to say that most of the

24   people that would have or should have attended the

25   training would be the administrators that handled the

1    grant applications?

2    A.        I think the trainings are open to publicly -- I

3    mean, any faculty, staff, and student.  I mean, I think

4    we posted them online and you could enroll in it and

5    show up.

6    Q.        Okay.  So you didn't particularly invite

7    anybody in particular; you just put an advertisement

8    out?

9    A.        Right, not to my rec- -- we did not invite

04:16PM 10   particular people to my recollection.

11            MR. LOMONACO:  Let's go to 7-Q if we could.  If

12   we could go to page 42.

13   BY MR. LOMONACO:

14   Q.        That's your name on it.

15   A.        That's correct.

16   Q.        And that looks like it's about one of the last

17   pages; is that right?

18   A.        That is correct.

19            MR. LOMONACO:  Okay.  Let's go back up to

04:17PM 20   page 36.

21   BY MR. LOMONACO:

22   Q.        Okay.  So how many pages do we have here on

23   this China Assurance letter, NASA submissions?  First

24   line, (as read) "UTK includes an amended NASA China

25   Assurance document as the final page of an application."

1    And basically it says, (as read) "This language

2    indicates that we do not view our faculty, staff, and

3    students to be entities of China."  It doesn't say

4    unless they're affiliated with China or unless they have

5    a part-time job during the summer in China, does it?

6    A.       It does not on this slide.

7    Q.       It just straight out (as read) "do not view

8    them to be entities of China".

9              MR. LOMONACO:  Let's go down a little bit

04:18PM  10   further.

11   BY MR. LOMONACO:

12   Q.       Is that really --

13             MR. LOMONACO:  Go ahead.  A little bit further.

14   BY MR. LOMONACO:

15   Q.       Is that all you say about the NASA restriction

16   itself?

17   A.       I mean, I'm not intimate- -- I don't recall all

18   the details.  That is my understanding.  And this --

19   like I say, it was mostly meant to be a high-level

04:18PM  20   overview of nuts and bolts and components of proposals,

21   budgets and justifications.

22             So I think we were just touching on documents

23   that need to be included.  Couldn't -- couldn't say that

24   this document has everything you need to know about

25   everything.  I mean, there is a lot of -- it depends.

1  In my field, you know, there are -- a lot of details

2  can, you know, flip a circumstance on its head.  So --

3          MR. LOMONACO:  Okay.  Stop.

4  BY MR. LOMONACO:

5  Q.       We can go down through it.  It seems about

6  three or four pages.

7          MR. LOMONACO:  Wait a minute.

8  BY MR. LOMONACO:

9  Q.       And I don't see anything there that even says

04:19PM 10  what the NASA restriction is.  That China will not -- or

11  NASA will not collaborate bilaterally in any proposals

12  with China or a Chinese company.  And that's what you're

13  saying, it was a high-level -- you didn't go down into

14  the more details; right?

15  A.       For the China Assurance, it does not appear

16  that we did.

17  Q.       Okay.  Was anybody else giving training to

18  anybody at UT about the China Assurance that you know

19  of?

04:20PM 20  A.       I know for sure that at other times other

21  people in the Office of Sponsored Programs gave

22  training.  I don't recall the subject matter, and I

23  don't recall whether other people in the Office of

24  Research were giving other more in-depth trainings about

25  other topics, like conflict of interest or responsibile

1  conduct of research, other things like that.  I would

2  assume so, but I --

3  Q.      Let me just talk about the NASA restriction

4  and, you know, not collaborating with China or Chinese

5  company.

6  A.      Okay.

7  Q.      That specific language, you do have -- you have

8  no knowledge of that being used in any other training

9  during this period of time, in any other training of

04:20PM 10  material or presentations?

11  A.      I don't -- I don't recall any specific

12  trainings myself about that topic.

13  Q.      Okay.  I'm not trying to trick you.  It's hard.

14  A.      No, I understand.

15          (Defendant's Exhibit 126 was marked for

16           identification.)

17  BY MR. LOMONACO:

18  Q.      Now, let's turn to Exhibit 126.  Let me show

19  you what's marked Defendant's Exhibit For Identification

04:21PM 20  126.  And here is a letter.  It says from Tammy Johnson,

21  sent September 23rd, and its subject is Proposal and

22  Budget Development Presentation.

23          Is that the same training document we were just

24  talking about?

