IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE, TENNESSEE

```
                                    )
UNITED STATES OF AMERICA,           )
                                    )
          Government,               )
                                    )
vs.                                 )  Case No. 3:20-cr-21
                                    )
ANMING HU,                          )
                                    )
          Defendant.                )
                                    )
```

**TRIAL PROCEEDINGS**
**BEFORE THE HONORABLE THOMAS A. VARLAN**

**June 10, 2021**
**VOLUME IV of VII**

<u>**APPEARANCES**</u>:

<u>**ON BEHALF OF THE GOVERNMENT**</u>:

CASEY ARROWOOD, ESQ.
U.S. DEPARTMENT OF JUSTICE
OFFICE OF U.S. ATTORNEY
800 Market Street
Suite 211
Knoxville, TN 37902

MATTHEW J. MC KENZIE, ESQ.
U.S. DEPARTMENT OF JUSTICE
NATIONAL SECURITY DIVISION
950 Pennsylvania Avenue, NW
Washington, DC 20530

<u>**REPORTED BY**</u>:

Teresa S. Grandchamp, RMR, CRR
P.O. Box 1362
Knoxville, Tennessee 37901
(865) 244-0454

1    **APPEARANCES:** (Continued)

2            ON BEHALF OF THE DEFENDANT:

3            A. PHILLIP LOMONACO, ESQ.
             LAW OFFICES OF A. PHILLIP LOMONACO
4            800 South Gay Street, Suite 1950
             Knoxville, TN 37929

5                    * * * * * * * *

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                                    **INDEX**

2      <u>**WITNESSES FOR THE GOVERNMENT:**</u>                        <u>PAGE</u>

3      <u>**FIONA YIU**</u>

4      Direct Examination                                        7
       By Mr. Arrowood
5
       Cross-Examination                                        36
6      By Mr. Lomonaco

7      <u>**KATHRYN MANZANARES**</u>

8      Direct Examination                                       51
       By Mr. Arrowood
9
       Cross-Examination                                       77
10     By Mr. Lomonaco

11     Redirect Examination                                    86
       By Mr. Arrowood
12
       Recross-Examination                                     87
13     By Mr. Lomonaco

14     <u>**TARA HALSTEAD**</u>

15     Direct Examination                                      89
       By Mr. Mc Kenzie
16
       Cross-Examination                                       97
17     By Mr. Lomonaco

18     Redirect Examination                                   109
       By Mr. Mc Kenzie
19
       <u>**YOSEPH BAR-COHEN**</u>
20
       Direct Examination                                     111
21     By Mr. Arrowood

22     Cross-Examination                                      137
       By Mr. Lomonaco
23

24

25

**KUJTIM SADIKU**

Direct Examination                                          172
By Mr. Arrowood

Cross-Examination                                           202
By Mr. Lomonaco


**EXHIBITS**

**FOR THE GOVERNMENT:**

| **EXHIBIT** (DESCRIPTION) | **ID:** | **IN EVID:** |
|---|---|---|
| **Exhibit No. 3-T and 11-I** | | 15 |
| **Exhibit No. 6-D and 11-O** | | 16 |
| **Exhibit No. 6-E and 11-P** | | 17 |
| **Exhibit No. 6-F and 11-N** | | 18 |
| **Exhibit No. 6-G and 11-Q** | | 19 |
| **Exhibit No. 6-H and 11-J** | | 20 |
| **Exhibit No. 6-I and 11-K** | | 21 |
| **Exhibit No. 7-K and 11-L** | | 22 |
| **Exhibit No. 7-L and 11-M** | | 23 |
| **Exhibit No. 5-D and 11-D** | | 24 |
| **Exhibit No. 5-E and 11-F** | | 26 |
| **Exhibit No. 5-F**(WeChat File) | 26 | |
| **Exhibit No. 11-H**(Translation of WeChat File) | 26 | |
| **Exhibit No. 5-F and 11-H** | | 27 |
| **Exhibit No. 5-G**(WeChat File) | 27 | |
| **Exhibit No. 11-E**(Translation of WeChat File) | 27 | |
| **Exhibit No. 5-G and 11-E** | | 28 |
| **Exhibit No. 5-H and 11-G** | | 29 |
| **Exhibit No. 10-B**(Jail Call) | 30 | |
| **Exhibit No. 11-A**(Translation of Jail Call) | 30 | |
| **Exhibit No. 10-B and 11-A** | | 31 |
| **Exhibit No. 10-C**(Jail Call) | 31 | |
| **Exhibit No. 11-B**(Translation of Jail Call) | 31 | |
| **Exhibit No. 10-C and 11-B** | | 33 |
| **Exhibit No. 10-D**(Jail Call) | 33 | 199 |
| **Exhibit No. 11-C**(Translation of Jail Call) | 33 | |
| **Exhibit No. 10-D and 11-C** | | 34 |
| **Exhibit No. 8-M**(Email) | 59 | 61 |
| **Exhibit No. 8-AA**(General Provisions) | 67 | 70 |

| | | |
|---|---|---|
| **Exhibit No. 8-L**(Budget Justification) | 72 | 73 |
| **Exhibit No. 8-BB**(Email) | 113 | 115 |
| **Exhibit No. 8-CC**(Attachment to Email) | 115 | |
| **Exhibit No. 8-CC** | | 117 |
| **Exhibit No. 8-DD**(Attachment to Email) | 117 | 118 |
| **Exhibit No. 8-EE**(Email) | 118 | 120 |
| **Exhibit No. 8-GG**(Email) | 120 | 121 |
| **Exhibit No. 8-FF**(Email) | 121 | 122 |
| **Exhibit No. 8-HH**(Email) | 122 | 124 |
| **Exhibit No. 8-E**(Email) | 124 | |
| **Exhibit No. 8-H**(Email Attachment) | 128 | |
| **Exhibit No. 8-II**(Emails) | 128 | 129 |
| **Exhibit No. 8-JJ**(Email) | 129 | 130 |
| **Exhibit No. 8-KK**(Email Attachment) | 130 | 131 |
| **Exhibit No. 8-I**(Email) | 134 | 135 |
| **Exhibit No. 10-O**(July 18, 2019 PowerPoint Presentation) | 184 | 184 |
| **Exhibit No. 10-P**(August 30, 2019 PowerPoint Presentation) | 184 | 185 |
| **Exhibit No. 10-Q**(September 17, 2019 PowerPoint Presentation) | 185 | 186 |
| **Exhibit No. 10-R**(Email) | 200 | 201 |

**FOR THE DEFENDANT(S):**

| | | |
|---|---|---|
| **Exhibit No. 62**(Email) | 141 | 141 |
| **Exhibit No. 63**(Email) | 141 | 142 |
| **Exhibit No. 60**(Email) | 143 | 144 |
| **Exhibit No. 61**(Letter) | 146 | 146 |
| **Exhibit No. 66**(Facilities Document) | 148 | 148 |
| **Exhibit No. 64**(Emails) | 152 | 152 |
| **Exhibit No. 65**(Emails) | 153 | 153 |
| **Exhibit No. 17**(Letter) | 156 | |
| **Exhibit No. 67**(Email) | 157 | 158 |
| **Exhibit No. 68**(Emails) | 159 | 160 |
| **Exhibit No. 144**(Emails) | 163 | 163 |
| **Exhibit No. 145**(Proposal) | 164 | 164 |
| **Exhibit No. 70**(Emails) | 165 | |
| **Exhibit No. 71**(Emails) | 166 | 166 |
| **Exhibit No. 39**(Report) | 213 | 213 |
| **Exhibit No. 22**(Redacted Report) | 217 | |
| **Exhibit No. 43**(Surveillance Memo) | 224 | |

* * * * * * * *

1          THE COURTROOM DEPUTY:  All rise.

2          This honorable court is again in session.

3          THE COURT:  All right.  Good morning, everyone.

4    It looks like the government's ready with its next

5    witness and the jury is all lined up; so we'll bring the

6    jury in and proceed forward.

7          (Whereupon the following report of

8           proceedings was had within the presence

9           and hearing of the jury:)

09:01AM  10          THE COURT:  All right.  Thank you.  Everyone

11   may be seated.

12          And swear in the next -- the first witness this

13   morning.

14          THE COURTROOM DEPUTY:  Yes, sir.

15          (The witness was thereupon duly sworn.)

16          THE COURTROOM DEPUTY:  Have a seat, please.

17   Scoot forward.

18          Will you state and spell your name for the

19   record.

09:01AM  20          THE WITNESS:  Fiona Yiu.

21          THE COURTROOM DEPUTY:  Thank you.

22

23

24

25

1          **FIONA YIU**,

2     having been first duly sworn, was examined and testified

3     as follows:

4                          DIRECT EXAMINATION

5     BY MR. ARROWOOD:

6     Q.        Good morning.

7     A.        Good morning.

8     Q.        Would you please spell your name for the court

9     reporter.

09:02AM 10    A.        First name Fiona, F-i-o-n-a.  Last name Yiu,

11    Y-i-u.

12    Q.        Thank you.

13              Would you please tell the jury where you're

14    currently employed.

15    A.        The Federal Bureau of Investigation.

16    Q.        And what do you do with the FBI?

17    A.        I am a language specialist for the FBI.

18    Q.        How long have you been a language specialist

19    for the FBI?

09:02AM 20    A.        Five years.

21    Q.        Let's go back in time just a little bit.

22    A.        Okay.

23    Q.        Where were you born?

24    A.        Guangzhou, China.

25    Q.        And how long did you live in China?

1  A.      28 years.

2  Q.      After 28 years, is that when you moved to the

3  United States?

4  A.      Correct.

5  Q.      If you would please describe for the jury your

6  educational background.

7  A.      I receive a bachelor's degree in China.  Then I

8  moved to the United States.  Then I pursue my Ph.D. in

9  chemistry.  I obtained my Ph.D. in chemistry from North

09:03AM  10  Carolina State University in 2010.

11          After that, I finished a two-year term

12  postdoctoral research fellowship at Penn State.  After

13  that, I finished a government-sponsored fellowship at

14  Georgetown.  Then I move on to become a contract

15  language specialist for the FBI.  In the meantime,

16  I'm -- I am -- part-time, I'm adjunct professor at

17  various community colleges.

18  Q.      Let me stop you right there.

19          Have you ever worked as a chemistry instructor?

09:04AM  20  A.      Yes, I taught at Community -- the Community

21  College of Allegheny County when I was living in

22  Pittsburgh, Pennsylvania.

23          Now I'm living in Jacksonville, Florida.  I

24  teach at Florida State College at Jacksonville.

25  Q.      Are you an adjunct professor at Florida State

1    College?

2    A.          Correct.

3    Q.          So is that essentially a part-time professor

4    position?

5    A.          Correct.

6    Q.          And moving on to your foreign language

7    background.  Are you a native Chinese speaker?

8    A.          Yes.

9    Q.          Have you ever taken a foreign language test --

09:04AM  10   A.          Yes.

11   Q.          -- administered by the U.S. government?

12   A.          Yes, I have.

13   Q.          Will you please describe for the jury what that

14   test is.

15   A.          To become a language specialist, one has to

16   pass a battery of multiple tests administered by the

17   FBI.  I am one of those.  I -- before I became a

18   language specialist, I took reading, listening, speaking

19   test in -- for both English and Chinese administered by

09:05AM  20   the FBI, as well as a translation test administered by

21   the FBI.

22   Q.          So when did you become a full-time language

23   specialist with the FBI?

24   A.          July 2016.

25   Q.          And prior to that, did you work for the FBI?

1    A.        Yes, I did.

2    Q.        And will you please tell the jury:  In what

3    capacity did you work for the FBI prior to being a

4    full-time language specialist?

5    A.        I was a contract -- in FBI jargon, contract

6    linguist, or you can call contract language specialist.

7    The relationship between the FBI and myself was contract

8    basis, not employment.

9    Q.        Okay.  As a full-time language specialist for

09:06AM  10    the FBI, would you please describe for the jury --

11    generally speaking, what are the duties of your job?

12    A.        We language specialists provide translation and

13    interpretation for any leads arising from case

14    investigation.  I myself in particular, I perform

15    translation for the most part.  Whenever there are

16    materials that need to be translated for case

17    investigation and if the source material is in Chinese,

18    I perform -- I review the material.  I sometimes -- I'll

19    determine whether these materials are pertinent for case

09:07AM  20    investigation.

21             Sometimes I will -- depending on the needs --

22    depending on the needs for case investigation, if

23    translation is needed, then I perform translation.

24    Q.        Earlier you mentioned, I believe,

25    interpretation; is that correct?

1  A.      That's correct.

2  Q.      What's the difference between translation and

3  interpretation?

4  A.      Translation is writing.  It's to provide a

5  written -- a written rendition of the source material

6  into a separate language.  Interpretation is oral.  It

7  is to render the source of material in a different

8  language verbally.

9  Q.      So do you do interpretations for the FBI?

09:07AM 10  A.      Yes, I do.

11  Q.      And you do translations as well?

12  A.      Yes.

13  Q.      Do you specialize in one or the other?

14  A.      There is no official specialization, but in

15  particular, in my case, I perform translation more.

16  Q.      I believe earlier you mentioned that you

17  translate from Chinese to English; do you remember that?

18  A.      Correct, yes.

19  Q.      Do you also translate material from English

09:08AM 20  into Chinese?

21  A.      Yes, I do.

22  Q.      Based on your work as a language specialist, do

23  you do more translations from Chinese into English or

24  more translations from English into Chinese?

25  A.      I do the former more, from English to

1  Chinese -- from Chinese to English more.

2  Q.        So during the course of your duties as a

3  language specialist for the FBI, did you become involved

4  in this case?

5  A.        Yes, I did.

6  Q.        And how did you become involved in this case?

7  A.        FBI language service headquarters sent out an

8  email letting us know there are several translations

9  that would go to court for trial.  They ask us if

09:09AM  10  someone -- if one of us could review and finalize these

11  translations and would be willing to testify in court.

12  I volunteered myself for this task.

13  Q.        If you would please describe for the jury the

14  process for translating material in this case.

15  A.        The case agent for his or her investigation

16  purposes decides that these documents, certain

17  documents, need to be translated from Chinese to

18  English.  Then the case agent will submit a request to

19  the relevant department.  Then these -- this source

09:09AM  20  material will be -- the translation of these source

21  documents will be assigned to whoever -- whoever is

22  certified to take on the task.  These source documents

23  would be first translated by one or a number of language

24  specialists.  The translations, once they're completed,

25  would be sent back to headquarters.

1    Then after I had agreed to perform the review

2  and finalization, those translations were sent to me,

3  along with the source documents.  Then I performed a

4  review of the finalization.

5  Q.        What does it mean to review a translation?

6  A.        Basically I perform quality control.  I make

7  sure the translation is a faithful representation of the

8  source document rendered in English, in terms of

9  grammar, in terms of registers, syntax, etcetera.

09:10AM  10  Q.        If you saw any mistakes in the first

11  translation when you're reviewing it, would you make

12  edits?

13  A.        Yes, I would, and I did.

14  Q.        What does it mean to finalize a translation?

15  A.        To assign a final form of the document that

16  will be used in court.

17  Q.        And then after the translations are reviewed

18  and finalized, are they provided back to the case agent?

19  A.        Yes, through headquarters.

09:11AM  20  Q.        Now, in this particular case, after the

21  documents were provided back to the case agent, did you

22  perform any additional edits to the translations in this

23  case?

24  A.        Yes, I did.

25  Q.        All right.  Now I'd like to show you some of

 1   the material in the case.

 2   A.        Okay.

 3            MR. ARROWOOD:  If you would please show the

 4   witness Government's Exhibit 3-T on the left-hand side

 5   of the screen, and then on the right, please put

 6   Government's Exhibit 11-I.

 7   BY MR. ARROWOOD:

 8   Q.        Please take a look at the document on the

 9   left-hand side of the screen.  Do you recognize that

09:12AM 10   document?

11   A.        Yes, I do.

12   Q.        Did you review and finalize a translation of

13   that document?

14   A.        Yes, I did.

15   Q.        Will you please take a look at the documents on

16   the right-hand side of the screen.  What is that

17   document?

18   A.        It's the translation of document on the left.

19   Q.        Is this the version that you reviewed and

09:12AM 20   finalized?

21   A.        Yes.

22   Q.        Is the document on the right-hand side a fair

23   and accurate translation of the document on the

24   left-hand side?

25   A.        Yes.

1        MR. ARROWOOD:  Your Honor, at this time, the

2   government moves to fully admit Government's Exhibit 3-T

3   and 11-I.

4        THE COURT:  So admitted.

5        (Government's Exhibits 3-T and 11-I were

6         received into evidence.)

7   BY MR. ARROWOOD:

8   Q.      All right.  Now I'd like to show you

9   Government's Exhibit 6-D, as in dog, on the left-hand

09:12AM  10   side and Government's Exhibit 11-O on the right-hand

11   side.  Will you please take a look at the document on

12   the left.  Do you recognize that document?

13   A.      Yes.

14   Q.      Did you review and finalize a translation of

15   that document?

16   A.      Yes.

17   Q.      All right.  Now take a look at the document on

18   the right.  What is that document?

19   A.      It's the translation of the document on the

09:13AM  20   left.

21   Q.      Is this the version that you reviewed and

22   finalized?

23   A.      Yes.

24   Q.      Is the document on the right a fair and

25   accurate translation of the document on the left?

1   A.      Yes.

2           MR. ARROWOOD:  Your Honor, at this time, the

3   government moves to fully admit Government's Exhibit 6-D

4   and 11-O.

5           THE COURT:  So admitted.

6           (Government's Exhibits 6-D and 11-O were

7            received into evidence.)

8   BY MR. ARROWOOD:

9   Q.      All right.  Now I'd like to show you

09:13AM  10   Government's Exhibit 6-E on the left-hand side and

11   Government's Exhibit 11-P on the right-hand side.

12   Again, please take a look at the document on the left.

13   Do you recognize that?

14   A.      Yes.

15   Q.      Did you review and finalize a translation of

16   that document?

17   A.      Yes.

18   Q.      Please take a look at the document on the

19   right.  What is that document?

09:14AM  20   A.      It's the translation of the document on the

21   left.

22   Q.      Is this the version that you reviewed and

23   finalized?

24   A.      Yes.

25   Q.      Is the document on the right a fair and

1  accurate translation of the document on the left?

2  A.       Yes.

3           MR. ARROWOOD:  Your Honor, at this time, we

4  move to admit Government's Exhibit 6-E and 11-P.

5           THE COURT:  So admitted.

6           (Government's Exhibits 6-E and 11-P were

7            received into evidence.)

8  BY MR. ARROWOOD:

9  Q.       Now I'd like to show you Government's

10 Exhibit 6-F on the left-hand side of the screen and

11 Government's Exhibit 11-N on the right-hand side.

12 Please take a look at the document on the left.  Do you

13 recognize that document?

14 A.       Yes.

15 Q.       Did you review and finalize a translation of

16 that document?

17 A.       Yes.

18 Q.       All right.  Now please take a look at the

19 document on the right.  What is that document?

20 A.       It's the translation of the document on the

21 left.

22 Q.       Is this the version that you reviewed and

23 finalized?

24 A.       Yes.

25 Q.       Is the document on the right a fair and

 1 accurate translation of the document on the left?

 2 A.      Yes.

 3          MR. ARROWOOD:  Your Honor, at this time, move

 4 to admit Government's Exhibit 6-G -- I'm sorry -- 6-F

 5 and 11-N.

 6          THE COURT:  So admitted.

 7          (Government's Exhibit 6-F and 11-N were

 8           received into evidence.)

 9 BY MR. ARROWOOD:

09:15AM 10 Q.      Okay.  I'd like to show you Government's

11 Exhibit 6-G, as in golf, on the left, and Government's

12 Exhibit 11-Q on the right.  Please take a look at the

13 document on the left.  Did you review and finalize a

14 translation of that document?

15 A.      Yes.

16 Q.      All right.  Now please take a look at the

17 document on the right.  What is that document?

18 A.      That's the translation of the document on the

19 left.

09:16AM 20 Q.      Is this -- is the document on the right the

21 version that you reviewed and finalized?

22 A.      Yes.

23 Q.      Is the document on the right a fair and

24 accurate translation of the document on the left?

25 A.      Yes.

1    MR. ARROWOOD:  Your Honor, I move to admit

2  Government's Exhibit 6-G and 11-Q.

3    THE COURT:  So admitted.

4    (Government's Exhibits 6-G and 11-Q were

5    received into evidence.)

6  BY MR. ARROWOOD:

7  Q.    Now I'd like to show you Government's

8  Exhibit 6-H on the left-hand side and Government's

9  Exhibit 11-J on the right.  Please take a look at the

09:16AM  10  left-hand side of your screen.  Do you recognize that

11  document?

12  A.    Yes.

13  Q.    Did you review and finalize a translation of

14  that document?

15  A.    Yes.

16  Q.    Now please take a look at a document on the

17  right.  What is that?

18  A.    It's the translation of the document on the

19  left.

09:16AM  20  Q.    Is this the version that you reviewed and

21  finalized?

22  A.    Yes.

23  Q.    Is the document on the right a fair and

24  accurate translation of the document on the left?

25  A.    Yes.

1          MR. ARROWOOD:  Your Honor, I move to admit

2    Government's Exhibit 6-H and 11-J.

3          THE COURT:  So admitted.

4          (Government's Exhibits 6-H and 11-J were

5           received into evidence.)

6    BY MR. ARROWOOD:

7    Q.      All right.  I'd like to show you Government's

8    Exhibit 6-I on the left-hand side and 11-K on the right.

9    Do you recognize the document on the left?

09:17AM  10  A.      Yes.

11   Q.      Did you review and finalize a translation of

12   that document?

13   A.      Yes.

14   Q.      All right.  Please take a look at the document

15   on the right.  What is that document?

16   A.      It's the translation of the document on the

17   left.

18   Q.      Is this the version you reviewed and finalized?

19   A.      Yes.

09:17AM  20  Q.      Is the document on the right a fair and

21   accurate translation of the document on the left?

22   A.      Yes.

23          MR. ARROWOOD:  Your Honor, move to admit

24   Government's Exhibit 6-I and 11-K.

25          THE COURT:  So admitted.

1          (Government's Exhibits 6-I and 11-K were

2           received into evidence.)

3          THE COURT:  All right.

4   BY MR. ARROWOOD:

5   Q.      Now we'll do 7-K on the left and 11-L on the

6   right.

7          All right.  Please take a look at the document

8   on the left.  Do you recognize that document?

9   A.      Yes.

09:18AM  10   Q.      Did you review and finalize a translation of

11   that document?

12   A.      Yes.

13   Q.      All right.  Please take a look at the document

14   on the right.  What is that?

15   A.      It's the translation of the document on the

16   left.

17   Q.      Is this the version you reviewed and finalized?

18   A.      Yes.

19   Q.      Is the document on the right a fair and

09:18AM  20   accurate translation of the document on the left?

21   A.      Yes.

22          MR. ARROWOOD:  Move to admit 7-K and 11-L, Your

23   Honor.

24          THE COURT:  So admitted.

25

1              (Government's Exhibits 7-K and 11-L were

2                  received into evidence.)

3    BY MR. ARROWOOD:

4    Q.        Now 7-L on the left, please, and 11-M, as in

5    Michael, on the right.

6              Please take a look at the document on the left.

7    Do you recognize that document?

8    A.        Yes.

9    Q.        Did you review and finalize a translation of

09:18AM 10   that document?

11   A.        Yes.

12   Q.        All right.  Now please take a look at the

13   document on the right.  What is that?

14   A.        It's the translation of the document on the

15   left.

16   Q.        Is this the version that you reviewed and

17   finalized?

18   A.        Yes.

19   Q.        Is the document on the right a fair and

09:19AM 20   accurate translation of the document on the left?

21   A.        Yes.

22             MR. ARROWOOD:  Your Honor, move to admit

23   Government's Exhibit 7-L and 11-M.

24             THE COURT:  F?

25             MR. ARROWOOD:  7-L and 11-M.

1    THE COURT:  M.  Thank you.  Admitted.

2         (Government's Exhibits 7-L and 11-M were

3          received into evidence.)

4  BY MR. ARROWOOD:

5  Q.       We've looked at several different documents.

6  I'd like to transition from documents into other types

7  of files.

8         In your work on this particular case, did you

9  translate WeChat communications?

09:19AM  10  A.       Yes.

11  Q.       What is WeChat?

12  A.       It's a communication app, application.

13  Q.       Can you send text messages over WeChat?

14  A.       Yeah.

15  Q.       What else can you send, if anything, through

16  WeChat?

17  A.       Voice message, text files, photos, videos.  You

18  can make audio or video phone calls.

19  Q.       And how are you familiar with WeChat?

09:20AM  20  A.       Very familiar.  I'm a user.

21  Q.       Now I'd like to show you Government's

22  Exhibit 5-D on the left-hand side and Government's

23  Exhibit 11-D on the right-hand side.

24         MR. ARROWOOD:  Would you please play

25  Government's Exhibit 5-D.

1          (Video file played in open court.)

2  BY MR. ARROWOOD:

3  Q.      Do you recognize this file on the left-hand

4  side?

5  A.      Yes.

6  Q.      Did you review and finalize a translation of

7  the content of that file?

8  A.      Yes.

9  Q.      Please take a look at the document on the

09:21AM 10  right-hand side.  What is that?

11  A.      It's the translation of the contents shown on

12  the left.

13  Q.      Is this the version that you reviewed and

14  finalized?

15  A.      Yes.

16  Q.      Is the document on the right a fair and

17  accurate translation of the content of the file on the

18  left?

19  A.      Yes.

09:21AM 20        MR. ARROWOOD:  All right.  At this time, we

21  move to admit Government's Exhibit 5-D and 11-D.

22        THE COURT:  So admitted.

23        (Government's Exhibit 5-D and 11-D were

24         received into evidence.)

25

1  BY MR. ARROWOOD:

2  Q.      Along those same lines, I'd like to show you

3  Government's Exhibit 5-E on the left-hand side and 11-F

4  on the right-hand side.

5          MR. ARROWOOD:  Please play 5-E.

6          (Video file played in open court.)

7  BY MR. ARROWOOD:

8  Q.      Do you recognize the file on the left?

9  A.      Yes.

09:21AM  10  Q.      Did you review and finalize a translation of

11  the content of the file on the left?

12  A.      Yes.

13  Q.      Will you please take a look at the document on

14  the right.  What is that?

15  A.      It's a translation of the contents on the left.

16  Q.      Is it the version that you reviewed and

17  finalized?

18  A.      Yes.

19  Q.      Is the document on the right a fair and

09:22AM  20  accurate translation of the content of the file on the

21  left?

22  A.      Yes.

23          MR. ARROWOOD:  Your Honor, at this time, we

24  move to admit Government's Exhibit 5-E and 11-F.

25          THE COURT:  So admitted.

1              (Government's Exhibits 5-E and 11-F were

2               received into evidence.)

3              (Government's Exhibit 5-F was marked for

4               identification.)

5              (Government's Exhibit 11-H was marked for

6               identification.)

7    BY MR. ARROWOOD:

8    Q.         I'd like to show you Government's Exhibit 5-F

9    on the left-hand side and Government's Exhibit 11-H on

09:22AM 10   the right-hand side.

11             MR. ARROWOOD:  Please play 5-F.

12             (Video file played in open court.)

13   BY MR. ARROWOOD:

14   Q.         Do you recognize the file on the left-hand

15   side?

16   A.         Yes.

17   Q.         Did you review and finalize a translation of a

18   portion of the content of the file on the left?

19   A.         Yes.

09:23AM 20   Q.         Please take a look at the document on the

21   right.   What is that?

22   A.         It is a translation of a portion of the

23   contents on the left.

24   Q.         Is that the version that you reviewed and

25   finalized?

1    A.        Yes.

2    Q.        Is the document on the right a fair and

3    accurate translation of those communications contained

4    in the file on the left?

5    A.        Yes.

6             MR. ARROWOOD:  Your Honor, I move to admit

7    conditionally Government's Exhibit 5-F and 11-H.

8             THE COURT:  So admitted.

9             (Government's Exhibits 5-F and 11-H were

10              conditionally received into evidence.)

11             (Government's Exhibit 5-G was marked for

12              identification.)

13             (Government's Exhibit 11-E was marked for

14              identification.)

15   BY MR. ARROWOOD:

16   Q.        All right.  Now I'd like to show you

17   Government's Exhibit 5-G on the left and Government's

18   Exhibit 11-E on the right.

19             MR. ARROWOOD:  Can you please play 5-G.

20             (Video file played in open court.)

21   BY MR. ARROWOOD:

22   Q.        Do you recognize the file on the left-hand

23   side?

24   A.        Yes.

25   Q.        Did you review and finalize a translation of

09:24AM

1  the content of that file?

2  A.      Yes.

3  Q.      Could you please take a look at the document on

4  the right.  What is that?

5  A.      It's a translation of the contents shown on the

6  left.

7  Q.      Is the document on the right the version that

8  you reviewed and finalized?

9  A.      Yes.

09:24AM 10  Q.      Is the document on the right a fair and

11  accurate translation of the content of the file on the

12  left?

13  A.      Yes.

14          MR. ARROWOOD:  Your Honor, we move to

15  conditionally admit Government's Exhibit 5-G and 11-E.

16          THE COURT:  So admitted.

17          (Government's Exhibits 5-G and 11-E were

18           conditionally received into evidence.)

19  BY MR. ARROWOOD:

09:24AM 20  Q.      Okay.  And moving on to Government's

21  Exhibit 5-H.

22          MR. ARROWOOD:  Please put that on the left-hand

23  side and Government's Exhibit 11-G on the right-hand

24  side.  Please play 5H.

25          (Video file played in open court.)

1    BY MR. ARROWOOD:

2    Q.        Do you recognize the file on the left-hand

3    side?

4    A.        Yes.

5    Q.        Did you review and finalize a translation of

6    the content of the file on the left?

7    A.        Yes.

8    Q.        Would you please take a look at the document on

9    the right.  What is that?

09:25AM 10   A.        It's a translation of the contents on the left.

11   Q.        Is it the version that you reviewed and

12   finalized?

13   A.        Yes.

14   Q.        Is the translation on the right-hand side a

15   fair and accurate translation of the content of the file

16   on the left?

17   A.        Yes.

18            MR. ARROWOOD:  Your Honor, we move to admit

19   Government's Exhibit 5-H and 11-G.

09:26AM 20            THE COURT:  So admitted.

21            (Government's Exhibits 5-H and 11-G were

22             received into evidence.)

23   BY MR. ARROWOOD:

24   Q.        During your work on this particular case, did

25   you also translate audio files?

1    A.        Yes.

2    Q.        Do you recall how many you translated?

3    A.        Three.

4              (Government's Exhibit 10-B was marked for

5               identification.)

6              (Government's Exhibit 11-A was marked for

7               identification.)

8              MR. ARROWOOD:  Okay.  What I'd like to do is:

9    On the left-hand side of the screen bring up

09:26AM 10   Government's Exhibit 10-B and then on the right-hand

11   side, please bring up Government's Exhibit 11-A.

12   BY MR. ARROWOOD:

13   Q.        Do you see on your screen the file on the

14   left-hand side?

15   A.        Yes.

16   Q.        I want to direct your attention to the file

17   name.  Do you recognize that file name?

