# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.:   3:20-CR-21-TAV-DCP-1 |
| | ) | |
| ANMING HU, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on defendant's motion for a judgment of acquittal, pursuant to Federal Rule of Criminal Procedure 29 [Doc. 116, pp. 80–81], a written supplement thereto [Doc. 104; Doc. 116, pp. 272–73], as well as his renewed motion for judgment of acquittal [Doc. 117, p. 23], and a written motion requesting ruling [Doc. 127]. The government opposes defendant's motions [Doc. 116, pp. 81–93; Doc. 117, pp. 23–33; Doc. 128]. After hearing arguments on defendant's motion during trial, the Court deferred ruling on the matter. For the reasons stated below, defendant's Rule 29 motion for a judgment of acquittal is **GRANTED** and defendant is **ACQUITTED** on all charges in the indictment [Doc. 3].

## I.      Background

### A.      Indictment

In February 2020, defendant was indicted on three counts of wire fraud, in violation of 18 U.S.C. §§ 1343 and 2 (Counts 1-3) and three counts of causing false statements to be made in violation of 18 U.S.C. §§ 1001 and 2 (Counts 4-6) [Doc. 3].

This case involves a restriction in several appropriations acts that prohibits the National Aeronautics and Space Administration ("NASA") from using appropriated funding to enter into or fund any grant or cooperative agreement of any kind to participate, collaborate, or coordinate bilaterally in any way with China or any Chinese-owned company ("NASA's China Funding Restriction") [*Id.* at 1]. The government alleged that, while defendant was an Associate Professor in the Department of Mechanical, Aerospace, and Biomedical Engineering at the University of Tennessee, Knoxville ("UTK"), he performed research under grants funded by agencies including NASA [*Id.* at 2]. However, the government alleged that, beginning at least as early as 2013, defendant was also a faculty member at the Beijing University of Technology ("BJUT"), Institute of Laser Engineering in Beijing, China [*Id.*].

The government alleged that, beginning in 2016, defendant engaged in a scheme to defraud NASA by falsely representing and concealing his affiliation with BJUT to UTK, and, through his fraudulent representations and omissions to UTK, he knowingly and willfully caused UTK to falsely certify to NASA that UTK was in compliance with NASA's China Funding Restriction. [*Id.* at 6]. As a result, defendant worked on several NASA-funded projects with UTK, including the Jet Propulsion Laboratory at the California Institute of Technology ("JPL") Subcontract No. 1560728 and a NASA's Marshall Space Flight Center ("MSFC") Cooperative Agreement [*Id.* at 10–14].

The government charges that the following separate instances of wire communications constitute wire fraud:

| COUNT | DATE | DESCRIPTION OF WIRE |
|---|---|---|
| 1 | October 20, 2016 | Email transmitting the "Cost-Reimbursement With an Educational Institution Subcontract" regarding JPL Subcontract 1560728 from UTK in Tennessee to JPL in California |
| 2 | November 12, 2018 | Email transmitting the "NASA Grant and Cooperative Agreement" from UTK in Tennessee to MSFC in Alabama |
| 3 | August 30, 2019 | Invoice Number 90095483 requesting payment of $5,000 transmitted from UTK in Tennessee to NASA in Mississippi through the Department of the Treasury's Invoice Processing Platform |

[*Id.* at 14–15]. The government further charges that the following conduct constitutes separate instances of causing false statements to be made in a matter within the jurisdiction of the executive branch of the United States government:

| COUNT | DATE | DESCRIPTION OF WIRE |
|---|---|---|
| 4 | February 15, 2017 | UTK submission of invoice number 90080002 to NASA/JPL requesting payment of $7,332.97 and certifying that the requested payment was for appropriate purposes and in accordance with the provisions of the application and award documents |
| 5 | March 9, 2017 | UTK submission of invoice number 90080450 to NASA/JPL requesting payment of $7,812.45 and certifying that the requested payment was for appropriate purposes and in accordance with the provisions of the application and award documents |
| 6 | July 24, 2017 | UTK submission of invoice number 90082670 to NASA/JPL requesting payment of $11,202.74 and certifying that the requested payment was for appropriate purposes and in accordance with the provisions of the application and award documents |

[*Id.* at 15–16].

3

## II.    Trial Evidence

### A.    Employment and Disclosures

Defendant began working at UTK as an Assistant Professor in the Department of Mechanical, Aerospace & Biomedical Engineering on November 1, 2013 [Doc. 112, p. 159; Government's Exhibit ("GE") 2-A] and worked in that position until around the time of his arrest in this matter on February 27, 2020 [Doc. 112, p. 66; Doc. 116, pp. 186–88]. However, the government introduced evidence that, during that same time, defendant held a professorship at BJUT. Specifically, the government introduced a translated "Employment Contract for High-level Talents" between defendant and BJUT, the term of which was three years from January 1, 2016, to December 31, 2018 [GE 11-Q, p. 1]. The contract provided for compensation of approximately 30,000 yuan per month, depending on defendant's actual working time [*Id.* at 2]. According to Special Agent Lee Gibson, a criminal investigator for the NASA Office of Inspector General [Doc. 112, p. 54], 30,000 yuan is approximately $4,700 [*Id.* at 71–72]. The contract also stated that defendant was to work "for no less than 2 months per year" at BJUT [GE 11-Q, p. 3].

The government also introduced a second translated "Employment Contract for High-level Talents" between defendant and BJUT, with a three-year contract term from January 1, 2019, to December 31, 2021 [GE 11-L, p. 1]. This contract contained the same compensation and two-month work minimum terms as the first contract [*Id.* at 2–3]. The second contract, however, did not have defendant's signature affixed [Doc. 113, pp. 14–15], but the government introduced a translated document that appeared to be a

4

copy of the last page of the second contract, which included defendant's signature [GE 11-M; Doc. 113, p. 78]. Agent Gibson stated that he believed this latter document was a translated version of an addendum to the second contract, which defendant had signed, but admitted that no representative of BJUT had signed the addendum [Doc. 113, pp. 16–17].

On his curriculum vitae ("CV") submitted in support of his hiring package at UTK, defendant did not list any employment or "teaching activities" with BJUT [GE 2-B].[1] Dr. John Zomchick, the provost and senior vice-chancellor at UTK [Doc. 113, p. 101], testified that he would expect a CV submitted as part of a hiring package to include all employment at another university, including honorary or summary positions, because UTK expects full disclosure [Id. at 118–19]. However, another version of defendant's CV, dated 2016, which law enforcement recovered from defendant's computer, stated that defendant was a "Special-hired Professor" at BJUT beginning in September 2013 [Doc. 112, p. 155; GE 11-O].

In 2018, defendant applied for tenure at UTK [Doc. 112, p. 160; GE 2-C]. The final document submitted as a tenure application at UTK is a "mini dossier," which includes a CV and other documents [Doc. 113, p. 113]. Dr. Zomchick stated that it is commonly expected or a common practice that an applicant would include all academic activities [Id. at 114]. Dr. Zomchick was involved in reviewing defendant's tenure application

---

[1] Of note, although testimony indicated that this CV was the one submitted in support of defendant's hiring package at UTK, the CV itself is not dated.

5

[*Id.* at 116]. Defendant did not include any mention of BJUT under the "Employment History" section on his tenure application [GE 2-C, p. 6; Doc. 113, p. 120]. Dr. Zomchick would have expected employment with BJUT to be included in this section because, without it, the record is incomplete [Doc. 113, pp. 120–21].

Defendant did list two visiting students from BJUT and one postdoctoral researcher from BJUT on his tenure application [GE 2-C, p. 32]. Defendant also listed his completed, current, and pending grants in his tenure application [*Id.* at 55–56]. Of the completed grants, the JPL-NASA subcontract for $60,000 was the highest single award [*Id.* at 55]. Dr. Zomchick testified that, for someone in the College of Engineering, receiving grant funding was "absolutely essential" to the tenure decision, and the College of Engineering has expectations in its bylaws that faculty bring in external funding [Doc. 113, p. 124]. Defendant was ultimately awarded tenure [Doc. 112, pp. 163–64].

During defendant's employment, UTK employees were required to complete outside interests disclosure forms annually, and any substantive changes to their answers in a given year were to be communicated to UTK as soon as the change happened [Doc. 113, p. 110]. Defendant completed his first outside interests disclosure form on November 4, 2013 [GE 2-D]. The form instructed that it was intended for faculty and staff to disclose outside interests "as required by the University's conflict of interests policy (Policy FI0125)" [*Id.* at 1]. Defendant answered "no" to the question "Do you hold an office, directorship, or employment in an outside organization?" [*Id.*]. Defendant also answered "no" to this same question on outside interests disclosure forms filed in 2015

[GE 2-E] and 2016 [GE 2-F]. Thereafter, the outside interests disclosure form was amended [Doc. 114, p. 80] to ask "Are you an officer, director, board member, trustee, or employee of any organization or business entity (for-profit or non-profit) other than the University?" and defendant answered "no" to this question in 2017 [GE 2-G], 2018 [GE 2-H], and 2019 [GE 2-I]. The outside interests disclosures form used in 2017 continued to include the language regarding policy FI0125 [GE 2-G], but the forms used in 2018 and 2019 do not appear to contain this language [GE 2-H; GE 2-I].

Section 6 of UTK's Conflicts of Interests policy, FI0125, regarding "Disclosure Requirements," stated that covered individuals would be notified annually to disclose outside interests on the form provided by the University, which "requires the disclosure of specific outside interests that may or may not represent conflicts of interests" [GE 2-J, p. 6]. Subsection (e) stated as follows:

> Covered individuals involved in research (i.e. investigators as defined in Section 1above [sic]) must have disclosed outside interests that may be affected by the research before proposals are submitted to funding agencies. Such covered individuals must keep their disclosures updated for the duration of the project. Examples of such interests include, but are not limited to, receiving payments for services exceeding $10,000 . . . .