25  A.      I couldn't -- I would -- I could assume so, but

1    I don't know for sure.  I've never seen the email

2    before, nor the attachment.  But that would make sense.

3    Tammy Johnson is a very likely candidate to have

4    attended that workshop.

5    Q.       And do you see the date September 23rd?  Is

6    that when the workshop was?  Do you want to go back to

7    that exhibit?  Would it help to refresh your --

8    A.       I mean, I don't -- I don't recall the timing of

9    that training.  It could have been in September of 2016.

04:22PM 10   Q.       Okay.  And you see where she is putting out --

11   Tammy Johnson is putting out information saying, "I've

12   attended the meeting" -- or "the training yesterday.

13   Attached is the presentation and information that was

14   discussed."

15           MR. LOMONACO:  Do we have that attachment?  Can

16   we --

17   BY MR. LOMONACO:

18   Q.       And this was the attachment (indicating).  So

19   that does appear to be the same training; right?

04:23PM 20   A.       Yeah, I do agree.

21   Q.       Okay.  So going back to the Exhibit 126 --

22           MR. LOMONACO:  And I ask that that be made an

23   exhibit at this time, Your Honor.

24           THE COURT:  What's the number on this one

25   again?

1          MR. LOMONACO:  126, Your Honor.

2          THE COURT:  So admitted.

3          (Defendant's Exhibit 126 was received into

4           evidence.)

5   BY MR. LOMONACO:

6   Q.      It appears that Tammy Johnson was telling a lot

7   of people about the training and Anming Hu was listed in

8   there.  Do you see that?

9          So apparently he got a copy of this, the part

04:24PM 10  that it said it doesn't apply to faculty and basically

11  not much else about the NASA restriction.  Fair

12  statement?

13  A.      From this particular document, I agree.

14  Q.      Thank you.

15         Now, we've already gone through the letter that

16  he sent you.  And so you didn't tell Anming that he was

17  disqualified from the NASA grant because of a long

18  collaboration with China; just that you couldn't use the

19  letter.  You submitted -- correct?  Correct?

04:24PM 20  A.      That's my understanding from the email

21  exchange.

22  Q.      Then you submitted the letter to Dr. Bar-Cohen,

23  and he is the person for NASA that would be looking for

24  your proposal?

25  A.      Yeah, it's my understanding that he was the

1  lead applicant and we were going to be a subrecipient,

2  and so we were submitting our subrecipient documents to

3  him for inclusion in the main application.

4  Q.      Okay.  Thank you for explaining that.

5          So you guys were working together on the

6  proposal; is that right?  I mean, NASA was making a

7  grant application itself; is that a fair statement?

8  A.      I believe that he worked with JPL, the Jet

9  Propulsion Laboratory.  So, yes, that sounds --

04:25PM  10  Q.      That's a little bit removed from NASA.

11  A.      I think it is a -- yeah, it's a component lab

12  of NASA.

13  Q.      Yeah.  And he didn't say anything about

14  checking into Anming's affiliations; right?

15  A.      I don't recall any further inquiries about the

16  matter.

17  Q.      So the proposal continued without the letter?

18  A.      That is my understanding.

19  Q.      Now, have you attended any meetings in 2018 or

04:26PM  20  '19 where the FBI talked to you about Anming Hu?

21  A.      No.

22  Q.      Let's talk about NSF grants, if we can; okay?

23          Professor Hu had many NSF grants applications,

24  proposals --

25          MR. MC KENZIE:  Objection, Your Honor.

  1   BY MR. LOMONACO:

  2   Q.        -- correct?

  3           MR. MC KENZIE:  We have no idea if he knows

  4   that.

  5   BY MR. LOMONACO:

  6   Q.        Well, do you know if he had some NSF grants?

  7   A.        Part of my subpoena called for, I think, one or

  8   two NSF applications.  So, to my knowledge, he submitted

  9   at least one or two applications.  But I don't know if

 10   they were funded or -- I don't know much beyond that or

 11   anything beyond that.

 12           MR. LOMONACO:  Okay.  So let's see Exhibit 20.

 13   BY MR. LOMONACO:

 14   Q.        February 2015, there was an NSF proposal?

 15   A.        Could you -- the date -- could you repeat the

 16   date?

 17   Q.        February of 2015.

 18   A.        Okay.  Okay.

 19   Q.        And if you were involved in this, would your

 20   name be on it someplace?

 21   A.        If I was the one who finally submitted it, it

 22   should be listed at the very bottom of at least the

 23   cover sheet, if not all the pages.