18   A.        Yes.

19   Q.        Have you listened to the audio recording

09:27AM 20   associated with that file name?

21   A.        Yes.

22   Q.        Did you review and finalize a translation of

23   the contents of the audio call with that file name?

24   A.        Yes.

25   Q.        I'd like to direct your attention to the

1  document on the right-hand side.  What is that document?

2  A.      It's a translation of the contents of the audio

3  file on the left.

4  Q.      Is this the version that you reviewed and

5  finalized?

6  A.      Yes.

7          MR. ARROWOOD:  Your Honor, at this time, the

8  government moves to conditionally admit Government's

9  Exhibit 10-B and 11-A.

09:27AM  10          THE COURT:  So admitted.

11          (Government's Exhibits 10-B and 11-A were

12           conditionally received into evidence.)

13          MR. ARROWOOD:  Your Honor, at this time, may we

14  have permission to play Government's Exhibit 10-B?

15          THE COURT:  Yes.

16          MR. ARROWOOD:  And then may we also allow the

17  witness to indicate when to advance the page on the

18  translation in Government's Exhibit 11-A corresponding

19  to the contents of the call on the left.

09:28AM  20          THE COURT:  Yes.

21          (Audio file played in open court.)

22          (Government's Exhibit 10-C was marked for

23           identification.)

24          (Government's Exhibit 11-B was marked for

25           identification.)

1    BY MR. ARROWOOD:

2    Q.        Now I'd like to show you Government's

3    Exhibit 10-C on the left-hand side of the screen and

4    Government's Exhibit 11-B on the right-hand side.

5            I'd like to direct your attention to the file

6    name associated with the document on the left.  Did you

7    listen to the contents of the audio file with that name?

8    A.        Yes.

9    Q.        Did you review and finalize a translation of

09:31AM  10   the contents of the audio file that's on the left-hand

11   side of the screen?

12   A.        Yes.

13   Q.        I'd like to direct your attention to a document

14   on the right-hand side.

15            MR. ARROWOOD:  Please scroll down to page 2.

16   BY MR. ARROWOOD:

17   Q.        Do you recognize this document?

18   A.        Yes.

19   Q.        What is it?

09:31AM  20   A.        It is a translation of the contents of the

21   document -- of the file on the left.

22   Q.        Is this the version that you reviewed and

23   finalized?

24   A.        Yes.

25   Q.        Is the document on the right-hand side a fair

1   and accurate translation of the contents of the audio

2   file indicated on the left?

3   A.      Yes.

4            MR. ARROWOOD:  Your Honor, at this time, we

5   move to conditionally admit Government's Exhibit 10-C

6   and 11-B.

7            THE COURT:  So admitted.

8            (Government's Exhibit 10-C and 11-B were

9             conditionally received into evidence.)

09:32AM  10            MR. ARROWOOD:  Again, Your Honor, we'd like to

11   play this file and have the witness indicate when to

12   advance the page.

13            THE COURT:  That's fine.

14            MR. ARROWOOD:  Thank you.

15            (Audio file played in open court.)

16            MR. ARROWOOD:  All right.  Thank you.

17            (Government's Exhibit 10-D was marked for

18             identification.)

19            (Government's Exhibit 11-C was marked for

09:39AM  20             identification.)

21   BY MR. ARROWOOD:

22            I'd like to show you Government's Exhibit 10-D

23   on the left-hand side and Government's Exhibit 11-C on

24   the right.  I'd like to direct your attention to the

25   file name that appears on the left-hand side of the

1    screen.  Have you listened to the audio file with that

2    name?

3    A.        Yes.

4    Q.        Did you review and finalize a translation of

5    the contents of the audio file indicated on the

6    left-hand side of the screen?

7    A.        Yes.

8    Q.        Will you please take a look at the document on

9    the right.  What is that?

09:39AM  10    A.        That is a translation of the contents of the

11    audio file on the left.

12    Q.        Is that the version that you reviewed and

13    finalized?

14    A.        Yes.

15    Q.        Is the document on the right a fair and

16    accurate translation of the contents of the audio file

17    on the left?

18    A.        Yes.

19             MR. ARROWOOD:  At this time, Your Honor, we

09:40AM  20    move to conditionally admit Government's Exhibit 10-D

21    and 11-C.

22             THE COURT:  So admitted.

23             (Government's Exhibits 10-D and 11-C were

24              conditionally received into evidence.)

25             MR. ARROWOOD:  And, again, Your Honor, we ask

1   permission to play this particular call and have the

2   witness indicate when to advance the page.

3           THE COURT:  That's fine.

4           MR. ARROWOOD:  Thank you.

5           (Audio file played in open court.)

6           MR. ARROWOOD:  Thank you.

7   BY MR. ARROWOOD:

8   Q.      Do you recall earlier in your testimony you

9   indicated that you had originally finalized these

09:45AM 10  translations and then made some additional edits; do you

11  recall that?

12  A.      Yes.

13  Q.      Why did you make those additional edits?

14  A.      I reviewed the translation again, and for the

15  sake of thoroughness, I decided to -- given the

16  importance of the document, I decided to review it one

17  more time, and then I got it -- maybe formality-wise,

18  maybe abbreviation-wise, I could make it better.  That's

19  why I make some additional edits.

09:46AM 20  Q.      And you work for the FBI; is that right?

21  A.      Yes.

22  Q.      Are you a special agent with the FBI?

23  A.      No.

24  Q.      Are you a law enforcement agent?

25  A.      No.

1    Q.       Do you attend agent training?

2    A.       No.

3    Q.       Prior to your involvement with these

4    translations that we reviewed today, were you aware of

5    this case?

6    A.       No.

7    Q.       During the course of your work on these

8    translations, did any law enforcement agent brief you on

9    the facts of this case?

09:47AM 10   A.       No.

11   Q.       Aside from the content of the material that you

12   reviewed and finalized, are you aware of any other facts

13   about this particular case?

14   A.       No.

15            MR. ARROWOOD:  No further questions, Your

16   Honor.

17            THE COURT:  Thank you.

18            Cross-examination?

19                        CROSS-EXAMINATION

09:47AM 20   BY MR. LOMONACO:

21   Q.       Good morning, Ms. Yiu.

22   A.       Good morning.

23   Q.       Let me make sure I understand your process that

24   you went through, if I may.

25   A.       Sure.

1    Q.        Did you say that these documents went up to

2    Washington and got translated first and then sent back

3    to you for you to do the final translation?

4    A.        Yes.

5    Q.        Okay.  Do you know why Washington had to

6    translate these first?

7    A.        It's part of FBI process.  Usually a document

8    would not go through this second step, review and

9    finalization.  It's only for translations that will be

09:48AM  10    used in court for trial.

11    Q.        So they wanted somebody that had the best

12    expertise, I guess, to do the translations and make a

13    final document; is that what you're saying?

14    A.        It's not necessary to have somebody that has

15    best expertise.  The purpose is to have a second set of

16    eyes to go over the translation to have added accuracy

17    to ensure the quality of the translation.

18    Q.        Okay.  In the 2019 contract --

19              MR. LOMONACO:  Could I see Government

09:49AM  20    Exhibit 7-K, please?  Can you put that on, 7-K?

21              THE COURT:  The government is going to assist.

22              MR. LOMONACO:  Thank you.

23              Could we go to the bottom of the last page of

24    that, please.  There we go.

25

1  BY MR. LOMONACO:

2  Q.        Okay.  Can you see that on your screen?

3  A.        Yes.

4            MR. LOMONACO:  Is that being published?

5            THE COURTROOM DEPUTY:  Yes, it is.

6            MR. LOMONACO:  Okay.

7  BY MR. LOMONACO:

8  Q.        If I could show you the circle there

9  (indicating).

09:50AM 10  A.        Uh-huh.

11  Q.        What does this say?

12  A.        Party A.

13  Q.        And the next?

14  A.        Parentheses, Official Seal.

15  Q.        Okay.  And what's this down here in the bottom

16  (indicating)?

17            MR. LOMONACO:  Oops.

18  BY THE WITNESS:

19  A.        It's --

09:50AM 20  BY MR. LOMONACO:

21  Q.        Is that the date?

22  A.        Date.  Equivalent -- equivalent of the English

23  date but rendered in Chinese is year, month, date.

24  Q.        And this is the contract that you interpreted;

25  right, or translated?

1    A.        Yes.

2    Q.        And what is this here (indicating)?

3    A.        Party B in quote; signature in parentheses.

4    Q.        Okay.  Is there any signature on this document?

5    A.        No.

6    Q.        And this is a 2019 contract?  That's what I

7    asked to put up there, but I can't tell.

8              Well, it says 2019 on the bottom; right?

9    A.        It is, 2019.

09:51AM 10             MR. LOMONACO:  Okay.  Now, if we could go to

11   Government's Exhibit 11-L, which would be the translated

12   version.

13             And could we go to the bottom of page 2.

14   Right.

15   BY MR. LOMONACO:

16   Q.        Now, you don't have any signature on that page

17   either; is that correct?

18   A.        Correct.

19   Q.        So, as far as you know, this contract was never

09:51AM 20   executed or signed by the parties?

21   A.        I would say this document has no signature.

22             MR. LOMONACO:  Okay.  Now, if we went to

23   Exhibit -- hold on a minute.

24             If we go to Exhibit -- or the contract in

25   English, 11-Q, and if we could page down to Roman

1    numeral III.

2    BY MR. LOMONACO:

3    Q.        Do you see here a section that says, "Housing

4    support," that paragraph that says "Housing support"?

5              MR. LOMONACO:  And if we could go to the 11-L

6    again and go down to section Roman numeral III.

7    BY MR. LOMONACO:

8    Q.        Do you see at the bottom, it says, "Housing

9    support"?

09:53AM   10   A.        Yes.

11             MR. LOMONACO:  Okay.  Now, can we go to the

12   Chinese version of 11-L, which is 7-K, and if we could

13   find section paragraph Roman numeral III again.

14   BY THE WITNESS:

15   A.        Next page.

16   BY MR. LOMONACO:

17   Q.        Are we there now?

18   A.        Yeah.

19   Q.        Okay.

09:53AM   20   A.        No.  Yeah, next page, please.

21   Q.        Okay.  Do you see anything there that talks

22   about "Housing support"?

23   A.        Yes, it says here (indicating).

24   Q.        Where is it?

25   A.        The second line.

1    Q.        I'm sorry?

2    A.        The second line from top to bottom, it says,

3    "Housing support".

4    Q.        Right there (indicating)?

5    A.        Uh-huh.

6              MR. LOMONACO:  All right.  May I have a moment,

7    please.

8              (A discussion was had off the record.)

9    BY MR. LOMONACO:

09:55AM  10  Q.        Does that -- does that Chinese version of the

11   housing support include a housing allowance of 500 yuan

12   a month in the language there?

13   A.        Can I see -- can I see the translation and the

14   source document?

15             MR. LOMONACO:  If they can do it, that's fine.

16   BY MR. LOMONACO:

17   Q.        So, in the English, we're going down to Roman

18   numeral III.  Do you see on the bottom of the --

19   A.        Will you please go to the first page of the

09:56AM  20  translation?  I need to make sure that this is the

21   translation of the source document on the left.  Please

22   go to the first page.

23   Q.        Of the translated one?

24   A.        Yes.

25             Yes, this is the translation.  Please go to

1   page 2 of the translation.   Okay.

2   Q.       So do you see the housing support section in

3   the Chinese version?

4   A.       Okay.   Yeah.   That one is not in Chinese

5   version.

6   Q.       Okay.   So, in the English, it is inaccurate as

7   far as what the Chinese version says on that section?

8   A.       This portion is inaccurate.

9   Q.       Let me go, if I could now, back to the same

09:58AM  10   contract on the right, but go to the next page, and I'd

11   like to draw your attention, if I could, to the

12   section --

13           MR. LOMONACO:   Is there any way we can make

14   that a little bit larger?

15           MS. DENARD:   Which section?

16           MR. LOMONACO:   The English, Section IV.

17           MS. DENARD:   Evaluation?

18           MR. LOMONACO:   No, not Roman numeral -- up here

19   in the middle (indicating).   This section right here

09:59AM  20   (indicating).   That's the section; right?

21   BY MR. LOMONACO:

22   Q.       Okay.   Do you see where it says, "Party A's

23   Rules and Regulations," and "Ensure working for Party A

24   for no less than two months"?

25   A.       Uh-huh.

1          MR. LOMONACO:  Okay.  If we could go to the

2  Chinese version Section IV.

3  BY THE WITNESS:

4  A.      Uh-huh.

5          MR. LOMONACO:  Is that the right section?

6  BY MR. LOMONACO:

7  Q.      Okay.  Does that section also -- besides

8  saying, "ensure working," does it say, "ensure actual

9  working time onsite of Party A"?

09:59AM 10  A.      Yes.

11  Q.      So that would be a more accurate translation

12  than what we have here; right?

13  A.      No, working for Party A is accurate.

14  Q.      I'm sorry?

15  A.      My translation is accurate.

16  Q.      All right.  So Section IV in Chinese has the

17  added words, "ensure actual working time onsite".

18  "Onsite"?

19  A.      Yes, "onsite" means working for Party A.

10:00AM 20  Q.      Okay.  Working for Party A, but onsite is a

21  little bit different, isn't it?

22  A.      No.

23  Q.      Onsite means in China?

24  A.      Onsite means in the premises of Party A.

25  Q.      So your interpretation is "ensure working for

1    Party A" means in China; working in China for Party A?

2    A.        Here "onsite," if it is a literal translation,

3    the meaning is working for Party A; work in the position

4    offered by Party A.

5    Q.        Okay.  So the literal translation includes

6    working for Party A at Party A or in Party A?

7    A.        No.

8    Q.        Well, okay.  I'm trying to understand what

9    you're saying.  Evidently you've told me there is two

10   variations of this interpretation; correct?

11   A.        No, I didn't say that.

12   Q.        You said the literal interpretation.

13   A.        Literal translation, yes, report to position.

14   If you say literal, report to position.

15   Q.        In English, the literal translation would be

16   what?

17   A.        Working for Party A.

18   Q.        Working for Party A?

19   A.        Uh-huh.

20   Q.        Now, are you saying that it doesn't include

21   working for Party A onsite?

22   A.        Would you please repeat?

23   Q.        The Chinese section, does it include "ensure

24   actual working time onsite"?

25   A.        I don't understand -- I don't interpret it as

1    onsite.  I would say report to duty.

2    Q.        What?

3    A.        Report to duty or report to position and work

4    at the position for no less than two months.

5    Q.        Okay.  So that's what it says?

6    A.        Uh-huh.

7    Q.        Report to duty?

8    A.        Report and perform duty for less than -- no

9    less than two months.

10   Q.        Report --

11   A.        Uh-huh.

12   Q.        -- and perform duty?

13   A.        Uh-huh.

14   Q.        Report where; does it say?

15   A.        Party A.

16   Q.        Report to Party A?

17   A.        Uh-huh.

18   Q.        And perform your duties?

19   A.        Uh-huh.

20   Q.        Okay.  That's your -- that's your best

21   interpretation?

22   A.        Yes.

23   Q.        Okay.  Excuse me a moment.

24             (A discussion was had off the record between

25              the defendant and his counsel.)

1  BY MR. LOMONACO:

2  Q.        So if we wanted to have a further and more

3  complete translation of that section, we could include

4  the words "report for duty" and "work for Party A," or

5  tell me again what you said.  "Report" --

6  A.        Yes.  Report for duty; report and perform the

7  duty for no less than two months.  And the meaning as

8  it -- based on my understanding, work for Party A for no

9  less than two months.

10  Q.        And is it your understanding that report for

11  duty would mean to go to China and work?

12  A.        Yes.

13           MR. LOMONACO:  Okay.  Thank you.

14           THE COURT:  Thank you.  Any redirect?

15           MR. ARROWOOD:  No, Your Honor.  We don't have

16  anything.

17           THE COURT:  All right.  Thank you.  This

18  witness may be excused.  Thank you.

19           Do we have anybody before our video witness?

20           MR. ARROWOOD:  No, Your Honor, we don't have

21  anyone before then.

22           THE COURT:  Do we think we can get him or her

23  maybe 10:30 versus 11:00, possibly?

24           MR. ARROWOOD:  We can certainly work on it,

25  yes.

THE COURT:  All right.  The next witness is a video witness.  We've been anxiously awaiting and pulling the screen forward.

We had that witness scheduled for 11:00.  Why don't we go ahead and take a recess, and maybe a little bit longer morning recess, but if we get the witness before 11 o'clock our time, we'll let you know.  But why don't we plan for at least a 30-minute recess right now.  And if it needs to be a little longer, we appreciate your patience with us.

We'll stand in recess.

(Jurors excused from the courtroom.)

THE COURT:  Let me go ahead and address defendant's request yesterday, I guess, prospective request or preemptive request to admit exhibits consisting of the PowerPoint presentations allegedly made to certain University of Tennessee officials during his cross-examination of FBI agent or agents.

The Court first notes that the defendant has been permitted to ask University of Tennessee witnesses about these presentations on cross-examination, and although the exhibits have not yet been admitted into evidence at this point, the Court has not curtailed defendant's ability to discuss the presentations and the exhibits with the University of Tennessee witnesses and

question these witnesses about what impact such presentation may have had on their subsequent actions and testimony in court.

As to defendant's request to introduce these exhibits into evidence while cross-examining FBI witnesses, the government objects on the grounds of hearsay and relevance.

The Court has now reviewed the proposed exhibits and will permit defendant to introduce these exhibits during his cross-examination of FBI witnesses.

First, the Court does not find these exhibits are objectionable on the grounds of hearsay as defendant does not seek to introduce the statements contained therein for the truth of the matter asserted. Instead, defendant seeks to admit such exhibits to show the state of mind and potential bias of witnesses, which the Court finds to be a proper ground for admission of these exhibits.

Additionally, the Court finds that the exhibits have some relevance in that defendant intends to present arguments regarding witness's credibility through such evidence.

Moreover, the Court finds the relevance of the evidence is not substantially outweighed by any factor listed in Rule 403 of the Federal Rules of Evidence.

1          Accordingly, the Court will permit the

2  defendant to introduce the exhibits, which the Court

3  understands to be Defendant's Exhibits 13, 14, and 25,

4  during his cross-examination of FBI witnesses.

5          Finally, the Court also notes the government

6  has requested that if the defendant is permitted to

7  introduce these exhibits that it be permitted to

8  introduce the corresponding exhibits listed in the

9  PowerPoint presentations for purposes of rehabilitation

10:08AM  10  or otherwise, and the Court will permit the government

11  to introduce as evidence those exhibits listed in the

12  PowerPoint presentation exhibits, to the extent they

13  relate to issues brought up on cross-examination.

14          We're going to make that ruling so the parties

15  can prepare accordingly potentially for tomorrow's

16  testimony.

17          MR. LOMONACO:  Thank you, Your Honor.

18          THE COURT:  All right.  So let's take a recess.

19  We'll say probably until -- well, until the witness is

10:09AM  20  available, but probably 10:45.  Perhaps if we can start

21  15 minutes early, that would be good.

22          MR. ARROWOOD:  Thank you, Your Honor.

23          MR. LOMONACO:  Thank you, Your Honor.

24          THE COURTROOM DEPUTY:  This honorable court

25  stands in recess.

1                    (A brief recess was taken.)

2                    THE COURTROOM DEPUTY:  All rise.

3                    THE COURT:  The Court understands our witness

4    is appearing by videotape is now ready.  We appreciate

5    her cooperation in starting a few minutes before her

6    scheduled time.  So we'll bring the jury in and proceed.

7                    (Whereupon the following report of

8                     proceedings was had within the presence

9                     and hearing of the jury:)

10:47AM  10          THE COURT:  All right.  Everyone please be

11   seated.

12                   As the jury can see, and as we've discussed,

13   the next witness, and I believe the witness after that,

14   will be testifying via on the monitor and on your

15   monitors via video -- live via video screen testimony.

16   That is by agreement of the parties, as well as approval

17   from the Court.  So you should consider this testimony

18   as you have all the other testimony in this case as if

19   this witness were appearing live in court.

10:48AM  20          So we'll swear in the witness.

21                   (The witness was thereupon duly sworn.)

22                   THE COURTROOM DEPUTY:  And would you please

23   state and spell your name for the record.

24                   THE WITNESS:  Kathryn Manzanares,

25   K-a-t-h-r-y-n.  M-a-n-z-a-n-a-r-e-s.

1          THE COURTROOM DEPUTY:  Thank you.

2                    **KATHRYN MANZANARES**,

3    having been first duly sworn, was examined and testified

4    as follows:

5                    DIRECT EXAMINATION

6    BY MR. ARROWOOD:

7    Q.        Good morning, Ms. Manzanares.

8    A.        Good morning.

9    Q.        Would you please tell the jury where you work.

10   A.        I work for Jet Propulsion Laboratory in

11   Pasadena, California.

12   Q.        What is Jet Propulsion Lab?

13   A.        Jet Propulsion Laboratory is an FFRDC, which

14   stands for Federally-Funded Research and Development

15   Center.  So we are contracted with NASA to do research

16   and development.

17   Q.        Is Jet Propulsion Lab part of the California

18   Institute of Technology?

19   A.        Yes, we are.  We are Cal Tech.

20   Q.        Okay.  And what's your position at JPL?

21   A.        I am a subcontracts manager.

22   Q.        How long have you been a subcontracts manager?

23   A.        Seven years.

24   Q.        And what did you do before becoming a

25   subcontracts manager?

10:48AM (line 10)
10:49AM (line 20)

1 A.       I worked at a legal office, a small firm.  I

2 was more of their manager.  But I did legal work for the

3 lead attorney there, too.

4 Q.       Would you please describe for the jury briefly

5 your educational background.

6 A.       I have a bachelor's degree in political science

7 from California State University at North Ridge.

8 Q.       Would you please describe some of the duties of

9 the job of a subcontracts manager at JPL.

10:50AM 10 A.       A subcontract manager handles proposals through

11 the science projects.  We are tasked with creating and

12 executing contracts for JPL.  So we are solely the only

13 division who can put the lab at risk; meaning we can

14 financially obligate the lab.

15       Other than that, when it comes to the science

16 part, we work hand in hand with the projects in order to

17 execute what it is that they're looking for, depending

18 on -- depending on the level of work that they want.

19 Q.       So in your role as a subcontracts manager, are

10:50AM 20 you able to sign contracts on behalf of the Jet

21 Propulsion Lab?

22 A.       Yes, depending on -- depending on your level, I

23 mean, and then currently you can sign a contract of any

24 dollar value.

25 Q.       Can you please describe for the jury what those

1  dollar values are and what the corresponding level is.

2  A.        Sure.  So if you're entry level, it means

3  you're level one, you have a signing authority of 100K

4  or 100,000; meaning you are responsible for signing that

5  subcontract that you did your part in and that you did a

6  thorough job in order to be able to assess the risk.

7  For level two means 250K.  Level three, 400.  Level

8  four, I believe goes up to seven, and so forth.  It goes

9  up to level six.

10:51AM  10  Q.        And what level are you?

11  A.        I'm a level three.

12  Q.        Again, just to remind the jury, what threshold

13  amount does that correspond to?

14  A.        400.

15  Q.        Now, did JPL provide any training for you in

16  how to be a subcontracts manager?

17  A.        Yes.  When I was hired back in 2014, one of the

18  first requirements that we have to do is you have to do

19  mandatory trainings, and those mandatory trainings are

10:52AM  20  how to -- how to and understanding subcontract types,

21  terms and conditions, and cost types.

22        So early on we're given those trainings that we

23  have to take within our first six months, and then after

24  that, we're highly encouraged to do refresher courses at

25  least every one to two years.

1  Q.        And have you taken refresher courses?

2  A.        Yes, I do, yearly.

3  Q.        Do you recall what some of those topics are

4  from your refresher courses?

5  A.        Some of the ones that I've been doing are just

6  mostly on the subcontract type with issues we have had

7  with cost type of contracts, risks that we should have

8  evaluated better, how to assess proposals, how to manage

9  costs.  We try to do refreshers on terms and conditions.

10 A lot of our terms didn't really change.  We had a GP

11 set in 2014, which when that -- this contract was

12 executed, and then we have a new NASA prime contract

13 that started in 2019.

14 Q.        I believe in your answer you mentioned the term

15 GPs.

16 A.        I'm sorry.  GP stands for general provisions.

17 Those are our terms and conditions.

18 Q.        All right.  So we'll get into some of those

19 specifics in just a moment, but have you taken any

20 training specific to terms and conditions of contracts?

21 A.        Yes, we -- we have -- when I first started,

22 that was one of the first classes we had to take, and it

23 just gives you an overview of the terms and conditions

24 that we handle and go through.  So they kind of just --

25 it's a very high overview of what the terms and

1  conditions stand for, when it's applicable and when it's

2  not applicable.

3  Q.      Okay.  So would JPL engaged in a contract to do

4  research, is that technically a subcontract?

5  A.      Yes, it is a subcontract.

6  Q.      And just sort of describe for the jury why is

7  it a subcontract.

8  A.      The reason why it is a subcontract is at the

9  contract level, when our contracting office sends out

10:54AM  10  their proposals at the beginning, that's how they're

11  able to obtain the budgets that the project needs.  And

12  during that time the project has an idea or a list of

13  the amount of money that they are looking for in order

14  to continue whatever it is that they're building or

15  doing research for.  And at that point on, they will

16  then trickle down to finding who these suppliers are,

17  or, in this case, universities or principal

18  investigators that they want to do the work with.  So

19  that's why they're a subcontract because they were

10:55AM  20  awarded in the beginning with the prime contract.  So

21  the project is given the money, that's their contract,

22  and then it's flowed down from there to the

23  subcontracts.

24  Q.      Okay.  So just so I understand, is it fair to

25  say that NASA and JPL have a contract where JPL is to

1  perform work for NASA; does that sound right?

2  A.        Yes.

3  Q.        Please correct me if I'm wrong.  I'm just --

4  and then is it right to say that when JPL engages in

5  contracts with others, it is a subcontract under that

6  larger contract between NASA and JPL?

7  A.        Exactly.

8  Q.        Now, if you know, do the terms and conditions

9  that apply to NASA contracts flow down to the

10:55AM  10  subcontracts that JPL signs?

11  A.        Yes, it does.  So because we have a prime

12  contract with NASA, those terms and conditions that's

13  embodied in the NASA part is actually flowed down into

14  our subcontracts.

15  Q.        Okay.  Would you please describe for the jury

16  briefly what the subcontracting process is for JPL.  I

17  know you mentioned it a little bit in some of your

18  answers, but if would start from the beginning in terms

19  of how a principal investigator, particularly at a

10:56AM  20  university, might begin the process of obtaining a

21  subcontract with JPL.

22  A.        So it can happen in two ways that are typical

23  for JPL.  First is:  We do a competitive announcement,

24  or, in this case, we sometimes do what are called NASA

25  announcement of opportunities.  When that happens, it's

1    a public forum, and the statement of work is posted for

2    pretty much anyone who is interested to send in a

3    proposal.  And at that time when the proposals are

4    submitted at the deadline, there is a select group from

5    NASA who will go through the proposals and select the

6    best candidates.

7        So when that happens, usually JPL will

8    collaborate with principal investigators, which are

9    scientists from universities.  They will put a proposal

10:57AM 10   together and submit it, and if they're selected, they're

11   awarded the money.  And then the money is given to JPL,

12   or the contract is given to JPL and then we flow that

13   down into the university.

14       The second way that we execute subcontracts is:

15   The scientist has the concept or an idea that they want

16   to do their research on.  They have an idea of who or

17   what universities can perform the work.  So they will

18   reach out to the subcontract manager who is in charge of

19   either that university or that state and let them know

10:57AM 20   that they're interested to do work with the university

21   and they will give us their statement of work, and from

22   there, we'll reach out to the university in order to get

23   a formal proposal from them which has the statement of

24   work; it has the letter that -- it has their proposed

25   budgets, their rates and so forth.

1    So we -- I -- typically I would take all that

2    into consideration, look at the dollar value, see what

3    it is that JPL is looking for, and then as long as the

4    university can meet that budget, it's fair and

5    reasonable, and that if they have done further work or

6    I'll further assess and see how well I can justify that

7    this is the only university who can do the work for us,

8    and as long as everything lines up, I go ahead and I

9    sign and execute the contract.

10:58AM   10   Q.       Is it fair to say that the second type of

11   process that you described is not competitive?

12   A.       Yes.  So we prefer -- or at least JPL prefers

13   to do competitive type of subcontracts, meaning we want

14   everything -- we want for it to be a fair competition.

15   But we do understand that there are people who are

16   experts in the field, and if it's justifiable and that

17   they are the only ones, we do execute contracts based on

18   noncompetitive measures.

19   Q.       Okay.  What is a cost reimbursable with an

10:59AM   20   educational institution?

21   A.       It is a subcontract type that we use.  "We,"

22   meaning universities under an acquisitions division, we

23   use that particular subcontract type with universities.

24   Q.       Are there other types of subcontracts?

25   A.       Yes.  We also execute cost reimbursable with

1  fee or without fee.  But that is typically used with

2  non-profits.  And then we use RSAs, which are called

3  research supported units, and that's a special type of

4  contract awarded by NASA to be used for research.

5  Q.      Now, do you specialize in any specific type of

6  subcontract?

7  A.      What do you mean?  I'm sorry.  Could you --

8  Q.      Sure.  Do you -- for example, do you work

9  mostly on the cost reimbursement with educational

10  institutions versus RSAs, or do you do all the different

11  types of subcontracts?

12  A.      I do all three.  So I do the three that I just

13  described, which is the cost reimbursable with an

14  education institution.  I handle RSAs.  I also handled

15  the cost -- cost types of contracts with non-profits

16  because -- and I also handle fixed price with foreign

17  education institutions, also.

18  Q.      All right.  Now, based on your experience as a

19  subcontracts manager, are you generally familiar with

20  the terms and conditions that apply to NASA contracts?

21  A.      Yes, I am.

22         (Government's Exhibit 8-M was marked for

23          identification.)

24  BY MR. ARROWOOD:

25  Q.      Okay.  All right.  Now I'd like to start

1  showing you some documents.  I'd like to show you what's

2  been marked as Government's Exhibit 8-M, as in Mike.

3  Of you can't see this document, please let me

4  know once we have it up.

5  A.  I can see it.

6  Q.  Okay.

7  MR. ARROWOOD:  So please scroll to the bottom.

8  Okay.  Back up.  Right there (indicating).

9  Okay.  Thank you.

11:01AM  10  BY MR. ARROWOOD:

11  Q.  Please just take a second and read this to

12  yourself.

13  Do you recognize this?

14  A.  Yes, I do.

15  Q.  What is this?

16  A.  This is the email I sent back on October 11,

17  2016.  When I finished and finalized the subcontract, I

18  cents it to Tara Halstead, who is my point of contact at

19  the University of Tennessee.

11:01AM  20  Q.  I see there on the cc line is an individual

21  identified as Yoseph Bar-Cohen.  Do you see that?

22  A.  Yes.

23  Q.  Who is Yoseph Bar-Cohen?

24  A.  He is my CTM, which stands for contract

25  technical manager.  So he's the scientist.

1  Q.      Okay.  And now I'll direct your attention to

2  the subject line.  Will you please read that for the

3  jury?