[*Id.* at 7]. Dr. Zomchick testified that the list of examples of conflicts of interest contained in this subsection are not exhaustive, as indicated by the phrase "but are not limited to" [Doc. 113, p. 111]. However, Dr. Zomchick admitted that, under UTK's conflict of interest policy, if someone worked a part-time summer job and made less than $10,000, it would not be a conflict of interest [*Id.* at 137].

7

UTK professors were also required to submit annual activity reports during the time of defendant's employment [Doc. 116, p. 183]. In his 2013–2014 annual activity report, defendant reported one "Abstract Review" published in Beijing [Defendant's Exhibit ("DE") 2, p. 3] as well as one graduate student that he was advising who had a Chinese government scholarship, and two others that he was advising who were "Chinese collaborator[s]" [*Id.* at 5]. He also noted that he was invited to a seminar or lecture in Beijing [*Id.* at 6]. In his 2014–2015 annual activity report, defendant reported four graduate students that he was advising who were partially or fully Chinese funded [DE 3, p. 5]. He also listed that he was invited to a seminar or lecture in Beijing [*Id.* at 6]. In his 2015–2016 annual activity report, defendant reported one published article in the Journal of Beijing University of Technology [DE 4, p. 2]. He also listed a graduate student that he was advising as a visiting student from BJUT [*Id.* at 6]. In his 2016–2017 report, defendant listed that he was a plenary speaker at a seminar or lecture in Beijing, and was invited to seminars in Xi'an, China and Shanghai, China [DE 5, p. 6]. Defendant also noted that he conducted review of papers or research proposals for the Chinese Nature Science Foundation [*Id.*]. In his 2017–2018 annual activity report, defendant reported that he had publications in several Chinese journals [DE 6, pp. 1–4]. In many of these annual activity reports, defendant reported publications that specifically identified him as affiliated with both UTK and BJUT [*See e.g.*, DE 49, p. 6 ("Ultra-Short Pulsed Laser Manufacturing and Surface Processing of Microdevices"), reported on DE 6, p. 3 (2017-2018 Annual Activity

8

Report)].  However, defendant did not specifically report his position at BJUT on any of these reports.

Dr. Zomchick stated that, without reviewing defendant's annual activity reports, he was not sure what defendant did or did not report to UTK [Doc. 113, p. 167].  Agent Gibson, however, did not review defendant's annual activity reports to UTK in his investigation [*Id.* at 62].  Furthermore, Federal Bureau of Investigation ("FBI") Agent Kujtim Sadiku,[2] the case agent on this investigation [Doc. 115, p. 174], admitted that he had not reviewed all of defendant's annual activity reports during the course of the investigation [Doc. 116, pp. 16, 22–23].

---

[2] The Court notes that Agent Sadiku was the government's last witness in this case, was the lead FBI agent investigating this matter, and was the government's designated officer at the trial under Federal Rule of Evidence 615(b).  Nevertheless, in reviewing the trial transcripts, the Court observes that only a portion of Agent Sadiku's testimony related to the elements of the charged offenses in this case.  Instead, Agent Sadiku's testimony generally related to how and why he began to investigate defendant, which, the Court notes, was based on suspicions of economic espionage that were ultimately deemed unfounded through the investigation.  Specifically, Agent Sadiku testified that he initiated his investigation of defendant after obtaining information that defendant was part of a foreign government talent plan, specifically, China's Thousand Talents program, but during an interview in April 2018, defendant denied participation in the Thousand Talents program, and Agent Sadiku believed defendant when he denied his involvement in the talent program [Doc. 115, pp. 174–75, 177, 219].  Nevertheless, Agent Sadiku continued to investigate defendant and update UTK on the investigation up through at least late 2019 [*Id.* at 183–87].  Indeed, as to the actual conduct that underlies the charges at issue, Agent Sadiku testified that, at his interview of defendant on his initial suspicions, defendant informed Agent Sadiku of his NASA grants, and Agent Sadiku "had to do research on NASA grants" because he "wasn't familiar with NASA grants at the time" [*Id.* at 222].  Further, Agent Sadiku acknowledged that he did not have substantial experience or knowledge of the grant processes of government agencies or university conflict of interest policies, nor was he familiar with the ways in which universities engage with government agencies for purposes of sponsoring proposals [*Id.* at 182–83].

### B. NASA Funding

NASA is prohibited by Section 1340(a) of The Department of Defense and Full-Year Appropriations Act, Public Law 112-10 and Section 539 of the Consolidated and further Continuing Appropriation Act of 2012, Public Law 112-55, from using funding appropriated under the Acts "to enter into or fund any grant or cooperative agreement of any kind to participate, collaborate, or coordinate bilaterally in any way with China or a Chinese-owned company, at the prime recipient level or at any subrecipient level, whether the bilateral involvement is funded or performed under a no-exchange of funds arrangement" [GE 1-A, p. 1; DE 131]. Agent Gibson testified that NASA issues grant information circulars periodically to let grant officers, contracting officers, and grantees know of changes to NASA's Grant and Cooperative Agreement Manual [Doc. 112, p. 61]. NASA issued a grant information circular on September 26, 2015, defining "China or Chinese-owned company" for purposes of NASA's China Funding Restriction as:

> the People's Republic of China, any company owned by the People's Republic of China or any company incorporated under the laws of the People's Republic of China. Chinese universities and other similar institutions are considered to be incorporated under the laws of the PRC and, therefore, the funding restrictions apply to grants and cooperative agreements that include bilateral participation, collaboration, or coordination with Chinese universities.

[GE 1-A, p. 2; Doc. 112, pp. 62–64].

### 1. UTK Procedures and Training on NASA's Funding Restriction

Jean Mercer, UTK's associate vice-chancellor for research administration, who served as the assistant vice-chancellor for research from January 1, 2016, until March 1,

10

2021 [Doc. 114, pp. 7–8], testified that research grant proposals generally contain a "biosketch" section, which typically contains information provided by the faculty member, and UTK trusted that the faculty member's provided biosketch was accurate [*Id.* at 17–18]. As to the NASA China Funding Restriction, in 2016, UTK looked at a proposer's biosketch and, if there was nothing in the biosketch, and if not aware of anything else, UTK did nothing more to ensure compliance with the NASA restriction [*Id.* at 19]. However, before sending a proposal, UTK provided a document called a China Assurance letter to the relevant faculty members and asked them to verify that they understand the document [Doc. 113, p. 180]. In 2017, Mercer was able to access the outside interest disclosure forms and began signing all of UTK's China Assurance letters herself, because she could check the faculty member's outside interest disclosure form for potential conflicts [Doc. 114, pp. 20–21].

Greg Tolliver, a senior contract analyst at UTK, testified that his job was to review contracts for compliance with state and federal law and administer them throughout their life [*Id.* at 117–18]. He stated that, when an award was granted, the principal investigator would be sent an e-mail informing the investigator that the proposal had been selected for a contract or grant and asking the investigator to review the contract and respond that they read, understood, and could comply with the terms of the agreement [*Id.* at 120].

UTK developed a "Proposal & Budget Development" PowerPoint training program through the Office of Sponsored Programs, which was intended as an "overlook" of certain areas of grant proposals [Doc. 113, p. 223; GE 7-Q]. Drew Haswell, who worked as a

11

proposal coordinator in UTK's sponsored programs department prior to April 2017 [Doc. 113, p. 217], assisted in preparing this training and delivered the training with some co-workers [*Id.* at 221]. The training specifically addressed NASA's China Funding Restriction, and stated:

- UTK always includes an amended NASA China Assurance document as the final page of an application

- The language indicates that we do not view our *Faculty, Staff & Students* to be "entities of China"

[GE 7-Q, p. 37 (emphasis in original)]. Tammy Johnson, who attended this training program, sent a copy of the PowerPoint presentation from the session to defendant, along with several other UTK faculty members [DE 126; Doc. 113, p. 248]. A similar training program from approximately 2018 contained identical language [DE 83, pp. 50, 61–62].

On March 13, 2019, UTK presented a "Know Your Sponsor: NASA" training program, created in part by Tolliver [DE 132, p. 1; Doc. 114, pp. 100–01]. The PowerPoint presentation created for this training session stated as follows regarding NASA's China Funding Restriction:

- NASA will not fund any cooperative efforts with Chinese companies or those affiliated (researchers, students)

- Researchers and students who are Chinese citizens may usually work on NASA-funded projects, provided they are not currently affiliated with a Chinese company or university

[DE 132, p. 17]. This training was not available to defendant prior to his NASA proposals [Doc. 114, pp. 101–02].

12

## 2.    JPL Subcontract Proposals

Defendant first applied for a NASA-funded grant through JPL in January 2016. [Doc. 113, p. 64; Doc. 116, p. 131]. JPL is a federally-funded research and development center, funded by NASA and managed by the California Institute of Technology [Doc. 112, pp. 59–60]. NASA and JPL have a contract whereby JPL performs work for NASA, and when JPL engages in contracts with others, it is a subcontract under that contract between NASA and JPL; therefore, the terms and conditions that apply to NASA contracts flow down to the subcontracts that JPL signs [Doc. 115, pp. 55–56].

Dr. Yoseph Bar-Cohen, a group supervisor at JPL [*Id.* at 111–12], first interacted with defendant when Dr. Bar-Cohen was looking for someone to assist in specific scientific research, and individuals at JPL suggested Dr. Sudarsanam Suresh Babu at UTK, who then referred Dr. Bar-Cohen to defendant [Doc. 115, p. 113; Doc. 116, pp. 97–98; DE 62]. Dr. Bar-Cohen, Dr. Babu, and defendant then began collaborating on creating a proposal [GE 8-BB].