 24   Q.        Okay.

 25   A.        Well --

1 Q.       Does it look like --

2 A.       Okay.  So that looks like David Smelser

3 submitted this application.

4 Q.       Oh, okay.

5          Are you familiar with the NSF applications?

6 A.       I am.

7 Q.       And there are certain requirements that they

8 ask for collaboration over the last 48 months?

9 A.       Yes.  I believe that that is in the

04:29PM 10 biographical sketch.

11 Q.       And what about the NASA applications; do they

12 have a section similar?  If you know.

13 A.       I do believe so.  I can't recall

14 concrete -- I -- I'm much more intimately familiar with

15 NSF requirements than NASA, but, so, yeah, I do believe

16 so.

17          (Defendant's Exhibit 134 was marked for

18           identification.)

19          MR. LOMONACO:  Let's do Exhibit 134.

04:29PM 20 BY MR. LOMONACO:

21 Q.       There is an email --

22          MR. LOMONACO:  Scroll down, please.

23 BY MR. LOMONACO:

24 Q.       -- that you sent to Mr. Smelser, it looks like.

25 Do you see that?

1    A.       Uh-huh, yes.

2    Q.       Is that from you?

3    A.       It appears to be, yes.

4             MR. LOMONACO:  Go down a little further.  Yes.

5    BY MR. LOMONACO:

6    Q.       And this was involving an NSF grant; is that

7    correct?

8    A.       It does appear to be correspondence regarding

9    an NSF grant.

04:30PM  10            MR. LOMONACO:  Your Honor, could I move

11   Exhibit 134, please.

12            THE COURT:  So admitted.

13            (Defendant's Exhibit 134 was received into

14             evidence.)

15            (Defendant's Exhibit 135 was marked for

16             identification.)

17            MR. LOMONACO:  And let's go to Exhibit 135,

18   please.

19   BY MR. LOMONACO:

04:30PM  20   Q.       And it says, (as read) "A Proposal File Update

21   has been submitted to NSF by:  Submitting Sponsored

22   Projects Officer:  Drew Haswell."  Do you see that?

23   A.       Yes, I do.

24            MR. LOMONACO:  Okay.  Could I admit Exhibit

25   135, Your Honor, please.

1    THE COURT:  So admitted.

2    (Defendant's Exhibit 135 was received into

3    evidence.)

4    (Defendant's Exhibit 21 was marked for

5    identification.)

6    MR. LOMONACO:  Now, Exhibit 21.  And let's go

7  to the collaboration page.

8  BY MR. LOMONACO:

9  Q.    If you would look here on this, this is

04:31PM 10  actually an NSF proposal; correct?

11  A.    This does look like a form required for an NSF

12  proposal, yes.

13  Q.    And this is the one that was referred to in the

14  previous email; do you know?  It's hard to tell from

15  just the document.

16  A.    It seems like the previous email was -- well,

17  I'm sorry.  There have been a few shown to me quickly.

18  There was one proposal from 2015.  This says 2016.  But

19  if you mean the proposal file update, I didn't catch the

04:32PM 20  date.

21  Q.    Okay.  Well, see this section here

22  (indicating)?  It says, "Collaborators and Other

23  Affiliations."

24  A.    Uh-huh.

25  Q.    That is a part of the proposal form; correct?

1    A.        Yes.

2    Q.        And do you see here Beijing University is

3    listed?

4    A.        Yes.

5    Q.        And there is an X under collaborator and

6    coauthor, the last 48 months?

7    A.        Yes.

8    Q.        And a thesis advisee, also?

9              MR. LOMONACO:  And if I haven't, Your Honor,

04:32PM  10    I'd ask that Exhibit 21 be admitted.

11             THE COURT:  So admitted.

12             (Defendant's Exhibit 21 was received into

13              evidence.)

14   BY MR. LOMONACO:

15   Q.        And also in this section -- what's the name of

16   this section here?

17             MR. LOMONACO:  Keep going up.  No, the other

18   way.  It's named Collaborators and Other Affiliations.

19             MR. PARSONS:  Yes.

04:33PM  20   BY MR. LOMONACO:

21   Q.        There is another person by the name of Delong

22   Ma from the Beijing University of Technology as a

23   collaborator.  And, now, this was submitted by Professor

24   Hu; correct?  He is the PI on this.  Would that be up at

25   the top of the page?