4  A.      Sure.  It says it says, (as read) "Related to

5  Jet Propulsion Laboratory, Subcontract 1560728."

6  Q.      And so what are you doing in this email?

7  A.      I'm letting the university know or Tara know

8  that this is in regards to the subcontract that we were

9  negotiating and that I am ready to -- I am attaching it

11:02AM 10  to this email because it's already been put together and

11  it's ready for their signature for them to review -- or

12  review and then their signature.

13          MR. ARROWOOD:  Your Honor, before I go any

14  further, I'd like to admit Government's Exhibit 8-M into

15  evidence.

16          THE COURT:  So admitted.

17          (Government's Exhibit 8-M was received into

18           evidence.)

19          MR. ARROWOOD:  Okay.  Will you please scroll up

11:03AM 20  to the top email.

21  BY MR. ARROWOOD:

22  Q.      Take just a second and read this for me,

23  please.

24          Is this a response to your previous email?

25  A.      Yes, it was.

1   Q.      Would you just describe for the jury what's

2   going on in this email.

3   A.      In this email Tara responded on October 20th

4   that she is attaching a signed -- a signed copy of the

5   contract that I had sent them requesting that I do a

6   bilateral signature.

7   Q.      And what do you mean by "bilateral signature"?

8   A.      So this subcontract has only been partially

9   signed, meaning they're the only ones that signed it so

11:03AM  10   far.  So since they signed it without any -- you know,

11   any refusals or requests for changes, I'm going to go

12   ahead and sign it and then send them the copy with my

13   signature making it a bilateral execution.

14   Q.      Okay.  I'd like to direct your attention there

15   to the top of the email.  Does this email indicate

16   whether there are any attachments to it?

17   A.      Yes.  It says that the subcontract I sent them

18   is attached and was signed on October 20th.

19   Q.      Do you recall what state of the United States

11:04AM  20   you were in when you received this email?

21   A.      Yes, in California.

22   Q.      All right.  Thank you.

23          Now I'd like to show you the attachment.

24          MR. ARROWOOD:  Please show the witness

25   Government's Exhibit 8-N, as in November.

1    Your Honor, I believe this has already been

2  admitted.

3  BY MR. ARROWOOD:

4  Q.      Ms. Manzanares, do you recognize this document?

5  A.      Yes, I do.

6  Q.      What does it appear to be?

7  A.      This is the subcontract that I put together and

8  executed and then sent over to the University of

9  Tennessee.  So this is what our cost reimbursable

10  education subcontract looks like.

11  Q.      Will you please read for the jury the

12  subcontract number up in the top right-hand corner.

13  A.      Unfortunately -- oh, there, we go.  It's

14  1560728.

15      MR. ARROWOOD:  Okay.  Please scroll down.

16  BY MR. ARROWOOD:

17  Q.      What's the name of the subcontractor?

18      MR. ARROWOOD:  Sorry.  Go back up.

19  BY THE WITNESS:

20  A.      University of Tennessee, Knoxville.

21  BY MR. ARROWOOD:

22  Q.      And what are the effective dates for this

23  subcontract?

24  A.      Effective dates starts on October 11, 2016, and

25  it ends on October 31st -- I believe it's 2017.  I

1    cannot see it.

2         Yes, 2017.

3    Q.        Okay.  And how much money is involved in this

4    particular subcontract?

5    A.        The estimated cost for this contract is 60,000.

6    Q.        Okay.  And right below the amounts where it

7    indicates point of -- points of contact, I'd like to

8    direct your attention to the entry for the principal

9    investigator.  Who is the principal investigator on this

11:06AM  10   subcontract?

11   A.        Dr. Anming Hu.

12   Q.        Are you the subcontracts manager on this?

13   A.        Yes, I am.

14   Q.        Is that your email address indicated on the

15   right-hand column?

16   A.        Yes, it is.

17   Q.        And then under Technical Manager, is that

18   Dr. Yoseph Bar-Cohen?

19   A.        Yes, that is.

11:06AM  20        MR. ARROWOOD:  Okay.  I'd like to scroll down

21   just a little bit further.

22   BY MR. ARROWOOD:

23   Q.        Will you please read what's in the box with the

24   words beginning, "The below parties..."

25   A.        "The below parties have agreed to subcontract's

1  terms and conditions and to the effect-" -- I can't see

2  it.

3  Q.      Hopefully we can fix this for you.

4          Can you see it now?

5  A.      Uh-uh.  I can only see it as far as "...and to

6  the effective."

7  Q.      Any better?

8  A.      No, unfortunately.  On my screen, like where I

9  can see you and I can see me is blocking.

11:07AM 10       MR. ARROWOOD:  Okay.  Maybe we can blow up that

11  one portion and then move it to the side so she can see

12  it.

13  BY THE WITNESS:

14  A.      Oh.  "...to the effective start date."

15  Q.      Okay.  Great.  Thank you.

16          Scrolling down there to where it indicates

17  signatures, is there a signature on the right-hand side

18  of the screen?

19  A.      Yes, there is.

11:07AM 20  Q.      Who signed the document?

21  A.      I believe it says Jean Mercer.

22  Q.      The date?

23  A.      October 20th, 2016.

24  Q.      And on the left-hand side, do you see any

25  signatures?

1    A.        No, not yet.

2    Q.        And that's you identified there; is that

3    correct?

4    A.        Yes, it is.

5    Q.        Why is there a Roman numeral -- or a Roman

6    Number II after Manager on your title?

7    A.        So a subcontracts manager, it was our division

8    policy to put what level we are, and at that time I was

9    a level II.

11:08AM  10  Q.        Okay.

11             MR. ARROWOOD:  All right.  If you'll please

12   scroll back up to the top of this document.  Stop right

13   there (indicating).

14   BY MR. ARROWOOD:

15   Q.        Do you see there where there is a bullet point

16   and it begins, "General Provisions"?

17   A.        Uh-huh.

18   Q.        What are the general provisions, generally

19   speaking?

11:08AM  20  A.        General provisions are -- these are the terms

21   and conditions for this specific, so what is applicable.

22   Q.        It appears that these are dated -- or the

23   general provisions that apply to this subcontract are

24   dated April 2014; is that right?

25   A.        That's correct.

1          (Government's Exhibit 8-AA was marked for

2          identification.)

3    BY MR. ARROWOOD:

4    Q.          Okay.  Now I'd like to show you Government's

5    Exhibit 8-AA.  Do you recognize this document?

6    A.          Yes, I do.

7    Q.          What is it?

8    A.          These are our terms and conditions for cost

9    reimbursable education institution.

11:09AM  10          MR. ARROWOOD:  Please just scroll down to the

11   bottom of this page.  Keep going.  A little further.

12   Right there (indicating).

13   BY MR. ARROWOOD:

14   Q.          Do you see where the government's exhibit

15   sticker is on the bottom right-hand side?

16   A.          No, it's blocked.

17   Q.          Okay.  Let's see if I can fix this for you.

18   A.          Yes, I do.

19   Q.          Okay.  So disregard the exhibit sticker, but

11:10AM  20   below the exhibit sticker, what do you see?

21   A.          It says, (as read) "JPL April 2014."

22   Q.          So are these the general provisions that we

23   just -- or that were just identified in the previous

24   document?

25   A.          Yes, it is.

1        MR. ARROWOOD:  Okay.  Would you please scroll

2    to page 2.  Just page 2.  Scroll down.

3    BY MR. ARROWOOD:

4    Q.        Are you generally familiar with these terms and

5    conditions?

6    A.        Yes, I am.

7    Q.        All right.  I'd like to direct your attention

8    to the final entry on the page.  Please read that to the

9    jury.

11:10AM  10    A.        "Restrictions on Funding Activity With China."

11    Q.        Are you familiar with that restriction?

12    A.        Yes, I am.

13    Q.        Based on your experience, is this restriction

14    included on all subcontracts with JPL?

15    A.        Yes, it is.

16        MR. ARROWOOD:  All right.  If we could please

17    go to page 20.  Scroll down, please.

18        Right there's good (indicating).

19    BY MR. ARROWOOD:

11:11AM  20    Q.        Do you recognize the language depicted on the

21    screen?

22    A.        Yes, I do.

23    Q.        What is this?

24    A.        So this is the terms and conditions that

25    tells -- that --

1    THE COURT:  Hold on a second.  I think we lost

2  the sound.

3  BY MR. ARROWOOD:

4  Q.      Ms. Manzanares, if you can hear us, we can't

5  hear you.  So please hold on for just a moment.

6    THE COURT:  What do we need to do, Julie?

7  BY MR. ARROWOOD:

8  Q.      Can you hear us, Ms. Manzanares?

9  A.      Yes, I can hear you.

11:12AM 10  Q.      Okay.  Great.  All right.  I'd like to direct

11  your attention to paragraph (d).  Do you see paragraph

12  (d)?

13  A.      Uh-huh.

14  Q.      Will you please read that to the jury.

15  A.      "The subcontractor represents that the

16  subcontractor is not China or a Chinese-owned company."

17  Q.      Okay.  And then refer back to paragraph (a) at

18  the top of this restriction.  Would you read that for

19  the jury.

11:12AM 20  A.      Sure.  "Definition - 'China' or 'Chinese-owned

21  company' means the People's Republic of China or any

22  company" -- I cannot see.

23    Oh.  (As read) "...any company owned" -- I

24  think it's, "...any company owned by the People's

25  Republic of China or any company incorporated under the

 1  laws of the People's Republic of China."

 2  Q.       Thank you.

 3  A.       Uh-huh.

 4          MR. ARROWOOD:  Your Honor, government moves to

 5  admit Government's Exhibit 8-AA.

 6          THE COURT:  So admitted.

 7          (Government's Exhibit 8-AA was received into

 8           evidence.)

 9  BY MR. ARROWOOD:

11:13AM 10  Q.       Now I'd like to show you Government's

11  Exhibit 6-B.  I believe this has already been admitted.

12          Can you see that document?

13  A.       Yes, I can.

14  Q.       Are you able to see the subcontract number on

15  the top right-hand side?

16  A.       Uh-huh.

17  Q.       What does it say?

18  A.       1560728.

19  Q.       Now I'd like to direct your attention to the

11:14AM 20  bottom portion of this page where it indicates the

21  signatures.  Now, this document on the left-hand side,

22  is there a signature?

23  A.       Yes, there is.

24  Q.       Is that your signature?

25  A.       Yes, that's my electronic signature.

1  Q.      Is this the fully-executed version of the

2  subcontract that we saw in -- earlier during your

3  testimony?

4  A.      Yes, it is.

5  Q.      Do you recall whether or not you ever reviewed

6  any of the proposal documents for this subcontract?

7  A.      I believe so.

8  Q.      Do you typically look at the proposal documents

9  for subcontracts?

11:14AM  10  A.      Yes, we do.

11  Q.      Why do you look at them?

12  A.      For multiple reasons.  One of the biggest is:

13  We make sure that obviously it has the letterhead of the

14  university, that the title of the proposal is the same

15  from the one that was given to us, that the statement of

16  work reflects the same statement of work that our CTM or

17  our contract technical manager sent to us, and then we

18  look to make sure that the proposed budget -- that the

19  proposed hours and material costs and so forth is true

11:15AM  20  and accurate, along with their fees or fringes, and then

21  if there is anything else we need to attach, we take a

22  look to see if it's applicable.

23  Q.      So I'd like to show you Government's

24  Exhibit 8-K.

25          MR. ARROWOOD:  Your Honor, I believe this has

1  already been admitted.

2  BY MR. ARROWOOD:

3  Q.       Can you please read the title of this to the

4  jury, if you can see it?

5  A.       (As read) "Nanobrazing stainless steel

6  containers for the breaking" -- "for breaking the

7  chain-of-contact Mars Sample Return Mission."

8  Q.       And underneath the title, what appears on the

9  document?

11:16AM  10  A.       It has the PI's name, so Anming Hu, University

11  of Tennessee, Knoxville, Oak Ridge National Lab.

12  Q.       And does this appear to be a typical statement

13  of work that you would see in reviewing proposals?

14  A.       Yes.

15           (Government's Exhibit 8-L was marked for

16            identification.)

17  BY MR. ARROWOOD:

18  Q.       All right.  I'd now like to show you

19  Government's Exhibit 8-L.  Do you recognize this type of

11:16AM  20  document?

21  A.       Yes, I do.

22  Q.       What is it generally?

23  A.       Generally this is just an overview of the

24  budget justification; meaning they tell you who the

25  personnels are who will be doing the work, cost of work,

1    how long they will be doing it, if it will have -- if

2    they will have a student or an assistant, they will give

3    us the fridge rate that they charge, which a typical for

4    university's fridge kind of encompasses like costs to be

5    reimbursed for the university, if there are supplies

6    that they need to buy, publishing the costs.

7            MR. ARROWOOD:  Your Honor, the government moves

8    to admit Government's Exhibit 8-L.

9            THE COURT:  So admitted.

11:17AM 10           (Government's Exhibit 8-L was received into

11              evidence.)

12   BY MR. ARROWOOD:

13   Q.      I'd like to direct your attention to the top

14   paragraph under the heading Personnel.  Will you please

15   just read that to yourself.

16           Where does this document indicate that Anming

17   Hu works?

18   A.      It's right in the beginning that he's an

19   assistant professor in the Department of Mechanical,

11:18AM 20   Aerospace and Biomedical Engineering at the University

21   of Tennessee.

22   Q.      Is there any mention of the Beijing University

23   of Technology?

24   A.      No.

25   Q.      Okay.  Earlier you mentioned that you do review

1  proposal documents.  Is this budget justification that

2  we just saw, is that typically included with proposal

3  documents?

4  A.      Yes, it is.

5  Q.      In your review of a budget justification like

6  the one we saw, if a principal investigator had

7  identified that he or she was employed at a Chinese

8  university, would that have raised any red flags for

9  you?

11:18AM  10  A.      Yes, it would have.

11  Q.      Why?

12  A.      Well, first, our subcontract is being executed

13  with the University of Tennessee.  So we would like to

14  know what -- what affiliation he or she has with a

15  foreign university, and if our -- if our funding is

16  actually going to that university.  If so, we would have

17  to let them know that we can't execute that subcontract.

18  Q.      If you saw that in that budget justification or

19  another different type of proposal document, what would

11:19AM  20  you have done specifically?

21  A.      First and foremost, I would definitely reach

22  out to my contract technical manager to let him know

23  that their proposal is stating that the PI is employed

24  with a foreign institution and it is with China and if

25  he had any knowledge of it, and if they are planning to

send any of the funding to that university, and if they say no, I would have to reach out to the University of Tennessee to let them know my findings and to find out where the funding is going.  And if it does show that any of the funding goes outside of the University of Tennessee, I would have to let them know that we cannot execute the subcontract based on our terms and conditions.

Q.      In your time as a subcontracts manager, have you ever seen a principal investigator on a proposal document indicate that he or she is employed at a Chinese university?

A.      No.

Q.      Do you or do people in your office that you know of do any independent research to determine whether or not the principal investigator or others working on potential subcontracts have any affiliation with any entity in China?

A.      Not necessarily.  What we do -- what we do in our part and a lot of my colleagues is:  We do make sure that, one, obviously the principal investigator is employed at the university.  We do independent research to see if they're found on the website, publications that they have done, if it correlates to the proposal that we are doing for the subcontract.  Other than that,

1    that's as far as we go.

2         Some of the -- at other times we've noticed

3    that we have principal investigators who are affiliated

4    to JPL.  That means they're working for us directly and

5    they are on our lab.  So we have to make sure that the

6    subcontract called out that they are not a JPL employee,

7    but they are an affiliate, but the funding is being sent

8    to the university and the university is paying that

9    principal investigator and not JPL.

11:21AM 10  Q.       Is it your understanding that by signing a

11   subcontract that the university is indicating that it

12   will comply with terms and conditions of the

13   subcontract?

14   A.       Yes.

15   Q.       Do you rely on representations by universities?

16   A.       Yes, of course.

17   Q.       If after the execution of a subcontract you

18   became aware that a principal investigator was employed

19   at a university in China, what, if anything, would you

11:22AM 20  do?

21   A.       First off we would have to let our -- our legal

22   advisors know of the information that we found out, let

23   obviously my group supervisor and our section manager

24   know, and then we would have to have a meeting with the

25   university to find out our findings or at least my

1  findings to see if they had any knowledge, and if they

2  did, we would quickly have to remind them that we would

3  have to cancel that subcontract based on the fact that

4  we cannot do contracts with China.

5  Q.      Has that ever happened in your experience?

6  A.      Not to my knowledge so far.

7  Q.      Okay.

8          MR. ARROWOOD:  All right.  Thank you very much.

9  No further questions, Your Honor.

11:23AM  10          THE COURT:  Thank you.

11          Cross-examination?

12                  CROSS-EXAMINATION

13  BY MR. LOMONACO:

14  Q.      Good morning, Ms. Manzanares.  Am I pronouncing

15  that correctly?

16  A.      Yes, Manzanares.

17  Q.      Thank you.  Manzanares.

18          Let me ask you a few questions, if I may,

19  please.  This is a 2016 proposal that we're talking

11:23AM  20  about; is that correct?

21  A.      Yes.

22  Q.      And contract?

23  A.      Uh-huh.

24  Q.      Okay.  Do you review the proposals when they

25  come in?

1  A.      Yes, I do, or when they're emailed or submitted

2  to me.

3  Q.      Did you review the proposal from the University

4  of Tennessee in this case?

5  A.      Yes, I did.

6  Q.      Are you familiar with an assurance letter that

7  University of Tennessee would attach to the proposal?

8  A.      No, I don't think so.

9  Q.      Okay.  Did you see a document that said

11:24AM  10  Assurance on it in the proposal?

11  A.      No, I didn't.

12  Q.      And to explain a little bit more, the assurance

13  would be the proposer assures -- in this particular

14  case, in this case, JPL or NASA, that it is not -- and

15  I'm paraphrasing, but that it is not China or a Chinese

16  company, and that kind of assurance, you didn't see a

17  document saying that?

18  A.      No, I don't think so.

19  Q.      Okay.  And you are expecting assurances from

11:25AM  20  the proposer that they are not China or a Chinese

21  company.  That's in the contract itself; right?

22  A.      It's -- our contract states that we don't do

23  contract -- or contracts with China.  We -- it's

24  not -- we don't ask for assurances, but when they sign

25  the contract, they acknowledge our terms and conditions.

1  Q.       They acknowledge what?  I'm sorry?

2  A.       They're acknowledging our terms and conditions,

3  and one of those terms and conditions is what I had read

4  earlier.

5  Q.       So -- yeah.  I stand corrected.  That language

6  is in your terms and conditions that I just mentioned;

7  right?

8  A.       Yes, it is.

9  Q.       Okay.  This contract, subcontract was

11:25AM 10  completed; correct?

11 A.       Correct.

12 Q.       Are you involved with the payments on the

13 contract as it progresses?

14 A.       No, I'm not.

15 Q.       No?  Okay.

16          But you do know that it was completed, and JPL

17 paid the contract price; right?

18 A.       I'm not -- I'm not made aware.  When the

19 subcontract is fully paid, the only time I'm involved is

11:26AM 20  when it expires, meaning the effective dates are -- has

21 passed and it's my job to close the subcontract at that

22 point, and that's when I'll know if it's fully been

23 paid.

24 Q.       Okay.  Did anybody talk to you about this case

25 before you testified?

1    A.        No.

2    Q.        No?  Nobody told you you were going -- you were

3    going to be testifying as a witness?

4    A.        Oh, no, in that sense, JPL's general counsel

5    reached out to me to let me know.

6    Q.        General counsel for NASA?

7    A.        For Jet Propulsion Laboratory.

8    Q.        JPL.  I'm sorry.

9              Did they tell you what the subject matter would

11:27AM 10    be that you were going to testify about?

11   A.        They told me it was about the subcontract that

12   I had executed with the University of Tennessee,

13   Knoxville.

14   Q.        Okay.  So you're familiar with the NASA

15   restriction.

16              MR. LOMONACO:  Could we see -- I believe it's

17   8-N, page 20.  Oh.  I'm sorry.  8-AA.

18   BY MR. LOMONACO:

19   Q.        Okay.  We talked about this a little bit.  All

11:27AM 20    right.  You talked about this a little bit ago with the

21   other gentleman.  Can you hear me okay?

22   A.        Yes, I can hear you.

23   Q.        Okay.  Your picture just -- there it is

24   (indicating).

25              So this is the NASA restriction that is in the

1    general provisions; correct?

2    A.        Yes, it is.

3    Q.        Okay.  And there is a definition about China or

4    a Chinese-owned company means the People's Republic of

5    China and any company owned by the People's Republic of

6    China or any company incorporated under the laws of the

7    People's Republic of China.

8    A.        Uh-huh.

9    Q.        Now, that section there does not mention

11:28AM  10   anybody in particular; right?  Like a human being or a

11   person.

12   A.        No, it does not.

13   Q.        And it also says that NASA is

14   restricted -- next paragraph -- from contracting to

15   participate, collaborate, coordinate bilaterally, in any

16   way with China or a Chinese-owned company.  There is

17   that language again; right?

18   A.        Yes.

19   Q.        And that's not talking about any particular

11:29AM  20   person.  It's talking about China or Chinese-owned

21   company as it's written; correct?

22   A.        Correct.

23   Q.        And when you look at the contract or the

24   proposal, it's the proposer that is responsible for

25   ensuring the compliance with the NASA restriction;

1   correct?

2   A.      On the proposal side?

3   Q.      Well, I guess on the contract in general.

4   A.      So, for the contract, the principal

5   investigator doesn't sign the contract, the university

6   does.

7   Q.      Okay.  So if you go down to Section D, the

8   subcontractor would be the university; is that right?

9   A.      Yes.

11:29AM 10  Q.      Now, the prosecutor has asked you if you had

11  learned that the personal -- or the investigator worked

12  for China, I think is the words that he used, or

13  something to that effect; had a job in China.  Do you

14  recall the questioning?

15  A.      I believe so.

16  Q.      That you would, you know, alert your -- the

17  people that you work with if you learned that.  But

18  nowhere in the proposal or the contract is there any

19  question about the principal investigator and his

11:30AM 20  affiliations, collaborations, or part-time jobs, is

21  there?

22  A.      No.

23  Q.      And if there is nothing in this proposal,

24  again, it would be the responsibility, if that is a

25  violation -- and I'm not saying it is, but if it is a

1  violation, it would be the responsibility of the

2  university to ferret that out before they made the

3  proposal; wouldn't you agree?

4  A.      I mean, I don't think I would be the subject

5  matter expert in saying that, but I don't know how the

6  universities handle who and how they employ someone,

7  but --

8  Q.      I'm sorry; you don't know how the university

9  would what?

11:31AM 10  A.      I'm not really privy to knowing how the

11  university -- how extensive that they look into

12  someone's background when they're hiring their

13  professors and so forth, and so I'm not really sure how

14  to answer that question.

15  Q.      Okay.  It's a little confusing, isn't it?

16  A.      Yes.

17  Q.      Now, in this particular contract --

18  subcontract, is there any indication that NASA or JPL

19  collaborated with China or a Chinese corporation?

11:32AM 20  A.      No.

21  Q.      Is there any agreement upfront or in the

22  contract that NASA would send money to China or a

23  Chinese corporation?

24  A.      No.

25  Q.      And, in fact, all the money in this JPL

1    subcontract that was paid went to the University of

2    Tennessee; correct?

3    A.       Yes.

4    Q.       And you indicated also that if -- if you

5    thought there was a problem with the -- with this issue,

6    one of the people you would alert would be the technical

7    manager; is that correct?

8    A.       Yes.

9    Q.       And who is the technical manager in this case?

11:33AM 10    A.       That is Dr. Yoseph Bar-Cohen.

11    Q.       Okay.

12           MR. LOMONACO:  Excuse me one moment.

13           THE WITNESS:  Uh-huh.

14    BY MR. LOMONACO:

15    Q.       Did you discuss this contract with Yoseph

16    Bar-Cohen at any time?

17    A.       Only at the very beginning when he reached out

18    to me when he found out I was the subcontracts manager

19    who was handling this university.  That's as far as our

11:33AM 20    communication went.  It's just an exchange of what he

21    was looking for, the paperwork that I needed, the

22    justification that I needed in order to show that only

23    the university's PI is the only one capable to do the

24    work that I'm describing.

25    Q.       So he indicated to you -- I'm sorry.  Did I cut

1    you off?

2    A.      No, I'm just saying that's as far as our

3    communication goes.

4    Q.      Okay.  So you did have some communications with

5    him, and he indicated to you that the PI at the

6    University of Tennessee was -- was really qualified for

7    this type of work; right?

8    A.      Yes.

9    Q.      And, of course, you all want to try to get the

11:34AM 10    most qualified you can get; correct?

11    A.      That's correct.

12    Q.      And did Mr. Bar-Cohen say anything to you about

13    any connections or collaborations that the PI had with

14    China?

15    A.      No.

16           MR. LOMONACO:  Okay.  All right.  Well, thank

17    you very much.

18           Oh, wait a minute.  They keep telling me to ask

19    another question.  Excuse me one second.

11:35AM 20           (A discussion was had off the record.)

21    BY MR. LOMONACO:

22    Q.      Yeah, I guess in case I didn't ask this, the

23    subcontractor in this case is the University of

24    Tennessee; correct?

25    A.      Yes, it is.

1    MR. LOMONACO:  All right.  Thank you, ma'am.

2  Appreciate your time.

3    THE COURT:  Thank you.

4    Redirect?

5    MR. ARROWOOD:  Just briefly, Your Honor.

6                REDIRECT EXAMINATION

7  BY MR. ARROWOOD:

8  Q.    I believe on cross-examination defense counsel

9  asked you about whether you met with anyone to talk

11:35AM  10  about your testimony today.  I know it may be difficult

11  for you to see, but is this the first time you and I

12  have spoken?

13  A.    No.

14  Q.    So we've spoken before?

15  A.    Yes.

16  Q.    Do you know about how many times?

17  A.    I think twice.

18  Q.    All right.  So during those conversations, did

19  we talk about some of the topics that we'd like you to

11:36AM  20  testify about during this trial?

21  A.    Yes.

22  Q.    Do you expect principal investigators to

23  provide fulsome and truthful information in their

24  submissions?

25  A.    Yes, I do.

1    Q.        I'd like to show you again Government's Exhibit

2    8-AA.

3             MR. ARROWOOD:  Would you please go back down to

4    page 20.  Scroll down, please.

5    BY MR. ARROWOOD:

6    Q.        Okay.  This is what we've been looking at

7    previously.  Based on your experience as a subcontracts

8    manager and your knowledge of the terms and conditions

9    that apply to these types of contracts, does the China

11:37AM  10  funding restriction apply to universities in China?

11   A.        Yes.

12            MR. ARROWOOD:  No further questions, Your

13   Honor.

14            THE COURT:  Thank you.

15            Any cross?

16            MR. LOMONACO:  Can you leave that up, please?

17            Just briefly, Your Honor.

18            MR. ARROWOOD:  8-AA.

19            THE COURT:  Recross, I should say.

11:37AM  20            MR. LOMONACO:  Yes.  Thank you.

21                       RECROSS-EXAMINATION

22   BY MR. LOMONACO:

23   Q.        And you were asked the question of whether the

24   NASA restriction applies to Chinese universities.  That

25   doesn't say -- there's nothing in this printed form on

1    the contract that says that, does it?

2    A.        No.

3    Q.        And that is an interpretation that NASA has

4    placed on this document; correct?

5    A.        Yes.

6    Q.        Do you know where else it is officially placed

7    or who -- anybody else place that interpretation other

8    than NASA?

9    A.        I'm -- I'm not sure if I understand your

11:38AM 10   question.

11   Q.        I'm sorry.  Let me rephrase that.

12             Do you know of any other agency, governmental

13   body, law in existence, other than what NASA says that

14   it is, Chinese universities are included?

15   A.        No.

16             MR. LOMONACO:  Okay.  Thank you.

17             THE COURT:  All right.  Thank you.  This

18   witness is excused.  Thank you for your appearance this

19   morning.

11:39AM 20            Does that conclude the morning testimony until

21   the next video witness?

22             MR. MC KENZIE:  Your Honor, I was told that we

23   do have a live witness here.  Last I knew, she was

24   walking through security.  So she should be here

25   momentarily, and I expect -- she's here.  If you would

1    like -- I expect it to be short, if you want to try to

2    call her.

3         THE COURT:  Yeah, let's go ahead and do that.

4         MR. MC KENZIE:  All right.  Your Honor, the

5    government calls Tara Halstead.

6         (The witness was thereupon duly sworn.)

7         THE COURTROOM DEPUTY:  Have a seat, please.  Go

8    ahead and scoot in.

9         Will you state and spell your name for the

11:40AM 10   record.

11        THE WITNESS:  My name is Tara Halstead,

12   T-a-r-a, H-a-l-s-t-e-a-d.

13        THE COURTROOM DEPUTY:  Thank you.

14        MR. MC KENZIE:  Your Honor, may I inquire?

15        THE COURT:  Yes.

16                   **TARA HALSTEAD**,

17   having been first duly sworn, was examined and testified

18   as follows:

19                   DIRECT EXAMINATION

11:40AM 20   BY MR. MC KENZIE:

21   Q.        Good morning, Ms. Halstead.  Thank you for

22   coming this morning.

23        Will you quickly tell the jury where you were

24   this morning.

25   A.        Yes.  I was on St. Pete Beach, but I flew in

1    this morning to be here.

2    Q.        I appreciate that.

3              By whom are you -- by whom are you employed?

4    A.        I'm employed by the University of Tennessee.

5    Q.        What is your current position?

6    A.        I'm the business manager for the Department of

7    Theater and the Clarence Brown Theater.

8    Q.        How long have you been the business manager at

9    the theater?

11:41AM 10  A.        Since April of 2019.

11   Q.        Prior to that position, what job title did you

12   hold?

13   A.        I was the senior contract specialist for the

14   Office of Sponsored Programs at the university.

15   Q.        University of Tennessee here in Knoxville?

16   A.        Yes, that's correct.

17             MR. LOMONACO:  Excuse me.  May I ask you move

18   the microphone a little bit closer to you.

19             THE WITNESS:  This one (indicating)?

11:41AM 20            THE COURT:  Either or both.

21             MR. LOMONACO:  Thank you.

22   BY MR. MC KENZIE:

23   Q.        Will you please describe to the jury what

24   your -- what your duties and responsibilities were as a

25   contract specialist.

1  A.      Sure.   After a sponsoring agency -- a federal

2  agency had awarded a grant to the University of

3  Tennessee, a contract would be issued by that sponsoring

4  agency that would need to be reviewed.   Those terms and

5  conditions were reviewed by me, and if they were

6  acceptable to the university, then it would go to our

7  director, Jean Mercer, for signature, and then it would

8  be returned to the sponsoring agency for their signature

9  so that a fully-executed contract would exist for the

11:42AM 10  grant duration.

11  Q.      Will you please explain to the jury, walk the

12  jury through your educational background from the time

13  you graduated high school until you graduated whatever

14  the highest degree you earned was.

15  A.      Sure.   I attended Auburn University where I

16  received a bachelor's degree in zoology.   Then I

17  attended the University of Miami Law School where I got

18  a juris doctor degree.   And then there was a little gap

19  there.   And I took classes from Emmanuel College in

11:43AM 20  Boston for a master's degree in management and

21  specializing in research administration.