On January 4, 2016, defendant emailed Dr. Bar-Cohen and Dr. Babu his final draft of the grant proposal they had been working on, and also attached: (1) a collaboration letter from Dr. Tao Chen at BJUT; and (2) a statement regarding his access to various "Facilities, Equipment and Other Resources at UTK" [GE 8-BB, p. 1; GE 8-CC; GE 8-DD]. Dr. Chen stated, in his letter, that he had "a long-term collaboration on nanomaterial synthesis and characterization with Dr. Anming Hu" and offered to provide access to certain scientific equipment [GE 8-CC]. Likewise, in his statement regarding access to facilities, defendant

stated that he could access equipment and facilities at BJUT through his collaboration with Dr. Chen [GE 8-DD]. Dr. Bar-Cohen responded the same day that he had revised defendant's facility description to remove any mention of a facility in China, stating "[w]e need to avoid mentioning since NASA does not allow such formal collaboration" [GE 8-EE, p. 1]. Later that same day, Dr. Bar-Cohen e-mailed defendant and Dr. Babu a revised version of the grant proposal, again stating "we cannot include any collaboration with institutes in China" [GE 8-FF, p. 1]. Also on January 4, 2016, Dr. Bar-Cohen responded to a separate e-mail from defendant, stating that defendant was trying to get additional letters of commitment, informing defendant that if he was "preparing letters from China – I cannot use them in the proposal" [GE 8-GG]. Two days later, Dr. Bar-Cohen e-mailed defendant about finalizing the proposal and asked whether defendant had any ongoing contracts that should be listed as current commitments in the proposal [GE 8-HH]. Defendant responded that he did not have any commitments "to the external agencies but only internal (university) funds" [*Id.*].

Dr. Bar-Cohen would have expected defendant to include any commitments that he had at the time in the proposal [Doc. 115, p. 123]. Dr. Bar-Cohen admitted that the letter from a BJUT professor stated that defendant was a "long-term collaborator" with him, but Dr. Bar-Cohen did not ask defendant to explain his collaboration described in this letter [*Id.* at 147–48].

On January 12, 2016, Haswell responded to an e-mail from defendant regarding the JPL proposal, suggesting a few edits, and stating that, after those issues were addressed,

"we will be ready to obtain the Letter of Commitment / UTK China Assurance document and have all of this submitted" [GE 8-A, pp. 1–2; GE 8-E, pp. 3–4]. Defendant responded: "For China Assurance: are you talking about Hefei National Radiation Facilities, right? I include one letter. Does it solve this concerning?" [GE 8-A; p. 1; GE 8-E, pp. 2–3]. Defendant attached a letter from Professor Guobin Zhang of the National Synchrotron Radiation Laboratory in Hefei, China, stating that Professor Zhang had "a long-term collaboration on nanostructure characterization" with defendant, and indicating that he would like to "guide [defendant] to apply for some beam time of X-ray analysis for relevant microstructure characterization and phase identification if his proposal is funded" [GE 8-B]. Haswell responded as follows:

> Regarding the China Assurance, NASA requires you to include a signed document stating you assure you will comply with the Chinese Funding Restrictions.
>
> However, UTK always includes a special copy stating that, as we understand it, this restriction does not apply to faculty, staff, and students.
>
> Attached is the unsigned version of the document I refer to.

[GE 8-C, p. 1; GE 8-E, p. 2]. At the time he sent that email, Haswell testified that he did not have any reason to believe defendant worked for a Chinese university [Doc. 113, p. 230]. As stated in his e-mail, Haswell attached an unsigned copy of UTK's China Assurance letter for the proposal [GE 8-D]. The China Assurance letter contained the following language:

> (iv)    An Assurance of Compliance with The Department of Defense and Full-Year Appropriation Act, Public Law 112-10 Section 1340(a); The Consolidated and Further Continuing Appropriation Act of 2012, Public Law

15

112-55, Section 539; and future-year appropriations herein after referred to as "the Acts", whereas:

(1)     NASA is restricted from using funds appropriated in the Acts to enter into or fund any grant or cooperative agreement of any kind to participate, collaborate, or coordinate bilaterally with China or any Chinese-owned company, at the prime recipient level and at all subrecipient levels, whether bilateral involvement is funded or performed under a no-exchange of funds arrangement.

(2)     Definition: "China or Chinese-owned Company" means the People's Republic of China, any company owned by the People's Republic of China, or any company incorporated under the laws of the People's Republic of China.

(3)     The restrictions in the Acts do not apply to commercial items of supply needed to perform a grant or cooperative agreement.

(4)     By submission of its proposal, the proposer represents that the proposer is not China or a Chinese-owned company, and that the proposer will not participate, collaborate, or coordinate bilaterally with China or any Chinese-owned company, at the prime recipient level or at any subrecipient level, whether the bilateral involvement is funded or performed under a no-exchange of funds arrangement.

[GE 8-D].  At the bottom of the Chinese Assurance letter, in bold, was the following language:

"This letter of assurance is predicated on the understanding that the NASA Class Deviation [implementing NASA Restrictions on Funding Activities with the People's Republic of China] does not apply to the participation of students, faculty and staff from non-Chinese entities engaged in fundamental research with a meaning consistent with National Security Decision Directive 189.  Such fundamental research does not raise national security or economic security concerns."

[*Id.* (quotation marks and alteration in original)].

On January 12, 2016, Haswell e-mailed Dr. Bar-Cohen and defendant a copy of the proposal package, UTK commitment letter, and UTK's China Assurance document

16

[GE 8-E, p. 1; GE 8-F; GE 8-G; GE 8-H].  Haswell stated that he had "reviewed the Letter of Commitment provided from Professor Zhang of National Synchrotron Radiation Laboratory, and it ***WILL NOT*** be considered an official-approved UTK document" [GE 8-E, p. 1 (emphasis in original)].  Haswell quoted language from UTK's China Assurance letter, specifically highlighting in yellow language that "the proposer will not participate, collaborate, or coordinate bilaterally with China or any Chinese-owned company . . . at any subrecipient level" [*Id.*].  Haswell thus stated that "UTK cannot agree to the letter of commitment arrangement provided & still maintain our assurance" and requested that the letter not be included in the main application submission to NASA [*Id.*].  The finalized proposal package did not contain any reference to defendant's affiliation with BJUT [GE 8-F].

Haswell also attached a copy of UTK's China Assurance letter that was signed by David Smelser, UTK's assistant director of sponsored programs [GE 8-H; Doc. 113, p. 171].  Smelser signed the China Assurance letter for this proposal based on the belief that the proposal coordinator had verified compliance [Doc. 113, p. 187].  Smelser testified that he did not know that defendant worked at a Chinese university at that time, and if he had known that, he would have referred the matter to a supervisor or the research compliance unit, but would not have submitted it to NASA [*Id.* at 188].

Dr. Bar-Cohen responded, stating that he would only use the three attachments to Haswell's e-mail [GE 8-II].  Thereafter, Dr. Bar-Cohen submitted the proposal to NASA [GE 8-JJ; GE 8-KK].  The proposal listed defendant as affiliated with UTK, and his

17

biosketch did not contain any reference to his affiliation with BJUT [GE 8-KK, pp. 3, 55].

However, under the "Facilities and Equipment" section, the proposal stated that defendant

could access "synchrotron X-ray diffractometer in Hefei National Synchrotron Radiation

Facilities through collaboration" [GE 8-KK, p. 63]. Dr. Bar-Cohen testified that, looking

back at the proposal, he recognized that Hefei National Synchrotron Radiation Facility is

a Chinese organization, but he overlooked it at the time that he submitted the proposal,

and did not anticipate collaborating with any Chinese entity on the work [Doc. 115,

pp. 133–34].

Ultimately, this first JPL proposal was not awarded [*Id.* at 164–65]. However,

approximately nine months later, Dr. Bar-Cohen sought defendant's assistance on another

JPL subcontract proposal [*Id.* at 165–66]. Dr. Bar-Cohen testified that if at any time during

his work on proposals with defendant he had learned that defendant was employed by

BJUT, he would not have gone forward with any further collaboration [*Id.* at 136–37].

On September 27, 2016, Marie Penn, from UTK's sponsored programs office,

e-mailed proposal documents for the second JPL proposal to Dr. Bar-Cohen on defendant's

behalf [GE 8-I]. These attachments included a commitment letter from UTK [GE 8-J], a

project narrative [GE 8-K], and a budget justification [GE 8-L]. The budget justification

identified defendant as affiliated with UTK and did not mention any affiliation with BJUT

[GE 8-L].

A subcontract was ultimately awarded based on this proposal [GE 6-B]. On

October 11, 2016, Kathryn Manzanares, a subcontracts manager for JPL, e-mailed a copy

of the unsigned subcontract to Tara Halstead at UTK, asking Halstead to return the partially executed subcontract [GE 8-M; GE 8-N; Doc. 115, p. 51].

The unexecuted subcontract stated that it was awarded pursuant to a prime contract between JPL and NASA, and was to be administered in accordance with, *inter alia*, the "'General Provisions (GPs) Set for Cost Reimbursement without Fee with an Educational Institution Subcontract,' dated 04/14," which the subcontract specifically incorporated by reference [GE 8-N, p. 1]. JPL's General Provisions document contained a section regarding "Restrictions on Funding Activity with China" which stated as follows:

> (a)    Definition – "China" or "Chinese-owned company" means the People's Republic of China, any company owned by the People's Republic of China or any company incorporated under the laws of the People's Republic of China.

> (b)    Public Laws 112-10, Section 1340(a) and 112-55, Section 539, restrict NASA from contracting to participate, collaborate, coordinate bilaterally in any way with China or a Chinese-owned company using funds appropriated on or after April 25, 2011. Subcontracts for commercial and non-developmental items are exempted from the prohibition because they constitute purchase of goods or services that would not involve participation, collaboration, or coordination between the parties.

> (c)    This Subcontract may use restricted funding that was appropriated on or after April 25, 2011. The Subcontractor shall not contract with China or Chinese-owned companies for any effort related to this Subcontract except for acquisition of commercial and non-developmental items. If the Subcontractor anticipates making an award to China or Chinese-owned companies, the Subcontractor must contact the Contracting Officer through the Subcontracts Manager to determine if funding on this Subcontract can be used for that purpose.

> (d)    The Subcontractor represents that the Subcontractor is not China or a Chinese-owned company.

19

[GE 8-AA, p. 20].   These are the terms and conditions that were identified in the subcontract sent to UTK for signature [Doc. 115, p. 67].  The provision titled "Restrictions on Funding Activity with China," is included in all subcontracts with JPL [*Id.* at 68].