1    A.        Yeah, it does say for Anming Hu there.  Okay.

2    Sorry.  I just can't -- I don't recognize this or

3    remember this document.  So -- but I do see his name at

4    the top; so it seems to be his form.

5    Q.        Okay.  So you never had any problems with

6    Professor Hu submitting his collaborations and

7    affiliations in an NSF grant when he was asked the

8    question, that you can recall?

9    A.        Right.  My recollection is that -- well, I

04:34PM  10  don't recall personally any specific restrictions about

11   that relationship for NSF funding.

12   Q.        Restrictions for that relationship.  I mean,

13   NSF asked if their PIs, their proposers, if they had

14   collaborations, and he answered the question, yes, I do,

15   and he listed it.

16   A.        Right.  I mean, again, we have a lot of

17   researchers from all across the world, and I don't

18   recall any specific restrictions for having had past

19   China collaborations.  I'm not saying that they don't

04:34PM  20  exist.  I don't recall NSF having any such restriction.

21   Q.        Right.  You're saying that it's not a problem

22   with NSF if there is some collaboration.

23   A.        To my recollection.

24   Q.        They didn't have a senator go to the House of

25   Appropriations bill and put in a --

1          MR. MC KENZIE:  Objection, Your Honor.

2          MR. LOMONACO:  That's all I have, Mr. Haswell.

3    Have a good day.  Thank you.

4          THE COURT:  All right.  Thank you.

5          Redirect?

6          MR. MC KENZIE:  No, Your Honor.  Thank you.

7          THE COURT:  All right.  Then this witness may

8    be excused.

9          You can go ahead and step down.

04:35PM 10          THE WITNESS:  Okay.

11          THE COURT:  We might just go ahead and stop now

12   instead of calling the next witness, unless it's very

13   short.

14          MR. MC KENZIE:  Your Honor, the entire

15   experience I don't expect to be short.  But I believe

16   that I could do my direct examination today.

17          THE COURT:  Let's just go ahead and start with

18   that witness in the morning.

19          MR. MC KENZIE:  Okay.  Yes, Your Honor.

04:35PM 20          THE COURT:  We'll give the jury a little early

21   time leaving.  So I'm not hearing any complaints.  All

22   right.  We'll stand adjourned for today.

23          And it might rain a little bit later.  So we're

24   in-between rain; so it's a good time to head out anyway.

25   Jurors are excused.

1          Just a reminder real quick.  Try to be here

2    about 8:45 a.m. so we can get lined up and start

3    tomorrow at 9:00 a.m., which is Wednesday, June 9.

4    Remember not to talk about the case among yourselves or

5    with anyone else, and importantly not to read anything

6    about the case if you happen to see an article or start

7    to hear something about the case, turn off the

8    television, shut down your computer, put the paper

9    aside, and definitely don't read anything about the case

04:36PM  10    until the case is over.

11          All right.  Jury is excused.

12          (Jurors excused from the courtroom.)

13          THE COURT:  Okay.  Well, thank you, everyone.

14    We'll see everybody back here tomorrow a few minutes

15    before 9:00 so we can be ready to go right at 9:00 a.m.

16    So we're adjourned for today.

17          Let me ask -- maybe on the record -- video

18    witnesses.  Is that tomorrow afternoon or Thursday

19    afternoon?

04:37PM  20          MR. ARROWOOD:  Your Honor, I think we'll plan

21    on Thursday afternoon if that's okay with the Court.

22          THE COURT:  We'll inform IT on that.  That's

23    fine.  Thank you, everyone.

24          THE COURTROOM DEPUTY:  This honorable court

25    stands in recess.

1          (Which were all the proceedings had and

2           herein transcribed.)

3                    * * * * * * *

1            C-E-R-T-I-F-I-C-A-T-E

2  STATE OF TENNESSEE

3  COUNTY OF KNOX

4        I, Teresa S. Grandchamp, RMR, CRR, do hereby

5  certify that I reported in machine shorthand the above

6  proceedings, that the said witness(es) was/were duly

7  sworn; that the foregoing pages were transcribed under

8  my personal supervision and constitute a true and

9  accurate record of the proceedings.

10       I further certify that I am not an attorney or

11  counsel of any of the parties, nor an employee or

12  relative of any attorney or counsel connected with the

13  action, nor financially interested in the action.

14       Transcript completed and signed on Wednesday,

15  June 30, 2021.

16

17

18

19

21                _____

22                TERESA S. GRANDCHAMP, RMR, CRR
                       Official Court Reporter

23

24

25