22  Q.      Directing your attention back now to your

23  duties as a contract specialist for the University of

24  Tennessee.   What, if any, training did you receive on

25  how to review those contracts once you were hired by the

1    University of Tennessee?

2    A.        Sure.  When I was hired, I was mentored by

3    contract specialists who had been in that department for

4    a while about the procedures for reviewing contract

5    terms and conditions, the special attention to ones of

6    concern to the university, and then any that would be of

7    concern, for example, period of performance or amount of

8    the grant, or who was allowed to work on the grant, as

9    far as how many graduate students were allowed to work

11:44AM  10    on the grant and those statements of work for that grant

11    to make sure it matched with the principal

12    investigators, what they thought the grant would be for.

13    Q.        In your particular function as a contract

14    specialist, were you involved in the proposal aspect of

15    receiving sponsored funding?

16    A.        Normally I am not involved -- I was not

17    involved with the preparation of the proposal or the

18    submittal of the proposal except as an advising person.

19    If any proposal people had a question or if the

11:45AM  20    department which we were submitting a proposal for had a

21    question and they just wanted to know about a term or

22    condition, they may ask me.

23             But in most instances, I did not see the

24    proposal until after the award was issued by the agency.

25    Q.        What about after contracts were signed and work

1    began; what, if any, role did you have during that part

2    of the process?

3    A.      The only time I would be involved after the

4    process started would be if the principal investigator

5    needed an extension on the period of performance, a

6    change in the statement of work, or if there was

7    something that the principal investigator needed to do

8    to change the personnel on the grant, then I would work

9    with the agency and the university to request proposed

11:46AM 10  changes and then I would negotiate an amendment to the

11    contract.

12    Q.      I'd like to direct your attention back to kind

13    of the overview that we were giving the jury of what you

14    do.  After you've reviewed the terms and conditions of

15    the contract and you're satisfied, who, if anyone, at

16    the university did you provide the contracts to for

17    signature?

18    A.      Part of the procedure with the Office of

19    Sponsored Program (sic), when a contract was awarded to

11:46AM 20  the university, it would come into the department

21    of -- I'm sorry -- excuse me -- the Office of Sponsored

22    Programs.  The general email would then go out from the

23    general OSP.  That's the abbreviation for Office of

24    Sponsored Programs.  The general OSP email would go out

25    to the department that was receiving the grant, the

1  principal investigator, and then it would also copy the

2  award administrator, and that would be me, as well as

3  our director for the Office of Sponsored Programs, Jean

4  Mercer.

5  Q.      Who had the ultimate signing authority within

6  the Office of Sponsored Programs to sign contracts?

7  A.      The director, Jean Mercer.

8  Q.      I ask that the witness be shown what is already

9  in evidence as 8-N.

11:47AM  10       I'd like to direct your attention to in or

11  about October 2016, and show you what is in evidence as

12  8-N.

13       MR. MC KENZIE:  Could we please scroll down.

14  And we can go ahead and stop right there (indicating).

15  BY MR. MC KENZIE:

16  Q.      What type of -- do you recognize this document?

17  A.      It's been a long time since I've seen one of

18  these, but, yes, it's a -- one of our standard type of

19  contracts that we would receive in the Office of

11:48AM  20  Sponsored Programs.

21  Q.      Under Points of Contact where it says

22  Administrative, whose name is listed?

23  A.      That's my name.

24  Q.      And looking at the bottom right portion of

25  this -- of this document, who, if anyone, signed this

1  document?

2  A.        Jean Mercer.

3            MR. MC KENZIE:  Could we please scroll up?

4  BY MR. MC KENZIE:

5  Q.        Who is listed as the subcontractor of this

6  agreement?

7  A.        The University of Tennessee.

8  Q.        Could you please read the subcontract number in

9  the top right-hand corner?

11:48AM 10  A.        1560728.

11  Q.        As the administrator on this contract, did you

12  review the terms and conditions of this subcontract?

13  A.        I did.

14  Q.        After you reviewed the terms and conditions,

15  what, if anything, did you do to ensure that the

16  University of Tennessee was in compliance with those

17  terms and conditions?

18  A.        On contracts like this, if I had any questions

19  or concerns, I would talk to our expert control officer,

11:49AM 20  Darren Malkemus, who I don't think he's the expert

21  control officer at this time, but he was when I was

22  there.  But this was a very standard contract we got

23  from the Jet Propulsion Lab.

24  Q.        After you reviewed the terms and conditions,

25  who, if anyone, did you send it to for signature?

1    A.        Jean Mercer, who was the director of OSP.

2    Q.        At the time that you sent this contract to Jean

3    Mercer, what, if any, reason did you have to believe

4    that the university was not in compliance with the terms

5    and conditions of this contract?

6    A.        I didn't have any concerns about this contract

7    or think of any possible problems with it.

8              MR. MC KENZIE:  Your Honor, I ask that the

9    witness now be shown 8-M, which I believe -- which is

10   already in evidence.

11             Can we zoom in here?

12   BY MR. MC KENZIE:

13   Q.        Do you recognize this document?

14   A.        I do.

15   Q.        What is that?

16   A.        It is an email.  It's a standard procedure once

17   the contract has been signed by the university's

18   official signatory, it is then forwarded to the

19   sponsoring agency for their signature.

20   Q.        Did you send this email?

21   A.        I did.

22   Q.        Could you please -- you may have mentioned it,

23   but will you please tell the jury what's attached to

24   this email.

25   A.        It is the subcontract with the University of

1  Tennessee's authorized signature.

2  Q.      Why did you send this email?

3  A.      It's necessary for the sponsor to countersign

4  it in order for there to be a fully-executed agreement

5  between the parties.

6  Q.      In what state were you when you sent this

7  email?

8  A.      Tennessee.

9  Q.      If at the time you sent this email you had

11:51AM  10  known that the principal investigator of the contract

11  had failed to disclose employment at another university

12  in China, would you have sent this contract to JPL?

13  A.      No.

14          MR. MC KENZIE:  Thank you, Your Honor.  No

15  further questions.

16          THE COURT:  Thank you.

17          Cross-examination?

18          MR. LOMONACO:  Thank you, Your Honor.

19                    CROSS-EXAMINATION

11:52AM  20  BY MR. LOMONACO:

21  Q.      Hello, Ms. Halstead.

22  A.      Hello.

23  Q.      Ms. Halstead, if at -- at any time during 2019,

24  did you attend any meetings with -- of FBI and DOE and

25  NASA special agents?

1    A.        I don't recall.  In 2019, I changed

2    departments.

3    Q.        Okay.

4    A.        If it was before April 2019, I may have, but I

5    don't recall.

6    Q.        What about a fraud awareness meeting in 2018?

7    A.        Yes, I did attend fraud awareness meetings in

8    2018.

9    Q.        Okay.  And were any of these individuals

11:53AM  10   (indicating) -- do you recognize any of these people?

11   Were they there?

12   A.        I don't recognize anybody.

13   Q.        Okay.  Let's talk about the terms and

14   conditions that the contract -- or the subcontract from

15   JPL had.

16             You mentioned you were a specialist and you had

17   a specialist teach you about the contracts and how to

18   review them; is that --

19   A.        Yes, that's correct.

11:53AM  20   Q.        And that was your job to review them to make

21   sure they're in compliance?

22   A.        Right.  The university can only accept certain

23   terms and conditions in contracts.  So we would

24   review -- you know, the contract specialists in OSP

25   would review the terms of the contracts to make sure

1  they were ones the university could accept.

2  Q.        Did the mentor tell you that you should

3  investigate whether the primary investigator or the

4  principal investigator, being Professor Hu in this case,

5  you should ask him whether he is in compliance

6  with -- excuse me -- you should ask him whether he has

7  any affiliations or collaborations with China?

8  A.        No, that was not required of the job at the

9  time.

11:54AM  10  Q.        Not required.

11         Was it because at the time you and everybody

12  else believed it didn't apply to faculty anyway?

13         MR. MC KENZIE:  Objection, Your Honor,

14  speculating as to why the policies of the university

15  were the way they were at the time.

16         MR. LOMONACO:  Let me ask it a different way,

17  Your Honor.

18  BY MR. LOMONACO:

19  Q.        Do you recall in the assurance letters that

11:54AM  20  there was a statement that said we don't believe it

21  applies to faculty or UT students; do you remember that?

22  A.        When I first started, I know there was

23  discussion about that, but I also worked with Darren

24  Malkemus, who was the export control officer at the

25  time, and I always referred to him about the PIs working

1    on projects, and it just was a default that I would

2    check with him to say --

3    Q.        Okay.

4    A.        -- this is a contract; these are the PIs.

5    Q.        And who was that person?

6    A.        Darren Malkemus.

7    Q.        Darren who?

8    A.        Malkemus.

9    Q.        Malkemus.  Was that the one that was your

11:55AM 10   mentor or -- at all or --

11   A.        He was the export control officer at the time.

12   Q.        So he was the specialist who taught you about

13   the grants?

14   A.        No, he was somebody I would seek advice for

15   when we dealt with any issues related to export control.

16   Even though this wasn't an export control issue, it was

17   still a topic that I would discuss with him.

18   Q.        Okay.  Did you have any discussions with him

19   about asking the PIs if they were affiliated or they had

11:56AM 20   associations with China?

21   A.        We discussed the assurance clause, but I

22   usually discussed it with him along with other export

23   control issues related to contracts.  And if we were

24   satisfied with what we knew at the time, we proceeded

25   with having the contract signed.

1  Q.      Okay.  So I guess the answer to my question

2  would be then, no, you didn't discuss with him whether

3  you or he or anybody should ask the PI if they had any

4  affiliations or collaborations with China; right?  You

5  didn't have that discussion with him?

6  A.      I may have.  I don't recall.  I just -- I

7  remember the procedure when contracts would come in, I

8  would talk to Darren, and then we would move forward or

9  hold it until questions were answered.

11:57AM  10  Q.      Okay.  Are you familiar with any questions that

11  UT or anybody at UT would ask the PI about

12  collaborations or employment with China?

13  A.      From my position, that -- I don't know what the

14  departments asked from PIs about their affiliations.

15  Q.      So you don't know of any?

16  A.      I don't know.

17  Q.      Okay.  Now, you indicate now that it would be a

18  problem if a PI had collaboration or employment with

19  China; right?

11:57AM  20  A.      It would be a concern that would need to be

21  investigated, yes.

22  Q.      Okay.  Well, can you see how big of a concern

23  it is in this particular case?

24  A.      If I thought it was a concern, sir, I would

25  have brought it up.  At the time, there was no concern.

1   Q.        If you thought it was a concern.  So you

2   weren't concerned about the NASA restriction at the

3   time; correct?

4   A.        Because I did not have reason to believe that

5   this PI would be -- I had no indication to think that it

6   would -- this clause would be a problem with this PI

7   working on this project.

8   Q.        Would it be fair to say that you had no

9   concerns at the time because you did not think a faculty

11:58AM 10  member at UT would be subject to the NASA restriction as

11  they had in writing at the time?

12  A.        When this contract came through, I did not have

13  any concerns that Dr. Hu was someone who required

14  further questioning from a post-awards specialist.

15  Q.        And the question I have then is:  Did you have

16  any concerns about the NASA restriction applying to

17  Professor Hu?

18  A.        At the time that I received the award, I did

19  not.

11:59AM 20  Q.        When did you decide that it was a concern?

21  A.        Well, I did not have a concern with this

22  instance because I -- I didn't have any indicators that

23  it would be a concern after discussion with other people

24  in the Office of Sponsored Programs.

25  Q.        So you did have a concern after discussions

1  with other people; is that what you said?

2  A.        I did not.

3  Q.        Did not?

4  A.        Did not have a concern.

5  Q.        Okay.

6  A.        Uh-huh.

7  Q.        Did you even think that the NASA restriction

8  that says the proposer assures NASA that NASA will not

9  collaborate bilaterally with China or a Chinese

12:00PM  10  corporation, did you have any concern that that even

11  applied to anybody that may have an affiliation with

12  China that worked as a PI in your office?

13        MR. MC KENZIE:  Objection, Your Honor.

14        THE COURT:  Go ahead.

15        MR. MC KENZIE:  Couple grounds:  One, compound.

16  I lost track of that question.  But also relevance.

17  And, third, asked and answered.  He's asked some version

18  of this question like ten times.

19        THE COURT:  Let's start with the first one.

12:01PM  20  The question is a little confusing.  Why don't you ask

21  it again.

22        MR. LOMONACO:  It was a little long, wasn't it?

23  And I was trying to just --

24        THE COURT:  You may have already inquired into

25  this, but go ahead.  If you want to ask again, go ahead.

1    But if not, we'll move on.

2    BY MR. LOMONACO:

3    Q.       Okay.  Are you aware that the conflict of

4    interest form during this period of time, Professor Hu's

5    conflict of interest form, was not reviewed by UT?

6    A.       I was not aware of that.

7            MR. LOMONACO:  One moment, please.

8    BY MR. LOMONACO:

9    Q.       Did you review the proposal for the JPL

10   subcontract grants?

11   A.       No, I did not.

12   Q.       Are you aware of the assurance letter that UT

13   sometimes attaches to the proposals?

14   A.       I am aware of it and I know it is a part of the

15   proposal submittal process.

16   Q.       So it's supposed to be attached to the

17   proposal, UT policy, or part of their proposal process?

18   A.       If it's a requirement from the Jet Propulsion

19   Lab or NASA, it would be attached.  But it just depends

20   what the proposal guidelines say.  I don't know if they

21   said it because I didn't submit the proposal.

22   Q.       When did you leave UT?  I'm sorry.

23   A.       I'm still with UT.  I left the Office of

24   Sponsored Programs in April of 2019.

25           MR. LOMONACO:  May I have a moment, Your Honor?

1          (A discussion was had off the record.)

2    BY MR. LOMONACO:

3    Q.        Okay.  I'm going to show you a slide out of the

4    training materials from UT.

5    A.        Okay.

6              MR. LOMONACO:  Your Honor, I think it's already

7    been entered as an exhibit, Exhibit 14.  I'd refer to

8    the portion of the training manual for UT.

9              Do you want to go to to the front page to make

12:04PM  10    sure we're in the same document?

11    BY MR. LOMONACO:

12    Q.        Do you see there Proposal and Budget

13    Development, Office of Sponsored Programs?  Do you

14    recognize that document?

15    A.        It's been a while, but it looks like a proposal

16    training PowerPoint presentation.

17              MR. LOMONACO:  Okay.  Let's go down a page or

18    two.

19    BY MR. LOMONACO:

12:05PM  20    Q.        Just -- so it talks about budgets and training

21    PowerPoints and so on.  And this includes more than just

22    NASA as a sponsor.  It talks about proposals for a lot

23    of different sponsors.

24              Are you aware of any of the other sponsor

25    requirements that UT tries to get grant money from?

1   A.      Back when I was in OSP, if a principal

2   investigator was submitting to a grant, the grant

3   guidelines would be examined and the proposal would be

4   submitted in accordance with those guidelines.

5   Q.      Right.  I'm asking if you're aware of any other

6   sponsor's guidelines.

7   A.      All the federal agencies have guidelines for

8   their proposal submittals.

9   Q.      I'm sorry; I didn't hear that last sentence.

12:06PM  10   A.      All the federal agencies have guidelines for

11   their proposal submittals.

12   Q.      Yes.  Are you aware of them?  Do you know any

13   of them?

14   A.      Not anymore because I don't do that anymore.

15   Q.      Okay.  Are you aware that NSF is one of the

16   sponsors?

17   A.      Yes, I'm aware NSF is a sponsor.

18   Q.      What does that stand for?

19   A.      I think it's the National Science Foundation.

12:06PM  20   Q.      Yes, I think so, too.

21           Are you aware that their proposal or their

22   contract asks for the principal investigators to

23   disclose any affiliations or collaborations with outside

24   interests within the last 48 months; do you recall that

25   one?

1  A.       No, I do not.

2  Q.       That would make sense in this JPL contract,

3  wouldn't it?  Let -- excuse me.

4           THE COURT:  Ask again.

5           MR. LOMONACO:  -- me ask again.

6  BY MR. LOMONACO:

7  Q.       If the JPL contract or UT had a similar

8  requirement that Professor Hu expose and disclose any

9  affiliations or collaborations he had with China or a

12:07PM 10  Chinese company or Chinese university, would that make

11  it more -- make your job or UT's job easier to determine

12  whether he qualified for a NASA grant or not?

13           MR. MC KENZIE:  Objection, Your Honor.

14  Relevance and speculation as to whether it would make

15  her job easier.

16           THE COURT:  Well, I'll let her answer to the

17  extent she can.  Go ahead.

18  BY THE WITNESS:

19  A.       I mean --

12:08PM 20  BY MR. LOMONACO:

21  Q.       It makes sense, doesn't it?

22  A.       I'm not the federal agency.  So I can't say,

23  you know, why some have different proposal guidelines

24  versus others.

25  Q.       Well, do you know why NASA has a guideline

1  saying not collaborate with China or Chinese company

2  or -- I mean, it has that guideline; right?

3  A.        It did at the time I was there, yes.

4  Q.        And wouldn't it make sense for UT to ask their

5  principal investigators if they're affiliated or

6  collaborating with China like NSF does?

7          Let's just go to the next one.  I'm sorry.  I

8  won't ask you to answer that question.

9          Let's go to this part of NASA.  And if you'll

12:09PM 10  look here, do you see under China Assurance, it says,

11  (as read), "UT always includes an amended NASA China

12  Assurance document as the final page of an application.

13  The language indicates that we do not view our faculty,

14  staff and students to be entities of China."

15          Does that refresh your memory on the assurance

16  letter?

17  A.        Yeah, I mean, it looks familiar, but, again,

18  that was several years ago.

19  Q.        Okay.  And you're not aware whether one was

12:09PM 20  included in this grant or not, are you?

21  A.        No, I wouldn't have submitted the proposal; so

22  I don't know if it was attached in the proposal at the

23  time.

24          MR. LOMONACO:  Thank you.  Hope you can get

25  back to where you were at before you got here.

1          THE COURT:  All right.  Thank you.

2          Any redirect?

3          MR. MC KENZIE:  Very briefly, Your Honor.

4                    REDIRECT EXAMINATION

5    BY MR. MC KENZIE:

6    Q.        As a contract specialist, did you submit

7    proposals?

8    A.        No.

9    Q.        Were you responsible for knowing what should or

10   should not have been included in a proposal?

11   A.        No, that was not my responsibility.

12   Q.        Was it your --

13          MR. MC KENZIE:  Your Honor, I have no further

14   questions.

15          THE COURT:  All right.  Any recross?  No?  All

16   right.  Thank you.  Then the witness can be excused.

17          Hold on just a moment.  We're going to let our

18   jury go first.  We'll break for a lunch recess until

19   1:30.  We'll just see the jury back here then.

20          (Jurors excused from the courtroom.)

21          THE COURTROOM DEPUTY:  This honorable court

22   stands in recess until 1:30.

23          (A luncheon recess was taken at 12:10 p.m.)

24

25

1          **AFTERNOON SESSION**

2                    (P.M.)

3          THE COURTROOM DEPUTY:  All rise.

4          THE COURT:  Thank you, everyone.  We'll bring

5  our jury back in for the next witness, which is a video

6  witness.  So I think we're ready to go.

7          (Whereupon the following report of

8           proceedings was had within the presence

9           and hearing of the jury:)

01:37PM  10          THE COURT:  Everyone may be seated.

11          The previous witness was on the JERS monitors

12  as well; is that correct?  The previous witness from

13  this morning that was a video witness.  I don't know if

14  the current witness is showing on your screens now or

15  not.  Not on mine either.  But I notice that it is

16  showing on Ms. Norwood's screen.

17          All right.  I think we're ready to go then.

18  The courtroom deputy will swear in the next witness.

19          (The witness was thereupon duly sworn.)

01:37PM  20          THE COURTROOM DEPUTY:  Would you please state

21  and spell your name for the record.

22          THE WITNESS:  Yoseph Bar-Cohen.  Y-o-s-e-p-h.

23  Bar-Cohen is B-a-r-dash-C-o-h-e-n.

24          THE COURTROOM DEPUTY:  Thank you.

25          THE COURT:  Can we turn up the volume?  That

1    may help as well.

2            Mr. Bar-Cohen, if you could just make sure the

3    microphone that's on your computer or video, if you'll

4    just be kind of close to it, that will be helpful.

5    Thank you, sir.

6            THE WITNESS:  Okay.

7            THE COURT:  That's much better.

8            Go ahead, Mr. Arrowood.

9            MR. ARROWOOD:  Thank you, Your Honor.

01:38PM  10                    **YOSEPH BAR-COHEN**,

11   having been first duly sworn, was examined and testified

12   as follows:

13                    DIRECT EXAMINATION

14   BY MR. ARROWOOD:

15   Q.       Good morning, Dr. Bar-Cohen.

16   A.       Good morning.

17   Q.       Would you please tell the jury where you work.

18   A.       I work at Jet Propulsion Lab.

19   Q.       And where is the Jet -- I'm sorry.

01:39PM  20   A.       Short, JPL.

21   Q.       And where is the Jet Propulsion Laboratory

22   located?

23   A.       In Pasadena, California.

24   Q.       And how long have you worked at JPL?

25   A.       30 years.

1  Q.          What is your current position at JPL?

2             THE COURT REPORTER:  I'm sorry.  I did not

3  understand the witness.  Can you repeat your answer,

4  please?

5  BY THE WITNESS:

6  A.          Group supervisor.

7  BY MR. ARROWOOD:

8  Q.          Dr. Bar-Cohen, would you please tell the jury,

9  what are the duties of a group supervisor?

01:39PM 10  A.          I am managing the group, monitor the programs

11  that we are responsible for, and seek funding to make

12  sure that they have a job.

13  Q.          Would you please describe your educational

14  background for the jury.

15  A.          I have a Ph.D. in physics.

16  Q.          As a group supervisor at JPL, are you involved

17  in contracts?

18  A.          Yes.

19  Q.          Would you please describe generally what your

01:40PM 20  role is in the contracting process at JPL.

21  A.          I am -- I have only the technical

22  responsibility, like proposals, and on the other end, I

23  also seek support to our efforts for procurement.  But

24  the procurement is done by the department that is the

25  procuring department.

1    Q.        During the course of your job as a group

2    supervisor at JPL and specifically related to proposals,

3    did you come into contact with a University of Tennessee

4    professor named Anming Hu?

5    A.        Yes.

6    Q.        Do you recall when you first interacted with

7    Dr. Hu?

8    A.        I was looking for -- acknowledging to help us

9    with the mission, and the work that we had been doing

01:42PM  10    was using high-temperature and high-powered mechanisms,

11    and I was looking for no temperature capability.

12             I contacted individuals at JPL to see who could

13    help us.  They suggested a professor in Tennessee called

14    Professor Babu, and he referred me to Professor Hu.

15             (Government's Exhibit 8-BB was marked for

16              identification.)

17    BY MR. ARROWOOD:

18    Q.        Okay.  Thank you.

19             And I'd like to show you some documents.  I'd

01:42PM  20    like to show you what's been marked as Government's

21    Exhibit 8-BB.

22             Dr. Bar-Cohen, can you see this document on

23    your screen?

24    A.        Yes.

25             MR. ARROWOOD:  Okay.  Will you please scroll

1  down a little bit.  One more.  You can stop there

2  (indicating).

3  BY MR. ARROWOOD:

4  Q.      Dr. Bar-Cohen, do you recognize this document?

5  A.      I think so.

6  Q.      If you would just please take a moment and read

7  this email.  And we'll scroll up and you can see the

8  emails above it.

9  A.      Okay.  Okay.  Okay.

01:45PM  10  Q.      So, Dr. Bar-Cohen, could you describe in a

11  general sense to the jury what is going on in this email

12  exchange.

13  A.      This is the process of presenting the proposal.

14  It involved technical side, description of capabilities,

15  and also proposed funding and details that would be

16  from the proposal.

17  Q.      According to this document, who wrote this top

18  email that's on your screen?

19  A.      Professor Hu.

01:45PM  20  Q.      And I believe you're listed as a recipient.  Do

21  you see that?

22  A.      Yes.

23  Q.      And then right next to your name is another

24  individual.  Is that, I believe, Dr. Babu that you

25  mentioned earlier?

1    A.       Yes.

2    Q.       Okay.  Do there appear to be a number of

3    attachments to this email?  Do you see that,

4    Dr. Bar-Cohen?

5    A.       Yes.

6             MR. ARROWOOD:  Okay.  Your Honor, government

7    moves to admit Government's BB -- or 8-BB.

8             THE COURT:  So admitted.

9             (Government's Exhibit 8-BB was received into

01:46PM  10           evidence.)

11   BY MR. ARROWOOD:

12   Q.       All right.  Now I'd like to show you some of

13   those attachments.

14            (Government's Exhibit 8-CC was marked for

15             identification.)

16            MR. ARROWOOD:  Will you please show the witness

17   Government's Exhibit 8-CC.

18   BY MR. ARROWOOD:

19   Q.       Dr. Bar-Cohen, do you recognize this document?

01:47PM  20   A.       I'm assuming so.

21   Q.       What is the date on this document?

22   A.       What is what?

23   Q.       What is the date?

24   A.       January 4.

25   Q.       And who does this document appear to be from?

1   A.          Professor Chen.

2   Q.          And with what institution does this professor

3   appear to be employed?

4   A.          Beijing Institute of Technology.

5   Q.          If you would, Dr. Bar-Cohen, please just take a

6   moment and read that first paragraph.  And when you're

7   finished, I'm going to ask you to describe for the jury,

8   if you can, what is going on in this first paragraph.

9   A.          "I have a long-term collaboration on

01:48PM   10   nanomaterial synthesis and characterization with

11   Dr. Anming Hu at the University of Tennessee."

12   Q.          Thank you.

13              MR. ARROWOOD:  Will you please scroll.

14   BY MR. ARROWOOD:

15   Q.          Dr. Bar-Cohen, how does this letter relate to

16   the proposal that was discussed in the email?

17   A.          We generally require of commitment at the time.

18   Nowadays it's different process.  And it was sent in as

19   part of this process.

01:49PM   20              However, it was me letting him know that we

21   cannot use anyone who is from China.  And, you know, the

22   description of the facility, which is really supposed to

23   state what is the facility, I edited the description so

24   as not to include anyone from China.

25   Q.          Thank you, Dr. Bar-Cohen.  We're going to go

1    through some of those documents here in just a moment.

2         MR. ARROWOOD:  Your Honor, at this time, move

3    to admit Government's Exhibit 8-CC.

4         THE COURT:  So admitted.

5         (Government's Exhibit 8-CC was received into

6          evidence.)

7         (Government's Exhibit 8-DD was marked for

8          identification.)

9    BY MR. ARROWOOD:

01:49PM  10   Q.      Now I'd like to show you another attachment to

11   that email.  I'd like to show you Government's

12   Exhibit 8-DD.

13        Dr. Bar-Cohen, if you'll please take a look at

14   this document.

15        MR. ARROWOOD:  Scroll down, please, just a

16   little bit.

17   BY MR. ARROWOOD:

18   Q.      Okay.  Dr. Bar-Cohen, I think in one of your

19   previous answers you mentioned the facilities.  Is this

01:50PM  20   what you're talking about?

21   A.      Yes, this was what was sent to me, and this is

22   what the last section is about that I have edited and

23   removed the inclusion of the facility in China and the

24   occupation of this individual.

25   Q.      Okay.  But at this time, at the time of the

1  first email that we saw that had this attachment, does

2  it indicate in that last paragraph whether a facility in

3  China would be utilized as part of this proposal?

4  A.        It seems that he has access.

5  Q.        All right.  Thank you.

6            MR. ARROWOOD:  Your Honor, I move to admit

7  Government's Exhibit 8-DD.

8            THE COURT:  So admitted.

9            (Government's Exhibit 8-DD was received into

10              evidence.)

11            (Government's Exhibit 8-EE was marked for

12              identification.)

13  BY MR. ARROWOOD:

14  Q.        Okay.  All right.  Dr. Bar-Cohen, now I'd like

15  to show you another email.  I'd like to show you

16  Government's Exhibit 8-EE.

17            MR. ARROWOOD:  Please scroll down.  Okay.  Stop

18  right there (indicating).  Scroll back up a little bit.

19  Okay.  Right there (indicating).  Thank you.

01:52PM  20  BY MR. ARROWOOD:

21  Q.        All right.  Dr. Bar-Cohen, please just take a

22  moment and review this email.

23  A.        Okay.

24  Q.        Would you please read for the jury that short

25  paragraph that I've highlighted on the screen.

A.      "I revised your facility description to the

following.  I removed the mentioning of the use of

facility in China.  We need to avoid mentioning since

NASA does not allow such formal collaboration."

Q.      Why did you say this to Anming Hu?

A.      Because, to the best of my knowledge at the

time, and now definitely, I knew that we are not allowed

to have any participation of -- from China.

Q.      And how did you come to know about that

restriction?

A.      I -- I had been aware of it and had another

experience about publishing a book.  I published quite a

few books as an editor, as well as author, and in one,

two, three years before that, this incident, there was a

chapter that was written by a coauthor from China, and I

requested permission to include it, and I was told very

clearly that we could not have anyone from China being

listed as an author in any publication that I am

involved in.  Then I asked can we at least acknowledge

thanking the individual for contributing, and the answer

is definitely no.  So it was very clear to me that we

could not have anyone from China involved in either

publication, let alone making proposal or procurement.

Q.      All right.  Thank you.

And if you would, please, before we leave this

1  document, would you please indicate for the jury the

2  date and time that you sent this email.

3  A.        Well, it was July -- or January 4, 2016, at

4  7:24 a.m.

5  Q.        All right.  Thank you.

6          MR. ARROWOOD:  I'd like to admit Government's

7  Exhibit 8-EE.

8          THE COURT:  So admitted.

9          (Government's Exhibit 8-EE was received into

10          evidence.)

11          (Government's Exhibit 8-GG was marked for

12          identification.)

13  BY MR. ARROWOOD:

14  Q.        All right.  Dr. Bar-Cohen, I'd like to show you

15  another email, Government's Exhibit 8-GG.

16          MR. ARROWOOD:  Will you please scroll down.

17  Stop right there (indicating).

18  BY MR. ARROWOOD:

19  Q.        All right.  Dr. Bar-Cohen, I'd like you just to

01:55PM  20  take a quick look at this email, but first I'd like

21  you -- I'd like to direct your attention to the date and

22  time.  Will you please read for the jury the date and

23  time of this email.

24  A.        January 4, 2016, 8:00 a.m.

25  Q.        Okay.  If you would, please, would you read

1  what you wrote in this email to Dr. Hu.

2  A.        "If you are preparing letters from China - I

3  cannot use them in the proposal."

4  Q.        Thank you.

5            MR. ARROWOOD:  Your Honor, I'd move to admit

6  Government's Exhibit 8-GG.

7            THE COURT:  So admitted.

8            (Government's Exhibit 8-GG was received into

9             evidence.)

10           (Government's Exhibit 8-FF was marked for

11            identification.)

12  BY MR. ARROWOOD:

13  Q.        Okay.  Now I'd like to show you Government's

14  Exhibit 8-FF.

15           MR. ARROWOOD:  You can leave it at the top

16  email, please.