On October 20, 2016, Halstead e-mailed Manzanares the partially signed subcontract, and asked Manzanares to send her a copy of the fully-executed subcontract [GE 8-M].  Halstead, who was the contract administrator for the JPL subcontract [GE 8-N], read the terms and conditions of the subcontract [Doc. 115, pp. 94–95].  At that time, she did not have any concerns about the contract [*Id.* at 96], but testified that it would be a problem if the principal investigator had collaboration or employment with China [*Id.* at 101].

The subcontract was fully executed as JPL Subcontract No. 1560728 with UTK listed as the subcontractor [GE 6-B, p. 1].  The subcontract was for a total amount of $60,000, had a start date of October 11, 2016, and a completion date of October 31, 2017, and listed defendant as the principal investigator [*Id.*].  It was signed by Manzanares on behalf of JPL and Mercer on behalf of UTK [*Id.*].  At the time that Mercer signed the JPL subcontract, she did not have any reason to believe that defendant worked for a Chinese university, and if she had known that, she would have had a conversation with the vice-chancellor for research, the department head, and the provost before moving forward with the subcontract [Doc. 114, p. 29].  Just as the proposed subcontract, the fully-executed subcontract incorporated JPL's General Provisions document which contained the "Restrictions on Funding Activity with China" [GE 6-B, p. 1; GE 8-AA, p. 20].

20

Manzanares testified that, in reviewing this proposal, if the principal investigator had identified that he was employed at a Chinese university, that would have raised "red flags" and Manzanares would have reached out to the contract technical manager for more information, and would potentially have informed UTK that JPL could not execute the subcontract in light of JPL's terms and conditions [Doc. 115, pp. 74–75]. Manzanares stated that JPL does not ask for assurances regarding the China Funding Restriction, but when a university signs the contract, the university acknowledges JPL's terms and conditions, one of which is the China Funding Restriction [*Id.* at 78–79]. Manzanares admitted that nothing in the text of JPL's General Provisions states that the China Funding Restriction applies to Chinese universities [*Id.* at 87–88].

The government introduced the following invoices that were sent from UTK to JPL requesting payment under JPL Subcontract 1560728:

| Invoice Number | Date | Amount | Exhibit Number |
|---|---|---|---|
| 90080002 | 2/15/2017 | $7,332.97 | GE 8-O |
| 90080450 | 3/9/2017 | $7,812.45 | GE 8-P |
| 90081036 | 4/14/2017 | $9,065.96 | GE 8-Q |
| 90081674 | 5/13/2017 | $2,938.46 | GE 8-R |
| 90082092 | 6/13/2017 | $2,938.46 | GE 8-S |
| 90082670 | 7/24/2017 | $11,202.74 | GE 8-T |
| 90083042 | 8/26/2017 | $2,938.46 | GE 8-U |
| 90083579 | 9/15/2017 | $8,577.07 | GE 8-V |
| 90084524 | 11/10/2017 | $2,393.76 | GE 8-W |
| 90085260 | 12/19/2017 | $2,955.07 | GE 8-X |
| 90085587 | 1/18/2018 | $1,407.17 | GE 8-Y |
| 90085951 | 2/12/2018 | $436.48 | GE 8-Z |

Each of these invoices contained a certification stating that the signor certified "that all expenditures reported (or payment requested) are for appropriate purposes and in accordance with the provisions of the application and award documents" [GE 8-O, GE 8-P, GE 8-Q, GE 8-R, GE 8-S, GE 8-T, GE 8-U, GE 8-V, GE 8-W, GE 8-X, GE 8-Y, GE 8-Z]. Carol Malkemus, the director of sponsored projects accounting at UTK [Doc. 114, p. 197], stated that her office serves as the "go-between" for the university and the sponsor in terms of finances [*Id.* at 199]. She signed invoice number 90082670 in July 2017 [GE 8-T]. She believed, at the time that she submitted this invoice, that the certification statement on the invoice was true [Doc. 114, pp. 202].

Monica Cole ("Monica")[3], an assistant director in the sponsored projects accounting department at UTK [*Id.* at 207], signed each of the remaining invoices relating to the JPL subcontract [*Id.* at 212, 215, 217, 219, 221, 223, 225, 227, 229, 231, 234], and, at the time she signed, she believed that the expenditures were for appropriate purposes and in accordance with the provisions of the application and award documents, as certified [*Id.* at 214, 216, 219–20, 222, 224, 226, 228, 230–31, 233, 235]. Monica testified that she relied on the department where the charges are "actually posted in the field" for determining whether the university is in compliance with the terms and conditions of an award, because that is where faculty and students certify their time and travel documents are processed [*Id.* at 210].

---

[3] For witnesses Monica Cole and Kelcey Cole, the Court will refer to the witnesses by their first name, for the sake of clarity.

### 3. MSFC Cooperative Agreement

In 2018, defendant submitted a proposal for a cooperative agreement for funding through NASA's MSFC [Doc. 116, p. 160]. On August 28, 2018, Jennifer Benson, from UTK's Office of Sponsored Programs, e-mailed proposal documents to several employees at MSFC on behalf of defendant [GE 9-A]. Benson attached a letter of commitment from UTK [GE 9-B] and the proposal [GE 9-D]. The proposal listed defendant as the principal investigator and indicated that he was affiliated with UTK [GE 9-D, p. 1]. In the section on "Personal [sic] and Facilities," defendant did not indicate that he had any affiliation with BJUT [*Id.* at 8]. MSFC selected defendant's proposal for a cooperative agreement [GE 6-A].

Kelcey Cole ("Kelcey") was the MSFC agreement specialist for the cooperative agreement [GE 6-A]. Tolliver e-mailed Kelcey after the cooperative agreement was drafted, informing her that it was under review by UTK's Office of Sponsored Programs [GE 9-E, pp. 1–2]. Tolliver ultimately e-mailed a copy of the cooperative agreement signed by Mercer[4] to Kelcey and asked her to return a fully executed copy of the agreement [GE 9-E, p. 1; GE 9-F]. Tolliver testified that, at the time he sent this e-mail, he had no reason to believe that defendant worked at a Chinese university, and if he had believed that, he would not have sent the e-mail and would have notified Mercer that there was a potential

---

[4] Before signing the MSFC cooperative agreement contract, Mercer had become aware of potential issues involving defendant, and reached out to UTK's Office of General Counsel to contact federal agents about whether she should sign the contract, and she was instructed to proceed with signing the contract [Doc. 114, pp. 34–35].

issue [Doc. 114, pp. 125–26]. The cooperative agreement signed by Mercer included a clause titled "Restrictions on Funding Activities with China," which stated as follows:

> (a) NASA is restricted from using appropriated funds to enter into or fund any grant or cooperative agreement of any kind to participate, collaborate, or coordinate bilaterally with China or any Chinese-owned company, at the prime recipient level or at any subrecipient level, whether the bilateral involvement is funded or performed under a no-exchange of funds arrangement.

> (b) Definition: "China or Chinese-owned Company" means the People's Republic of China, any company owned by the People's Republic of China, or any company incorporated under the laws of the People's Republic of China.

[GE 9-F, p. 6].

Kathy Cooper, a contracting officer at MSFC [Doc. 114, pp. 147–48], stated that, to confirm compliance with the China Funding Restriction, MSFC contracting officials would read through a proposal but otherwise relied on the university to ensure that they were meeting the requirements of the cooperative agreement's terms and conditions [*Id.* at 164]. If, at the proposal stage, a principal investigator disclosed employment with a Chinese university, Cooper would have called the policy office and the legal office to ask if there were any concerns with proceeding with the cooperative agreement [*Id.* at 164–65]. Cooper stated that the China Funding Restriction clause on page 6 of the executed cooperative agreement is included in all of MSFC's cooperative agreements [*Id.* at 163].

Kelcey e-mailed the fully-executed cooperative agreement to Tolliver and defendant [GE 9-G; GE 9-H]. The fully-executed cooperative agreement contained the same terms regarding "Restrictions on Funding Activities with China" as the version e-mailed to

24

MSFC from UTK, with Mercer's signature [GE 9-H, p. 6]. The fully-executed cooperative agreement was identified as federal award number 90MSFC19M0003, and was an agreement between UTK and NASA's MSFC [*Id.* at 1]. The award was for $50,000 and identified defendant as the principal investigator on the project [*Id.*]. Kelcey stated that to her knowledge, the terms and conditions related to the China Funding Restriction are included in every cooperative agreement that MSFC awards [Doc. 114, p. 191]. If she had known that a principal investigator was employed by a Chinese university, Kelcey testified that she would not have processed this cooperative agreement as usual, but would have forwarded that information to her team lead or office chief and asked for advice [*Id.* at 192].

The government introduced the following invoices that were sent from UTK to NASA requesting payment under 90MSFC19M0003:

| Invoice Number | Date | Amount | Exhibit Number |
|---|---|---|---|
| 90094841 | 7/22/2019 | $20,000 | GE 9-I |
| 90094842 | 7/22/2019 | $10,000 | GE 9-J |
| 90095482 | 8/30/2019 | $10,000 | GE 9-K |
| 90095483 | 8/30/2019 | $5,000 | GE 9-L |

Each of these invoices contained a certification stating that the signor certified that, to the best of their knowledge and belief "the report is true, complete, and accurate, and the expenditures, disbursements, and cash receipts are for the purposes and objectives set forth in the terms and conditions of the above-referenced award/contract" [GE 9-I, GE 9-J, GE 9-K, GE 9-L]. Monica signed each of these invoices relating to the MSFC cooperative

agreement, which was not a cost-reimbursement contract, but was a fixed-price, milestone-based contract, meaning that UTK did not itemize its costs [Doc. 114, pp. 236–37].

Addressing both the JPL Subcontract and the MSFC Cooperative Agreement, Agent Gibson of the NASA Office of Inspector General testified that the NASA grant money that defendant helped obtain went to UTK, and defendant "did not steal money from NASA" [Doc. 113, p. 31]. Agent Gibson testified that, from his understanding, NASA was satisfied with defendant's work on the grants [*Id.* at 90]. He stated that "NASA got what they thought they had bargained for" and specifically, NASA "got their research" and "[t]he technical reviewer was satisfied with it" [*Id.* at 90–91]. Further, Agent Gibson testified that he had no evidence that defendant "took any money to China or had anybody in China working on" the NASA grants [*Id.* at 91; *see also id.* at 72–73].