17  BY MR. ARROWOOD:

18  Q.        Dr. Bar-Cohen, if you would, please, just take

19  a quick look at this top email.  Do you recognize this?

01:57PM  20  A.        I think so.

21  Q.        Does this appear to be an email from you to

22  Dr. Hu and Dr. Babu?

23  A.        Yes.

24  Q.        I'd like to direct your attention again to the

25  date and time of this email.

1   A.      It is January 4, 2016, and the time 10:56 a.m.

2   Q.      All right.  Thank you.

3           If you would please read for the jury the

4   second sentence of this email which begins with the word

5   "as".

6   A.      "As I mentioned, we cannot include any

7   collaboration with institutes in China."

8           MR. ARROWOOD:  Your Honor, I move to admit

9   Government's Exhibit 8-FF.

01:58PM 10          THE COURT:  FF?  Thank you.  Admitted.

11          (Government's Exhibit 8-FF was received into

12           evidence.)

13          (Government's Exhibit 8-HH was marked for

14           identification.)

15  BY MR. ARROWOOD:

16  Q.      Okay.  All right.  Dr. Bar-Cohen, now I'd like

17  to show you Government's Exhibit 8-HH.  As you can see,

18  most of these emails are from the January 2016 time

19  frame.

01:58PM 20          MR. ARROWOOD:  Will you please scroll down.

21          Right there is good (indicating).

22  BY MR. ARROWOOD:

23  Q.      Dr. Bar-Cohen, if you would, please, read your

24  email here (indicating), and I'm just going to ask you a

25  question about it.

1    A.        "I am finalizing the proposal and noticed that

2    in the current commitment for you nothing has been

3    identified.  Do you have any ongoing contract that we

4    should list?"

5             This is a different proposal.  It is about

6    commitments because when we write proposals, NASA wants

7    to know that we are not overcommitted beyond the

8    capacity of work available to us to get work done.

9    Q.        Thank you.

01:59PM  10            MR. ARROWOOD:  If you would please scroll up.

11   BY MR. ARROWOOD:

12   Q.        Does it appear based on this top email that

13   Dr. Hu responded to you?

14   A.        (As read) "Currently I do not have any

15   commitments to external agencies but only internal

16   funds.  I do not think we need to list the internal

17   commitments, right?"

18            If it's not, then there is nothing to do.

19   Q.        Dr. Bar-Cohen, if Dr. Anming Hu had commitments

02:00PM  20   at this time, would you have expected him to include

21   them in this proposal?

22   A.        Yeah.  But that would have triggered me to stop

23   all the collaborations.

24   Q.        Thank you.

25            MR. ARROWOOD:  Your Honor, move to admit

1 Government's Exhibit 8-HH.

2         THE COURT:  So admitted.

3         (Government's Exhibit 8-HH was received into

4          evidence.)

5         (Government's Exhibit 8-E was marked for

6          identification.)

7 BY MR. ARROWOOD:

8 Q.       Okay.  Dr. Bar-Cohen, I'd like to show you

9 Government's Exhibit 8-E.

02:00PM 10         MR. ARROWOOD:  Scroll down just a little bit,

11 please.  Okay.  Stop there (indicating).

12         Scroll back up to the top.

13 BY MR. ARROWOOD:

14 Q.       Dr. Bar-Cohen, this is a little bit of a

15 lengthy email.  Do you recall this?

16 A.       I think so.

17 Q.       Does it appear that you received this email?

18 A.       Yes.

19 Q.       Do you know Mr. Drew Haswell?

02:01PM 20 A.       Drew what?

21 Q.       Do you know the person who sent this email?  It

22 appears to be a Mr. Drew Haswell.

23 A.       Yeah, it came from Drew.

24         MR. MC KENZIE:  If you would please just scroll

25 down.

BY MR. MC KENZIE:

Q.        If you would, Dr. Bar-Cohen, again, please just take a look at this email, and then I'm going to ask you to explain to the jury what your understanding of this email is.

A.        Well, this email, basically, it's providing me with all the documents.  It includes an attachment that states that the university is abiding by the China -- the NASA China restriction.

It's also telling me that this professor will not be considered officially approved document, and basically I'm going to read you from the part of the proposal, (as read) "By submission of the proposal, the proposal" -- "the proposer presents that the proposal is not China or a Chinese-owned company, and that" -- and highlighted in yellow -- "the proposer will not participate, collaborate, or coordinate bilaterally with China or any Chinese-owned company, at the prime recipient or at any level or at any subrecipient level, whether the bilateral involvement is funded or performed under a no-exchange of funds arrangement."

Q.        Thank you.

MR. ARROWOOD:  Can you please scroll back up to the top.

1   BY MR. ARROWOOD:

2   Q.        I'd like to direct your attention to the top of

3   this email.  Does this email appear to have any

4   attachments?

5   A.        Yes, there are three.

6   Q.        Okay.  We're going to go through these fairly

7   quickly.  I'd like to show you Government's Exhibit 8-F.

8            MR. ARROWOOD:  Scroll down just a little bit.

9   Keep going.  All right.  Stop there (indicating).

02:04PM  10   BY MR. ARROWOOD:

11   Q.        Dr. Bar-Cohen, do you recognize this document?

12   A.        I think so, yeah.

13   Q.        What is this?  If you know.

14   A.        This is a -- what the university is asking for

15   the funds and they are providing the details to the

16   budget and the justifications of what this expense is

17   for.

18            MR. ARROWOOD:  Can you please go down to

19   page 2.  Actually, I'm sorry.  Scroll back up.  This is

02:04PM  20   the second page.  Right there (indicating).  Thank you.

21   BY MR. ARROWOOD:

22   Q.        All right.  Dr. Bar-Cohen, if you would please

23   just take a moment and read to yourself the paragraph

24   that begins, "Anming Hu."  And I'm going to ask you

25   whether or not -- I'm sorry.  Dr. Bar-Cohen, you can

1  read it to yourself.

2  A.      Oh, I'm sorry.

3  Q.      That's okay.

4  A.      Okay.

5  Q.      Is there anywhere in this paragraph that Dr. Hu

6  indicates that he is employed at the Beijing University

7  of Technology?

8  A.      No.

9          MR. ARROWOOD:  Will you please scroll down to

02:05PM 10  page 9.  Scroll down.  Keep going.  Keep going.  Okay.

11  Stop.  Go back up to the facilities.

12  BY MR. ARROWOOD:

13  Q.      All right.  Dr. Bar-Cohen, will you please just

14  take a quick look at this particular portion of this

15  document titled UTK Facilities.

16  A.      Okay.

17          MR. ARROWOOD:  Scroll down.  That's it.

18  BY MR. ARROWOOD:

19  Q.      Does it indicate anywhere in this portion of

02:06PM 20  the document that any person or any entity from China is

21  going to be involved in this proposal?

22  A.      No.

23  Q.      All right.  Thank you.

24          MR. ARROWOOD:  Your Honor, I believe

25  Government's 8-F is already in evidence.

1      THE COURT:  8F?  I believe so, yes.

2      (Government's Exhibit 8-H was marked for

3       identification.)

4  BY MR. ARROWOOD:

5  Q.      All right.  Now I'd like to show you

6  Government's Exhibit 8-H.  This was also one of those

7  attachments to the email.  Does this look familiar to

8  you?

9  A.      I think so.

02:07PM 10  Q.      Can you describe briefly for the jury what this

11  is.

12  A.      It's the university assurance that they are

13  complying with the China funding restriction of NASA.

14  Q.      All right.  Thank you.

15      (Government's Exhibit 8-II was marked for

16       identification.)

17  BY MR. ARROWOOD:

18  Q.      Now I'd like to show you Government's

19  Exhibit 8-II.

02:07PM 20      MR. ARROWOOD:  Scroll down, please.  Little bit

21  more.

22  BY MR. ARROWOOD:

23  Q.      All right.  So, Dr. Bar-Cohen, what appears

24  here, I think, in this email towards the bottom is one

25  of the emails we just saw just a few moments ago.

1       MR. ARROWOOD:  So if you'll please scroll up.

2  BY MR. ARROWOOD:

3  Q.      In the email that's in the middle of your

4  screen, are you replying to Mr. Haswell?

5  A.      Yeah.

6  Q.      And why did you indicate here that, (as read)

7  "I'm only going to use the three attachments that you

8  sent."

9  A.      Because I did not want to have any

10  document -- I wanted them to know that I'm only going to

11  use this document that looked legitimate to me, and this

12  three includes the assurance document that addresses the

13  NASA restriction.  So --

14       MR. ARROWOOD:  Okay.  Move to admit

15  Government's Exhibit 8-II.

16       THE COURT:  So admitted.

17       (Government's Exhibit 8-II was received into

18        evidence.)

19       (Government's Exhibit 8-JJ was marked for

20        identification.)

21  BY MR. ARROWOOD:

22  Q.      Okay.  Now I'd like to show you Government's

23  Exhibit 8-JJ.

24       MR. ARROWOOD:  Scroll down just a little bit.

25  All right.  Scroll back up.

1   BY MR. ARROWOOD:

2   Q.      Dr. Bar-Cohen, does this document look familiar

3   to you?

4   A.      Yeah.

5           MR. ARROWOOD:  Your Honor, I move to admit

6   Government's Exhibit 8-JJ.

7           THE COURT:  So admitted.

8           (Government's Exhibit 8-JJ was received into

9            evidence.)

02:09PM 10  BY MR. ARROWOOD:

11  Q.      Will you please explain to the jury what is

12  going on in this email.

13  A.      Once a proposal is submitted, I am always

14  sending to all the -- all inventors -- I'm sorry -- all

15  investigators so they will know what we committed

16  ourselves to if we win.

17  Q.      And does this particular email have an

18  attachment?

19  A.      Yeah, the proposal itself that was submitted.

02:10PM 20          (Government's Exhibit 8-KK was marked for

21           identification.)

22  BY MR. ARROWOOD:

23  Q.      Now I'd like to show you Government's

24  Exhibit 8-KK.  Dr. Bar-Cohen, this is a fairly lengthy

25  document.  Is this the attachment to that previous

1  email?

2  A.         It seems like, yes.

3         MR. ARROWOOD:  Your Honor, move to admit

4  Government's Exhibit 8-KK.

5         THE COURT:  So admitted.

6         (Government's Exhibit 8-KK was received into

7          evidence.)

8         MR. ARROWOOD:  Please go to page 22.  Scroll

9  down a little bit to 5.2.

02:10PM  10  BY MR. ARROWOOD:

11  Q.         All right.  Dr. Bar-Cohen, we're just going to

12  look at a few parts of this document.  We're going to

13  look at 5.2 and 6.1, 6.2, and a couple others, but we'll

14  start there.

15         MR. ARROWOOD:  If you would please -- I believe

16  it's page 55.

17  BY MR. ARROWOOD:

18  Q.         Just please take a quick look at this portion

19  of the document.

02:11PM  20  A.         Okay.

21  Q.         Is there any mention in here of employment with

22  the Beijing University of Technology?

23  A.         No.

24         MR. ARROWOOD:  If we could go to pages 58 to

25  59.  Keep going.  I'm sorry.  I'm sorry.  Scroll back

1  up.  Okay.  One more.  Keep going.  I'm sorry.

2  BY MR. ARROWOOD:

3  Q.      What is -- what is this title?

4  A.      Current and Pending Support.  If you recall,

5  there was an item of commitment that that was asking

6  for, and this is what was supposed to be included if it

7  was a starting commitment or ending commitment.

8          MR. ARROWOOD:  All right.  Please scroll down

9  again.  Keep going.  Keep going.

10 BY MR. ARROWOOD:

11 Q.      Dr. Bar-Cohen, was there any entry for Dr. Hu?

12 A.      No.

13         MR. ARROWOOD:  I'd like to go to page 60.  Stop

14 right there (indicating).

15 BY MR. ARROWOOD:

16 Q.      All right.  Dr. Bar-Cohen, what is this portion

17 of the proposal?

18 A.      This is the pending awards.  So it -- it

19 doesn't notify that he was awarded.  It basically

20 included him.  And if you look at the column on the

21 right, it says how much I am committed, because if it is

22 above, then the person is overcommitted.

23         MR. ARROWOOD:  Can you please scroll through

24 this section as well.  Scroll down.  Keep going.  All

25 right.  Stop.  Now go back up.  Okay.  Stop.

1  BY MR. ARROWOOD:

2  Q.        All right.  Dr. Bar-Cohen, will you please just

3  take a quick look at the entry for Anming Hu.

4  A.        Okay.

5  Q.        Are there any entries of pending support for

6  any entity in China?

7  A.        No.

8          MR. ARROWOOD:  Please go down to page 63.

9  BY MR. ARROWOOD:

02:14PM 10  Q.        All right.  Dr. Bar-Cohen, if you would please

11  just quickly review this section indicated by the

12  University of Tennessee, Knoxville.

13  A.        Okay.

14          MR. ARROWOOD:  We need to scroll down a little

15  bit.  Keep going.  All right.  You can go back up,

16  please.

17  BY MR. ARROWOOD:

18  Q.        That's the full entry for University of

19  Tennessee, Knoxville.

02:15PM 20          Dr. Bar-Cohen, in this particular paragraph, I

21  believe it addresses facilities, is there any

22  organization in China mentioned here?

23  A.        Looking back now, it is because now I recognize

24  that Hefei National Synchrotron Radiation Facilities is

25  a Chinese organization.

1    Now, I -- probably at the time, apparently I

2  received these edits to the proposal two days before the

3  final commitment, and by that time, we were not supposed

4  to have any changes to the facility because this is

5  issue that had been settled and it was not intended to

6  do any changes.  This is not the technical side that we

7  are supposed to focus on.  So I guess I missed seeing

8  that.  And in looking at this, I would think that

9  Harvard is our Harvard University.  So I seem like I

02:16PM 10  missed that.  It didn't say China.  It's something that

11  I missed.

12  Q.    So, to your knowledge -- well, let me ask it

13  this way:  You submitted this proposal; is that correct?

14  A.    Yes.

15  Q.    As part of this proposal, did you anticipate

16  collaborating with any entity in China on this work?

17  A.    No, and I clearly stated that.

18    MR. ARROWOOD:  Okay.  Your Honor, if I haven't

19  moved to admit Government's 8-KK, I'd like to do so now.

02:17PM 20    THE COURT:  So admitted.

21    (Government's Exhibit 8-I was marked for

22     identification.)

23  BY MR. ARROWOOD:

24  Q.    Okay.  I'd like to show you Government's

25  Exhibit 8-I.

1      Okay.  Again, Dr. Bar-Cohen, we're moving on to

2  a different proposal at this time.  As you can see, the

3  date on this email is September 27th, 2016.

4      Do you recognize this document?

5  A.      I think so.

6  Q.      Can you describe for the jury generally what's

7  going on in this email.

8  A.      Like I said, sometimes we support research at

9  universities when it can help us enhance our research

02:18PM 10  capability.  This was -- since he had the technology

11  that was supposed to help us with the tasks that we

12  would be pursuing, I sought procurement to have

13  a -- have a Ph.D. student work on this technology with

14  guidance from Professor Anming Hu.  So he prepared a

15  proposal in preparation for this procurement.

16  Q.      Thank you.

17      MR. ARROWOOD:  Your Honor, admit Exhibit 8-I.

18      THE COURT:  So admitted.

19      (Government's Exhibit 8-I was received into

02:19PM 20       evidence.)

21  BY MR. ARROWOOD:

22  Q.      Does there appear to be a couple of attachments

23  to this email?

24  A.      Yes.

25  Q.      I'm just going to show you one of those.  I'd

1   like to show Government's Exhibit 8-L.  Do you recognize

2   this type of document, Dr. Bar-Cohen?

3   A.      I think so.  We're talking about five years

4   ago, five-and-a-half.

5   Q.      Just take a quick look at this first paragraph.

6   A.      Okay.

7   Q.      Is there any mention of the Beijing University

8   of Technology in that paragraph?

9   A.      No.

02:19PM  10      MR. ARROWOOD:  Your Honor, move to admit

11  Government's Exhibit 8-L.

12          THE COURT:  L?

13          MR. ARROWOOD:  I think it's already in,

14  actually.

15          THE COURT:  8-L?  So admitted.

16  BY MR. ARROWOOD:

17  Q.      All right.  Dr. Bar-Cohen, if at any time

18  during your work on proposals that involved Anming Hu

19  had you known that he was employed by the Beijing

02:20PM  20  University of Technology, what, if anything, would you

21  have done?

22  A.      No, I did not know.  I thought by this time it

23  was explained to me about bringing outside or other

24  people or facilities from China, so I didn't even think

25  of bringing it into the discussion.  And if I knew, as I

1  said, I would not have gone forward with any further

2  collaboration.

3         MR. ARROWOOD:  Thank you, Dr. Bar-Cohen.  No

4  further questions, Your Honor.

5         THE COURT:  All right.  Thank you.

6         Cross-examination?

7                    CROSS-EXAMINATION

8  BY MR. LOMONACO:

9  Q.       Good morning -- or good afternoon,

10 Dr. Bar-Cohen.  My name is --

11 A.       Good afternoon.  Good morning on my end.

12 Q.       I'm Phil Lomonaco.  I'm Anming Hu's attorney.

13         You and I have not talked; correct?

14 A.       Right.

15 Q.       Have you had conversations with the government

16 leading up to your testimony today?

17 A.       I have been told that we have a client/attorney

18 privileged conversation.

19 Q.       Oh, okay.  So you have a lawyer; correct?  Are

20 you saying you're asserting some sort of privilege?

21 A.       I have the assistance from JPL.

22 Q.       Okay.  And there is -- that's not against the

23 law.  But I'd like to ask you some questions, and I

24 might talk about a couple of documents that the

25 government has just talked to you about.  But let

1  me -- let me start with the fact that you were at the

2  time and maybe still are a group leader at NASA/JPL; is

3  that right?

4  A.        Yes.

5  Q.        And you're an expert on welding materials and

6  processing and things like that?

7  A.        Not quite.

8  Q.        Not quite?  What's your expertise, sir?

9  A.        I have general expertise in the field of

10 science.

11 Q.        Okay.  Let me -- let me ask you if you

12 recognize Exhibit 62.

13         MR. LOMONACO:  Can you put that up.

14 BY MR. LOMONACO:

15 Q.        And this appears -- see if you can recognize

16 this letter when it gets up there.

17         MR. LOMONACO:  Scroll down; okay?  Start at the

18 bottom.

19 BY MR. LOMONACO:

20 Q.        This appears to be a letter from Dr. Babu to

21 you.  Do you recognize that letter?

22 A.        It's something that I would have agreed to.

23 Q.        Let me suggest that he says he's working on a

24 proposal that is due in -- October 29th, and this last

25 sentence in the first paragraph says, "A call for the

1 proposal is about performing material science

2 investigation on the International Space Station."  And

3 the last sentence in the second paragraph says, "I am

4 wondering if you are interested in the possibility of

5 partnering on this proposal, and if so, would you have

6 time to phone conversation to discuss the details."

7 Do you remember that letter now?

8 A.      It is something that I would have seen.  It is

9 in the right context.

02:24PM 10 Q.      Dr. Babu said that he had an idea of partnering

11 with somebody on the proposal.

12              MR. LOMONACO:  Go up; okay?

13 BY MR. LOMONACO:

14 Q.      Do you see where you say, "I would love to.

15 Right now I'm in a meeting."

16 A.      It is not showing on --

17              MR. LOMONACO:  Did we miss one?

18 BY MR. LOMONACO:

19 Q.      So Babu sent this --

02:25PM 20 A.      Yeah, I can see it.

21 Q.      Yeah.  And, "I would like my colleague, Anming,

22 to join the discussion, if possible."

23              So you and Dr. Babu were working on a project

24 or a proposal; is that right?

25 A.      It's an initiative that I started.

1    Q.       I'm sorry; could you say that again?

2    A.       This is an initiative to a proposal that they

3    started.

4    Q.       Okay.  So Dr. Babu took the initiative to ask

5    Anming Hu to join in on the proposal?

6    A.       (No audible response.)

7    Q.       Yes?

8    A.       Yes.

9    Q.       Okay.  Thank you.

10           MR. LOMONACO:  Keep going.

11   BY MR. LOMONACO:

12   Q.       And then the next part of the email is from

13   Anming Hu, and he says, "I would love to join the

14   discussion.  Thanks for chances."  Do you see that?

15   A.       Yes.

16           MR. LOMONACO:  Keep going.

17   BY MR. LOMONACO:

18   Q.       And then you say, (as read) "It is great you

19   can join.  I will send you the files related to the

20   proposal."  Correct?  That's how he got involved; right?

21   A.       Yes.

22   Q.       Okay.

23           MR. LOMONACO:  Your Honor, we'd like to move

24   that as Exhibit 62, please.

25           THE COURT:  So admitted.

1            (Defendant's Exhibit 62 was marked and

2             received into evidence.)

3            (Defendant's Exhibit 63 was marked for

4             identification.)

5            MR. LOMONACO:  Now, if we could turn to

6    Exhibit 63.  And is this -- is this broadcast to the

7    jury right now?  Okay.

8    BY MR. LOMONACO:

9    Q.        Okay.  So the next email I'd like to discuss

02:27PM  10    with you, sir, is another email.

11            MR. LOMONACO:  Go to the bottom and start up.

12    BY MR. LOMONACO:

13    Q.        And this is continuing the discussion.  You

14    write to Dr. Babu and Anming.  You call Dr. Babu Suresh

15    and Anming Hu.  And these next couple of emails

16    basically are about how to get signed up for the project

17    and get registered, I believe.

18            MR. LOMONACO:  So let's go up a couple.

19    BY MR. LOMONACO:

02:27PM  20    Q.        Then you start talking about the title of the

21    project; is that right?

22    A.        Right.

23    Q.        Because if you have a proposal, you have to

24    give it a name; right?

25    A.        Right.

1  Q.      And you suggest "Rapid heating of braze

2  materials in micro-gravity and the effects on the

3  microstructure, the resultant material and the joint

4  characteristics."  And you talk about Anming's

5  reflecting the inclusion of Professor Hu's brazing

6  material.

7         Did you -- did you believe at the time that

8  Professor Hu had good expertise and knowledge in the

9  area that you were interested in?

02:28PM  10  A.      Based on Professor Babu's suggestions, I --

11  Q.      Okay.

12  A.      -- took that and --

13         MR. ARROWOOD:  Let's go back up some more.

14  BY MR. LOMONACO:

15  Q.      Yes, sir.

16         This one just says that Anming has gotten into

17  the system.  I guess that's the system for the proposal

18  system.

19         MR. LOMONACO:  Go to the next one; okay?

02:29PM  20         Oh, Your Honor, I'd like to publish Exhibit 63.

21         THE COURT:  Like to admit it into evidence?  So

22  admitted.

23         (Defendant's Exhibit 63 was received into

24          evidence.)

25

1    BY MR. LOMONACO:

2    Q.        So, by this time, the three of you are working

3    on this project; right?

4    A.        Yes.

5              (Defendant's Exhibit 60 was marked for

6               identification.)

7              MR. LOMONACO:  Let's go to 60.

8    BY MR. LOMONACO:

9    Q.        Now I show you what's marked as Exhibit 60 and

02:29PM  10   ask you --

11             MR. LOMONACO:  Get to the bottom.

12   BY MR. LOMONACO:

13   Q.        Let's go to the start of the email and see who

14   it's from; okay?

15             And this is from Babu to Anming and you, and

16   he's talking about making the proposal better, and

17   you're talking about the page limits, talking about what

18   you're going to put in the proposal, and you're talking

19   about a different name for it.  And you ask if Anming

02:30PM  20   can compare the densities and also phase diagrams of his

21   alloy selection.

22             So we're talking the technical things that are

23   going in the proposal; right?

24             MR. LOMONACO:  Go to the next page.

25

1    BY MR. LOMONACO:

2    Q.        And then you send another email to Babu Suresh

3    telling him that the limit is 20 pages and he's going on

4    a trip and you say, "Enjoy your trip."

5            MR. LOMONACO:  Let's go to the next one.

6    BY MR. LOMONACO:

7    Q.        And then Anming Hu says he's working on the

8    relevant questions and suggestions and he's talking

9    about the budget, about how much it's going to cost, and

02:31PM 10    he's talking about the university, I guess the

11    University of Tennessee, talking about the budget.  And

12    he thanks you for his collaboration and continuing

13    efforts.  So that's in -- let's get the date on that.

14    January 1st.  New Year's Eve -- New Year's Day 2016.

15            MR. LOMONACO:  Let's go to the next -- that's

16    the next one; right?

17            If we can admit -- can we admit Exhibit 60,

18    Your Honor, please?

19            THE COURT:  So admitted.

02:31PM 20            (Defendant's Exhibit 60 was received into

21             evidence.)

22    BY MR. LOMONACO:

23    Q.        Now, on page 60 --

24            MR. LOMONACO:  Let's go to page 3 -- okay? --

25    before we go any further.

1    MR. PARSONS: We're on page 3.

2    MR. LOMONACO: Okay.

3    BY MR. LOMONACO:

4    Q.    So in the bottom of that page to you, Dr. Hu

5    says, "The other files" -- parentheses -- "(facilities

6    and letters) will be ready soon." Did you know what he

7    was referring to when he wrote that, or did --

8    A.    It is supposed to be for complementary items

9    beyond the technical and it's mentioning facilities and

10   individuals.

11   Q.    And when he wrote that "facilities and

12   letters," do you know what letters he was talking about?

13   A.    I assumed that they are about the proposal.

14   Q.    Okay. And what about facilities? Would that

15   be other facilities that could do work on the proposal?

16   Is that what you understand that to be?

17   A.    No, my understanding is that it's the

18   description of facilities, but there is a section about

19   facilities, and at the time that was required with the

20   letter of commitment.

21   MR. LOMONACO: Okay. So let's go to page 1 on

22   that. Go right up to the top. Is that January 4th?

23   Yeah.

24   BY MR. LOMONACO:

25   Q.    Now, at --

1          MR. LOMONACO:  Drop down a little bit.

2          Send the -- get that 10/28 email.

3          MR. PARSONS:  This is it.

4          MR. LOMONACO:  Okay.  Can you show me the whole

5     email, front page, top?

6     BY MR. LOMONACO:

7     Q.        Okay.  Now, on January 4th at 10:28, Professor

8     Hu sends you an email to you, and there are some other

9     people here that are included.  But the attachment says,

02:35PM  10     (as read) "Letter-bjut," and then "Facilities."

11     "Proposal Brazing in microgravity."  And he says that

12     he's attaching a letter from BJUT.  Do you see that?

13     From BJUT, Beijing University of Technology.

14     A.        Yes, I see that, yes.

15          (Defendant's Exhibit 61 was marked for

16           identification.)

17     BY MR. LOMONACO:

18     Q.        Okay.  Let's go to Exhibit 61 then.

19          And you may have seen this already by the

02:35PM  20     government, but I'd like to show it to you again.

21          MR. LOMONACO:  And, Your Honor, I'd like to

22     move into -- 61, please.

23          THE COURT:  61 is admitted.

24          (Defendant's Exhibit 61 was received into

25           evidence.)

1  BY MR. LOMONACO:

2  Q.        And this says, "Letter of Commitment for the

3  study on the brazing in microgravity."

4          This letter is from a professor in China at the

5  Beijing University of Technology; correct?

6  A.        That's what it states.

7  Q.        Yes.  And in that letter, Dr. Hu is discussed

8  as a long-term collaborator with this individual;

9  correct?

02:36PM 10  A.        Yes.

11  Q.        So this letter is not hiding Professor Hu's

12  collaboration with the Chinese professor at Beijing

13  University, is it?

14  A.        This is what is stated.

15  Q.        I'm sorry; what did you say?

16  A.        This is what is stated in the letter.

17  Q.        Yes, it's what's stated; right?

18          He's disclosing his relationship with a

19  professor from Beijing University and that he's had a

02:37PM 20  long-term collaboration; correct?

21  A.        Well, collaboration doesn't mean working at or

22  working --

23  Q.        Right, right.  Collaboration can mean a lot of

24  different things, can't it?

25  A.        It can mean.

1 Q.        Did you ask him what he meant or what this

2 professor meant by collaboration?

3 A.        No, because I did not see it as working

4 collaboration.

5 Q.        Okay.  Well, we'll get to that.  But you didn't

6 ask him to explain the letter as far as his

7 collaboration; correct?

8 A.        No.

9           (Defendant's Exhibit 66 was marked for

02:37PM 10           identification.)

11           MR. LOMONACO:  Okay.  Let's go to Exhibit 66.

12 Let me make sure.  Did I move in 61?  If not --

13           THE COURT:  You did.

14           MR. LOMONACO:  Thank you, Your Honor.  I'd like

15 to move in Exhibit 66 as the next exhibit.

16           THE COURT:  So admitted.

17           (Defendant's Exhibit 66 was received into

18           evidence.)

19 BY MR. LOMONACO:

02:38PM 20 Q.        Now, the government showed you this, too, and

21 at this point this is a draft of the proposal; correct?

22 A.        This is not the draft.  This is just a proposal

23 that was sent to me and I edited.

24 Q.        I'm sorry, Dr. Bar-Cohen.  I'm having a hard

25 time understanding what you're saying.  Can you move a

1    little bit closer to the microphone.

2    A.        Sure.

3    Q.        And tell me what this is.

4    A.        This is the facilities description that Anming

5    sent for inclusion in the proposal.

6    Q.        Okay.  So, in other words, this is talking

7    about facilities that could be used in the contract, in

8    the project?  Is that right?

9    A.        That is what is stated here.

02:39PM   10    Q.        Okay.  And the part that I have highlighted

11    here, he's talking about X-ray computed tomography

12    available through collaboration between Dr. Hu and

13    Dr. Tao Chen, and he's talking about see the letter of

14    commitment at the Beijing Institute of High Energy

15    Physics; can be accessed through a user proposal.  So

16    does it look like he's hiding his affiliations with BJUT

17    at this point?

18            MR. ARROWOOD:  Objection, Your Honor,

19    argumentative.

02:40PM   20    BY MR. LOMONACO:

21    Q.        Let me ask it this way?

22            THE COURT:  Ask it a different way.  Thank you.

23    BY MR. LOMONACO:

24    Q.        Did you realize when you read this that he has

25    further affiliations with BJUT?

1   A.      No.

2   Q.      You didn't?

3           What did you think --

4   A.      No.

5   Q.      -- when you found out that he had the

6   connections of these laboratory -- with this laboratory?

7   A.      We have friends throughout the world and I work

8   with people throughout the world, and the fact that I

9   have follow-up question would be (unintelligible)

02:40PM 10  anyways.  I assume collaboration means in connection

11  with technical people anywhere.  I did not see this -- I

12  just did for my eyes that the technologies to work with

13  people anywhere around the world.  And this is -- was my

14  interpretation.  He can access -- you know, I have

15  friends that I can go to anywhere in the world and say,

16  hey, could you help me with that.

17  Q.      Well, Dr. Bar-Cohen, were you aware of the NASA

18  restriction during this time?

19  A.      I was aware that there is a NASA restriction.

02:41PM 20  Q.      Were you aware that the NASA restriction said

21  that NASA cannot collaborate bilaterally with China or a

22  Chinese company?  Did you know that's what it said?

23  A.      I did not -- I did not interpret this and I

24  edited it and I thought that he is not going to use any

25  collaboration in the proposal.