### C. Rule 29 Motions and Mistrial

At the close of the government's case [Doc. 116, p. 79], defendant moved for a judgment of acquittal under Rule 29 of the Federal Rules of Criminal Procedure [*Id.* at 80–81], and the Court heard argument from both parties [*Id.* at 81–93]. The Court took the motion under advisement [*Id.* at 93]. During a break, defendant filed a "Motion to Dismiss Because of Void for Vagueness" [Doc. 104], which defendant clarified, in open court, was intended as a written argument in support of his motion for judgment of acquittal [Doc. 116, pp. 272–73].

26

The next trial day, defendant rested his case [Doc. 117, p. 42], and the government rested its entire case [*Id.*].  Defendant renewed his Rule 29 motion [*Id.* at 23].  The Court heard additional argument on the renewed Rule 29 motion [*Id.* at 23–33].  The Court kept the Rule 29 motion under advisement at that time [*Id.* at 33] but permitted the case to go to the jury for deliberation. After a multi-day trial, and deliberating over the course of three days, the jury informed the Court that it was hopelessly deadlocked, and the Court declared a mistrial [Doc. 118, pp. 16–18].

Thereafter, defendant filed a motion asking the Court to require the government to announce its intent regarding whether it would seek to retry defendant [Doc. 120].  The government responded, requesting until July 30, 2021, to inform the Court of its decision regarding retrial [Doc. 122].  The Court ultimately granted the government until July 30, 2021, to update the Court as to whether it intended to retry defendant [Doc. 123].  On July 30, 2021, the government notified the Court of its intent to retry defendant on the indictment [Doc. 125].  Defendant then filed a motion asking the Court to rule on his Rule 29 motion, which remained under advisement [Doc. 127].  The government opposes defendant's motion, in that it contends that a judgment of acquittal is not appropriate in this case [Doc. 128].

## III. Legal Standard

Rule 29 of the Federal Rules of Criminal Procedure permits a defendant to move for a judgment of acquittal on "any offense for which the evidence is insufficient to sustain a conviction," and also permits the Court to *sua sponte* consider whether the evidence is

insufficient to sustain a conviction. Fed. R. Crim. P. 29(a). "When evaluating motions for judgment of acquittal, courts view the evidence in the light most favorable to the prosecution and consider whether '<u>any rational trier of fact</u> could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Funzie*, 2011 WL 13128852, at *2 (W.D. Tenn. Dec. 8, 2011) (emphasis in original) (quoting *Jackson v. Virginia*, 443 U.S. 307, 318 (1979)). In ruling on a Rule 29 motion, the Court does not judge the credibility of witnesses or weigh the evidence and draws all reasonable inferences in the government's favor. *United States v. Ostrander*, 411 F.3d 684, 691 (6th Cir. 2005). Thus, granting a motion for a judgment of acquittal is "confined to cases where the prosecution's failure is clear." *United States v. Donaldson*, 52 F. App'x 700, 706 (6th Cir. 2002) (quoting *Burks v. United States*, 437 U.S. 1, 17 (1978)).

## IV. Analysis

### A. Vagueness of NASA's China Funding Restriction

Defendant first argues for a judgment of acquittal on both the wire fraud and false statement charges because NASA's China Funding Restriction is void for vagueness, as previously asserted in his motion to dismiss [Doc. 116, p. 81]. The government responds that the relevant criminal statues are not vague, and nothing requires that the NASA restriction actually be violated [*Id.* at 86].

In addressing this argument, the Court incorporates and adopts its prior ruling on this issue [Doc. 63]. Specifically, the Court explained in that Order that "nothing in the wire fraud charges requires the [NASA China Funding Restriction] to have actually been

28

violated," and, instead, the government must only prove "that defendant (1) *had a scheme to defraud NASA*; (2) made a material misrepresentation or omission in furtherance of this scheme; (3) used interstate wire communications in furtherance of the scheme; and (4) *intended to deprive NASA of money or property*." [*Id.* at 7 (emphasis added)]. The Court reiterates now that, whether the statutory basis for NASA's China Funding Restriction is too vague to be understood is not an appropriate ground for dismissal of the charges here, as there is no requirement in the elements of either the wire fraud or false statement statutes, which defendant is alleged to have violated, that NASA actually have violated the China Funding Restriction in funding defendant's projects. However, the Court will consider this argument as it relates to the elements of knowledge and intent for the charges at issue here.

**B.     Wire Fraud**

As to his wire fraud charges, Defendant argues that the government has not proved that he had any intent to injure NASA [Doc. 116, p. 82]. Defendant argues that, for wire fraud, something of value must be taken, and NASA got what it bargained for in this case [*Id.* at 84]. The government responds that what NASA bargained for was a contract with an individual at a United States university that did not violate the NASA funding restriction [*Id.* at 86–87]. Here, the government submits, NASA and JPL were "tricked" into entering a contract that, by their own regulations, they could not enter, and that is the harm in this case [*Id.* at 87].

29

To support a conviction for wire fraud, the government must prove (1) a scheme or artifice to defraud; (2) use of interstate wire communications in furtherance of the scheme; and (3) intent to deprive a victim of money or property. *United States v. Daniel*, 329 F.3d 480, 485 (6th Cir. 2003). Defendant's arguments regarding the "harm" that NASA did or did not suffer appears relevant to an overlap of the first and third elements: first, did defendant's scheme have the purpose of "defrauding" NASA, and second, did defendant have the intent to deprive NASA of money or property. As the case law below illustrates, these questions are essentially one in the same.

"A scheme to defraud includes any plan or course of action by which someone intends to . . . deprive another by deception of money or property by means of false or fraudulent pretenses, representations, or promises." *Daniel*, 329 F.3d at 485–86 (quoting *United States v. Gold Unlimited, Inc.*, 177 F.3d 472, 479 (6th Cir. 1999)). Additionally, "[w]ire fraud is a specific intent crime, meaning 'a defendant must act with specific intent to defraud.'" *Bloodstock Rsch. Info. Servs., Inc. v. Edbain.com, LLC*, 622 F. Supp. 2d 504, 513 (E.D. Ky. 2009) (quoting *United States v. Vasilakos*, 508 F.3d 401, 409 (6th Cir. 2007)). The intent of defendant's scheme must have been to injure or harm but "this is no more than to say that the intent must be to deprive the victim of money or property." *Daniel*, 329 F.3d at 488.

In support of his argument regarding harm, defendant cites *United States v. Takhalov*, 827 F.3d 1307 (11th Cir. 2016) [Doc. 117, pp. 32–33]. In that case, the Eleventh Circuit reversed defendants' wire fraud and related convictions after the district court

30

declined to instruct the jury "that they must acquit if they found that the defendants had tricked the victims into entering a transaction but nevertheless gave the victims exactly what they asked for and charged them exactly what they agreed to pay." *Takhalov*, 927 F.3d at 1310, 1323–24. Judge Amul Thapar,[5] sitting by designation, wrote that the federal wire fraud statute "forbids only schemes to *defraud*, not schemes to do other wicked things, *e.g.*, schemes to lie, trick or otherwise deceive" and thus, the fact that a defendant merely induced a victim to enter into a transaction that he otherwise would have avoided is insufficient to establish the offense of wire fraud. *Id.* at 1310 (emphasis in original). The *Takhalov* case involved defendants who hired women to pose as tourists, locate visiting businessmen, and lure them to defendants' bars and nightclubs. *Id.* The Eleventh Circuit reasoned that the scheme in a wire fraud case must be a "scheme to defraud," and thus, the question was what the word "defraud" means. *Id.* at 1312. The Eleventh Circuit concluded that "to *defraud*, one must intend to use deception to cause some injury; but one can *deceive* without intending to harm at all" and thus "deceiving is a necessary condition of defrauding but not a sufficient one" or "[p]ut another way, one who defrauds always deceives, but one can deceive without defrauding." *Id.* (emphasis in original).

The Eleventh Circuit noted that, based on the distinction between "defraud" and "deceive," its precedent makes clear that a defendant "schemes to defraud" under the wire

---

[5] At the time of the *Takhalov* decision, Judge Thapar was a district judge for the Eastern District of Kentucky. However, Judge Thapar has since been appointed to the Sixth Circuit Court of Appeals. *See* "Judges," United States Court of Appeals for the Sixth Circuit, http://ca6.uscourts.gov/judges (last accessed September 3, 2021).

31

fraud statute only if he schemes to deprive someone of something of value by "trick, deceit, chicane, or overreaching." *Id.* at 1312–13 (citing *United States v. Bradley*, 644 F.3d 1213, 1240 (11th Cir. 2011)). The Eleventh Circuit continued on to hold that "[f]rom that conclusion, a corollary follows: a schemer who tricks someone to enter into a transaction has not 'schemed to defraud' so long as he does not intend to harm the person he intends to trick" and this is true "even if the transaction would not have occurred but for the trick." *Id.* at 1313. The *Takhalov* court gave the following example:

> Consider the following two scenarios. In the first, a man wants to exchange a dollar into four quarters without going to the bank. He calls his neighbor on his cell phone and says that his child is very ill. His neighbor runs over, and when she arrives he asks her to make change for him. She agrees; the quarters pass to the man; the dollar passes to the woman; and they part ways. She later learns that the child was fine all along. The second scenario is identical to the first, except that instead of giving the woman a true dollar, he gives her a counterfeit one.