1   Q.      Okay.

2   A.          And the way I interpreted is:  The fact that he

3   has friends in China doesn't make him -- it an

4   illegitimate proposal.  I have employees in my group

5   that is from China.  That does not exclude him from

6   working in my group.  He's just American citizen and so

7   on.  I did not interpret this collaboration as something

8   that is working relation that has formal collaboration.

9   For collaboration, I am working with people in

02:42PM  10   Australia.  I'm working with people in Europe.  I'm

11   working with people in Canada.  And I call it

12   collaboration.

13          The interpretation of the word collaboration

14   has been for my eyes in the technologies.  He wanted to

15   include someone.  He send this letter from Dr. Tao Chen,

16   and I did not include this.  And I -- since I asked him

17   not to include it, and my response to this email has

18   been that he should not use anyone in China.

19   Q.      Yes, sir.  I understand.  And nobody is --

02:43PM  20   nobody is trying to point any fingers at you.  We're

21   just trying to get to the point about what Professor --

22   A.          I understand, but you asked me a question about

23   this work collaboration and in light as if I am -- I

24   knew that he had the contract somewhere.  I did not know

25   any of that.  For me, collaboration, we are scientists

1   and I collaborate with people.  This is my

2   interpretation.

3           (Defendant's Exhibit 64 was marked for

4            identification.)

5   BY MR. LOMONACO:

6   Q.      Okay.  Let's go to the next spot there.  Let's

7   go to Exhibit 64.

8           I'd ask that this be moved into exhibit (sic),

9   Your Honor, if it hasn't already.

02:43PM  10     THE COURT:  64?  So admitted.

11          (Defendant's Exhibit 64 was received into

12           evidence.)

13          MR. LOMONACO:  Okay.  Let's go to the bottom.

14  This is a set of emails.  And let's go to the top.

15  BY MR. LOMONACO:

16  Q.      Okay.  So now we've got -- what's the date on

17  that? -- another email from Anming Hu, January 4th

18  stating, in relevant part -- I've got it circled or

19  boxed there -- talking about fixing a financial file and

02:44PM  20  trying to get the second letter of commitment.

21          Did you -- do you know what that second letter

22  of commitment is that he was talking about?

23  A.      I was not sure about that.

24  Q.      Okay.  Let's move on up.

25          And then you said -- you had an idea, though,

1  didn't you, because your response was, "If you are

2  preparing letters from China, I cannot use them in this

3  proposal."  That's what you said; right?

4  A.       Right.

5  Q.       Right.  And then his response is, "I see.  In

6  this case we do not need them."  Right?  So he wasn't

7  committed to those people.  He just was suggesting

8  possible help.  Is that your understanding of what he

9  was doing?

02:45PM 10  A.       I'm assuming that that was -- it said that we

11  do not need this letter because we weren't going to use

12  it.

13  Q.       And then he said, well, if you don't think we

14  should use them, then we won't use them; correct?

15  A.       Yes.

16           MR. LOMONACO:  Scroll up.

17           (Defendant's Exhibit 65 was marked for

18            identification.)

19           MR. LOMONACO:  All right.  Now we can turn to

02:46PM 20  65.  And move into evidence Exhibit 65, Your Honor,

21  please.

22           THE COURT:  So admitted.

23           (Defendant's Exhibit 65 was received into

24            evidence.)

25           MR. LOMONACO:  Bottom of page 1.

BY MR. LOMONACO:

Q.      And you said -- you submitted your current version and -- to Dr. Hu and said, (as read) "I revised the description, the facility description," and that's the one that had the Chinese laboratory in it.  "I removed the mentioning of the use of facility in China. We need to avoid mentioning since NASA does not allow such formal collaboration."

        And at that time, that was a true statement; right?

A.      Yeah.

Q.      Now, you didn't tell Professor Hu he couldn't be on the project even though he had a long-term collaboration; correct?

A.      Correct.

Q.      And isn't it -- isn't it true that the NASA restriction --

        MR. ARROWOOD:  Objection, Your Honor.  Let the witness answer the question.

        THE COURT:  He may not have been done with that answer to the last question.

        Go ahead, Dr. Bar-Cohen.  If you have a further response, you can go ahead.

        MR. LOMONACO:  Yes, sir.

        THE COURT:  Did you have anything further you

1  wanted to say in response to that last question?

2         THE WITNESS:  He was trying to ask if knowing

3  that he has collaboration.  I thought I clarified that.

4  I interpret collaboration not as a working

5  collaboration, but as just scientists talking to each

6  other.  This is my interpretation.  That's why I didn't

7  see it as an issue.  But in the proposal, I did not want

8  to see any inclusion of Chinese organization or China.

9  BY MR. LOMONACO:

02:48PM 10  Q.        Now, let me ask you:  At this time, was your

11  understanding of the NASA restriction that NASA could

12  not cooperate or collaborate bilaterally with China or a

13  Chinese corporation on the project?  In other words,

14  that NASA can't use its grant money to enter into some

15  sort of collaboration with any Chinese company or China

16  itself; right?

17  A.        It would be more general.  Any NASA proposal,

18  we're not supposed to use funds to any foreign --

19  Q.        Any what?  I'm sorry; I didn't hear that.

02:49PM 20  A.        Any foreign scientists (unintelligible).

21  Q.        Any pointing?

22  A.        Funding -- funding proposal supposed to be only

23  for U.S. company and U.S. participants --

24  Q.        Okay.

25  A.        -- or investigators.

1  Q.      Okay.  I can understand that.

2  A.      Not only China, but let alone China.

3  Q.      Okay.  So it's not so much somebody has got a

4  job.  It's whether they use the money from NASA to do

5  something in China or do something with China; right?

6  A.      The proposal is a contract, basically.  We are

7  committing what we're doing -- we're going to do

8  technically and what do we do with the funds; execute

9  what we propose technically.  So we are not using funds

02:50PM  10  to anyone in China, and, therefore, we are not -- the

11  proposal is not involved participation with anyone in

12  China, and as I said, anyone else outside the country.

13  Q.      Okay.  Now, after -- after --

14          (Defendant's Exhibit 17 was marked for

15           identification.)

16          MR. LOMONACO:  Let's go to Exhibit 17.

17  BY MR. LOMONACO:

18  Q.      On January 6th, this letter was written, and

19  this is from Guobin Zhang from University of Science and

02:51PM  20  Technology in China.

21          MR. LOMONACO:  Scroll up a little bit.

22  BY MR. LOMONACO:

23  Q.      And this is another letter, is it not, a second

24  letter?

25  A.      I have not seen this letter before.  If this

1   was an attachment to, I did not see it before.  And I

2   always respond to letters or emails.  As a conclusion, I

3   always try to say thank you.  This email has not been

4   responded.  I did not see it.

5           MR. LOMONACO:  Okay.  One moment, please.

6   BY MR. LOMONACO:

7   Q.      Are you saying you haven't seen the email or

8   that it wasn't sent to you?

9   A.      I have not seen it.

02:51PM 10  Q.      Okay.  Are you aware that it was an attachment

11  to the last letter?

12          MR. LOMONACO:  Let's go back to the last

13  letter.  The last one.  67.

14          (Defendant's Exhibit 67 was marked for

15           identification.)

16  BY THE WITNESS:

17  A.      I look for the emails archive.  This was the

18  first time that I've seen this letter, this email,

19  because I was looking to see what was sent and what was

02:52PM 20  received.

21  BY MR. LOMONACO:

22  Q.      Do you see where this letter from Anming says,

23  "Although you did not need this letter of support for

24  submission, I send it to you for your records."  Do you

25  see that?

1  A.        I see it, yes.

2  Q.        Okay.  You just didn't review it; is that what

3  you're saying?

4  A.        I'm saying I didn't see it at the time.

5  Q.        Okay.  You're aware that your attorney sent it

6  to us as -- are you aware that your attorney sent it to

7  us as part of your subpoena request?

8  A.        Yes.  In response to the subpoena, I went

9  and -- and with help with our IT department looked for

02:53PM  10  all the archive of the emails that was asked, and I went

11  through to know what was in there, and that was the

12  first time since I've seen this one.

13  Q.        Yes, sir.  Thank you.  And we appreciate your

14  efforts.

15            MR. LOMONACO:  Let's go back to Exhibit 17.

16            MR. PARSONS:  Did you admit 67?

17            MR. LOMONACO:  Admit 67?  I think I already

18  did, but if I didn't, Your Honor, I'd move 67.

19            THE COURT:  So admitted.  You may not have, but

02:53PM  20  we'll admit it.

21            (Defendant's Exhibit 67 was received into

22             evidence.)

23            MR. LOMONACO:  Thank you, Your Honor.

24            Now let's look at Exhibit 17.  I admit that

25  one, too, if I may.

1        MR. PARSONS:  That's already admitted.

2        MR. LOMONACO:  That one's admitted.  Okay.

3   BY MR. LOMONACO:

4   Q.      So getting back to this letter --

5        MR. LOMONACO:  It's from a different professor;

6   right?  Can you move it up just a little bit?  No, the

7   other way.

8        Can we -- all right.  That's good.

9   BY MR. LOMONACO:

02:54PM  10   Q.      Do you see the second sentence in this letter

11   says, (as read) "I have a long-term collaboration on

12   nanostructure characterization with Dr. Anming Hu at the

13   University of Tennessee.  He has explained to me that he

14   is pursuing a research proposal."  And what is the

15   title -- what does the letterhead say on this case -- on

16   this letter?  National Synchrotron Radiation Laboratory.

17        So, again, Anming Hu was openly producing

18   documents demonstrating that he communicates and

19   collaborates with people in China.

02:54PM  20        (Defendant's Exhibit 68 was marked for

21         identification.)

22        MR. LOMONACO:  Let's go to Exhibit 68 if we

23   could.

24   BY THE WITNESS:

25   A.      This is -- this is the email and the letter

1  that I have not seen because I did not respond to it.

2  BY MR. LOMONACO:

3  Q.      That's fine.  Do you want to read it some more?

4          Have you had time to look at the letter?

5  A.      Well, when I send -- I did not read it in

6  detail.  I just saw it when I was in the process of

7  compiling all the emails to be sent to you.  I did not

8  read it in detail.

9  Q.      Did you ever at this time tell Professor Hu

02:55PM 10  that he couldn't work on the NASA proposal because he

11  had too much connection to China?

12 A.      I did not see it at the time.

13 Q.      Okay.

14 A.      He was contacting or having the technical

15 introductions with people.  As I said, I do it, also.

16 So I didn't see it as a working relation effort.

17 Q.      I understand, sir.

18          MR. LOMONACO:  Let's go to Exhibit 68.  And I

19 can move that in, please, Exhibit 68, for the next

02:56PM 20  exhibit.

21          THE COURT:  So admitted.

22          (Defendant's Exhibit 68 was received into

23           evidence.)

24          MR. LOMONACO:  Thank you, Your Honor.

25          Let's go up one.

1  BY MR. LOMONACO:

2  Q.        This is when Professor -- or Drew Haswell was

3  getting involved.

4          MR. LOMONACO:  Back up.  Let me see the blue.

5          Okay.  Keep going.

6          MR. PARSONS:  Up?

7          MR. LOMONACO:  Yeah.

8  BY MR. LOMONACO:

9  Q.        This is the email from Drew Haswell, and I

02:57PM 10  think you were cc'd on it, and in this email -- this was

11  an email that was actually written by Professor Hu to

12  Drew Haswell, and he's asking for -- he has a question

13  about the China Assurance.  Do you see that last

14  sentence?

15  A.        Yes.

16          MR. LOMONACO:  And let's -- let's go back to

17  the letter that Drew Haswell sent that caused that

18  question.

19  BY MR. LOMONACO:

02:57PM 20  Q.        Here is the letter that Drew Haswell sent.

21          Here it is (indicating).  Right at the end of

22  that letter that Drew Haswell sent, it says, "After

23  these two items have been addressed" -- and I think

24  they're talking about financing -- and, (as read)

25  "...we'll be ready to obtain the Letter of

1    Commitment/UTK China Assurance document and have all

2    this submitted."

3            MR. LOMONACO:  And then let's go back up again.

4    BY MR. LOMONACO:

5    Q.      And Professor Hu says, (as read) "The

6    UK" -- (as read) "The China Assurance letter, are you

7    talking about the letter I submitted?  Are you talking

8    about the Hefei National Radiation Facility, right?  I

9    included one letter.  Does this solve this concerning?"

02:58PM 10    Did you read that at the time?

11    A.      I interpret it as the NASA assurance that he

12    will assure that this will not be used.

13    Q.      Does this indicate that Professor Hu is

14    confused about this whole process with China?

15            MR. ARROWOOD:  Objection, Your Honor, calls for

16    speculation on the defendant's state of mind.

17            THE COURT:  I think as asked, that's probably a

18    valid objection.

19    BY MR. LOMONACO:

02:59PM 20    Q.      Were you confused about the connection with

21    China collaboration and the NASA restriction at the

22    time?

23    A.      I wasn't sure about the meaning, but I assume

24    that this is something that was between the university

25    and Anming and they are trying to clarify because he

1  mentioned that he has collaboration and he wanted to

2  have a clear clarification.

3      So I didn't see it myself as part of this

4  discussion, and I assumed that once they resolved the

5  problem, I will be --

6  Q.     Thank you, sir.  I think you said you didn't

7  see it yourself; is that what you said?

8  A.     What do you mean?

9  Q.     I thought I was just repeating what you said.

03:00PM 10  I thought you said something to the effect --

11 A.     No, what I'm saying is:  I did not look at this

12 in detail because I saw this as something between Anming

13 and the university.  So I did not try to interpret what

14 he was talking about.

15      (Defendant's Exhibit 144 was marked for

16       identification.)

17      MR. LOMONACO:  Okay.  Let's go to Exhibit 144,

18 please.

19      Did we admit that last exhibit, Exhibit 68?

03:01PM 20      THE COURT:  It's admitted.

21      MR. LOMONACO:  Thank you, Your Honor.

22      Can I move in Exhibit 144, please?

23      THE COURT:  Yes, admitted.

24      (Defendant's Exhibit 144 was received into

25       evidence.)

1  BY MR. LOMONACO:

2  Q.        Exhibit 144 is an email.  Do you recognize this

3  email?  I know it's a tough question because it's been a

4  while, but this is where you submitted the proposal, and

5  you testified about it on direct examination here a

6  minute ago.  And I won't belabor it.  I think I

7  understand your testimony about this.

8          When you submitted the proposal, there was

9  still part of the proposal that had a reference to a

03:01PM 10  Chinese lab in the proposal, and that was probably a

11  mistake, that it just didn't get all taken out of there;

12  is that what you were saying?

13  A.        Yes, I noticed that now that I was looking at

14  the document.

15          (Defendant's Exhibit 145 was marked for

16           identification.)

17          MR. LOMONACO:  All right.  Let's go to

18  Exhibit 145.

19          We can move that in as the next exhibit.

03:02PM 20          THE COURT:  So admitted.

21          (Defendant's Exhibit 145 was received into

22           evidence.)

23  BY MR. LOMONACO:

24  Q.        And, again, this is the proposal.  You were the

25  principal investigator on this proposal.  But this

1  proposal that we've been talking about and that

2  Professor Hu submitted the letters, that one did not get

3  approved; is that correct?

4  A.      Yeah, we didn't win this proposal.

5  Q.      You didn't win that one.

6          (Defendant's Exhibit 70 was marked for

7           identification.)

8          MR. LOMONACO:  Let's go to Exhibit 70.

9          And move to admit Exhibit 70, please.

03:03PM 10          THE COURT:  So admitted.

11  BY MR. LOMONACO:

12  Q.      Okay.  Exhibit 70 is the second proposal.  It's

13  an email first.  And you had actually asked Anming to

14  send a proposal on this; correct?  If you look at the

15  highlighted part -- I can give you time to read it if

16  you'd like.

17          Do you see where it says, "...I have asked you

18  to send me a proposal to support our MSR task of

19  Break-the-Chain using brazing..."  Do you see that?

03:04PM 20  A.      Yes.

21  Q.      You were interested still -- what's the date on

22  this?  September?

23          This is nine months after the first proposal,

24  and you wanted to have Anming work on this proposal with

25  you; correct?

1    A.      Yes.

2            MR. LOMONACO:  And scroll down; okay?  The

3    other way.  Well, no, keep going up.

4            (Defendant's Exhibit 71 was marked for

5             identification.)

6            MR. LOMONACO:  All right.  Let's go to

7    Exhibit 71.  And I ask that that be moved in, please.

8            THE COURT:  So admitted.

9            (Defendant's Exhibit 71 was received into

10           evidence.)

11   BY MR. LOMONACO:

12   Q.      Now, Exhibit 71 is an email from Anming Hu, and

13   I believe it's sending this second proposal to you and

14   your office, and basically you -- he says, "I" -- you

15   ask, first of all, for a short statement.

16           MR. LOMONACO:  71.  Yeah, let me get down to

17   that.  I'm sorry.

18   BY MR. LOMONACO:

19   Q.      You ask him to provide a short statement of why

20   he is qualified to write this proposal.  Can you see

21   that?

22   A.      Yes.

23   Q.      And were you going to use that as part of the

24   proposal?

25   A.      Let me explain what this is.  This is what we

1  call procurement, trying to support research at the

2  university that will help us develop the needed

3  technology that we're going to have inhouse.

4      I cannot use -- I have to justify why this

5  university will be, and I need to identify organizations

6  that are competitive.

7      We had three organizations and universities

8  that are working with the technology that I identified,

9  and one in China, one in Portugal, and one in Canada,

03:07PM  10  and this is -- all three are foreign countries, and

11  Anming had the capability in our -- in this country.

12  That was the justification that we needed to put forth

13  for justification.

14  Q.      Okay.  Thank you, sir.

15      So even though he had told -- sent you some

16  letters about his collaboration with China a few months

17  prior to that, you still requested that he submit

18  something so he could be considered.  So you weren't

19  trying to exclude him from NASA grants at that point,

03:07PM  20  were you?

21  A.      I will repeat what I said.  I did not see those

22  letters at the time and I didn't know about those

23  letters, the work collaboration that was -- that he

24  mentioned.  I did not see it.

25  Q.      Okay.  When was the first time you knew that

1  Anming had so-called employment in China?

2  A.      Well, this -- whatchamacallit -- subpoena made

3  me aware that the reason -- the issue that he had

4  employment.  I did not know it before.

5  Q.      Now, the subpoena didn't tell you that --

6          MR. LOMONACO:  Did somebody say something, or

7  was that just an echo.

8  BY MR. LOMONACO:

9  Q.      Professor, the subpoena didn't tell you that

03:08PM 10  Anming Hu had a job in China, so-called employment from

11  China.  Where did you first hear that?

12  A.      I think I saw an email from him asking me to

13  help him, and that was what alerted me to understand

14  this -- the issue with this.  I did not know it before.

15  Q.      You saw it where, sir?

16  A.      Anming sent me an email asking my help.

17  Q.      So Anming sent you a subpoena?

18  A.      (Unintelligible).

19          THE COURT REPORTER:  I did not understand the

03:09PM 20  answer.

21  BY THE WITNESS:

22  A.      That was the first time I've seen it.

23  BY MR. LOMONACO:

24  Q.      Did you talk to a federal agents about that,

25  too?

1    A.        As I said, I have the attorney.

2    Q.        Are you looking at your attorney when you turn

3    away like that?

4    A.        Excuse me?

5    Q.        Are you looking at your attorney?

6              THE COURT:  Let me interject.  Let me

7    interject.

8    BY THE WITNESS:

9    A.        I'm looking for the wording.

03:09PM  10              THE COURT:  He's asking right now have you

11    talked with federal agents.  He's not asking about

12    conversations with your attorney.  So the question is:

13    Have you talked with federal agents about this?

14              Is that right, Mr. Lomonaco?

15              MR. LOMONACO:  Yes, Your Honor.

16              THE COURT:  All right.  So that's the question

17    on the table.

18    BY THE WITNESS:

19    A.        Yes.

03:10PM  20    BY MR. LOMONACO:

21    Q.        Yes?  I think you said yes.  And I apologize.

22    I don't hear as good as I used to.  But if you don't

23    correct me, I'll assume you said yes.  Thank you, sir.

24              How long ago did you talk to them?

25    A.        (Unintelligible) a week.

1    THE COURT REPORTER:  I did not understand the

2    witness.

3    THE COURT:  Could you repeat that answer,

4    please?

5    BY MR. LOMONACO:

6    Q.    A week?

7    A.    Something like that.

8    Q.    Is that the first time you talked about this

9    case was a week ago with the federal agents?  Is that

03:11PM 10    the first time or just one of the times?

11    A.    Second time.

12    Q.    And when was the first time?

13    A.    I think a week before.  I don't remember.

14    Q.    Is that when you found out Anming Hu had a job

15    in China?

16    A.    Yes.

17    Q.    Did you talk to Lee Gibson about this case,

18    too?

19    A.    I'm not sure who I talked to.

03:12PM 20    Q.    Okay, sir.  Thank you for your time and

21    trouble.

22    THE COURT:  Thank you.

23    Redirect examination?

24    MR. ARROWOOD:  Nothing, Your Honor.  Thank you.

25    THE COURT:  Okay.  Thank you.  That concludes

1    this witness's testimony, and we'll take an afternoon

2    break at this time.

3              THE COURTROOM DEPUTY:  All rise.

4              (Jurors excused from the courtroom.)

5              THE COURTROOM DEPUTY:  This honorable court

6    stands in recess until 3:30.

7              (A brief recess was taken.)

8              THE COURTROOM DEPUTY:  This honorable court is

9    again in session.

03:34PM  10              THE COURT:  Let's bring our jury in.

11              (Whereupon the following report of

12               proceedings was had within the presence

13               and hearing of the jury:)

14              THE COURT:  All right.  Thank you.  Everyone

15    may be seated and the courtroom deputy will swear in the

16    next witness.

17              (The witness was thereupon duly sworn.)

18              THE COURTROOM DEPUTY:  Have a seat, please.

19    Please state and spell your name for the record.

03:35PM  20              THE WITNESS:  My first name is Kujtim,

21    K-u-j-t-i-m.  My last name is Sadiku, spelled

22    S-a-d-i-k-u.

23              THE COURTROOM DEPUTY:  Thank you.

24

25

**KUJTIM SADIKU**,

having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. ARROWOOD:

Q.      Good afternoon.

A.      Good afternoon.

Q.      Will you please tell the jury where you're employed.

A.      I am employed -- I am employed at the Federal Bureau of Investigation, the Knoxville Field Office.

Q.      What is your role in the FBI?

A.      I'm a special agent.

Q.      So let's just go a little bit further back in your background.  Would you please describe for the jury your educational background.

A.      I have a bachelor's in science in biology from the University of Illinois in Chicago, and I have a master's in public health and epidemiology from the School of Public Health from the University of Illinois in Chicago.

Q.      Were you employed by any other organization prior to joining the FBI?

A.      I was.

Q.      What job did you have before joining the FBI?

1  A.      I was a consumer safety officer with the United

2  States Food and Drug Administration.

3  Q.      And just generally speaking, what are the

4  duties of that role?

5  A.      I was a signed to the bioresearch monitoring

6  program and I conducted inspections of clinical trials

7  that were testing investigational drugs and

8  investigational devices.

9  Q.      So when did you join the FBI?

03:37PM 10  A.      2008.

11  Q.      When you joined the FBI, did you undergo

12  initial training as a special agent?

13  A.      I did.  I attended the FBI training academy for

14  new agents.  It's approximately a 20-week course.

15  Q.      And where is that training located?

16  A.      Quantico, Virginia.

17  Q.      So after graduating from that course, where did

18  you go next?

19  A.      I was assigned to the Knoxville Field Office.

03:37PM 20  Q.      What year was that?

21  A.      2008.

22  Q.      What is your assignment within the Knoxville

23  Field Office of the FBI?

24  A.      Since reporting to Knoxville from Quantico,

25  I've been assigned to national security matters.

1    Q.        So as a special agent that investigates

2    national security matters, could you just describe in

3    very general terms what your roles and duties are.

4    A.        I conduct investigations from alleged federal

5    crimes from foreign actors against the United States.

6    Q.        Is it fair to say that you're the case agent

7    for this particular case?

8    A.        That's correct.

9    Q.        I'm sorry.  Are you one of the case agents on

03:38PM 10    the case?

11    A.        That's correct.

12    Q.        When was this case opened in the FBI?

13    A.        This case was opened in March 2018.

14    Q.        And at that time, what was the basis for

15    opening the case?

16    A.        I initiated this investigation predicated on

17    information I had that Anming Hu was part of a foreign

18    government talent plan.

19    Q.        As part of the case, have you worked with other

03:38PM 20    law enforcement agencies?

21    A.        Yes.

22    Q.        What were those law enforcement agencies?

23    A.        The Department of Energy, Office of Inspector

24    General, and NASA, Office of Inspector General.

25    Q.        During the course of the investigation, early

1    on in the investigation, did you conduct an interview of

2    the defendant?

3    A.       I did.

4    Q.       Why did you want to interview the defendant?

5    A.       So, after initiating the investigation in

6    March, approximately March 2018, the next course of

7    action in an investigation is to collect information and

8    ask questions and conduct fact-finding missions to

9    further the investigation.

03:39PM 10   Q.       So when did this interview take place?

11   A.       Sometime in April 2018.

12   Q.       So about a month into the investigation?

13   A.       That's correct.

14   Q.       Do you recall where the interview took place?

15   A.       The interview took place in his office at the

16   University of Tennessee in Knoxville.

17   Q.       Do you happen to recall approximately what time

18   of day this interview occurred?

19   A.       I don't, but it was -- it was light out.

03:40PM 20   Q.       Do you believe it was during the workday?

21   A.       Yes.

22   Q.       Now, did you interview the defendant by

23   yourself?

24   A.       I did not.

25   Q.       Who was with you?

1  A.        Department of Energy, Office of Inspector

2  General, Special Agent Laura Slatton.

3  Q.        Now, did you or Special Agent Slatton record

4  the interview?

5  A.        We did not.

6  Q.        Did you take notes?

7  A.        We did.

8  Q.        Both you and Special Agent Slatton took notes?

9  A.        That's correct.

03:40PM 10  Q.        And so how, if at all, did you memorialize this

11  interview?

12  A.        Well, I wrote up a record, a report of the

13  interview.

14  Q.        Is that record a verbatim account of what

15  occurred during that interview?

16  A.        No, it is not.

17  Q.        Do you recall some of the topics that you

18  covered during that interview with the defendant?

19  A.        I do.

03:41PM 20  Q.        What, if anything, did the defendant tell you

21  about his citizenship?

22  A.        Anming Hu told me he was a Canadian National

23  with a Canadian passport.

24  Q.        Did he tell you what his current position was?

25  A.        He did.

1  Q.      What did he say?

2  A.      He was a professor at the University of

3  Tennessee in Knoxville.

4  Q.      Earlier you mentioned that you predicated the

5  investigation based on information that at least

6  indicated association with a foreign government talent

7  plan.  Did you ask the defendant about that?

8  A.      I did, yes.

9  Q.      If you can recall, what did you ask him?

03:42PM 10  A.      I showed him a printout of a Thousand Talents

11  website.

12  Q.      Do you know what a Thousand Talents is?

13  A.      I do.  It --

14  Q.      Please just generally describe that to the

15  jury.

16  A.      It's a Chinese government-sponsored recruitment

17  program attempting to acquire U.S. science and

18  technology and transfer it back to China to aid their --

19  the Chinese military and economy.

03:42PM 20  Q.      And so when you presented that to the

21  defendant, what, if anything, did he say?

22  A.      When I showed him the printout, he said he was

23  not a member of that talent plan and he called them

24  cheaters.

25  Q.      So after that, did you show the defendant any

1  other documents?

2  A.      I did, yes.

3  Q.      And did the defendant respond in any way that

4  you can recall?

5  A.      Yes, he -- I showed him a printout of a

6  translated page from a Chinese web page that listed him

7  as a speaker at a conference in China, and he was -- I

8  think it -- I think it was sponsored or -- the printout

9  was a -- I showed him a printout of a conference held in

03:43PM  10  China where he was listed as a speaker at a conference

11  and it referenced the Beijing University of Technology.

12  Q.      And what, if anything, did he tell you about

13  that?

14  A.      That it was a short-term talent plan and it was

15  different than the Thousand Talents Plan, and it was, I

16  believe, two weeks long and it was just he attended the

17  conference.

18  Q.      Did he tell you where he first heard about that

19  program?

03:44PM  20  A.      He did.

21  Q.      What did he say?

22  A.      He said that he first heard about the program

23  at a -- somewhere in Florida.  I believe it was a

24  conference from a representative of the Beijing

25  University of Technology.

1  Q.      Now, during the interview, did the defendant

2  discuss with you his travels to China?

3  A.      Yes.

4  Q.      What, if anything, do you recall about what he

5  said?

6  A.      As I recall, during the interview, he told me

7  that he had a trip planned to China and he was going to

8  go speak at a conference in China.

9  Q.      Did he mention anything about previous trips to

03:44PM  10  China?

11  A.      I don't understand.  Can you repeat?

12  Q.      I'm just curious.  Did he mention any previous

13  trips to China?

14  A.      Yes, he did.

15  Q.      Did he indicate whether he was paid for those

16  trips?

17  A.      I believe he -- he said he was paid and he

18  described them as being tips.

19  Q.      Did he indicate any dollar amount?

03:45PM  20  A.      $100, $200.

21  Q.      All right.  Going back to his employment with

22  the University of Tennessee.  Did he tell you whether or

23  not he was a full-time employee?

24  A.      Yes, he did.

25  Q.      Did he say anything else about the time frame

1   of his employment at the university?

2   A.      Yes.  He told me that he was employed at the

3   University of Tennessee as a member of the faculty for

4   nine months and he had the summers off to do what he

5   wanted.

6   Q.      Did he indicate any view as to whether or not

7   it would be okay to work for a China program and

8   University of Tennessee?

9   A.      Yes, he did.

03:46PM   10   Q.      What did he say?

11   A.      He said that if he worked for another

12   organization that he would have to report it.

13   Q.      Did he describe any -- any potential

14   consequences that he was aware of for not reporting it?

15   A.      Yes.  He said that if he didn't report it, he

16   could be terminated from employment at UT.

17   Q.      Do you recall approximately how long this

18   interview lasted?

19   A.      I would say about approximately one hour.

03:46PM   20   Q.      And so after that interview, did you correspond

21   at all with the defendant?

22   A.      Yes, I did.

23   Q.      And how did you correspond with the defendant?

24   A.      I corresponded with him via email.

25   Q.      Do you recall how many emails you two

1  exchanged?

2  A.        Two or three.

3  Q.        If you recall, will you tell the jury what the

4  general substance of those emails were.

5  A.        During the interview that I conducted, he told

6  me about his trip that he had planned to go to China,

7  and I had asked him to meet after he would come back,

8  and he sent me the -- a link to the conference that he

9  was going to attend, and in the email, he stated that he

03:47PM  10  decided he was not going to attend the conference.

11  Q.        In those email communications, did he indicate

12  to you that he was working on any NASA projects?