*Id.* The Eleventh Circuit stated that the first scenario was not wire fraud, but the second was, because, although the first scenario would not have occurred but for the lie, the man nevertheless did not intend to deprive the woman of something of value by trick or deceit. *Id.*

Thus, the Eleventh Circuit concluded that a "scheme to defraud" within the meaning of the federal wire fraud statute, "refers only to those schemes in which a defendant lies about the nature of the bargain itself." *Id.* Such can take two primary forms: the defendant might lie about the price or he might lie about the characteristics of the good. *Id.* at 1313–14. "But if a defendant lies about something else—*e.g.*, if he says that he is the long-lost cousin of a prospective buyer—then he has not lied about the nature of the bargain and has

32

not 'schemed to defraud,' and cannot be convicted of wire fraud on the basis of that lie alone." *Id.* at 1314.

The Eleventh Circuit noted that the Second Circuit has also interpreted the wire fraud statute this way, and has "'drawn a fine line between schemes that do no more than cause their victims to enter into transactions that they would otherwise avoid—which do not violate the . . . wire fraud statute[]—and schemes that depend for their completion on the misrepresentation of a single element of the bargain—which do violate the . . . wire fraud statue[].'" *Id.* (quoting *United States v. Shellef*, 507 F.3d 82, 108 (2d Cir. 2007)). The Eleventh Circuit concluded that the Second Circuit's interpretation of the wire fraud statute "follows as a matter of logic from Congress's decision to use the phrase 'scheme to defraud' rather than 'scheme' or 'scheme to deceive,'" and therefore, the Eleventh Circuit adopted that interpretation. *Id.*

So, this Court must determine whether the Eleventh Circuit's interpretation of "scheme to defraud" applies under Sixth Circuit law. It appears that the Sixth Circuit has not yet directly addressed this question. However, in determining what type of intended harm is required for a "scheme to defraud," the Court looks to a line of cases involving "honest-services" wire fraud, which addresses the related issue of whether intangible harm is sufficient under the wire fraud statute.

The Supreme Court previously set forth the procedural history of the so-called theory of "honest-services" wire fraud. *Skilling v. United States*, 561 U.S. 358, 399–403 (2010). Enacted in 1872, the original mail-fraud provision, which was the predecessor to

33

the modern mail and wire fraud statutes, prohibited the use of the mails to advance "any scheme or artifice to defraud." *Id.* at 399 (citing *McNally v. United States*, 483 U.S. 350, 356 (1987)). In 1909, Congress amended the statute to prohibit "any scheme or artifice to defraud, *or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises*." *Id.* (emphasis in original) (citing 18 U.S.C. § 1341 (mail fraud); *but see* 18 U.S.C. § 1343 (wire fraud statute, containing identical language)); *see also Daniel*, 329 F.3d at 486 n.1 ("cases construing mail fraud can be used in analyzing wire fraud"). "Emphasizing Congress's disjunctive phrasing, the Courts of Appeals . . . interpreted the term 'scheme or artifice to defraud' to include deprivations not only of money or property, but also of intangible rights." *Id.* at 400. Most of these cases involved bribery of public officials, but courts also recognized private-sector honest-services fraud when an employer accepted bribes or kickbacks in the course of his employment. *Id.* at 401.

However, in 1987, the Supreme Court, in *McNally*, "stopped the development of the intangible-rights doctrine in its tracks." *Id.* In *McNally*, several public officials were charged with violating the federal mail fraud statute by devising a scheme to defraud the Commonwealth of Kentucky and its citizens of certain "intangible rights," such as the right to have the Commonwealth's affairs conducted honestly. *McNally*, 483 U.S. at 352. The Court noted that the mail fraud statute clearly protects property rights, but does not refer to "the intangible right of the citizenry to good government." *Id.* at 356. The Court concluded that "the words 'to defraud' commonly refer 'to wronging one in his property rights by

dishonest methods or schemes,' and 'usually signify the deprivation of something of value by trick, deceit, chicane or overreaching.'" *Id.* at 358 (quoting *Hammerschmidt v. United States*, 265 U.S. 182, 188 (1924)). The Court ultimately concluded that the federal mail (and wire) fraud statutes were "limited in scope to the protection of property rights." *Id.* at 360.

"Congress responded swiftly. The following year, it enacted a new statute [18 U.S.C. § 1346] 'specifically to cover one of the 'intangible rights' that lower courts had protected prior to *McNally*: 'the intangible right of honest services.''" *Skilling*, 561 U.S. at 402 (quoting *Cleveland v. United States*, 531 U.S. 12, 19–20 (2000)) (alteration added). Section 1346 clarifies that "[f]or the purposes of this chapter, the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services." *Id.*; 18 U.S.C. § 1346. However, in addressing a vagueness challenge to § 1346, the Supreme Court held that "§ 1346 criminalizes *only* the bribe-and-kickback core of the pre-*McNally* case law." *Id.* at 409 (emphasis in original). The Court noted that construing § 1346 to proscribe a wider range of offense conduct would raise the due process concerns underlying the vagueness doctrine. *Id.* at 408.

In a recent case, involving criminal prosecutions that stemmed from the so-called "Bridgegate" conspiracy—in which then-New Jersey Governor Chris Christie's Deputy Chief of Staff and Deputy Executive Director of the Port Authority reduced the number of lanes on the George Washington Bridge reserved for morning rush commuters travelling into Manhattan from Fort Lee, New Jersey to punish Fort Lee's mayor for failing to support

35

Christie's re-election bid—the Supreme Court again emphasized that the federal wire fraud statute prohibits only deceptive schemes to deprive the victim of money or property. *Kelly v. United States*, 140 S. Ct. 1565, 1568–71 (2020). Thus, for a conviction for wire fraud, the government must prove that the object of a defendant's fraud was property. *Id.* at 1571 (citing *Cleveland*, 531 U.S. at 26). Moreover, the Court stated that property fraud convictions cannot stand when the loss to the victim is only an "incidental byproduct of the scheme." *Id.* at 1573. Ultimately, the Court stated that "[t]he property fraud statutes . . . do not proscribe schemes to defraud citizens of their intangible rights to honest and impartial government . . . [t]hey bar only schemes for obtaining property" and reversed the convictions for wire fraud in that case. *Id.* at 1574 (internal quotation marks omitted).

This delve into the history of the theory of "honest-services" wire fraud provides support for *Takhalov*'s conclusion that the federal wire fraud statute requires a defendant to deceive the victim in order to obtain money or property and there is no "defrauding" if there is no intent to harm, even if the transaction would not have occurred otherwise. Specifically, in *McNally*, the Supreme Court stated that the term "defraud" in the mail and wire fraud statutes refers to "deprivation of something of value by trick, deceit, chicane, or overreaching," 483 U.S. at 358 (internal quotation marks omitted), which is the same definition that the Eleventh Circuit relied upon in its *Takhalov* decision. 827 F.3d at 1312–13. Based upon this definition, the *McNally* Court determined that the wire fraud statute was limited to the protection of property rights. 483 U.S. at 360. This holding is still largely applicable, despite the passage of § 1346, based on the Supreme Court's limitation

36

of § 1346 to bribery and kickback schemes, *Skilling*, 561 U.S. at 409, which is inapplicable in this case. Moreover, in *Kelly*, the Court recently reaffirmed the centrality of property rights to the wire fraud statute. 140 S. Ct. at 1574.

The Court also notes that Black's Law Dictionary defines "defraud" as "[t]o cause *injury or loss* (to a person or organization) by deceit; to trick (a person or organization) in order to get *money*." *Defraud*, Black's Law Dictionary (11th ed. 2019) (emphasis added). This definition provides further support for *Takhalov*'s holding.

Finally, the Court notes a Sixth Circuit case that involved facts with some similarity to the instant case. *See United States v. Frost*, 125 F.3d 346 (6th Cir. 1997). *Frost* involved professor defendants who allegedly provided student defendants with written materials and assistance from employees of a private scientific research firm to assist the student defendants in completing their dissertations and obtaining advanced degrees with minimal effort, and, in exchange, the students would abuse their positions with the government to secure for the private research firm lucrative government research contracts. *Id.* at 353. The government argued that, by pursuing this scheme, the professor defendants obtained property from the federal government which they would not have otherwise received. *Id.* One of the student defendants in the case, "Congo," was a NASA chemist and a Ph.D student, who was provided the above-referenced assistance in completing his dissertation, and, thereafter, assisted the private research company in obtaining a "chemical hazards contract" with NASA. *Id.* at 359–60.

37

The Sixth Circuit noted that the "only deception with which Congo is charged in relation to the government . . . is a failure to disclose his relationship [with the private research firm] to . . . NASA." *Id.* at 360. Quoting the Second Circuit, the Sixth Circuit stated that "lack of information that might have an impact on the decision regarding where [the victim's] money is spent, without more, is not a tangible harm and therefore does not constitute a deprivation of section 1341 'property.'" *Id.* at 361 (quoting *United States v. Mittelstaedt*, 31 F.3d 1208, 1217 (2d Cir. 1994)). The Sixth Circuit emphasized that, in the case at hand, testimony indicated that the private research company "performed necessary and needed work under the chemical hazards contract" and NASA employees "had no reason to believe that [the private research firm] had not performed the terms of the contract, or that there had been any complaints regarding the ability of [the firm] to fulfill the project requirements." *Id.* Thus, the Sixth Circuit stated that there was no evidence "that NASA would have had to pay less money or would have received more services if Congo had disclosed his conflict of interest," and therefore concluded that there was insufficient evidence that Congo intended to defraud NASA by failing to disclose his conflict of interest. *Id.* at 361–62. The Court, accordingly, vacated the relevant mail fraud convictions, relating to this activity. *Id.* at 352, 362.

The Sixth Circuit's *Frost* decision is squarely aligned with *Takhalov*'s conclusion that the federal wire fraud statute requires the intent to cause a tangible harm to the victim regarding the benefit of the bargain between the parties. *Frost*'s ultimate conclusion that the lack of tangible harm meant there was insufficient evidence on the element of intent to

defraud, 125 F.3d at 361–62, further confirms that *Takhalov*'s definition of the term "defraud" in the federal wire fraud statute is correct and applies equally in this Circuit.

Ultimately, considering the above-described case law, the Court agrees with the *Takhalov* court's interpretation of the term "defraud" for purposes of the federal wire fraud statute. Accordingly, the Court will analyze whether, viewing the evidence in the light most favorable to the government, any rational jury could conclude that defendant acted with intent to cause harm to NASA, such that he could be said to have acted with intent to "defraud."