13  A.        Yes, he did.

14  Q.        Do you recall what he said?

15  A.        I think he said two NASA projects.

16  Q.        Now, going back to the conference that you just

17  mentioned, if you know, did the defendant attend that

18  conference?

19  A.        I do not know.

03:47PM  20  Q.        Did you ask him to attend that conference?

21  A.        I did not.

22  Q.        Okay.  So moving forward in the investigation,

23  did you at some point meet with officials with the

24  University of Tennessee?

25  A.        Yes, I did.

1    Q.        Why did you do that?

2    A.        Well, in the course of the investigation, I had

3    the information of the talent plan and there was

4    information that I didn't have.  I had questions on

5    certain aspects of policies at the University of

6    Tennessee that I did not know.

7    Q.        Did you wish to obtain any documents?

8    A.        Yes, I did.

9    Q.        And did you ever ask the university to provide

03:48PM  10   any documents?

11   A.        Yes, I did.

12   Q.        In general terms, what kind of documents did

13   the university provide you?

14   A.        The university provided conflict of interest

15   forms, emails.

16   Q.        Now, why did you ask for those types of

17   documents?

18   A.        Prior to asking for those documents, I

19   conducted research and found that he had reported in his

03:49PM  20   publications that he was affiliated with the Beijing

21   University of Technology.

22   Q.        Now, prior to this investigation, did you have

23   a lot of experience and knowledge in the grant process

24   for U.S. government agencies?

25   A.        I did not.

1   Q.      Did you have a lot of experience with

2   university conflict of interest policies?

3   A.      I did not.

4   Q.      Were you familiar with the way in which

5   universities go about engaging with sponsoring proposals

6   and contracts with government agencies?

7   A.      I was not.

8   Q.      Now I'd like to direct your attention to July

9   2019.  Did you meet with university officials in

03:49PM  10   July 2019?

11   A.      Yes, I did.

12   Q.      What was the purpose of that meeting?

13   A.      The purpose was -- I mean, two-fold,

14   essentially; to provide information and an update on my

15   investigation, also to ask the university questions that

16   I didn't have the answers to.

17   Q.      And did you have additional meetings with

18   university personnel?

19   A.      Yes, I did.

03:50PM  20   Q.      Did one such meeting occur in August 2019?

21   A.      Yes, it did.

22   Q.      Was there another in September 2019?

23   A.      Yes, there was.

24   Q.      Now, at those three meetings, the one in July,

25   the one in August, and the one in September, did you

1   provide any PowerPoint presentations at these meetings?

2   A.     I -- yes, I did.

3   Q.     Now, did you create the PowerPoint

4   presentations?

5   A.     Yes, I did.

6          (Government's Exhibit 10-O was marked for

7           identification.)

8   BY MR. ARROWOOD:

9   Q.     I'd like to show you what's been marked as

03:50PM  10   Government's Exhibit 10-O.

11          Do you recognize this document?

12   A.     Yes, I do.

13   Q.     What is it?

14   A.     It is the cover page of the PowerPoint

15   presentation that I made for that meeting on July 18th,

16   2019.

17          MR. ARROWOOD:  At this time, the government

18   moves to admit Government's Exhibit 10-O.

19          THE COURT:  Without objection, so admitted.

20          (Government's Exhibit 10-O was received into

21           evidence.)

22          (Government's Exhibit 10-P was marked for

23           identification.)

24   BY MR. ARROWOOD:

25   Q.     All right.  Now I'd like to show you what's

1  been marked as Government's Exhibit 10-P.

2          Do you recognize this document?

3  A.      Yes, I do.

4  Q.      What is it?

5  A.      It is a cover page that I produced of the

6  PowerPoint presentation that I gave to the University of

7  Tennessee on August 30th, 2019.

8          MR. ARROWOOD:  Your Honor, I move to admit

9  Government's Exhibit 10-P.

03:51PM 10          THE COURT:  So admitted.

11          (Government's Exhibit 10-P was received into

12           evidence.)

13

14          (Government's Exhibit 10-Q was marked for

15           identification.)

16  BY MR. ARROWOOD:

17  Q.      All right.  Now I'd like to also show you

18  Government's Exhibit 10-Q.

19          Do you recognize this document?

03:52PM 20  A.      Yes, I do.

21  Q.      What is it?

22  A.      It is the cover page of the PowerPoint

23  presentation that I put together that I provided at a

24  meeting with the University of Tennessee administration

25  on September 17th, 2019.

1        MR. ARROWOOD:  Will you just scroll down,

2  April.

3  BY MR. ARROWOOD:

4  Q.        I want to show you it's not just simply the

5  title page, but it's --

6        MR. ARROWOOD:  All right.  Scroll back up,

7  please.

8  BY MR. ARROWOOD:

9  Q.        Does this appear to be the entire PowerPoint

03:52PM  10  presentation for that?

11  A.        Yes, it does.

12        MR. ARROWOOD:  At this time, the government

13  asks to admit Government's Exhibit 10-Q.

14        THE COURT:  So admitted.

15        (Government's Exhibit 10-Q was received into

16         evidence.)

17        MR. ARROWOOD:  You can take it off.

18  BY MR. ARROWOOD:

19  Q.        Now, let's talk about these PowerPoints for

03:52PM  20  just a moment.  What was the purpose of these PowerPoint

21  presentations?

22  A.        There was a lot of information that I had

23  collected and my goal was to share that information with

24  the University of Tennessee because alone, I wasn't able

25  to verify it, so I had questions that the university had

1 more knowledge on the information. So it was an

2 information-sharing session, if you will, with questions

3 and answers.

4 Q. And so what type of material did you rely upon

5 in putting that PowerPoint presentation together?

6 A. Open-source Google searches, summary

7 translations of emails, summary translations of

8 websites.

9 Q. Did you use some of the material that had been

03:53PM 10 provided to you by the university?

11 A. That's correct, I did.

12 Q. I believe you may have just mentioned that some

13 of that material was in a foreign language.

14 A. That's correct.

15 Q. And was it in Chinese?

16 A. Yes.

17 Q. Do you speak Chinese?

18 A. I do not.

19 Q. Do you speak any other foreign languages?

03:53PM 20 A. I do.

21 Q. What do you speak?

22 A. I speak Albanian.

23 Q. How did you learn Albanian?

24 A. My parents are from Albania and that's the

25 language I learned before I went to school.

1   Q.      So earlier you talked about -- I believe you

2   said summary translations; is that what you said before?

3   A.      Correct.

4   Q.      Would you please describe for the jury, what is

5   a summary translation?

6   A.      So, it's a translation of a document in a

7   foreign language, and it is not accurate in its

8   entirety; it's just a summary of the document.

9   Q.      And are summary translations performed by FBI

03:54PM 10  linguists?

11  A.      Yes, that's correct.

12  Q.      Now, did you also use machine translations?

13  A.      I did, yes.

14  Q.      Please describe for the jury, what is a machine

15  translation?

16  A.      I mean, if you use Google as a search engine

17  and you can put in text from a foreign language and

18  translate it and the result is the Google translation.

19  Q.      Now, in terms of the content in the -- in these

03:55PM 20  presentations, what was your understanding when you

21  drafted it of the purpose for the entries on the slides?

22  A.      Well, I had a number of documents, I mean,

23  hundreds, that I wasn't exactly -- I didn't understand

24  them all.  So I created an outline, if you will, of the

25  notes and the talking points that I wanted to go through

1    and ask any questions that I had and also provide

2    information that I had found to the university.

3    Q.        Other than these three PowerPoint presentations

4    that we talked about, July 2019, August and

5    September 2019, did you present any other PowerPoint

6    presentations that you recall to the university?

7    A.        Yes, I did.

8    Q.        And when was that?  If you recall.

9    A.        It was after the third PowerPoint presentation.

10   I don't remember the date.

11   Q.        All right.  In the summer months of 2019,

12   again, July, August, and September, had you formed any

13   conclusions about the investigation at that time?

14   A.        No, I didn't.

15   Q.        Do you recall when the Grand Jury returned an

16   indictment in this case?

17   A.        Yes, I do.

18   Q.        Do you recall the month and year that that

19   happened?

20   A.        February 2020.

21   Q.        So several months later?

22   A.        Yes.

23   Q.        Okay.  I'd like to switch topics with you.

24            Do you recall precisely which day the defendant

25   was arrested?

1    A.        Yes, I do.

2    Q.        What day was that?

3    A.        February 27, 2020.

4    Q.        And after the defendant was arrested, was he

5    initially taken to jail?

6    A.        No, he was not.

7    Q.        Where was he taken?

8    A.        He was taken to the FBI office for processing.

9    Q.        And thereafter, where did he go?

03:57PM 10   A.        We took him to the U.S. marshals awaiting his

11   initial appearance.

12   Q.        Did he have a court hearing that day?

13   A.        Yes, he did.

14   Q.        After court, did the defendant go to jail after

15   that?

16   A.        No, he did not.  I misspoke.  Yes, he went to

17   jail until -- I think for eight or nine days, yes.

18   Q.        He was ultimately released on conditions,

19   wasn't he?

03:57PM 20   A.        Yes, he was.

21   Q.        Do you happen to know whether the defendant

22   made any telephone calls while he was in jail?

23   A.        Yes, he did.

24   Q.        How do you know that?

25   A.        I read the translations that were from the

1 audio calls that were recorded at the Blount County

2 jail.

3 Q.      Okay.  So were these jail calls recorded?

4 A.      Yes, they were.

5 Q.      Were they recorded by the jail?

6 A.      Yes.

7 Q.      And so at a certain point in this

8 investigation, were you able to obtain those recorded

9 telephone calls?

03:58PM 10 A.      Yes.

11 Q.      And did you listen to them?

12 A.      I did, yes.

13 Q.      When you listened to them, were some of them in

14 Chinese?

15 A.      Yes, they were.

16 Q.      So then what, if anything, did you do with

17 those recorded jail calls?

18 A.      I submitted a request to have these calls

19 translated.  So I submitted that request and a

03:58PM 20 translator was a signed and translated the documents and

21 provided summary translations to me.

22 Q.      So these were the summary translations; is that

23 right?

24 A.      That's correct.

25 Q.      And so based on a review of the summary

1  translations, did you provide any of the calls to a

2  linguist for the full translation?

3  A.       Yes, I did.

4  Q.       Do you recall how many of those calls you

5  provided?

6  A.       Three; three calls.

7  Q.       I'd like to show you what's been previously

8  conditionally admitted as Government's Exhibit 10-B.

9          Do you see the file name on the top left-hand

03:59PM 10  corner?

11  A.       Yes, I do.

12  Q.       Have you listened to the audio file identified

13  by file name on the screen?

14  A.       Yes, I have.

15  Q.       And was it one of the jail calls involving the

16  defendant that you had listened to previously?

17  A.       Yes, it was.

18          MR. ARROWOOD:  Your Honor, at this time, the

19  government moves to fully admit Government's

03:59PM 20  Exhibit 10-B and 11-A.

21          THE COURT:  Without objection, so admitted.

22  BY MR. ARROWOOD:

23  Q.       I'd like to show you Government's Exhibit 11-A.

24          MR. ARROWOOD:  Go to page 2.

25

1  BY MR. ARROWOOD:

2  Q.      Do you recognize this document?

3  A.      Yes, I do.

4  Q.      Is it one of the transcripts of the jail calls?

5  A.      Yes, it is.

6  Q.      This is in English; right?

7  A.      That's correct.

8  Q.      Okay.  Who are the participants in this call?

9  A.      The participants in this call are Anming Hu and

04:00PM 10 David Hu.

11         MR. ARROWOOD:  Okay.  Will you please scroll

12 up.

13 BY MR. ARROWOOD:

14 Q.      All right.  I'd like you to --

15         MR. ARROWOOD:  Stop.  Go back.

16 BY MR. ARROWOOD:

17 Q.      I'd like you to begin reading for the jury

18 right here (indicating).

19         And, again, before you do that, is -- the

04:00PM 20 individual identified with the initials AH, do you know

21 who that is?

22 A.      Yes.  It's Anming Hu.

23 Q.      And who was the individual identified with HU?

24 A.      David Hu.

25 Q.      Who is David Hu, if you know?

1   A.      I believe it's Anming Hu's son.

2   Q.      All right.  Would you please just read, again,

3   beginning with the, "So, uh..." all the way to,

4   "Alright."

5   A.      (As read) "So, uh, you need to contact your

6   mother.  It is best to...to these people. (Door

7   banging).  She can look them up online.  It is best to

8   send an email to the department head, and Matthew Mench,

9   formerly...and also to our college dean, uh, better yet

04:01PM 10  also the vice university president, to represent me, to

11  say" -- "to say that my husband says, says, uh, uh, that

12  he does not have any position in China.  Say

13  this...represent me because they, within 48 hours, from

14  yesterday to today...We need to say this.  Okay?"

15  Q.      Please continue.

16  A.      So David Hu responds:  "48 hours, say what?

17  You..."

18          Anming Hu responds:  "You need to say that I

19  don't hold a position in China."

04:02PM 20          David Hu responds:  "Ah, okay."

21          Anming Hu responds:  "Okay?  This is extremely

22  crucial."

23          David Hu responds:  "Alright."

24  Q.      Thank you.

25          I'd now like to show you what's been previously

1    conditionally admitted as Government's Exhibit 10-C.

2            Please take a look at the file number on the

3    top left-hand portion of the screen.  Do you see that

4    file name?

5    A.       Yes, I do.

6    Q.       Have you listened to the audio file identified

7    by file name on the screen?

8    A.       Yes, I have.

9    Q.       Was it one of the recorded jail calls involving

04:02PM  10    the defendant that you had listened to previously?

11    A.       Yes, it was.

12            MR. ARROWOOD:  All right.  At this time, the

13    government moves to fully admit Government's

14    Exhibit 10-C and the associated translation,

15    Government's Exhibit 11-B.

16            THE COURT:  So admitted.

17    BY MR. ARROWOOD:

18    Q.       I'd like to show you Government's Exhibit 11-B.

19            MR. ARROWOOD:  Please go to page 2.

04:03PM  20            Scroll down just a little bit.  Stop.

21    BY MR. ARROWOOD:

22    Q.       Okay.  Please read for the jury beginning here

23    (indicating).

24            Oh, and -- I'm sorry.  Before you do so, again,

25    on the left-hand side of the screen are the initials AH.

1  Do you know who AH represents?

2  A.      Yes, I do.

3  Q.      Who is it?

4  A.      Anming Hu.

5  Q.      And I also see a participant HU.  Do you know

6  who that is?

7  A.      Yes, I do.

8  Q.      Who is that?

9  A.      That is David Hu.

04:03PM 10  Q.      Okay.  Again, please read from where I've

11  indicated here on the screen, "Hey, son."

12  A.      "Hey, son.  Uh, that, I, because there is a

13  telephone in here, so, uh...I can make phone calls.  So,

14  did you tell your mom?"

15          David Hu responds:  "Yeah, her...She, she

16  should --"

17          Anming Hu responds:  (As read) "Ah, you go

18  ahead."

19          David Hu responds:  "Okay, could you explain,

04:04PM 20  like, what do they need you to do within 48 hours?"

21          Anming Hu responds:  (As read) "This, this

22  48-hour...They need me" -- I'm sorry, I'll start over.

23          Anming Hu responds:  (As read) "This, this

24  48-hour...They need...If I don't respond, they

25  will -- they will consider I give up by default.  That

1  means, if you don't provide an explanation, you are

2  relinquishing the position.  They will then

3  automatically, ter -- uh, terminal you.  You need to

4  say --"

5      David Hu responds:  (As read) "Okay."

6      Anming Hu responds:  (As read) "You know?  You

7  need to send a mes-" -- "you need to send a, send a

8  message so they know your response.  Because I am in

9  jail the entire, entire time, I do not have any chance

04:04PM  10  to...and I can't make" -- "and I can't make

11  long-distance calls to your mom.  You know?  I can only

12  call you."

13      David Hu responds:  "Yeah."

14      Anming Hu responds:  "Okay, yeah."

15      David Hu responds:  "Yeah."

16      Anming Hu responds:  (As read) "Okay, so

17  you" -- "so you need to tell your mom.  You...haven't

18  you told your mom yet?"

19      David Hu responds:  "I told mom this.  She

04:05PM  20  needs to --"

21      Anming Hu responds:  (As read) "Yes."

22  Q.      Continue.

23  A.      David Hu responds:  "Yes, mom asked me, like,

24  if she represents you in the response, then she, like,

25  if she says it wrong, or something then, won't that be a

1    problem?"

2          Anming Hu responds:  "It is not a big deal.

3    That is just to say, you just say, let mom say that your

4    dad says he does not hold a position in China.  Just say

5    this one sentence."

6          David Hu responds:  "Okay."

7          Anming Hu responds:  "Right."

8          David Hu responds:  "Alright."

9          Anming Hu responds:  "Then, I am the one who

04:06PM  10   says it, not mom, about this, because mom is not

11   familiar with the situation anyway, okay?  Just that,

12   let me --"

13         David Hu responds:  (As read)  "Okay."

14   Q.        Okay.  I'd like to show you Government's

15   Exhibit 10-D, as in dog.  Please take a look at the

16   left-hand -- top left-hand side of the screen.  Do you

17   recognize that file name?

18   A.        Yes, I do.

19   Q.        Have you listened to the audio file identified

04:06PM  20   by the file name on the screen?

21   A.        Yes, I have.

22   Q.        Was it one of the recorded jail calls involving

23   the defendant that you listened to previously?

24   A.        Yes, it was.

25   Q.        Now --

1          MR. ARROWOOD:  At this time the government

2    moves to fully admit Government's Exhibit 10-D and the

3    associated translation, Government's Exhibit 11-C.

4          THE COURT:  So admitted.

5          (Government's Exhibit 10-D was received into

6           evidence.)

7    BY MR. ARROWOOD:

8    Q.     I'd like to show you Government's Exhibit 11-C.

9          MR. ARROWOOD:  And stop right there, if you

04:07PM 10   will.

11   BY MR. ARROWOOD:

12   Q.     And in this particular document, again, on the

13   left-hand side, do you know who is indicated by the

14   initials AH?

15   A.     Yes, I do.

16   Q.     Who is that?

17   A.     It is Anming Hu.

18   Q.     And then the initials HU, do you know who that

19   is?

04:07PM 20   A.     Yes, I do.

21   Q.     Who is that?

22   A.     That is David Hu.

23         MR. ARROWOOD:  Please go down to page 4.

24   BY MR. ARROWOOD:

25   Q.     And just read those two for the jury, please

1  (indicating).

2  A.        Anming Hu says:  "They want to get our money by

3  imposing fines.  Because, right now, we need to resolve

4  all of this first before addressing the UTK matter.  You

5  know?  Did your mom send email to UTK?"

6         David Hu responds:  "Um-hum.  Yeah, it was

7  sent, but they didn't...They didn't respond,

8  whatsoever."

9  Q.        Based on your investigation, do you happen to

10  know whether or not David Hu's mother ever sent an email

11  to the University of Tennessee personnel?

12  A.        Yes.

13         (Government's Exhibit 10-R was marked for

14          identification.)

15  BY MR. ARROWOOD:

16  Q.        I'd like to show you what's been marked as

17  Government's Exhibit 10-R.

18         Do you recognize this document?  Sorry.

19         MR. ARROWOOD:  Scroll down, please.

20  BY THE WITNESS:

21  A.        Can you repeat the question?

22  BY MR. ARROWOOD:

23  Q.        Do you recognize this document?

24  A.        Yes, I do.

25  Q.        Who is the individual identified in the From

1  line on this email?

2  A.        The individual is Ivy Yang.

3  Q.        And when was this email sent?

4  A.        The email was sent on February 28th, 2020.

5  Q.        Will you please read the first paragraph and

6  then that final line right here (indicating).

7  A.        (As read) "To whom it may concern:  My name is

8  Yi Yang, ex-spouse of Anming Hu.  I was informed and

9  shocked that Anming Hu was arrested yesterday.  Anming

04:09PM  10  Hu is not able to send this message to the college due

11  to his current situation.  Through calling my son David,

12  Anming asks" -- "asked me to help send this message to

13  you on his behalf that:  He doesn't hold any position in

14  China."

15  Q.        Thank you.

16          MR. ARROWOOD:  No further questions, Your

17  Honor.

18          Oh, Your Honor, if I may, I don't think I

19  admitted that exhibit into evidence.  So if I would,

04:10PM  20  please, move Government's Exhibit 10-R into evidence.

21          THE COURT:  10-R is admitted.

22          (Government's Exhibit 10-R was received into

23           evidence.)

24          MR. ARROWOOD:  Thank you, Your Honor.

25

CROSS-EXAMINATION

BY MR. LOMONACO:

Q.      Agent Sadiku, good afternoon.

        THE COURT:  Cross-examination.

BY MR. LOMONACO:

Q.      Can you hear me okay?

A.      Yes.

Q.      Professor Hu was concerned about losing his job in those telephone jobs, wasn't he?

        MR. ARROWOOD:  Objection, Your Honor, calls for speculation as to the defendant's state of mind.

BY MR. LOMONACO:

Q.      He was talking about losing his job, wasn't he --

        MR. LOMONACO:  I'll withdraw that question.

BY MR. LOMONACO:

Q.      -- right?

A.      Can you repeat the question?

Q.      He was talking about losing his job; right? With his son and his wife -- or his son.

A.      Yes, that's what it appears to be.

Q.      That's what it appears to be.

        And he had his son try to get a hold of his mom to call the university and say that he didn't hold a position --

1    A.       Yes.

2    Q.       -- right?

3    A.       Yes.

4    Q.       And he didn't hold a position, did he?

5    A.       I don't understand your question.

6    Q.       The question is:  He had two contracts with

7    Beijing University, and the last contract that was in

8    effect expired in December of 2018; isn't that right?

9    A.       I don't recall.

04:11PM  10    Q.       Okay.  Well, aren't you the investigator?

11    Aren't you supposed to know those things?

12             MR. LOMONACO:  It's argumentative.  I'm sorry.

13    BY MR. LOMONACO:

14    Q.       Do you recall there was two contracts?

15    A.       Which ones?

16    Q.       From Beijing University --

17    A.       Yes.

18    Q.       -- with Dr. Hu.

19    A.       Yes.

04:12PM  20    Q.       And one had a signature on it, and the date

21    that it expired was December 2018; do you recall that?

22    A.       I don't remember the date, but I do remember

23    the contract.

24             MR. LOMONACO:  Pull it up.

25

 1   BY MR. LOMONACO:

 2   Q.         While we're looking for that, why did -- what's

 3   the significance of you telling the jury about these

 4   phone calls that he had with his son about telling his

 5   wife to tell UT that he doesn't have a position?

 6             MR. ARROWOOD:  Objection, Your Honor.  It's

 7   asking for the significance.  He's here just to talk

 8   about the facts.

 9             MR. LOMONACO:  Okay.  I'll withdraw.  I

04:13PM 10   apologize if I keep asking these questions I have to

11   withdraw.

12             THE COURT:  That's all right.  Keep going.

13             MR. LOMONACO:  Practice a little bit more.

14   BY MR. LOMONACO:

15   Q.         Do you see this on the screen, Exhibit 11-Q

16   (indicating)?  I think it's your exhibit.

17             If it hasn't been admitted, I'd ask that it be

18   admitted for the government.  Do you see that?

19   A.         Yes.

04:13PM 20   Q.         Okay.  Is this an Employment Contract For

21   High-Level Talents, Beijing University, Short-Term;

22   correct?

23   A.         Yes, I see that.

24             MR. LOMONACO:  Okay.  Scroll down.  Keep going.

25

BY MR. LOMONACO:

Q.    Do you see where the contract term says this term of this contract is three years beginning on January 1st, 2016, and ending on day of December 31st, 2018?

A.    Yes, I see that.

Q.    Does that refresh your memory about how long he had employment under this contract?

A.    According to this contract, yes.

Q.    Do you have any other contracts that show that he had further employment under contract?

A.    I don't understand your question.  Contract with who?

Q.    Beijing University.

A.    Yes.

Q.    Okay.  What is it?

A.    A contract with the Beijing University of Technology.

Q.    What exhibit is it?

A.    I don't know.

Q.    Are you talking about the one that looks like this but is not signed?

A.    Can you scroll to the top, please?

Q.    Is that the contract you're talking about?

A.    What's the date on this contract?

1    Q.      I'm sorry?  What's the date?

2    A.      Yes.

3    Q.      Okay.  Here it is right here.  January 1, 2019,

4    to December 31st, 2021.

5    A.      Yes, I see that.

6    Q.      That's the contract.

7           MR. LOMONACO:  Okay.  Let's go to the bottom.

8           That's the old contract.  Let's use their

9    exhibit.

04:15PM 10           MR. ARROWOOD:  Your Honor, the defendant is

11    showing the wrong exhibits.

12           MR. LOMONACO:  Yes, we've already cleared up

13    that this --

14           MR. ARROWOOD:  Maybe we should just show our

15    exhibits.

16           THE COURT:  Do you want to show the

17    government's exhibits?  That might be easier.

18           Mr. Lomonaco, pull that microphone -- that

19    one (indicating) -- back toward the middle.  Thank you.

04:15PM 20           MR. LOMONACO:  Thank you.

21           THE COURT:  All right.  Could the government

22    assist with -- what are you trying to show him right

23    now?

24           MR. LOMONACO:  I'm trying to show the contract

25    for 2019 to 2021 that the government has that the

1    linguist -- or translated and said it wasn't signed.

2              MR. PARSONS:  11-L.

3              THE COURT:  All right.  11 what?

4              MR. PARSONS:  L.

5              THE COURT:  All right.  Government's 11-L.  If

6    the government would assist in putting that on the

7    screen.

8              All right.  Here is Government's Exhibit 11-L.

9    Go ahead.

04:16PM  10              MR. LOMONACO:  Thank you.

11              Can we go to the bottom of that page, please,

12    or the contract.

13    BY MR. LOMONACO:

14    Q.        Okay.  Do you see that it's not signed?

15    A.        Yes, it doesn't appear to be signed.

16    Q.        And just so I'm sure and I'm clear and the jury

17    is clear, there is no valid signed contract for these

18    dates; correct?

19              MR. ARROWOOD:  Objection, Your Honor.  It calls

04:16PM  20    for a legal conclusion.

21    BY MR. LOMONACO:

22    Q.        That you know of.

23              THE COURT:  Well, I think if you remove the

24    word "valid" -- that's the legal conclusion -- I don't

25    think there would probably be an objection.  "Is there a

1    signed document?"

2    BY MR. LOMONACO:

3    Q.        Do you have any signed document with these

4    dates on it?

5    A.        I don't recall.

6    Q.        Okay.  Do you recall a few days ago we went

7    through the fact that there was evidently one proffer

8    that was signed and then it was withdrawn as inaccurate?

9    Do you recall that?

04:17PM  10   A.        I don't understand your question.

11   Q.        Okay.  Let me ask you this:  When was of the

12   last time that Anming Hu was in China?

13   A.        I don't know.

14   Q.        You've been carrying around his passport for

15   the last three days.  We've been asking you for a copy

16   of it so we can see the last time he went to China and

17   you don't know?

18   A.        That's correct.

19   Q.        You don't know.  Would 2017 ring a bell?

04:17PM  20   A.        I don't know.

21   Q.        You know you're under oath, don't you, Agent

22   Sadiku?

23   A.        I don't remember the documents and the dates on

24   his passports.

25   Q.        His passport, his Canadian passport, you've had

1  it every day this week; right?

2  A.      That's correct.  Per your request, yes.

3  Q.      Yes.

4  A.      Correct.

5  Q.      And we still asked you to make a copy of it for

6  two days and you haven't produced a copy of it yet;

7  right?

8          MR. ARROWOOD:  Objection, Your Honor.  It's

9  argumentative.

04:18PM 10          THE COURT:  What's the next question,

11  Mr. Lomonaco?  Let's see if there is an objection.

12          MR. LOMONACO:  I'm sorry, Your Honor?

13          THE COURT:  What's your question?

14          MR. LOMONACO:  I guess I already asked it.

15          THE COURT:  Okay.  Let's go on then.

16  BY MR. LOMONACO:

17  Q.      Can we get the passport now?

18  A.      Yes.

19  Q.      Where is it?

04:18PM 20  A.      It's with an FBI agent in the room.

21          THE COURT:  Do you want the witness to have the

22  passport, or do you want the passport --

23          MR. LOMONACO:  I'd like to show --

24          THE COURT:  Apparently you now have it in your

25  hands.  So --

1    MR. LOMONACO:  Yes, I have the passport.

2    THE COURT:  We can put it on the screen if we

3  need to.

4  BY MR. LOMONACO:

5  Q.    Agent Sadiku, do you know how to read these

6  passports?

7    THE COURT:  Go ahead and show it, Julie.

8  BY THE WITNESS:

9  A.    Can you zoom out?  I can't see the entire page.

10  BY MR. LOMONACO:

11  Q.    Pardon me?

12  A.    Can you zoom out?

13  Q.    Do you know how to read these passports?

14  A.    Yes.

15  Q.    Okay.  What does a square mean compared to a

16  circle?

17  A.    I don't know.

18  Q.    Can I show you this passport and can you -- if

19  I -- if I show you this passport, can you show me the

20  last time he went to China and left?

21  A.    I rely on information through a tech system

22  that identifies when travelers enter and exit the United

23  States, and during this search after arrest of Anming

24  Hu, we found more than one passport at his residence.

25  So I cannot answer your question.

1   Q.     Are you saying that you found two passports for

2   Anming Hu or more than one?

3   A.     There was expired passports.

4   Q.     Well, expired would be before this one;

5   correct?

6   A.     If one existed for this country, yes.

7   Q.     An expired one would be maybe his old passport

8   before he became a Canadian citizen; is that one of

9   them?

04:21PM 10   A.     Perhaps.

11   Q.     Well, that wouldn't show the last time he was

12   in China, would it?

13   A.     I don't know.

14   Q.     If I showed you this passport -- let me ask it

15   again -- can you find the latest, most-recent stamp that

16   shows he was in China?

17   A.     No.

18   Q.     Pardon me?

19   A.     No, I wouldn't rely on that document.

04:21PM 20   Q.     You wouldn't rely on a passport?

21   A.     Which -- I'd need to see which passport it was.

22   Q.     Well, can he have it back since you won't rely

23   on it?

24         Let me go on.

25         Do you know how much money he made in China?

A.        I don't.

Q.        Has anybody put together a calculation, or do you have any evidence of how much money he made working part-time at Beijing University during the summer?

A.        I don't know that he made any money in China.

Q.        Now, you said that he told you he had to report his summer jobs or he would be in trouble.  You testified to that a few minutes ago.  I'm sure it wasn't exactly that way, but that's what I managed to write down.  Do you recall making that statement?

A.        What was the statement?

Q.        That he told you in that initial interview that if he had a job, he would be in trouble.  Something to that.  Repeat what you said, if you would, please.

A.        I don't understand your question.  A job with who and trouble with what?

Q.        You seem to be able to remember the answer when the U.S. attorney asks you the question.

        Do you recall the question when he said, "What did he tell you about a job in China?"  Do you recall your answer?

A.        I recall the question was in reference to my report that I wrote up when I conducted the interview of Anming Hu.

Q.        Yes.

1    A.      Yes.

2            (Defendant's Exhibit 39 was marked for

3             identification.)