The evidence at trial showed that, had NASA known of defendant's position with BJUT, defendant may not have received the grant funding for UTK at issue, or at least that some additional level of review may have been conducted before the grants were awarded. Specifically, numerous individuals involved in the grant process, at UTK, JPL, and MSFC, testified that, had they known of defendant's position with BJUT, they would not have proceeded as normal with the grant application, award, and disbursement processes, but instead, would have contacted legal or supervisory employees for additional guidance [Doc. 113, p. 188, Doc. 114, pp. 29, 125–26, 164–65, 192 Doc. 115, pp. 74–75, 136–37]. However, such evidence is insufficient to show a scheme to defraud because, although, even if we assume that defendant intended to deceive, such deception about his affiliation with BJUT does not show intent to harm NASA. And again, without intent to harm, there is no "scheme to defraud" even if "the transaction would not have occurred but for the trick." *Takhalov*, 827 F.3d at 1313.

Here, again, assuming without deciding that defendant could be deemed to have intentionally deceived NASA about his affiliation with BJUT, such did not go to the nature of the bargain. NASA bargained for research on a particular scientific topic in exchange for providing funding to the research project. And there is no evidence that NASA did not receive exactly the type of research that it bargained for. In fact, Agent Gibson of NASA's Office of Inspector General testified that NASA was satisfied with defendant's work on their grants; NASA "got what they thought they had bargained for," and defendant "did not steal money from NASA" [Doc. 113, pp. 90–91]. And, neither Agent Gibson nor any other witness testified that NASA received any less services, that NASA was unable to use the research that defendant conducted after NASA discovered defendant's affiliation with BJUT, or that defendant "took any money to China or had anybody in China working on" the NASA grants [*See id*. at 9, 72–73]. In fact, the evidence showed that NASA allowed the 2018 MSFC Cooperative Agreement to be funded even after Agent Gibson became involved in the investigation of defendant for his alleged Chinese affiliations [*Id*. at 47–49]. There is simply no evidence that NASA did not receive something of value, and specifically, the benefit of its bargain.

The government attempts to redefine the bargain in this case by asserting that what NASA actually bargained for was research conducted by an individual who would not cause NASA to violate the China Funding Restriction [Doc. 116, pp. 86–87]. However, as already noted, and under similar circumstances, the Sixth Circuit vacated mail fraud convictions when "the only deception with which [defendant] is charged . . . is a failure to

40

disclose his relationship [with a private research firm] to . . . NASA." *Frost*, 125 F.3d at 360. And, further, under the reasoning of *Takhalov*, Defendant's affiliation with BJUT did not impact the price or characteristics of the service provided, namely, the research work conducted. *See Takhalov*, 827 F.3d at 1313–14. Instead, defendant's alleged deception about his affiliation with BJUT is more comparable to the *Takhalov* court's example of a defendant who lies that he is the long-lost cousin of a prospective buyer, to induce the buyer into purchasing the good or service. *See id.* at 1314. And *Takhalov* made clear that, in such a case, the defendant "has not lied about the nature of the bargain and has not 'schemed to defraud,' and cannot be convicted of wire fraud[.]" *See id.* at 1314.

Because, as in *Frost*, there is no evidence "that NASA would have had to pay less money or would have received more services if [defendant] had disclosed his conflict of interest," 125 F.3d at 361–62, there is ultimately no evidence that defendant intended to deceive NASA about the nature of the bargains involved in the research grants at issue, and thus, no evidence that defendant had a scheme to *defraud* NASA. And, even viewing the evidence presented in the light most favorable to the government, in light of *Takhalov*'s definition of "defraud," no rational jury could have concluded that defendant had a scheme to defraud NASA in this case. Accordingly, defendant's motion for judgment of acquittal on all three counts of wire fraud (Counts 1, 2, and 3) will be **GRANTED**, and defendant will be adjudged **ACQUITTED** on those counts.

Although the Court finds ample reason to grant defendant's motion for judgment of acquittal as to the wire fraud charges on this ground, the Court nevertheless finds that, even

41

if it were to construe the term "defraud" more broadly, such that deception about defendant's position at BJUT could be deemed adequate, the government has failed to provide sufficient evidence from which any rational jury could find, beyond a reasonable doubt, that defendant had specific intent to defraud NASA by hiding his affiliation with BJUT from UTK. *See Daniel*, 177 F.3d at 487 (stating that "a defendant must knowingly make a material misrepresentation or knowingly omit a material fact . . . [with] the purpose of inducing the victim of the fraud to part with property or undertake some action that he would not otherwise do[.]").

The Court first notes that, in analyzing whether the government sufficiently proved that defendant had a scheme to defraud, even under this broad definition of the term "defraud," there was no direct evidence of defendant's intent in this case. Instead, the jury was left to make inferences from the circumstances surrounding the NASA grants. While the jury is free to draw reasonable inferences from circumstantial evidence presented, "there must be sufficient record evidence to permit the jury to consult its general knowledge in deciding the existence of the fact." *United States v. Jones*, 580 F.2d 219, 222 (6th Cir. 1978). And, here, the evidence would not allow a rational jury to infer that defendant had a scheme to defraud NASA.

A primary point of the government's case was that defendant failed to disclose his employment with BJUT on his UTK outside interest disclosure forms, on which he repeatedly answered "no" to questions asking whether he was employed by any other

42

organization [GE 2-D; GE 2-E; GE 2-F; GE 2-G, GE 2-H, GE. 2-I].[6]  However, defendant

submitted his first outside interest disclosure form, answering this question in the negative,

in November 2013, when he was first hired at UTK, and more than two years before he

first applied for a NASA-funded grant, in January 2016 [Doc. 113, p. 64; Doc. 116, p.

131].[7]  And, even more compelling, the grant proposal that was submitted in January 2016

was not even initiated by defendant.  Instead, defendant became involved in this first

proposal after Dr. Bar-Cohen contacted Dr. Babu about a JPL research project, *and Dr.*

*Babu suggested that defendant could be helpful to the research* [Doc. 115, p. 113; Doc.

116, pp. 97–98; DE 62].  Such facts counsel against a conclusion that defendant hid his

BJUT affiliation from UTK, beginning in 2013, as part of a scheme to defraud NASA years

later.

Moreover, addressing one facet of defendant's vagueness argument, the Court

concludes that there is insufficient evidence that defendant formed a scheme to defraud

NASA by allegedly hiding his affiliation with BJUT, because there is insufficient evidence

---

[6] The Court notes that there was some dispute as to whether defendant was even required to disclose his affiliation with BJUT on these outside interest disclosure forms, because the relevant conflict of interest policy specifically provided, as an example of a conflict of interest "receiving payments for services exceeding $10,000" [GE 2-J, p. 7].  And, although Dr. Zomchick referenced the "included but not limited to" language of the policy, he also testified that, under this policy, if a professor worked a part-time summer job and made less than $10,000, it would not be a conflict of interest [Doc. 113, pp. 111, 137, 141–42].

[7] Even Agent Gibson did not offer insight into why defendant would have failed to disclose his affiliation with BJUT on UTK's outside interest disclosure forms filed well before defendant first sought a NASA grant [Doc. 113, p. 63].  And, as to the disclosure forms in general, Agent Gibson "assumed" that defendant's failure to disclose his BJUT affiliation had something to do with receiving tenure [*Id.* at 65].

43

that defendant personally understood that NASA's China Funding Restriction applied to his affiliation with BJUT. And, as the Court noted previously, wire fraud is a specific intent crime, and therefore, to be guilty of wire fraud, the government must prove that defendant formed the specific intent to defraud NASA. *See Bloodstock Rsch. Info. Servs.*, 622 F. Supp. 2d at 513. In reaching this conclusion, the Court has reviewed the entire record, but, of particular relevance: (1) the China Funding Restriction language in the grant contracts; (2) UTK's China Assurance letters; (3) UTK's training on the China Funding Restriction; and (4) e-mails from Dr. Bar-Cohen and Haswell to defendant, explaining the China Funding Restriction.

The Court acknowledges that the government presented evidence that NASA had issued guidance indicating that, although the terms of the China Funding Restriction itself was limited to collaboration with "China or a Chinese-owned company" [GE 1-A, p. 1; DE 131], Chinese universities were considered "incorporated under the laws of the" People's Republic of China, and therefore, NASA considered collaboration with Chinese universities to also be covered by the China Funding Restriction [GE 1-A, p. 2; Doc. 112, pp. 62–64]. Although evidence was presented that NASA issued this guidance, the proof was lacking that defendant received any information about this guidance or was aware of the guidance, and, as discussed below, the terms of the China Funding Restriction that were explicitly related to defendant did not ever specifically mention collaboration with a Chinese university. And further, no evidence was presented that BJUT was actually incorporated under the laws of the People's Republic of China, such that defendant

44

necessarily should have been aware that BJUT would be considered "China or a Chinese-owned company." In fact, Agent Gibson specifically testified that he was not sure whether BJUT was incorporated under the laws of the People's Republic of China [Doc. 113, p. 37].

Notably, both the JPL Subcontract and the MSFC Cooperative Agreement contained language mirroring the China Funding Restriction itself [GE 8-N, p. 1; GE 8-AA, p. 20; GE 9-F, p. 6]. The government did introduce evidence from which the jury could infer that defendant was asked to read these contracts and confirm that he could comply with the conditions prior to UTK signing the contracts [*See* Doc. 114, p. 120 (Testimony from Tolliver that when an award was granted, the principal investigator would be sent an e-mail with the contract, asking the investigator to review it and confirm compliance with the terms)]. However, again, neither the JPL Subcontract nor the MSFC Cooperative Agreement made any reference to collaboration with Chinese universities.