4            MR. LOMONACO:  Your Honor, I'd ask that

5    Exhibit 39 --

6    BY MR. LOMONACO:

7    Q.      Do you recognize this report here, Agent

8    Sadiku?

9    A.      Yes.

04:24PM  10          MR. LOMONACO:  And I move to admit Exhibit 39,

11   please.  He said he recognized it, Your Honor.

12          THE COURT:  I'm waiting for a response from the

13   government.

14          MR. LOMONACO:  Oh, I didn't know they were

15   talking.

16          MR. ARROWOOD:  No objection, Your Honor.

17          THE COURT:  All right.  So admitted.

18          What was the number again?  39?

19          MR. LOMONACO:  39, Your Honor.

04:24PM  20          THE COURT:  Defendant's 39.

21          (Defendant's Exhibit 39 was received into

22           evidence.)

23   BY MR. LOMONACO:

24   Q.      Now, you and Agent -- DOE Agent Laura Slatton

25   dropped in on Anming Hu while he was at work and took

1    this interview; correct?

2    A.        We interviewed him at his office on -- in

3    October -- or, I mean -- I'm sorry -- April 2018.

4    Q.        Yes.  And you interviewed him.  You didn't

5    record the conversation.

6    A.        No.

7    Q.        So these notes are basically -- or these --

8    this statement here is basically what you believe he

9    said and what you were willing to put down on paper;

04:25PM  10    right?

11    A.        This document appears to be a letterhead

12    memorandum regarding the case.  I don't know if it is.

13    Q.        Well, did you write it?

14    A.        Can you scroll to the bottom?

15              Yes.

16    Q.        Okay.  Paragraph U, "During" -- they're all U,

17    aren't they?

18              Third paragraph from the bottom or second from

19    the top -- let me read it -- "During the summer, Hu has

04:26PM  20    three months that is his" -- quote -- "'free time'" --

21    quote -- "to go anywhere and allows for academic

22    exchanges."  Do you see that?

23    A.        Yes.

24    Q.        "The other nine months of the year he is under

25    contract with UTK and not permitted to work anywhere

1    else without disclosing it to UTK."  Right?

2    A.        Yes.

3    Q.        So he's talking about during his academic year,

4    he would not be able to work anyplace else without

5    disclosing it; right?

6    A.        Working where and disclosing to who?

7    Q.        Anywhere to anyone.

8    A.        That is my written report, yes.  I did write

9    those words based on the information he told me, but I

04:27PM  10   don't understand your question.

11   Q.        The question is:  When you testified, you said

12   just work anywhere; you didn't say during the summer or

13   during the academic year.

14   A.        My understanding of the information he provided

15   when I interviewed him in April 2018 is that he was on a

16   nine-month contract at the University of Tennessee and

17   he was free to engage in other employment during the

18   summer.

19   Q.        Okay.  Have you -- well, you don't recall his

04:27PM  20   trips to and from China, do you?

21   A.        I don't.

22   Q.        Do you recall any trips to China during his

23   academic year when he's supposed to be working at UT?

24   A.        I don't remember.

25   Q.        Now, you said that you couldn't verify some

1    information, so you put it in a PowerPoint; is

2    that -- that doesn't make sense to me.  If you're trying

3    to verify information, why would you put unverified

4    information in a PowerPoint?

5    A.        If you're referring to the PowerPoints that I

6    provided to the University of Tennessee --

7    Q.        Yes.

8    A.        -- I used a PowerPoint program to write out an

9    outline of the information that I was providing and the

04:28PM  10   questions that I didn't have the answers to and wanted

11   to ask the University of Tennessee.

12   Q.        Agent Sadiku, let me just settle down here and

13   just ask some questions.

14        Professor Hu is accused of willfully and

15   knowingly hiding his affiliations and collaborations

16   with BJUT in order to get a NASA grant; correct?

17   A.        Can you repeat that?

18   Q.        He's accused of willfully and knowingly hiding

19   his affiliations and collaborations and employment with

04:29PM  20   BJUT in order to get a NASA grant.

21   A.        If you're reading from a document, I don't know

22   what document that is.  Are you reading from the

23   indictment?

24   Q.        I'm reading from my notes.  It's a question.

25   You're the one who investigated him.

1  A.       That's correct.

2  Q.       Did you investigate him for trying to trick

3  NASA?

4  A.       I investigated him based on his association

5  with a foreign government talent program that is

6  sponsored and controlled by the Chinese government that

7  attempts to acquire science and technology from the

8  United States and transfer it back to China to benefit

9  their Chinese military and their economy.

04:30PM  10  Q.       Yeah.  Did you ever find any evidence of that?

11  A.       Evidence of what?

12  Q.       What you just said that you investigated him

13  for.  You didn't present any of it here today or

14  yesterday or the day before, did you?

15  A.       So when I opened the investigation, I opened it

16  up as an economic espionage investigation because the

17  only information I had that he was part of this foreign

18  talent program and knowing that the program is

19  attempting to acquire science and technology from the

04:31PM  20  United States, my investigation was to determine whether

21  this activity was occurring.  So when I opened the case,

22  I did not know the activity that was occurring, if any.

23             (Defendant's Exhibit 22 was marked for

24              identification.)

25

1  BY MR. LOMONACO:

2  Q.        Okay.  Well, let me turn your attention to

3  Exhibit 22.

4          Do you recognize this redacted version of a

5  report dated March 5th, 2018?

6          MR. LOMONACO:  Keep going.

7  BY THE WITNESS:

8  A.        Yes.

9  BY MR. LOMONACO:

04:31PM  10  Q.        And who is Chelsea Dagger?

11  A.        That's the code name assigned to this

12  investigation.

13  Q.        It's a code name assigned to Anming Hu; right?

14  A.        That's correct.

15          MR. LOMONACO:  Okay.  Let's go down to where it

16  starts -- okay.  Right there (indicating).

17  BY MR. LOMONACO:

18  Q.        Is this -- is this one of your reports?

19  Initial report?

04:32PM  20  A.        That appears to be the opening document.

21  Q.        So you -- it says you initiated this

22  investigation on Anming Hu based on his association with

23  China's Thousand Talents Program.  That's not true, is

24  it?  He didn't belong to the China One Thousand Talents

25  Program (sic)?

A. At the time of this opening, I did not know. But after I interviewed him in April, I showed him the Thousand Talents web page printout and he told me he was not. So when I opened this, I did not know whether he was, and after I interviewed him, he told me he wasn't. So I believed that he wasn't.

Q. But at the time --

MR. LOMONACO: Your Honor, I move to admit Exhibit 22 into evidence.

04:33PM MR. ARROWOOD: Objection, Your Honor. Relevance.

THE COURT: What's the relevance of this document?

MR. LOMONACO: Well, it's -- it's relevant to demonstrate that the federal agents had false information when they started this investigation.

MR. ARROWOOD: Your Honor, it's specific evidence then of bias. He can question the witness.

THE COURT: I'll let you question, but for now, 04:33PM I'm not going to introduce the document based on what I've heard so far.

MR. LOMONACO: That's fine, Your Honor.

BY MR. LOMONACO:

Q. Now, you said you made this assessment with -- well, let's go back up here.

1   You also believed or said Professor Hu's role

2   as an expert evaluator for China's Ministry of Science

3   and Technology indicates a willingness to collaborate

4   with Chinese government entities.

5   He wasn't an expert evaluator for China's

6   Ministry of Science and Technology, was he?

7   A.      So, this opening document, this opening of the

8   investigation was based on a lead that I had received on

9   FBI analysis that was conducted.

04:34PM 10   Q.      I see.  And you refer to that in the next

11   paragraph or sentence where it says, "FBI KX" -- that's

12   Knoxville; right?

13   A.      That's correct.

14   Q.      -- "made this assessment with medium confidence

15   based on multiple sources with varying degrees of

16   reliability."

17   A.      Those are not my assessments.

18   Q.      But that's -- that's your source of

19   information?

04:34PM 20   A.      The analysis that was provided to me as a lead

21   to initiate the investigation.

22   Q.      Okay.  So starting with this investigation,

23   this was when you started the investigation, and then

24   you went and talked to Anming Hu with Special Agent

25   Slatton at his office.  We've already established that.

1    That was in April of this year; right?

2    A.        2018, yes.

3    Q.        Yes.  And we've talked about some of the

4    conversations you had with Professor Hu where he told

5    you he wasn't a member of the Thousand Talents Program,

6    and would you -- would you indicate or believe that he

7    was honest with you?

8    A.        At the time, I had no reason to believe that he

9    was not honest with me.

04:35PM 10   Q.        And isn't it a fact that lying to an FBI agent

11   is a criminal offense?

12   A.        That is correct.

13   Q.        And if he had lied to you, you would have

14   arrested him for the lies; correct?

15            MR. ARROWOOD:  Objection, Your Honor.

16   BY MR. LOMONACO:

17   Q.        If you know.

18            THE COURT:  Let's go on.

19            MR. LOMONACO:  All right.

04:36PM 20   BY MR. LOMONACO:

21   Q.        And you had a conversation with him about a

22   seminar or symposium that he was going to go to;

23   correct?

24   A.        That's correct.

25   Q.        And you asked him to come and talk to you about

1   that symposium before he left, come to your office and

2   talk to you about it.

3   A.     Yes.  We normally give briefings to travelers

4   who are heading overseas to areas that may be of

5   concern.

6   Q.     And you asked him to go to the symposium.

7   A.     I did not.

8   Q.     You told him that when -- and when he came

9   back, you wanted him to come back to your office and

04:36PM 10   talk to you about it some more.

11   A.     That's correct, I did.  I asked him to.

12   Q.     Did you ask him to be a spy for you?

13   A.     I did not.

14   Q.     At the time, he told you he had a couple

15   of NAS- -- he had a couple of NASA grants; that was part

16   of the conversation you had?

17   A.     That's correct, he did.

18   Q.     Did you -- were you concerned about that at the

19   time or did you have to do your research on NASA grants

04:37PM 20   before you became concerned?

21   A.     I had to do research on NASA grants.  I wasn't

22   familiar with NASA grants at the time.

23   Q.     Okay.  And so shortly thereafter, you got an

24   email from him saying he's changed his mind; he's too

25   busy; he's not going.

1 A.  That's correct.

2 Q.  And did that make you upset?

3 A.  No.

4 Q.  Did that cause you to conduct a

5 year-and-nine-month inves- -- surveillance investigation

6 undercover to follow him around?

7 A.  It had nothing to do with any investigative

8 activity that I took after that point.

9 Q.  How many agents assisted you in following

04:37PM 10 Professor Hu around and his son around for the next

11 year-and-a-half?

12 A.  We normally conduct surveillance on various

13 subjects, victims and other people of interest, and we

14 have surveillance teams designated to perform this

15 activity.

16 Q.  Okay.  My question was:  How many agents were

17 on the team?

18 A.  Our surveillance team does not have any agents

19 a signed.

04:38PM 20 Q.  How many humans were on the team?

21 A.  I don't know how many members make up a

22 surveillance team.  It depends.  It varies.  I just

23 don't know.

24 Q.  Did you keep a record of how much that cost

25 over the next year-and-a-half?

1  A.        I did not.

2  Q.        Okay.  So your surveillance began on or about

3  August 28th, 2018; does that sound about right?

4  A.        I don't remember the date, but there would be a

5  document documenting the date that I requested

6  surveillance and it would be in the case file.

7          MR. LOMONACO:  Exhibit 43.

8          (Defendant's Exhibit 43 was marked for

9           identification.)

04:39PM  10  BY MR. LOMONACO:

11  Q.        Let me ask you if you can identify Exhibit 43.

12          MR. LOMONACO:  Your Honor, I ask -- oh, there

13  it is -- that it be moved into --

14  BY MR. LOMONACO:

15  Q.        Is this the document you're talking about?

16  A.        I don't understand the question.  I wasn't

17  talking about a document.

18  Q.        You said there would be some sort of writing to

19  talk about the surveillance; right?

04:40PM  20  A.        Yeah.

21          MR. ARROWOOD:  Your Honor, if I may just object

22  to showing this document to the jury.

23          THE COURT:  It's not being shown right now.

24          MR. ARROWOOD:  Okay.  Thank you.

25          THE COURT:  It hasn't been admitted into

1    evidence yet.

2           So sometimes documents are used with the

3    witness only and are not admitted into evidence.

4    Sometimes the Court waits until it hears whether there

5    is objection.

6           A lot of the documents during this trial, the

7    Court knows beforehand that there are stipulations and

8    there is not objections and we've been letting you see

9    them.  But some documents there is a question.  So

04:41PM  10   that's why there might be questions before if and when

11   the jury sees the document.

12   BY MR. LOMONACO:

13   Q.       Do you recognize the document?

14   A.       Yes, this is an FD-1055.  This is a

15   surveillance report that the bureau uses.

16          MR. LOMONACO:  Is there going to be an

17   objection to moving this into --

18          MR. ARROWOOD:  Yes, Your Honor, it's hearsay,

19   relevance.  He can show it to the witness and ask the

04:41PM  20   witness questions, but it has nothing to do with the

21   facts of this particular case, Your Honor.

22          THE COURT:  For this particular document,

23   that's probably a valid objection.

24   BY MR. LOMONACO:

25   Q.       Well, this document has -- one, two, three,

1    four, five, six -- seven people listed as Drafted By.

2    Do you see that?

3    A.       Yes, I do.

4    Q.       And are those some of the people that did the

5    surveillance?

6    A.       Based on this document and the Drafted By

7    portion, anyone who participated in this activity would

8    be a coauthor and they would have to review the report

9    before it was submitted for approval.  So based on this

04:42PM  10   document, I would say the names listed are those who

11   participated in this surveillance activity.

12   Q.       And what was the worst evidence against Anming

13   Hu during this year-and-a-half investigation?  Did you

14   find that he committed any crimes?

15   A.       I don't understand the question.

16   Q.       Did you find that he committed any economic

17   espionage?

18   A.       During the investigation, I collect

19   observations and I present them to the U.S. Attorney's

04:42PM  20   Office, who makes a decision on whether to prosecute a

21   case on potential charges.  I do not make that decision.

22   Q.       You staked out his house; right?  Right?

23   A.       I don't understand the question.  What do you

24   mean by "staked out"?

25   Q.       You and agents sat in a car outside his house

1  and waited for him to go to work, and you followed him

2  down Kingston pipe and you followed him down Northshore

3  and you followed him all the way downtown to his office

4  on a regular basis; right?

5  A.        I did not, no.

6  Q.        You or your agents.

7  A.        FBI employees.  None of those that I see on

8  this list are FBI agents.  They're FBI employees.

9  Q.        And these seven people here, they followed him

04:43PM  10  to work, to school, followed his son, took pictures of

11  his son, and all I'm asking is:  Did you witness or did

12  these people witness any crimes during that year and

13  nine months?

14        MR. ARROWOOD:  Objection, Your Honor.  It calls

15  for a legal conclusion.

16        MR. LOMONACO:  All right.

17        MR. ARROWOOD:  It's entirely irrelevant.

18        MR. LOMONACO:  I think I've made my point on

19  that, Your Honor.  I'll move on.

04:43PM  20        THE COURT:  Thank you.  We'll go on.

21  BY MR. LOMONACO:

22  Q.        In August of 2018, you had been communicating

23  with some of the administrators at UT, and they had been

24  giving you documents about Professor Hu; is that

25  correct?

1    A.        Did you say August 2018?

2    Q.        Yes.

3    A.        It sounds right.

4    Q.        And August 28th, an administrator sent Mr. --

5    or Professor Hu's annual conflict of interest forms to

6    you; correct?

7    A.        I don't know where that question is coming

8    from.  Do you have a document to refer to?

9    Q.        Well, did you get conflict of interest forms

04:45PM  10    from UT on Anming Hu?

11    A.        I asked for conflict of interest forms from the

12    University of Tennessee because I developed information

13    that he was affiliated with the Beijing University of

14    Technology and I wanted to verify that, A, if it was

15    reported to the university per their policy and what

16    exactly was their policy for reporting these types of

17    affiliations.

18    Q.        Okay.  Good.  Did you find out what the policy

19    was?

04:45PM  20    A.        I found out they have one.

21    Q.        You said you wanted to know what the policy

22    was.  Did you find out what the policy was?

23    A.        The policy from the University of Tennessee has

24    a disclosure policy, yes.

25    Q.        Did you read it?

1  A.      No, I did not.

2  Q.      A couple days after that you had your first

3  fraud awareness meeting; is that right?

4  A.      I did not attend a fraud awareness meeting.

5  Q.      You didn't go to it?

6  A.      No, I did not.

7  Q.      Do you know who did?

8  A.      I do not.

9  Q.      In September of 2018, you made contact with an

04:46PM 10  administrator at UT who gave you information about what

11  that person believed the NASA requirement required.

12  Correct me if I'm wrong, but I believe they told you

13  there were two types of entities that NASA would refuse

14  to cooperate with with their research and funding.  One

15  entity was directly owned by the Chinese government or

16  an entity employed by the Chinese government.  Do you

17  recall the administrator at UT telling you that was

18  their understanding or that was her understanding?

19  A.      Is your question based on this report that is

04:47PM 20  in the screen in front of me?

21  Q.      Yes.

22  A.      I don't know if I was at that meeting.

23  Q.      You don't know what?

24  A.      I don't know if I attended this particular

25  meeting that you reference.

1        MR. LOMONACO:  Is his name on there?

2   BY THE WITNESS:

3   A.        If I was in attendance, my name would be on the

4   report.

5   BY MR. LOMONACO:

6   Q.        Okay.  So you don't recognize this report?

7   A.        Can you please scroll up?

8        MR. LOMONACO:  Go up to the top.

9        THE WITNESS:  No, no, no, no, no.

04:48PM 10       MR. LOMONACO:  Go past that first document.

11  Right there (indicating).

12  BY MR. LOMONACO:

13  Q.        It says, "Chelsea Dagger, Knoxville."  Do you

14  see those numbers, Case ID?  Does that Case ID 2595463

15  mean anything?

16  A.        Yes.

17  Q.        What is that?

18  A.        QX2595463 was the case number assigned to

19  Anming Hu.

04:48PM 20  Q.        There is a lot of things that are redacted on

21  here, but what are these other case numbers, 4048071?

22       MR. ARROWOOD:  Objection, Your Honor.

23  Relevance.

24       MR. LOMONACO:  Let me just go on.

25       Can you --

1    THE COURT:  So he's withdrawing that question.

2    MR. LOMONACO:  I'm withdrawing, Your Honor.

3    Just go on.

4  BY MR. LOMONACO:

5  Q.    Let's see if we can find any identification

6  marks for you.

7    MR. LOMONACO:  Slow down.

8  BY MR. LOMONACO:

9  Q.    Does it look familiar yet, or you still don't

10  know if you wrote it or not?

11  A.    I do not know if I wrote it.

12  Q.    All right.  The case agent name is covered up.

13  So we don't know who the case agent name is; right?

14  A.    Yes, that portion is redacted.

15    MR. LOMONACO:  Okay.  Keep going a little bit

16  more.

17    Okay.  We'll just -- we'll just go on to the

18  next document.

19    Can we mark that for identification, Your

20  Honor, Exhibit 22?

21    THE COURT:  Yes, it's -- I think we've -- yes,

22  it's marked for identification purposes.

23    MR. LOMONACO:  Thank you, Your Honor.

24  BY MR. LOMONACO:

25  Q.    So let's just assume that we have two types of

1    entities that would violate the NASA restriction.

2           MR. ARROWOOD:  Your Honor, objection.  It

3    assumes facts not in evidence.  It is a misstatement of

4    the law, or -- I don't know where this has been coming

5    from, Your Honor.

6           THE COURT:  Do you want to start over,

7    Mr. Lomonaco, with that anticipatory objection?

8           MR. LOMONACO:  Yes, Your Honor.

9           THE COURT:  Thank you.

04:50PM  10   BY MR. LOMONACO:

11   Q.     Do you have any evidence that Anming Hu was

12   employed by the Chinese government?

13   A.     How do you define "employed"?

14   Q.     He gets a paycheck from the Chinese government.

15   A.     I have not been able to verify that he received

16   any payment from the government of China or any entity

17   in China.

18   Q.     Okay.  Have you been able to verify any

19   employment of Professor Hu from China?

04:51PM  20   A.     The laws of the FBI do not extend beyond the

21   United States borders.  So there is no way, even if I

22   attempted to verify employment with China, they -- even

23   if I served -- or they were served with legal process,

24   they would not respond, and they -- so there is no way I

25   could verify that.

Q.        Have you been able to verify any information about the universities over there in China?  For instance, whether they're incorporated?

A.        I'm not familiar with the laws of China.

Q.        Has anybody in this investigation or prosecution been able to verify that?

A.        Not to my knowledge, no.

Q.        Are you aware on November 30th, 2018, when Professor Hu was going to a symposium in Japan that at the airport they took his computer and his telephone; did you know that?

A.        Yes, I'm aware that he was stopped at the border attempting to exit the United States en route to, I believe, Japan.

Q.        And was the reason he was stopped is because you put his name on some sort of list?

A.        I provided information to Department of Homeland Security, and they made the decision on whether to pull him aside and question him based on the information I provided.

Q.        I'm not even going to ask you what the information was, but isn't it a fact that he got his telephone and his computer taken and there was no sensitive information, no classified information, or anything he got accused of taking out of the country,

1    was there?

2    A.        So during this border stop, he was interviewed

3    by customs, and they -- there is a report documenting

4    this interaction, and I have read the report, and it's

5    been years since I've read it, but, to the best of my

6    recollection, the border stop occurred -- he was

7    interviewed by customs and a mention of the University

8    of Tennessee nano- -- some sort of science, and at that

9    point, they reviewed electronics.  And at that point,

04:53PM  10   they made a determination to image the electronics.  And

11   I believe they were -- they were kept because sometimes

12   an image -- to image an electronic device takes longer

13   than his flight.  So I think they -- there was a

14   decision made that he would proceed on to Japan without

15   the electronics.  That is my understanding.

16   Q.        And he got the computer and his telephone back

17   when he came back, and do you know where he had to go to

18   get it or who delivered it to him?

19   A.        I do not know.

04:54PM  20   Q.        It was sent to Knoxville; right?

21   A.        I don't know.

22   Q.        In December -- excuse me -- July 18th, 2019,

23   you prepared to have a meeting with -- you and Laura

24   Slatton had a meeting with several of the administrators

25   at UT; correct?

1  A.        That is correct.

2  Q.        Was that your idea?

3  A.        I don't remember if it was my idea, but if it

4  wasn't, I'm sure I had a decision in the meeting, yes.

5  Q.        You are sure you had a what?

6  A.        A decision in calling the meeting or requesting

7  the meeting or being requested to meet.

8  Q.        And you put together several PowerPoints,

9  18-page PowerPoint presentations; correct?

04:55PM 10  A.        I use PowerPoints as my notes.  In an effort to

11  share the information that I had developed, I was trying

12  to be as transparent as I could with my findings to

13  provide it to the university and they reciprocated.  And

14  because I had questions and there was things that I

15  developed that I just didn't have knowledge or expertise

16  in but they did.  So during the course of this

17  investigation, we met at whatever designated frequency

18  to update, share and ask questions on a regular basis.

19  Q.        Did you tell any of that to the administrators

04:56PM 20  you were meeting?

21  A.        Tell them what?

22  Q.        That you couldn't verify the information you

23  put on the PowerPoints?  That, as you said earlier,

24  these were summary translations, not accurate in total?

25  A.        Yes, they were aware.  I told them that the

1    limitations to a summary translation, whether it's

2    obtained via Google Translate or even an FBI summary

3    translation is not an accurate reflection of the

4    document or text in its entirety.

5    Q.        So let me show you -- I think you've already

6    introduced this as Government 10-O.  Is this the

7    July 18th -- first page of your PowerPoint presentation?

8    A.        Yes.

9    Q.        Let's go down here.  Did you make any

04:57PM 10  statements here that this is just summary translations

11   or that you can't verify all this information here?  Is

12   there anything here that advises them ahead of time that

13   what they're about to hear from you in these PowerPoint

14   presentations is not accurate in a lot of respects?

15   A.        Well, this document, the PowerPoint that I

16   created, I used it as an outline to -- and it wasn't a

17   presentation.  It was more of a discussion, a back and

18   forth between myself and the university.

19   Q.        Isn't all the explanations you're giving here

04:58PM 20  right now, Agent Sadiku, just some way of covering up

21   the fact that you put a lot of lies into this thing?

22          MR. ARROWOOD:  Objection, Your Honor.

23   Argumentative.

24          THE COURT:  Well, it's cross-examination.

25   We'll let the witness answer to the extent he can.  So

1    I'll overrule the objection.

2    BY THE WITNESS:

3    A.       Can you repeat the question?

4    BY MR. LOMONACO:

5    Q.       You stated on direct examination that the

6    purpose was to share information and gain information.

7    It was a summary translation, understanding why you

8    drafted it, that it was -- you couldn't verify it, so

9    you put it in a PowerPoint.  Isn't all of those

04:58PM  10   explanations just trying to cover up the fact that you

11   lied to the -- in many respects to the UT

12   administrators?

13   A.       The document that I created as a PowerPoint to

14   be used as an outline contained summary translations and

15   other documents that -- I mean, by definition of a

16   translation, whether it's Google or a summary, it's

17   information that I couldn't verify.  So, yes, per that

18   definition, they would be inaccurate.

19   Q.       And yes to my question two?

04:59PM  20   A.       What was your question two?

21   Q.       You lied to them.

22   A.       I did not lie to UT.

23   Q.       All right.  Let's look at the first accusation

24   or statement.

25            MR. LOMONACO:  Could we admit our Exhibit 24-A,

 1  Your Honor, please, that he's identified?

 2          THE COURT:  Is that the same as Government's

 3  11-O?  I think it is.

 4          MR. PARSONS:  There is a memo that the

 5  government has asked that we not show, but we would like

 6  to show the PowerPoint without that top portion.  So

 7  we're not going to admit this.

 8          MR. LOMONACO:  So we're not going to admit

 9  this.

04:59PM 10          MR. PARSONS:  Not this one, but we'd like to

11  show it to the jury.

12          MR. LOMONACO:  Okay.  We'll just start from the

13  part that doesn't have the memo and -- and --

14          THE COURT:  Is it the same as 11- -- as 10-O?

15          MR. PARSONS:  Yes, sir.

16          MR. LOMONACO:  We can do that one, Your Honor.

17  It's hard to page down when the government's doing it

18  for me.

19          THE COURT:  Well, if it's the same, then

05:00PM 20  we'll -- let's start with the page that the government

21  is on, I guess.

22          MR. LOMONACO:  Okay, Your Honor.

23          THE COURT:  Let me think about that.  Let me

24  see counsel here at the side for a moment.

25              (Whereupon a sidebar was had outside the

1        hearing of the jury as follows:)

2        THE COURT:  I'm probably just going to ask

3   where we are in terms of -- it seems like you've got

4   more cross, obviously.

5        MR. LOMONACO:  Yes.

6        THE COURT:  Do you have any idea?  I don't

7   think you're going to be finishing in the next

8   15 minutes.

9        MR. LOMONACO:  No, probably an hour.

05:00PM  10        THE COURT:  You will have some redirect?

11        MR. ARROWOOD:  Yes, Your Honor.

12        THE COURT:  Okay.  Is this the last witness?

13        MR. ARROWOOD:  It's the government's last

14   witness for its case-in-chief.

15        THE COURT:  So will you be prepared with

16   witnesses tomorrow?

17        MR. LOMONACO:  Yes, Your Honor.  We've got one

18   lined up and we're going to get another one lined up.  I

19   think we'll get enough to fill the day.

05:01PM  20        THE COURT:  Okay.  Then let's just stop right

21   now and give you time to make sure of that and we'll

22   come back and probably do this witness kind of through

23   the morning break and then we'll rest and then go from

24   there.

25        MR. MC KENZIE:  Your Honor -- Phil, would it be

1    easier for us to email you the admitted government

2    versions of those PowerPoints so that you don't have to

3    worry about removing the memos and that way you control

4    it on your screen?  Would that make it easier for

5    everybody?

6              MR. PARSONS:  Yes.  Thank you.

7              THE COURT:  Why don't we do that?

8              MR. MC KENZIE:  All right.  We'll take care of

9    it.

05:01PM  10         THE COURT:  That might make it go quicker in

11    the morning.

12              (Whereupon the following was had in open court

13               within the hearing of the jury:)

14              THE COURT:  All right.  Thank you.  In

15    discussing with counsel, this is probably a good

16    stopping point for a couple of reasons.  One, it's the

17    end of the day and we usually stop between 5:00 and

18    5:15, and, two, I think counsel can get together with

19    the documents that are being shown now and have the time

05:02PM  20    this evening to prepare and make things go smoother with

21    respect to the use of these particular documents

22    tomorrow.  So we will adjourn for the day.

23              I'll ask the jury to be back as usual around

24    8:45 in the morning so we can start back with the trial

25    testimony tomorrow, Friday, June 11 at 9:00 a.m.

1    Again, remind the jury, keep an open mind as

2    you continue to hear all the evidence in this case.  Do

3    not engage in any outside research or reading in any

4    fashion about the case, and just put things aside and

5    continue not to discuss the case itself with your fellow

6    jurors or with anyone else.

7         So, with that being said, we'll see all of you

8    back here tomorrow morning.  Thank you.

9         (Jurors excused from the courtroom.)

05:03PM 10    THE COURT:  Okay.  Sit down for just a moment.

11   So the plan, as I understand it from our sidebar, with

12   respect to this particular cross-examination, you know,

13   the Court had ruled earlier this morning that the

14   defendant could introduce certain exhibits, but the

15   government went ahead and introduced those exhibits as

16   Government's 10-O, 10-P, and 10-Q.

17        MR. MC KENZIE:  Your Honor, do you want the

18   witness to hear this?  He's still on the stand.  I

19   didn't know if you were going to say anything that --

05:03PM 20    THE COURT:  So essentially the government is

21   going to email those documents to the

22   defendant -- defendant's counsel so the defendant can

23   utilize those government's exhibits tomorrow for this

24   portion of the cross-examination.  Essentially the same

25   documents, but since they're already admitted as

1    government's exhibits, I think, Mr. Lomonaco, your plan

2    or agreement -- I mean, subject to looking them

3    over -- is just to use the admitted documents tomorrow

4    morning.

5            MR. LOMONACO:  Yes.

6            THE COURT:  All right.  We'll see everybody

7    back here tomorrow morning.  Thank you.

8            MR. ARROWOOD:  Thank you.

9            THE COURTROOM DEPUTY:  All rise.  This

05:04PM  10  honorable court stands in recess.

11                       *  *  *  *  *  *  *

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C-E-R-T-I-F-I-C-A-T-E

STATE OF TENNESSEE

COUNTY OF KNOX

I, Teresa S. Grandchamp, RMR, CRR, do hereby certify that I reported in machine shorthand the above proceedings, that the said witness(es) was/were duly sworn; that the foregoing pages were transcribed under my personal supervision and constitute a true and accurate record of the proceedings.

I further certify that I am not an attorney or counsel of any of the parties, nor an employee or relative of any attorney or counsel connected with the action, nor financially interested in the action.

Transcript completed and signed on Wednesday, June 30, 2021.

_____
TERESA S. GRANDCHAMP, RMR, CRR
Official Court Reporter