Instead, the JPL Subcontract's terms stated that "[t]he Subcontractor shall not contract with China or Chinese-owned companies for any effort related to this Subcontract[,] and "[t]he Subcontractor represents that the Subcontractor is not China or a Chinese-owned company," defining "China or Chinese-owned company" as "the People's Republic of China, any company owned by the People's Republic of China or any company incorporated under the laws of the People's Republic of China" [GE 8-AA, p. 20 (incorporated by GE 8-N, p. 1)]. Manzanares, a JPL employee, admitted that nothing in this text specifically stated that the restriction applies to Chinese universities [Doc. 115,

45

pp. 87–88]. Likewise, the MSFC Cooperative Agreement simply reiterated that "NASA is restricted from" collaborating "with China or any Chinese-owned company," and contained an identical definition of "China or Chinese-owned company" as the JPL Subcontract [GE 9-F, p. 6]. It is clear that, even if defendant read the language in these contracts, neither contract provided any indication that Chinese universities were all considered incorporated under the laws of the People's Republic of China by NASA, and therefore, there was no reason for defendant to believe that his affiliation with BJUT would be in violation of these contract terms.

Moreover, specifically with regard to the JPL Subcontract, the terms of the contract limited the collaboration of the Subcontractor and required a statement that the Subcontractor was not China or a Chinese-owned company [GE 8-AA, p. 20 (incorporated by GE 8-N, p. 1)]. And it is undisputed that, in both the JPL Subcontract and the MSFC Cooperative Agreement, defendant was not the "Subcontractor" or the contracting party, and instead, the "Subcontractor" or contracting party was UTK [GE 6-B, p. 1; GE 9-H, p. 1]. Thus, the contracts themselves do not make clear that they impose any restriction on defendant, the principal investigator.

Further, the language provided by UTK in its training and China Assurance letters did not help clarify this matter. UTK's China Assurance letter, which was provided to defendant on at least one occasion, stated that NASA is restricted from funding a grant or cooperative agreement to collaborate "with China or any Chinese-owned company," contained the same definition of "China or Chinese-owned company" as the contracts

46

discussed above, and stated that "the proposer represents that the proposer is not China or a Chinese-owned company, and that the proposer will not . . . collaborate . . . with China or any Chinese-owned company" [GE 8-D; GE 8-C, p. 1]. The letter further stated that the restriction "*does not apply* to the participation of students, faculty and staff from non-Chinese entities engaged in fundamental research" [GE 8-D (emphasis added)]. Again, the letter provided no reference to Chinese universities, nor did it indicate that an affiliation with a Chinese university would be prohibited.

In fact, defendant appears to have first received a copy of UTK's China Assurance letter when applying for the first JPL subcontract that was not ultimately awarded, when Haswell informed him that a "China Assurance" would be needed, and defendant, in response, e-mailed Haswell a letter from Professor Zhang of the National Synchrotron Radiation Laboratory in Hefei, China, stating that Professor Zhang had "a long-term collaboration on nanostructure characterization" with defendant [GE 8-A, p. 1; GE 8-B; GE 8-E, pp. 2–3]. Haswell responded by sending a copy of the letter to defendant and informing him that NASA required assurance that defendant would comply with the Chinese Funding Restrictions but stated that "UTK always includes a special copy stating that, as we understand it, this restriction *does not apply to faculty, staff, and students*." [GE 8-C, p. 1; GE 8-E, p. 2 (emphasis added)]. UTK training on the China Funding Restriction, which was provided to defendant at some point, similarly indicated that UTK did "not view our *Faculty, Staff & Students* to be 'entities of China'" for purposes of the restriction [GE 7-1, p. 37; DE 125; Doc. 113, p. 248].

Two relevant points arise from this evidence. First, UTK's China Assurance letter and training program not only provided no clarification about the impact of affiliation with Chinese universities under the China Funding Restriction, but indicated that the China Funding Restriction was not applicable to UTK faculty, which included defendant. Thus, rather than providing clarification that defendant's affiliation with BJUT may violate the restriction, UTK's language could reasonably be construed as exempting defendant from the restriction altogether. And second, defendant's attachment of the letter from Professor Zhang suggests that, at least until this point, defendant was not hiding his Chinese affiliations as part of a scheme to defraud NASA. The letter itself clearly stated that defendant had a long-time collaboration with a professor at a Chinese institute, and defendant himself submitted this letter in support of the first JPL subcontract. If defendant was attempting to conceal his affiliation with Chinese institutions for the purpose of obtaining NASA grants, it is unlikely that defendant would have highlighted his collaboration with Professor Zhang in the documentation he intended to be submitted to NASA.

Perhaps the government's strongest evidence in support of an inference that defendant had knowledge that his affiliation with BJUT would violate the China Funding Restriction is found in a series of e-mails between defendant and Dr. Bar-Cohen relating to the first JPL subcontract. Defendant first e-mailed Dr. Bar-Cohen including a letter from Dr. Chen at BJUT, stating that he and defendant had "a long-term collaboration on

nanomaterial synthesis and characterization" [GE 8-CC].[8]  Dr. Bar-Cohen then informed defendant that he could not mention facilities in China in the proposal "since NASA does not allow such formal collaboration" [GE 8-EE, p. 1].  In later e-mails, Dr. Bar-Cohen stated that they could not "include any collaboration with institutes in China" in the proposal [GE 8-FF, p. 1], and informed defendant that if he was preparing letters of commitment from China, he could not "use them in the proposal" [GE 8-GG].

From this evidence, a rational jury may be able to infer that defendant was aware that collaboration with a Chinese university or entity in the course of conducting the research on his NASA grants would be covered by NASA's China Funding Restriction. However, that is not the issue here, as there was no evidence presented that defendant ever collaborated with a Chinese university in conducting his NASA-funded research, or used facilities, equipment, or funds from a Chinese university in the course of such research. Instead, the issue is whether the evidence is sufficient that a rational jury could have inferred that defendant knew his holding a professorship at BJUT would completely bar his involvement in NASA-funded research under the China Funding Restriction.  Given the lack of evidence that defendant was aware of such an expansive interpretation of NASA's China Funding Restriction, the Court concludes that, even viewing all the evidence in the light most favorable to the government, no rational jury could conclude that defendant acted with a scheme to defraud NASA in failing to disclose his affiliation

---

[8] Again, as noted previously, the submission of a letter indicating a long-term collaboration with a Chinese university to NASA itself would appear contrary to the government's theory that defendant was hiding his affiliation with a Chinese university for the purpose of defrauding NASA.

49

with BJUT to UTK. Accordingly, for this alternate reason, defendant's motion for judgment of acquittal on all three counts of wire fraud (Counts 1, 2, and 3) will be **GRANTED**, and defendant will be adjudged **ACQUITTED** on those counts.

### C. False Statements

Five elements comprise a § 1001 offense for making false statements: "(1) the defendant made a statement; (2) the statement is false or fraudulent; (3) the statement is material; (4) the defendant made the statement knowingly and willfully; and (5) the statement pertained to an activity within the jurisdiction of a federal agency." *United States v. Steele*, 933 F.2d 1313, 1318–19 (6th Cir. 1991). Pursuant to 18 U.S.C. § 2, however, a defendant can be guilty of violating § 1001 as a principal even if he did not make the false statements himself, so long as the evidence shows that he caused the false statements to be made. *United States v. Brown*, 151 F.3d 476, 486 (6th Cir. 1998).

To be guilty of causing a false statement to be made under 18 U.S.C. § 2, there must be evidence that the "defendant shared in the criminal intent of the principal." *Brown*, 151 F.3d at 486 (internal quotation marks omitted). Accordingly, "'to convict a person accused of making a false statement, the government must prove not only that the statement was false, but that the accused knew it to be false. Thus, the government is required to show that the misrepresentation was not made innocently or inadvertently.'" *Id.* (quoting *United States v. Curran*, 20 F.3d 560, 567 (3d Cir. 1994)).

The statements alleged to be false here are the certifications in the following invoices submitted by UTK as part of receiving disbursement of funds on the JPL Subcontract:

| | | | |
|---|---|---|---|
| 90080002 | 2/15/2017 | $7,332.97 | GE 8-O |
| 90080450 | 3/9/2017 | $7,812.45 | GE 8-P |
| 90082670 | 7/24/2017 | $11,202.74 | GE 8-T |

[Doc. 3, pp. 15–16]. Those certifications stated that "all expenditures reported (or payment requested are for appropriate purposes and in accordance with the provisions of the application and award documents" [GE 8-O; GE 8-P; GE 8-T]. The UTK employees who signed the certifications on these invoices believed that the certifications were true at the time they signed [Doc. 114, pp. 202, 214, 216].

The question with regard to the false statements charges is whether defendant knew that these certifications were false. And this question again implicates defendant's vagueness argument, because, to know that these statements were false, defendant would necessarily have to know that he was in violation of the terms of the JPL Subcontract award documents, specifically, the China Funding Restriction term, by virtue of his affiliation with BJUT.

The Court previously explained why the evidence presented at trial was insufficient to show that defendant had knowledge that his position at BJUT necessarily violated NASA's China Funding Restriction, and therefore concluded that no rational jury could have determined that defendant had a scheme to defraud NASA by hiding his BJUT affiliation from UTK. *See supra* pp. 39–45. The Court will not repeat that evidence here

51

but incorporates its earlier analysis. With regard to the false statements charges, because the government failed to adequately prove that defendant understood that his affiliation with BJUT violated NASA's China Funding Restriction, the Court concludes that no rational jury could find beyond a reasonable doubt that defendant knew that the certifications that he caused UTK to submit with the invoices for disbursement of funds under the JPL Subcontract were false. And, absent evidence that defendant knew these statements to be false, he cannot be guilty of causing false statements to be made, even under § 2. *See Brown*, 151 F.3d at 486. Accordingly, defendant's motion for judgment of acquittal on all three counts of causing false statements to be made on a matter within the jurisdiction of the executive branch of the United States government (Counts 4, 5, and 6) will be **GRANTED**, and defendant will be adjudged **ACQUITTED** on those counts.

## V. Conclusion

For the reasons stated above, defendant's Rule 29 motion for a judgment of acquittal is **GRANTED** and defendant is **ACQUITTED** on all counts of the indictment.

IT IS SO ORDERED.

s/ Thomas A. Varlan
UNITED STATES DISTRICT JUDGE

52